# EXHIBIT F

Page 1

1

2                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
3                 CASE NO:  1:20-cv-05589-GBD-DCF
4   -----------------------------------------------------x
    BRIAN JOSEPH GREF,                                    )
5                             Plaintiff                   )
                                                          )
6              -versus-                                   )
                                                          )
7   AMERICAN INTERNATIONAL INDUSTRIES, individually and   )
    as successor-in-interest for the CLUBMAN BRAND, and   )
8   To THE NESLEMUR COMPANY and PINAUD COMPANY, et al.,    )
                              Defendants.                 )
9   -----------------------------------------------------x
10
11                 TRANSCRIPT of the Virtual Videotaped
12  Deposition of the witness, JACQUELINE MOLINE, MD,
13  taken  by Defendant, called for Oral Examination in
14  the above-captioned matter, said deposition being
15  taken pursuant to Federal Rules of Civil Procedure
16  by and before,  ELEANOR SEKULIC, a Notary Public on
17  Wednesday, July 6, 2022, commencing at 11:16 a.m.
18
19
20
21
                    PRIORITY-ONE COURT REPORTING, INC.
22          290 West Mount Pleasant Avenue, Suite 2260
                  Livingston, New Jersey  07039
23                       (718) 983-1234
24
25  Job Number:  5276089

```
 1
 2                   A P P E A R A N C E S:
 3    SIMMONS, HANLY, CONROY, LLC
      112 Madison Avenue, 7th Floor
 4    New York, New York  10016
      By:  GARY DIMUZIO, ESQ.
 5    Attorneys for the Plaintiff
 6    LATHROP GPM, LLP
      2049 Century Park East, Suite 3500S
 7    Los Angeles, California  90067-1623
      By:  DAVID ASHDOWN, ESQ.
 8    Attorneys for the Defendant
      American International Industries
 9
      LATHROP GPM, LLP
10    2101 Cedar Springs Road, Suite 1400
      Dallas, Texas  75201-2134
11    By:  ROBERT THACKSTON, ESQ.
      Attorneys for the Defendant
12    American International Industries
13    CLYDE & CO US, LLP
      The Chrysler Building
14    405 Lexington Avenue, 16th Floor
      New York, New York  10174
15    By:  JEFFREY FEGAN, ESQ.
      Attorneys for the Defendant
16    Kolmar Laboratories, Inc.
17    GOLDBERG SEGALLA LLP
      665 Main Street
18    Buffalo, New York  14203-1425
      By:  JOSEPH WELTER, ESQ.
19    Attorneys for the Defendants
      The Procter & Gamble Company
20    and Shulton Inc.
21    LANDMAN, CORSI, BALLAINE & FORD, P.C.
      One Gateway Center, 4th Floor
22    Newark, New Jersey  07102
      By:  CHRISTOPHER KOZAK, ESQ.
23    By:  JANELLE WINTERS, ESQ.
      Attorneys for the Defendant
24    Whittaker, Clark & Daniels, Inc.
25
```

Page 3

```
 1
 2                   APPEARANCES (continued):
 3   NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
     105 S. Charles Street, Suite 1600
 4   Baltimore, Maryland  21201
     By:  KATHERINE LAWLER, ESQ.
 5   Attorneys for the Defendant
     Colgate-Palmolive Company, as
 6   successor-in-interest to The Mennen Company
 7   GORDON REES SCULLY MANSUKHANI REES, LLP
     One Battery Park Plaza
 8   New York, New York  10004
     By:  MOHAMMAD HAQUE, ESQ.
 9   Attorneys for the Defendant
     Colgate-Palmolive Company, as
10   successor-in-interest to The Mennen Company
11   COSMICH SIMMONS & BROWN, PLLC
     One Eastover Center, Suite 200
12   Jackson, Mississippi  39211
     By:  JOHN D. COSMICH, ESQ.
13   Attorneys for the Defendant
     Shulton, Inc.
14
15   ALSO PRESENT:
16   Thomas Devine, Videographer
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 13

 1                  Jacqueline Moline, MD - Direct

 2         Moline 3?

 3    A.       Yes.

 4    Q.       Is that right?  And it's a 23-page report?

 5    A.       Yes.

 6    Q.       And you've drafted no other reports in this

 7         matter; is that correct?

 8    A.       Correct.

 9    Q.       And what I marked as Moline 4 is this 17-page,

10         it's titled as "Exposure Testimony Summary for Brian

11         Gref - Applications" on the first page.  Is that

12         what you're referring to?

13    A.       Yes.

14    Q.       And you indicated that you did not draft that?

15    A.       Correct.

16    Q.       Who did draft it?

17    A.       Someone from Mr. -- someone from Simmons

18         Hanly.

19    Q.       Okay.  When is the first time that you saw

20         that document?

21    A.       Some point over the past ten days or so.

22    Q.       But you don't know for sure?

23    A.       I don't remember the day I received it.  I was

24         out of the office for a couple days.  I do know it

25         was sent to me.  I don't remember when I opened it.
```

1          Jacqueline Moline, MD - Direct

2     Q.     Okay.  Did it come to you by e-mail or by

3        mail?

4     A.     It was left on my desk.  So I assume it might

5        have been e-mailed to my assistant and she printed

6        it out for me.

7     Q.     So you don't know how it got to you other than

8        it was on your desk?

9     A.     I don't, I don't recall.

10    Q.     Okay.

11           By the way, I forgot to ask, is there anyone

12       else in the room?

13    A.     No.

14    Q.     And is there anyone else on another phone line

15       or anything that you have access to in that office?

16    A.     Not currently.

17    Q.     Fair enough.

18           And you said that you have a number of testing

19       results, I think you said.  Can you tell me in an

20       index what you have in front of you in terms of

21       testing results?

22    A.     I have testing results for MAS testing results

23       of Mennen aftershave talc for men and Mennen baby --

24       Mennen talc, it says Mennen talc, dated June 24th,

25       2022.  I have Mennen shave talc testing, May 26th,

```
                                                    Page 15

                         Jacqueline Moline, MD - Direct

 1

 2          2022.  I got a Mennen Baby Magic dated June 3rd,

 3          2022.  I have MVA testing on Clubman and a number of

 4          -- and then testing on Montana micro talc retains.

 5      Q.     Let me back up a second.  I'm sorry.  The

 6          Clubman, is a there a MVA report number or date that

 7          you can reference?

 8      A.     There are a number of them.  There is an MAS

 9          -- there's an MVA, there's one report dated March

10          15th, 2019, there's an MAS M71523 dated June 10th,

11          there's a MVA --

12      Q.     What year?  I'm sorry.

13      A.     Which one, the MAS?

14      Q.     The MAS June 10th.

15      A.     2022.

16             There's an MVA September 20th, 2017, an MVA

17          March 4th, 2020, an MVA August 27th, 2020, an MVA

18          August 16th, 2021, and an MVA February 17th, 2022.

19      Q.     Is that all?

20      A.     Yes.  I mean, I have papers on my desk but

21          they're not related.

22      Q.     So, in terms of the testing results that are

23          before you, you have three MAS reports for Mennen

24          products, yes?

25      A.     Correct.
```

```
                                               Page 16

 1                    Jacqueline Moline, MD - Direct

 2      Q.      And you have six MVA Clubman reports and one

 3          MAS Clubman report; is that correct?

 4      A.      That's correct.

 5      Q.      Do you have any other reports for testing of

 6          products that you refer to in this case?

 7      A.      Not of the products that Mr. Gref used, no.

 8      Q.      And none of the particular reports that you

 9          identified just now were referenced in your October

10          28th, 2021 report.  So my question for you is, when

11          did you receive those testing reports?

12      A.      That's actually not true.  They are referenced

13          in my report on Page 22.  I received the Mennen

14          reports over the past week.  I was away and they

15          were here when I got back.  So the three MAS Mennen

16          reports I received within the past week.

17      Q.      Okay.  And you're saying that Page 22

18          references all of the reports that are dated before

19          October 28th, 2021; is that what you're saying?

20      A.      No, I didn't say that.  You're misrepresenting

21          what I said.  I was referring to the fact that if

22          you look in the second paragraph it talks about Dr.

23          Compton, which is MVA, found asbestos in six

24          containers of Clubman.  So there were six different

25          containers he found.  And...
```

Page 17

1                   Jacqueline Moline, MD - Direct

2        Q.      I just want to know how we know what reports

3            you looked at prior to drafting this report, because

4            it doesn't state the dates or the MVA numbers for

5            any of the reports that you say you relied on.

6        A.      Well, all of those -- the Compton reports, the

7            MVA reports all predated my preparation of this

8            reporter.  So the information would have been

9            contained from the reports that I referenced.

10       Q.      Okay.

11       A.      Not including the MVA ones, correct.

12       Q.      The materials sent to you in connection with

13           this report came to you in what form?

14       A.      I don't understand what you're asking.

15       Q.      How did -- any materials that -- did you

16           receive materials in connection with this case?

17       A.      I received -- yeah, I did receive materials in

18           connection to this case.

19       Q.      Okay.  Do you recall when that was?

20       A.      The majority of them were some point before

21           October 28th.  I don't remember when they were sent

22           to me.

23       Q.      Do you recall receiving what I'm marking as

24           Moline 6, an October -- I'm sorry --  an August

25           31st, 2021 letter from Plaintiff's counsel?

Jacqueline Moline, MD - Direct

1

2          typewritten report.  Did you do that in this

3          particular instance for Mr. Gref's matter?  Did you

4          take handwritten notes at any time?

5     A.      I don't recall taking notes in this case.

6     Q.      Before this August 31st letter, did you review

7          anything in connection with this matter?

8     A.      No -- well, I mean, obviously, I reviewed

9          other documents that were not related to this case

10         for other cases.  But not specifically related to

11         Mr. Gref's case.

12    Q.      Okay.

13            Before you, from your review of the materials

14         in this matter, did any medical professional that

15         you're aware of say anything about what they thought

16         caused Mr. Gref's condition?

17    A.      To me?

18    Q.      Before you, from your review of the medical

19         records and other materials in this matter, did any

20         medical professional say anything about what they

21         thought caused Mr. Gref's condition?

22    A.      Not that I recall.

23    Q.      And in terms of -- I understand that your rate

24         that's charged for you is $750, correct?

25    A.      For my testimony, yes.

1                   Jacqueline Moline, MD - Direct

2        A.      Let's not talk acronyms.  Can you tell me what

3           they stand for, please?

4        Q.      Sure.  I want to pull up the actual reference

5           in your list.

6                           MR. KOZAK:  Anybody want to help

7           me out on the phone where it appears in the list of

8           492?

9        A.      Well, actually, if you go alphabetically,

10          maybe you'll find it.

11       Q.      I was there.  I just --

12       A.      Maybe you can't see it, but it's there.  If

13          you go to the letter after H, is usually I.

14       Q.      Here it is.  So you only -- Number 192, you

15          have the Executive Summary from the IWGACP, which is

16          the Interagency Working Group on Asbestos and

17          Consumer Products.  So, here when you say "the FDA

18          Working Group," is that what you're referring to?

19          Or are you referring to their White Paper?  Or you

20          don't know?

21                          MR. DIMUZIO:  Objection.  Form.

22       Q.      Actually, it has to be this because the White

23          Paper hadn't come out yet; is that right?

24       A.      Yes, it would have been that document.

25       Q.      So you're saying somewhere in that document it

```
 1                     Jacqueline Moline, MD - Direct
 2           diseases.  What I have said in the past is that
 3           there must be -- asbestos must be airborne and with
 4           the individual being present where the asbestos is
 5           in the area so that it could be breathed in in order
 6           to cause -- to later caused disease.
 7      Q.      Okay.
 8              And in terms of what you rely on for that
 9           statement or those -- that -- what you just told us,
10           is that contained in your report?  Or is that
11           something that's not contained in your report?
12                     MR. DIMUZIO:  Objection.  Form.
13      A.      I mean, that's a basic tenant.  And it's such
14           a --
15      Q.      Well, you just said it has to be in the air
16           and inhaled.  So I just want to know if it's more
17           than that?  Or is that your opinion?
18                     MR. DIMUZIO:  Objection.  Form.
19      A.      My opinion is, without getting really snarky,
20           which is where you're going here and I don't
21           appreciate it, so maybe you could de-snarkify, if
22           that is such a word.
23              Asbestos is well-known to cause disease when
24           it is breathed in.  I have made that clear in about
25           three decades of work.  So -- and I have
```

1                   Jacqueline Moline, MD - Direct

2     Q.      When we left off, we were talking about the

3           issue of threshold, and, one of the things you said

4           in an answer was something about a low level of

5           exposure and you referred to the Helsinki, I assume

6           1997 document, where it references a low level of

7           exposure might be sufficient in a clinical setting.

8                        MR. DIMUZIO:  Objection.

9     Q.      Is that what you're referring to?

10                       MR. DIMUZIO:  Objection.  Form.

11          Mischaracterizes the underlying document.

12    A.      You know, I've been asked these questions so

13          many times.  I'm really at a loss why I'm being

14          asked the same questions that I've been asked for

15          the past ten years.  And it's just there's volumes

16          of transcripts that you could be referring to rather

17          than wasting all of our time.  But I just, I just

18          don't understand this.

19               The Helsinki Criteria from 1997, I don't know

20          if they use the term from a clinical perspective, as

21          you mischaracterize.  I think it's -- they

22          definitely say low level exposure, and it also is

23          also repeated in the updated 2014 with respect to

24          mesothelioma.

25    Q.      And neither of those --

1              Jacqueline Moline, MD - Direct

2      A.      I wasn't done.

3      Q.      Okay.

4      A.      If you look at my face, you can see my mouth

5          moving and know that I'm still talking.

6      Q.      You actually were turned around, by the way.

7      A.      What?

8      Q.      You were turned around, and I thought you were

9          done.  I'll wait.

10     A.      I'm done.

11     Q.      Okay.

12             And neither the '97 nor the 2014 document

13         defines low level or a threshold for mesothelioma,

14         correct?

15                     MR. DIMUZIO:  Objection.  Form.

16         Asked and answered.

17     A.      I said that earlier.  You're just repeating

18         the words that I even said earlier today where I

19         specifically said they don't define it.

20     Q.      Threshold is --

21     A.      So you're -- that's a question that's

22         absolutely wasting my time.

23     Q.      Okay, Doctor.

24     A.      And you're not listening to what I said

25         earlier.

```
                                              Page 89
 1              Jacqueline Moline, MD - Direct

 2                   MR. DIMUZIO:  Objection.  Form.

 3      A.      Can it come from both?  I mean, why do they

 4         have to be mutually exclusive?  Some industrial

 5         hygienists actually do use common sense.

 6      Q.      Okay.  So it's --

 7      A.      Now, you can see my mouth talking and you know

 8         I wasn't done and you still interrupted me.  Because

 9         I can see you now and you know I was talking.  My

10         mouth was moving (indicating).

11      Q.      Would you like to finish your answer?

12      A.      I think I did.

13      Q.      I thought so too.

14              Do you agree that there's a difference between

15         a releasable amount and an inhalable amount?

16                   MR. DIMUZIO:  Objection.  Form.

17         Vague and ambiguous.

18      A.      I don't understand what you're asking.

19      Q.      Okay.  We just talked about an amount and then

20         an amount that would be inhaled, and it would be the

21         same thing.  And then I just asked you a question

22         that was very similar, a little bit different

23         obviously, I asked you, do you agree that there's a

24         difference between a releasable amount and an amount

25         that would be inhaled?
```

1              Jacqueline Moline, MD - Direct

2    A.       Correct.

3    Q.       It would be difficult for you to compare the

4         methods or results in that study to anything else

5         because all you have in what's written in that 2014

6         article, right?

7                   MR. DIMUZIO:  Objection.  Form.

8    A.       I don't know what you mean by "anything else."

9    Q.       All right.  We'll get there.

10   A.       I mean, there's fully standard ways of -- I'm

11        talking.  Look, mouth open, talking (indicating).

12            There are standard ways that they describe

13        what they did, their methods were described on

14        exactly what they did, and you can read article and

15        look at the methodology that other studies do to see

16        if they're analogous or they're similar.

17            So that's what one does when comparing the

18        scientific literature when you're looking to see how

19        comparable a study might be to one another.

20   Q.       Have you written anything that compares any of

21        these studies?  Other than what we see in your

22        report, have you compared the methods, have you

23        compared the results?  Other than just stating what

24        the result is, have you compared the analytical

25        methodology to tasks done, what you said earlier,

1          Jacqueline Moline, MD - Direct

2     A.     Seriously?  You're asking me the MAS study

3          when I've given you a whole litany of MAS studies.

4     Q.     I'm asking you about the one you cite in your

5          report on Page 20, the MAS baby diapering study from

6          2020, do you recall how many minutes that study was?

7     A.     I'm sorry.  It's on Page 20?

8     Q.     Twenty in your image there, you say the MAS

9          baby diapering at 1.11 fibers per cc.  I asked you

10         how many minutes that was?

11    A.     I don't have that report in front of me.  I

12         don't recall how many minutes it was.  I would have

13         to go pull the paper, which I don't have in front of

14         me because I didn't expect to be asked questions

15         from Johnson & Johnson.

16    Q.     Is duration important for you when considering

17         exposure studies?

18                    MR. DIMUZIO:  Objection.  Form.

19         Incomplete hypothetical.

20    A.     It depends on the nature of the study and what

21         they're talking about.

22    Q.     Okay.

23         Did you do anything to compare your ambient

24         figure there to the five minutes of Gordon, 48

25         minutes of Anderson, the five minutes of Steffen or

1                    Jacqueline Moline, MD - Direct

2        A.      Correct.

3        Q.      And you never spoke to him or a family member,

4            correct?

5        A.      Correct.

6        Q.      And you never spoke to any of his doctors or

7            medical providers?

8        A.      Correct.

9        Q.      Aside from the documents that you received in

10           the August 31st, 2021 letter and the June 13th, 2022

11           letter, you haven't performed any other document

12           review relative to this case, right, relative to

13           Mr. Gref?  Let's talk about Mr. Gref only, okay?

14       A.      You mean specific records related to Mr. Gref?

15       Q.      Right.

16       A.      No, I have not.

17       Q.      You haven't performed any particular research

18           or investigation with respect to Mr. Gref, where he

19           lived, where he worked, who he could have been

20           around, anything like that?

21                        MR. DIMUZIO:  Objection.  Form.

22           Asked and answered.

23       A.      Well, I can't go to Guantanamo since I'm a

24           civilian.  And apart from that, I did not, no.

25       Q.      Okay.  No independent research by you or by

Page 116

1    Jacqueline Moline, MD - Direct

2            MR. KOZAK:  For purposes of the

3    record, I'm withdrawing document five which was not

4    shown to the witness.

5            THE VIDEOGRAPHER:  The time is

6    approximately 2:34 p.m.  We're back on the record at

7    the beginning of Media 4.

8    Q.    Good afternoon again, Doctor.  I'm going to

9    refer to Page 7 of your report.  That's where you

10    have -- I'm going to try to share the screen.

11            On Page 7, this is where you made -- you

12    summarized or made certain assumptions about

13    Mr. Gref's alleged product use or products that are

14    alleged to have been used on him or in his presence.

15    Do you see that?

16    A.    I didn't realize it was a criminal case where

17    we use "alleged."  This is where I describe his

18    exposure and use of powders as he described them.

19    Q.    Is there any evidence that you're aware of

20    that supports whether Mr. Gref used or was in the

21    presence of any talcum product at any time?

22            MR. DIMUZIO:  Objection.  Form.

23    A.    I don't know what you're asking me for.  Are

24    you saying did someone take pictures of him while he

25    was being powdered that could then be shown to you?

1              Jacqueline Moline, MD - Direct

2    A.      You mean evidence like that, like a photograph

3        or a video, no, I have not.

4    Q.      A photograph, a video, a container, anything

5        like that, a receipt, anything to demonstrate that a

6        product was ever purchased or present as he claims

7        throughout the case?

8    A.      No.

9                   MR. DIMUZIO:  Objection to form.

10   Q.      If this case goes to trial and if he can't

11       prove that products were present and used, then his

12       peritoneal mesothelioma obviously wouldn't have been

13       caused by any of these products, right?

14                  MR. DIMUZIO:  Objection.  Form.

15       Vague and ambiguous.  Lack of foundation.  And calls

16       for a legal conclusion not a medical conclusion.

17   A.      I think that's an evidence issue and that's

18       not for me to describe.  You're asking me for a

19       legal conclusion, and I think that's a -- that's

20       something, that's why we have juries.

21   Q.      Did you make evidentiary assumptions when you

22       assumed that he used products?

23                  MR. DIMUZIO:  Objection.  Form.

24       Asked and answered.  And calls for a legal

25       conclusion.

Page 119

1          Jacqueline Moline, MD - Direct

2     A.      I'm a doctor.  I spend too much time with

3          lawyers, but I am not a lawyer.  So, if you want to

4          ask me questions, please remove the legal jargon.  I

5          can answer them from a medical standpoint.  But I'm

6          not going to comment on legal evidence or things

7          along those lines.

8     Q.      Okay.

9             Did you assume that Mr. Gref used products the

10         way he described them?

11                    MR. DIMUZIO:  Objection.  Form.

12         Asked and answered.

13    A.      Yes.

14    Q.      Did you assume that he used these products in

15         the volume that he says he used them?

16                    MR. DIMUZIO:  Objection.  Form.

17    A.      I base the amount that he used off of his

18         sworn testimony.

19    Q.      Okay.

20             And there's nothing that you can point to that

21         corroborates his use of these products or the volume

22         he says he used them in, correct?

23                    MR. DIMUZIO:  Objection.  Form.

24    A.      Apart from his parents, no.

25    Q.      In your report I didn't see any reference to

Page 131

1                    Jacqueline Moline, MD - Direct

2          Asked and answered.

3     A.       These were not -- these were -- I think that

4          was the purpose of any of this.  I think it was to

5          describe what the measurements were of what was in

6          these various products.

7               It was in the same way that you're analyzing

8          what's in a bottle of shampoo.  You're not -- you're

9          just writing a report or a paper on what's in the

10         shampoo.  You're not necessarily saying anything

11         beyond that.  Or maybe you are.  But I didn't take

12         it that any of these papers were necessarily doing

13         anything other than describing what they found.

14    Q.       Based on the methods that they were using at

15         the time and the definitions that they were using at

16         the time, correct?

17                    MR. DIMUZIO:  Objection to form.

18    A.       Well, they can't really use something into the

19         future, right?  They weren't Michael J. Fox.  They

20         didn't have a special car that could go into the

21         future and then go backwards.

22    Q.       Do you agree with me?

23    A.       They used the methods that were available to

24         them at the time.

25    Q.       Okay.

Page 132

1                Jacqueline Moline, MD - Direct

2       A.      Or, they chose to use different methods.

3           There may have been others that were available and

4           they chose not to.

5       Q.      So you can't vouch for any of the methods that

6           they used or the results that were given in the

7           articles that you're citing there on Pages 17

8           through 19?

9                        MR. DIMUZIO:  Objection.  Form.

10          Asked and answered.

11      A.      You've asked me these questions so many times

12          today.  I can only tell you what was on the written

13          paper.  I'm not a methods person.  You should speak

14          to a methods person if you want to ask some

15          questions about the methods.

16      Q.      Okay.

17              Jumping back to Mr. Gref for a second.  In

18          terms of the way he says he used any of these

19          products or the way his witnesses say that the

20          product was used on him, that all comes from the

21          transcripts, right?

22      A.      Correct.

23      Q.      Okay.

24              And you have -- if he used the products or if

25          the products were used on him, the only information

1          Jacqueline Moline, MD - Direct

2          that you would have is that the -- if the products

3          were used, they would have been used or were used in

4          a normal way, right?

5                    MR. DIMUZIO:  Objection.  Form.

6          Vague and ambiguous.

7     A.    The way they were described was -- I mean,

8          "normal" is, I think, a subjective term.  Your

9          normal is definitely not my normal.  I can tell that

10         by spending five hours with you today.

11              They used it in a manner which has been

12         described by hundreds of other folks who have used

13         talcum powders.

14    Q.    You assume if the products were used, would

15         you assume that they would have been used in a

16         normal way, right?

17                   MR. DIMUZIO:  Objection.  Form.

18         Asked and answered, Counsel.

19    A.    Again, define "normal" for me.  I mean, I

20         don't know how to describe it except for they used

21         them how they describe them.  And it didn't seem out

22         of the ordinary that they applied the powders in the

23         method by which they described them.

24    Q.    All right.

25              You didn't estimate or quantify or describe

```
 1                    Jacqueline Moline, MD - Direct
 2                    MR. DIMUZIO:  Objection to form.
 3      A.      Only from the standpoint of how many bottles
 4          that he used that were cumulatively substantial.
 5      Q.      Did you compare his lifetime cumulative to all
 6          sources to any of cumulative product use that you're
 7          claiming with respect to talcums?
 8                    MR. DIMUZIO:  Objection.  Form.
 9      A.      I'm sorry.  I don't understand your question.
10      Q.      You were unstable to define or describe his
11          total lifetime cumulative dose because, as we talked
12          about earlier, it would be virtually impossible to
13          do so because he didn't wear a dosimeter on his
14          shoulder every minute of his life, right?
15      A.      Correct.
16      Q.      And so, my question is whether you attempted
17          in spite of that to compare that alleged potential
18          cumulative dose to what you're saying you believe he
19          could have been exposed to from the use of talcum
20          products if any of those testimony contained
21          asbestos, as you defined it?
22                    MR. DIMUZIO:  Objection.  Form.
23      A.      I did not do a formal dose estimate in this
24          particular case.  I looked at the summary that was
25          provided to me with the number of minutes, but
```

Page 136

1          Jacqueline Moline, MD - Direct

2      didn't undertake the full arithmetic exercise.

3      Q.     Okay.

4             When you say it's your belief that he was

5      exposed to a level that was above background, did

6      you attempt to qualify that in any way?

7                    MR. DIMUZIO:  Objection to form.

8      A.     Again, you know, based on my understanding of

9      levels from some of the powder that he used and the

10     manners in which the powders were being used, the

11     frequency with which he used them, I could do an

12     estimate to say that it was significantly above

13     background.

14     Q.     But you didn't do that in the report, there's

15     nothing that shows what above background or define

16     what above background is or was to be, correct?

17                    MR. DIMUZIO:  Objection.  Form.

18     A.     Well, it defines what background is in there.

19     So, anything that's a bigger number is going to be

20     above background.

21     Q.     You didn't try to say how much above

22     background you are claiming it is, right?

23     A.     I did not.

24                    MR. DIMUZIO:  Objection.  Form.

25     A.     I did not put that in the report, correct.

Page 166

1               Jacqueline Moline, MD - Cross

2       Q.       Understood.

3       A.       But not the non-product specific or the

4           formula of the particular talc product.

5       Q.       Okay.

6                And similarly, if any of those four witnesses

7           had testified or identified Mennen shave talc, you

8           would have noted that in your report, as well, as a

9           specific product of Mennen's, right?

10      A.       That would have been my practice, yes.

11      Q.       Okay.

12               Now, you mentioned in the beginning of your

13          deposition when you were talking about some of the

14          material that you have there with you in your office

15          today, I noted that you mentioned three MAS studies.

16          And I apologize to go back to these.  I wasn't

17          taking quick enough notes.  I believe you said the

18          first of the studies was dated March 31, 2022.  Is

19          that one of the studies that you have in front of

20          you?

21      A.       No.

22      Q.       Then let me go back.  Tell me the three MAS

23          studies that you identified for us at the beginning

24          of your deposition.

25      A.       One was May 26th, 2022, and that was Mennen

Page 167

1                    Jacqueline Moline, MD - Cross

2          shave talc.

3      Q.      Okay.

4      A.      One was June 3rd, 2022, and that's Baby Magic.

5          And the third was Mennen aftershave talc for men and

6          baby powder, and that's dated June 24th, 2022.

7      Q.      June 24, 2022.  Okay.

8              Stop me any time you need to get a drink or

9          anything.  I know we've been going a long time.

10     A.      No.  I got my water.  Thank you.

11     Q.      Okay.  Okay.

12             There's a total of three studies that you told

13         us about that tested purported Mennen products.  It

14         sounds like they all -- well, except for June 24th.

15         The May 26, the June 3rd, neither of those studies

16         was provided to you with the last letter that you

17         received from the Simmons firm on June 13th with the

18         supplemental case materials, correct?

19     A.      Correct.

20     Q.      And all three of those studies were given to

21         you, I think you said some time in the last week?

22     A.      Right.

23     Q.      Was there --

24     A.      I'm sorry.  It might have been last Tuesday,

25         Monday or Tuesday.

```
                                                     Page 168

  1                     Jacqueline Moline, MD - Cross
  2         Q.      Okay.
  3                 Was there a transmittal with those?  Like,
  4           were they sent by e-mail?  In a letter?  Anything
  5           like that?
  6         A.      They were not sent by Simmons.  And I
  7           honestly, I don't know.  They were sent, and I think
  8           they might have been e-mailed to my assistant.
  9         Q.      You said they were not sent by Simmons?
 10         A.      Correct.
 11         Q.      Who provided them to you?
 12         A.      They were sent by Weitz & Luxenberg.
 13         Q.      Were they sent for your review in this
 14           particular case?
 15         A.      No.
 16         Q.      And your report that you prepared in this
 17           case, the October 31st [sic] report, that's your
 18           only report, you haven't supplemented that for
 19           Mr. Gref's case, correct?
 20         A.      October 28th, no.
 21         Q.      I'm sorry.  I better get the right date.
 22           October 28th has not been supplemented?
 23         A.      Correct.
 24         Q.      So you didn't rely on any of these three MAS
 25           studies for the opinions you provided in that report
```

Page 169

1                    Jacqueline Moline, MD - Cross

2          for Mr. Gref's case, right?

3     A.         I didn't time travel.

4     Q.         All right.

5                         MS. LAWLER:  Mr. DiMuzio, I'm

6          going to request copies of those reports, please, to

7          be provided after the deposition.  Would you be

8          willing to stipulate that this witness will not

9          offer testimony about those reports since they were

10         not contemplated for her October 28th report in this

11         case?

12                        MR. DIMUZIO:  Well, they were not

13         referenced in her report or any reports in this

14         particular case.  I think that means according to

15         Federal Rules she can't refer to them there.  In

16         terms of getting them to you, I'm not even sure that

17         we have them, number one.  Number two, they were

18         provided by a different law firm, presumably for a

19         different lawsuit.  And therefore, they're not at

20         issue in this case.  So I can't agree to give you

21         those materials.  I suggest discussing with Weitz &

22         Luxenberg.

23                        MS. LAWLER:  In the interest of

24         time, I will move on.  And I will just reserve the

25         right to reopen this line of questioning if those

1          Jacqueline Moline, MD - Cross

2      three MAS reports that we've described and dated on

3      the record do come into play in Mr. Gref's case.

4              MR. DIMUZIO:  Understood.  I

5      understand your objection, sure.

6              MS. LAWLER:  Okay.

7    Q.     One of the other materials, Dr. Moline, that

8      you said you had in front of you was a 17-page

9      document, I think we marked it as Exhibit 4 to this

10     deposition.  You also said you received pretty

11     recently, maybe I got my lines crossed, was that

12     17-page document sent to you by the Simmons firm?

13   A.     Yes.

14   Q.     Okay.

15         So you were not involved in the preparation of

16     that summary or any of the calculations in Exhibit

17     4, correct?

18   A.     Correct.  It was basically counting.  But

19     there's no real calculation, apart from adding

20     numbers.  But I didn't have anything to do with the

21     preparation of it actually, no.

22   Q.     Okay.

23         And I'll stick in my lane with respect to

24     Mennen.  Mennen is mentioned in Exhibit 4.  You're

25     not adopting those calculations into your report

Page 171

1                   Jacqueline Moline, MD - Cross
2          specific to Mennen at this time; is that fair?
3                         MR. DIMUZIO:  Objection to form.
4      A.      I think you're asking me a legal question.  I
5          don't know what exactly you mean.  I don't know what
6          you mean by adopting into my report.
7      Q.      Well, they're not your opinions.  You told us
8          they were prepared by Simmons.  You weren't involved
9          in the preparation of those calculations or
10         estimates, however you want to characterize them.
11         So I'm just trying to understand.  If those are part
12         of your opinions, then I need to ask you about them
13         or if we can put them aside.
14                        MR. DIMUZIO:  Objection to form.
15     A.      I mean, I had asked that they go through and
16         come up with a number of minutes that each product
17         was used.  But, so, if you want to ask based on
18         that, go right ahead.  But I did not create them.
19     Q.      Okay.
20             Well, you did talk earlier, and like I said, I
21         don't want to repeat any of Mr. Kozak's questions.
22         He confirmed with you that you didn't do any sort of
23         a dose estimate in terms of a shake of a bottle of
24         talcum powder.  Is it also true that you did not
25         attempt to quantify the number of grams that would

Page 172

Jacqueline Moline, MD - Cross

1
2      be released from a bottle of Mennen talcum powder in
3      a shake?
4      A.      Correct.
5      Q.      And you haven't attempted to quantify the
6      number of fibers per cc of any particulate that
7      would have been released from a bottle of Mennen
8      talcum powder in a minute; is that fair?
9      A.      I didn't do any quantification, correct.
10     Q.      Okay.
11             Give me one second and see if I can skip
12     through in the interest of time.  All right.
13             So, I know Mr. Kozak covered a lot of the
14     studies that you rely on in your report, and I think
15     I can close this out.  You're not aware of any
16     studies that measure airborne asbestos fibers or
17     fiber released from a Mennen product; is that
18     correct?
19     A.      Correct.
20     Q.      I apologize for skipping again.  I'm trying to
21     shortcut some of these.  We talked about the four
22     depositions that you had, and I wanted to confirm
23     for Mr. Gref's case whether you read the transcript
24     of his ex-wife, Tabatha Smith Ugalde (phonetic),
25     does that sound familiar?

1        Jacqueline Moline, MD - Cross

2        mine in Montana.

3    Q.     And you say in your second -- the next

4        paragraph that studies done, it says, "Studies

5        recently on both Clubman talc products and on

6        products using ore taken from the same source mines

7        as those used in the manufacture of Clubman talc

8        showed significant amounts of chrysotile,

9        anthophyllite and tremolite asbestos."  Dr. Compton

10       found asbestos (primarily anthophyllite) in six

11       different containers of Clubman talc manufactured

12       with Montana talc."  Did I read that correctly?

13   A.     Yes.

14   Q.     You don't, you don't identify what six

15       different containers Dr. Compton tested, do you, by

16       case name?

17   A.     Not in this report.  Again, they're on the

18       reliance list that should have been provided to you.

19       I don't know why it wasn't.  But they are certainly

20       on the reliance list.  And you have asked me

21       questions about this before and I know you have

22       copies of all of them, Mr. Thackston.

23   Q.     What are the name of the -- are those all

24       different litigation cases?

25   A.     Yes.

Page 197

1        Jacqueline Moline, MD - Cross

2     Q.     What are the names of those six different -- I

3         haven't asked you about six different cases, have I?

4     A.     It seems like it.  It seems like it.  I've

5         been in more depositions with you than I'd like to

6         recall.  I know one was Lashley, one was Bell, one

7         was Zaptinsky, Z-A-P-T-I-N-S-K-Y, Burnett.  And I

8         don't know.  I don't know.  There were multiple

9         containers in some of them, so I don't know if there

10        was others in addition to that.

11    Q.     Do you have a --

12    A.     Wait a minute.

13    Q.     I'm sorry.

14    A.     Gibson.  I don't know if I mentioned that.

15    Q.     Okay.

16         You have not been deposed in the Zaptinsky

17        Burnett or Simpson cases, have you?

18                    MR. DIMUZIO:  Objection.  Form.

19    A.     I have not been deposed in the Zaptinsky case.

20        Burnett, I don't -- no.  And what was the third one?

21    Q.     Gibson.

22    A.     No.

23    Q.     And Dr. Compton has not been deposed in those

24        three cases, has he?

25    A.     How would I know?  I don't have his calendar.

Page 205

1

2                    C E R T I F I C A T E

3           STATE OF NEW YORK     )

4           COUNTY OF NEW YORK    )

5

6           I, ELEANOR SEKULIC, a Notary Public of the

7     State of New York, do hereby certify that the

8     foregoing deposition of JACQUELINE MOLINE, MD was

9     taken by and before me on July 6, 2022.

10          The said witness was duly sworn before the

11    commencement of her testimony, the said testimony

12    was taken stenographically by myself and then

13    transcribed.  The within transcript is a true record

14    of the said deposition.

15          I am not connected by blood or marriage with

16    any of the said parties, nor interested directly or

17    indirectly in the matter in controversy, nor am I in

18    the employ of any of the Counsel.

19

20    DATED:_____

21

22    _____

23    ELEANOR SEKULIC

24

25