# EXHIBIT G

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------------------------------X
4    BRIAN JOSEPH GREF
                                    Plaintiff,
5
                          ZOOM VIDEOCONFERENCE
6                         VIDEOTAPED DEPOSITION
                               UNDER ORAL
7                          EXAMINATION OF
                          JACQUELINE MOLINE, M.D.
8
                    against
9
10   AMERICAN INTERNATIONAL INDUSTRIES, individually and
     as successor-in-interest for the CLUBMAN BRAND, and
11   to THE NESLEMUR COMPANY and PINAUD COMPANY, et al.,
12                                  Defendants.
13   Civil Action No: 1:20-cv-05589-GBD-DCF
     ----------------------------------------------------X
14
15   Volume II
16
                    Transcript of the Zoom Videoconference
17   Videotaped Deposition of the witness, called for Oral
     Examination in the above-captioned matter, said
18   deposition taken by and before BRENDA FITZGERALD, a
     Notary Public and Shorthand Reporter, on Friday,
19   September 23, 2022, commencing at 10:05 in the
     forenoon.
20
21
          PRIORITY-ONE COURT REPORTING SERVICES, INC.
22                290 West Mt. Pleasant Avenue
                  Livingston, New Jersey 07039
23                     (718) 983-1234
24
25   Job No.: 5418333

1

2                                STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND AGREED by and among

5     the attorneys for the respective parties herein that

6     the sealing, filing and certification of the within

7     deposition be waived; that such deposition may be

8     signed and sworn to before any officer authorized to

9     administer an oath with the same force and effect as

10    if signed and sworn to before a judge.

11         IT IS FURTHER STIPULATED AND AGREED that all

12    objections, except as to form, are reserved to the

13    time of trial.

14

15                              - oOo -

16

17

18

19

20

21

22

23

24

25

Page 208

1

2                          I N D E X

3

4    WITNESS                    EXAMINATION BY        PAGE

5    Jacqueline Moline, M.D.    Mr. Thackston     211, 304

6                               Mr. Kramer            293

7                               Mr. Kozak             297

8

9                          EXHIBITS

10   MOLINE             DESCRIPTION           FOR IDENT

11     18    2019 article by Michele Carbone        213

12     19    Morbidity and Mortality Weekly Report  244

13     20    2022 CDC Morbidity and Mortality Weekly

             Report                                 267

14

       22    Photograph of MAS Project M71373,

15            Pinaud Clubman container              277

16     23    2018 article by Jiang                  311

17

18   (There is no Exhibit 21.  Exhibits retained by

     counsel.)

19

                          - oOo -

20

21

22

23

24

25

Page 209

```
 1
 2     A P P E A R A N C E S:
           SIMMONS, HANLY, CONROY, LLC
 3               Attorneys for the Plaintiff(s)
                 112 Madison Avenue
 4               New York, New York 10016
           BY:   JAMES KRAMER, ESQ.
 5
 6
           NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
 7               Attorneys for the Defendant(s)
                 Colgate-Palmolive Company, as
 8               successor-in-interest to the Mennen Co.
                 105 S. Charles Street, Suite 1600
 9               Baltimore, Maryland 21201
           BY:   KATHERINE A. LAWLER, ESQ.
10
11
           CLYDE & CO US, LLP
12               Attorneys For Defendant(s)
                 Kolmar Laboratories, Inc.
13               The Chrysler Building
                 405 Lexington Avenue, 16th Floor
14               New York, New York 10174
           BY:   KEVIN C. McCAFFREY, ESQ.
15
16         LATHROP GPM LLP
                 Attorneys for Defendant(s)
17               American International Industries
                 2101 Cedar Springs Road, Suite 1400
18               Dallas, Texas 75201-2134
           BY:   ROBERT THACKSTON, ESQ.
19               DAVID ASHDOWN, ESQ.
                 KURT GREVE, ESQ.
20
21
           GOLDBERG SEGALLA, LLP
22               Attorneys for Defendant(s)
                 The Procter & Gamble Company, Shulton Inc.
23               1037 Raymond Boulevard, Suite 1010
                 Newark, New Jersey 07102-5423
24         BY:   DAVID E. RUTKOWSKI, ESQ.
25
```

Page 210

1

2    A P P E A R A N C E S: (Cont'd)

3

         LANDMAN, CORSI, BALLAINE & FORD, P.C.
4                Attorneys for Defendant(s)
                 Whittaker Clark & Daniels
5                One Gateway Center, 22nd Floor
                 Newark, New Jersey, 07102
6        BY:    CHRISTOPHER S. KOZAK, ESQ.

7

8        Also Present:
9                Bob Jorissen, videographer
10
                          - oOo -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Jacqueline Moline, M.D.

2        idea of prior abdominal surgeries promoting

3        mesothelial growth or promoting malignant

4        mesothelioma.

5                    I don't know what they're referencing in

6        number two.  They're referencing the same articles

7        they talked about before, but I don't know what

8        reference number two is, and a review article is just

9        basically summarizing other people's work.

10            Q.      Have you published anything on the

11        percentage of peritoneal mesotheliomas that you

12        believe to be related to asbestos exposure?

13            A.      I have not specifically published any

14        papers on peritoneal mesothelioma.

15            Q.      What literature do you rely upon for

16        your opinion that Mr. Gref's peritoneal mesothelioma

17        is related to or was caused by asbestos exposure?

18            A.      I think we can look at literature dating

19        back to some of the Selikoff where there's peritoneal

20        mesotheliomas related to asbestos exposure and

21        insulators.  There's Creighton, there's Welch,

22        there's Rodelsperger.  I think some of the Chinese

23        studies like Jiang where they talk about peritoneal

24        mesotheliomas in workers.  I think I've talked about

25        this several times in the past.

1                    Jacqueline Moline, M.D.

2         Q.      Do you in your report in this case, I

3    believe we already marked it, in your report in this

4    case, do you identify the authorities that you rely

5    upon for your opinion that Mr. Gref's peritoneal

6    mesothelioma was caused by asbestos exposure?

7         A.      I don't understand what you're asking

8    me.

9         Q.      You were giving us some references and

10   it just occurred to me that I should cross-reference

11   the report, your report in this case marked as

12   Exhibit 3 to see where in your report we would look

13   to find what reference you rely upon for your opinion

14   that Mr. Gref's peritoneal mesothelioma was caused by

15   asbestos exposure.

16              MR. KRAMER:  Objection to form.

17        A.      I don't believe in the report I

18   specifically have a section about peritoneal

19   mesothelioma.  I think it's -- there's no specific

20   section that I've written specifically about

21   peritoneal mesothelioma.

22        Q.      You said generally the literature that

23   you would rely upon for an opinion that Mr. Gref's

24   mesothelioma, peritoneal mesothelioma was caused by

25   asbestos, you mentioned Dr. Selikoff.

1                    Jacqueline Moline, M.D.

2          Q.        Who is Freeman?

3          A.        Freeman is a physician who wrote an

4    article about causation methodology.

5          Q.        Do you know what's the full name?

6          A.        I believe it's Michael Freeman.

7          Q.        This says that Dr. Welch identifies four

8    questions that should be examined:  "One, was the

9    individual exposed to a toxic agent?  Two, does the

10   agent cause the disease present in the individual?

11   Three, was the individual exposed to this substance

12   at a level where the disease has occurred in other

13   settings?  Four, have other competing explanations

14   for the disease been excluded?", right?

15         A.        Correct.

16         Q.        For your analysis under this rubric, did

17   you separate peritoneal mesothelioma or did you

18   consider peritoneal and pleural mesothelioma

19   together?

20         A.        The rubric is used on each individual

21   case, so it's not a rubric, there's no separate

22   rubric for pericardial, tunica vaginalis, pleural or

23   peritoneal, which are the four areas in which

24   mesothelioma can arise.  It's a general methodology

25   that does not discriminate between source or location

Page 235

1              Jacqueline Moline, M.D.

2     of tumor.

3          Q.    For number two, quote, does the agent

4     cause the disease present in the individual, end of

5     quote, you did not apply that to the disease

6     peritoneal mesothelioma, correct?

7              MR. KRAMER:  Objection,

8     mischaracterizes.

9          A.    In my opinion I can apply that disease.

10    Peritoneal mesothelioma has been associated with

11    asbestos exposure, so that's the opinion that I have

12    stated multiple, multiple times, and I continue to

13    have that opinion so, yes, I can say that.

14              MR. THACKSTON:  Object to the

15    responsiveness.

16         A.    I don't know what's unresponsive of me

17    giving an answer to your question.

18              MR. KRAMER:  It's okay, Dr. Moline.

19    Let's wait for the next question.

20              THE WITNESS:  Okay.

21         Q.    Let me read a statement from page 421.

22    For question number two, there is ample literature

23    that asbestos causes mesothelioma and no dispute in

24    the medical literature, end of quote.

25              That statement, first of all, did I read

Page 239

1                    Jacqueline Moline, M.D.

2       the nomenclature, use the correct nomenclature.

3       Peritoneal is location.  Subtype is inferring the

4       pathological subtype.

5             Q.    Let me do -- use layperson's term

6       because I'm a layperson presumably and so will the

7       jury be.

8                    You would agree with me that -- you

9       agreed with me earlier that the peritoneal area, the

10      stomach area is different than the lung area, right?

11                   MR. KRAMER:  Objection to form.

12            A.    I would not define it as stomach.

13      Stomach is in the upper part of the abdomen.  I would

14      describe it as the abdominal cavity.  Stomach is even

15      more vernacular and maybe someone might refer to it

16      as the stomach, but even a layperson understands

17      usually the term abdomen.

18            Q.    Abdominal cavity is further away from

19      the nose than the pleural cavity or the chest cavity,

20      right?

21                   MR. KRAMER:  Objection, relevance.

22            A.    Yes.

23            Q.    You have not evaluated specifically

24      whether there's literature that supports the idea

25      that cosmetic talc even if adulterated with trace

1          Jacqueline Moline, M.D.

2     levels of asbestos has been linked to peritoneal

3     mesothelioma, have you?

4               MR. KRAMER:  Objection to form.

5          A.     There is not a lot of literature related

6     to that in general.  There are certainly cases where

7     it has been described in individuals with exposure to

8     cosmetic talc that have developed peritoneal

9     mesotheliomas in the literature.

10          Q.     So, you're saying that the only

11    literature you're aware of relating to cosmetic talc

12    and peritoneal mesothelioma are case reports of

13    someone who had mesothelioma, peritoneal mesothelioma

14    and also used cosmetic talc, right?

15               MR. KRAMER:  Objection, misstates.

16          A.     I'm sorry, I didn't hear the second

17    half.  You're fading out.

18          Q.     The only literature that you're aware of

19    relating to peritoneal mesothelioma and cosmetic talc

20    are case reports of people who have been diagnosed

21    with peritoneal mesothelioma who also used cosmetic

22    talc, right?

23          A.     I think that I'm referring to case

24    series as well as case reports.  I'm also referring

25    to -- I believe in other cases where they've looked

1          Jacqueline Moline, M.D.

2    at tissue and found in cases where mesothelioma has

3    been present, they've looked at lung fiber burden and

4    found characteristic findings of -- well, they found

5    asbestos fibers that are characteristically found in

6    talcum powder, so they found the same type of fibers

7    that are not seen typically in commercial talcum

8    powder -- in commercial asbestos, but are seen in

9    talcum powder.

10          Q.    In looking at your paragraph related to

11    question number two, the cite that I see, the last

12    sentence says -- it's also related to number three --

13    quote, as described above and recently referenced by

14    the Center for Disease Control -- there was no cite

15    for that, right, referenced by the Center for Disease

16    Control, you don't have a footnote and you don't have

17    an article, right?

18          MR. KRAMER:  Objection to form.

19          A.    It's on my reference list, but I don't

20    have a specific citation.  It was from the MMWR

21    report.

22          Q.    Your reference list, how many items are

23    on your reference list?

24          A.    Currently there's about 505 or

25    something, but there aren't that many that are from

Page 242

1                     Jacqueline Moline, M.D.

2    the CDC.

3         Q.     Somebody would have to go read it and

4    try to find the Center for Disease Control in one of

5    the 500 items?

6              MR. KRAMER:  Objection to form.

7         A.     The list is not alphabetical, so, yes,

8    they would have to go and find that because I do not

9    give a specific reference.

10         Q.     Do you know whether that -- what's the

11   name of that article?

12         A.     It's Mazurek, I believe, from 2017.

13         Q.     What page is that on your reliance list?

14         A.     I don't have an up-to-date reliance list

15   that I'm looking at, so I don't know what page it's

16   on, but if you look under "M", the letter "M" as in

17   Mary, you can find it, the last name is

18   M-a-z-u-r-e-k.

19         Q.     What's the title of the article?

20         A.     The author should be easier to find than

21   the title.  Malignant mesothelioma mortality - United

22   States, 1999 to 2015, Centers for Disease Control and

23   Prevention:  Morbidity and Mortality Weekly Report,

24   66, volume 8, pages 214 to 218, March 3rd, 2017.

25         Q.     Is there a statement in that article

Page 243

1                    Jacqueline Moline, M.D.

2   about the percentage of peritoneal mesotheliomas that

3   have been linked to asbestos exposure?

4          A.     I don't recall.  That wasn't the purpose

5   of that reference, but I don't recall.

6          Q.     Criteria number three mentions what you

7   call analogous exposure scenarios.

8                 Does that article referenced by the CDC

9   relate to exposure scenarios involving alleged trace

10   contamination of cosmetic talc?

11          A.     The article from the CDC is talking

12   about mesothelioma in individuals and they reference

13   that cosmetic talc may be a cause is my recollection.

14   I don't recall, I don't believe the reference

15   specifically separated it out, the location of the

16   mesothelioma.

17                 We've been going an hour, I would like a

18   stretch break, please.

19          Q.     Sure.

20                 VIDEOGRAPHER:  We'll be going off the

21   record at 11:01 a.m.

22                 (A recess was taken.)

23                 VIDEOGRAPHER:  We're back on the record

24   at 11:11 a.m.  Quick correction to the read in, this

25   is actually volume two of Dr. Moline.

1                    Jacqueline Moline, M.D.

2     kinds of product.

3                    Are you familiar with that document?

4          A.     Are you referring to the exposure

5     testimony summary that was provided to me by

6     Mr. Kramer's firm that we talked about at the onset

7     of today's deposition that I was asked about at ad

8     nauseam in volume one in this deposition; is that

9     what you're referring to?

10         Q.     No, I'm referring to a document where

11    there was some estimates about the number of products

12    that was used and for how long.

13                   Do you remember that document?

14         A.     I don't know what you're referencing.

15    If you show it to me, I can tell you.  I don't know

16    what you're talking about.

17         Q.     If you attempted to -- have you

18    attempted to estimate the number of -- well, have you

19    done an exposure analysis for each of the defendant

20    products in this case?

21         A.     I have done a dose estimate, dose

22    calculation based on the number of applications, yes.

23    I had referenced that it was possibly mathematically

24    to do, so I went ahead and did it.

25         Q.     That's not something that's in your

Page 274

1                    Jacqueline Moline, M.D.

2   report?

3           A.      No, it is not.

4           Q.      When did you do these calculations?

5           A.      I did these calculations when I saw that

6   this deposition was on my calendar.

7           Q.      When was that?  Was it in the last week?

8           A.      Within the last week or so, yes.

9           Q.      When did you provide them to plaintiff's

10  counsel?

11          A.      I didn't.  I did it in case I was asked

12  questions about it.  I have not provided it to him.

13          Q.      So the plaintiff's counsel don't know

14  what your opinions are about the dose estimates, your

15  math on the dose estimates?

16          A.      No, I was asked questions about it and

17  whether I done it, so I went ahead and did it.

18          Q.      Is there a document?  Did you create a

19  document?

20          A.      I have just some scribbled notes.  It

21  was not a formal thing.  I did it just in case I was

22  asked questions.  It's not a typed document.  It's

23  just some scribbled notes that won't make a lot of

24  sense to anyone but me.

25          Q.      Are you familiar with a document that

Page 275

         1                Jacqueline Moline, M.D.

         2    purports to show the low, medium and high estimates

         3    for the number of containers Mr. Gref may have used

         4    of various products?

         5                MR. KRAMER:  Form.

         6         A.     I don't know what document you're

         7    talking about, especially when you're talking about

         8    purports to show, that's confusing me.

         9         Q.     Did you create a document where you

        10    estimated the number of containers that Mr. Gref may

        11    have used for any particular product?

        12         A.     I did not create a document related to

        13    the number of containers.

        14         Q.     Did someone else create a document that

        15    they shared with you relating to the number of

        16    containers that Mr. Gref may have used?

        17         A.     There was a document, it was part of the

        18    exposure testimony summary or the number of bottles,

        19    yes.

        20         Q.     In your report, do you reference a test

        21    that Dr. Longo did on a Clubman container that

        22    Mr. Gref claims to have owned?

        23         A.     If I recall correctly, I'm not a time

        24    traveler, I wrote this report in 2021 and if

        25    Dr. Longo tested the container in 2022, I am not

Page 276

Jacqueline Moline, M.D.

1
2  clairvoyant and did not know what Dr. Longo's report
3  several months later would find.  It is not
4  referenced in my report because it was done after my
5  report was completed.
6       Q.    When is the first time you saw
7  Dr. Longo's report on the test that he did on the
8  Gref container?
9       A.    I don't know exactly.  At some point I
10 have it with me, it was provided to me with
11 additional documents.  It was provided to me, it
12 looks like it was provided to me on August 9th.  I
13 might have seen it before that, but it was provided
14 to me by Mr. Kramer's firm.  I have a cover letter
15 stating, enclosed I find -- here's one folder
16 containing this, which included the Clubman talc,
17 testing by Dr. Longo for the compiled notebook.
18      Q.    Did you read and consider the Longo
19 report on the Gref container that you received in
20 August?
21      A.    I did and now I'm looking for that
22 report.
23      Q.    We can display the Longo report.  So,
24 it's fair to say you didn't express any opinions in
25 your report about Dr. Longo's testing because it was

Page 277

1            Jacqueline Moline, M.D.

2    done after your report, right?

3         A.    Correct.

4         Q.    And you've not done any type of

5    supplemental report to reflect any impact on your

6    opinions that the Longo tests may have had, right?

7         A.    You're speaking like a New Yorker,

8    Mr. Thackston, that was really fast.  Can you repeat

9    that?

10        Q.    Did you do any supplemental report

11   reflecting any impact that Dr. Longo's document may

12   have had on your opinions?

13        A.    I don't believe I did a supplemental

14   report in this case.

15        Q.    Do you know the vintage of the container

16   that Dr. Longo tested?

17             MR. KRAMER:  Objection to form.

18             MR. THACKSTON:  We'll make that

19   Exhibit 22.  Correct me if I've got the numbers

20   wrong.

21             (Whereupon, photograph of MAS Project

22   M71373, Pinaud Clubman container was received and

23   marked Moline Exhibit 22, for identification, as of

24   this date.)

25        Q.    The photograph on the Longo test report

Page 281

1              Jacqueline Moline, M.D.

2         Q.      I've asked you previously if you knew in

3    the context of microscopes what PLM is and you

4    weren't familiar with that term, were you?

5         A.      PLM, I'm not a microscopist, I'm

6    familiar with the term, but I'm not familiar with the

7    methodology behind it.

8         Q.      You do know what it stands for?

9         A.      I didn't realize this was a quiz on

10   acronyms.  The M is for microscope and I believe it's

11   light and it may be phase light microscope, but I'm

12   not exactly sure.  I'm not a microscopist.

13             If you want to go down the acronym

14   route, I can give you all sorts of medical acronyms

15   you'll never figure out.  Every profession has its

16   acronyms.

17             MR. THACKSTON:  Object to

18   responsiveness.

19        Q.      Is your testimony though that you read

20   and relied upon Dr. Longo's report?

21             MR. KRAMER:  Asked and answered.

22        A.      I read Dr. Longo's report and I relied

23   on his findings, yes.

24        Q.      What color is chrysotile under the PLM?

25             MR. KRAMER:  Objection, lacks foundation

1                    Jacqueline Moline, M.D.

2      mesothelioma.

3                    I don't know if in the Welch article

4      that I was speaking about earlier with the

5      college-educated individuals with peritoneal

6      mesothelioma that there was a specification.

7                    Certainly other articles talk about

8      chrysotile.  It's been found in the Chinese cohorts

9      of chrysotile only that peritoneal mesothelioma is

10     there.

11                   MR. THACKSTON:  Object to

12     responsiveness.

13          Q.    What article talks about chrysotile

14     asbestos causing peritoneal mesothelioma at the

15     levels that someone might be exposed to chrysotile if

16     it's a contaminate of cosmetic talc?

17                   MR. KRAMER:  Form, asked and answered.

18          A.    You're parsing down into a specific

19     hypothesis or a specific phrase when I'm not sure

20     there exists one in the medical literature.

21                   MR. KRAMER:  Counsel, we have now

22     exceeded the seven-hour mark by my clock.  It's now

23     12:37.  Do you have a last question you want to ask

24     before I begin my follow-up?

25                   MR. THACKSTON:  I have a lot of

Page 292

1                Jacqueline Moline, M.D.

2    questions I would like to ask.

3              MR. KRAMER:  I'm sure you do, but is

4    there one last one you're going to be asking today?

5              MR. THACKSTON:  No, I'm not going to ask

6    the last question today.  I'm going to ask the Court

7    for more time.  I think any questions you ask,

8    anything that I ask by way of follow-up is not part

9    of the seven hours, and I plan to ask the Court to

10   continue my examination for a lot of reasons.

11             MR. KRAMER:  Dr. Moline --

12             MR. THACKSTON:  We can wait until you

13   get a ruling on that and then do yours or you can do

14   yours now and then I'll cross-examine based on what

15   you do, and then we can find out whether I'm going to

16   get additional time for discovery, or as you see fit.

17             I don't think we're going to agree on

18   the record today about how we're going to resolve the

19   issue about whether we get more time.

20             MR. KRAMER:  I agree with that.  I think

21   the Court will determine, if you chose to seek leave,

22   whether or not you are successful in that.  I'm going

23   to follow up based on the two days of testimony in

24   the record so for however.

25

Page 295

1              Jacqueline Moline, M.D.

2         Q.      The steps that you testified about a

3    couple of moments ago, were you able to utilize those

4    to calculate a conservative dose estimate based on

5    the evidence in this case?

6              MR. THACKSTON:  Objection.

7         A.      Yes.

8         Q.      Can you please provide your results of

9    that dose estimate?

10        A.      I calculated based on Mr. Gref's

11   exposure from 1982 to 2010, I stopped at 2010, that

12   his overall or his cumulative exposure was .22 fiber

13   per cc years.

14        Q.      His cumulative exposure you said was

15   .225 fiber per cc years?

16        A.      It was 0.22 fiber per cc years.

17        Q.      Thank you.  Did you perform any other

18   calculations aside from the cumulative conservative

19   dose estimate?

20        A.      Well, what went into it were the

21   different products that either were used on him or he

22   used over the years.

23        Q.      Are you able to further specify any

24   calculations you performed with regard to those

25   individual products?

Page 296

1                  Jacqueline Moline, M.D.

2          A.      Yes.

3          Q.      Can you please do so.

4          A.      The Clubman was 0.034 fiber per cc

5     years, English Leather was 0.034 fiber per cc years,

6     Mennen was 0.04 fiber per cc years, Old Spice was

7     0.034 fiber per cc years, and Johnson & Johnson and

8     Shower to Shower, which I included together since

9     they use the same talcum powder or they use the same

10    sourcing, was 0.07 fiber per cc years.

11         Q.      Do you have an opinion as to

12    individually whether each of those products

13    substantially contributed to Mr. Gref's mesothelioma?

14         A.      Yes, they all contributed.

15              MR. THACKSTON:  Form.

16         Q.      The numbers that you mentioned, are

17    those supported by numbers evaluating increased risk

18    for disease in the literature that you cited?

19         A.      Yes.

20              MS. LAWLER:  Object to form.

21         Q.      Thanks, Dr. Moline.  I think that's all

22    I have.

23         A.      Okay.

24              MR. KRAMER:  Understanding what

25    Mr. Thackston already stated on the record, I think

Page 297

1                    Jacqueline Moline, M.D.

2      we're done.

3                    VIDEOGRAPHER:  Mr. Thackston, are you

4      going to cross?

5                    MR. THACKSTON:  Yes, my position will be

6      that I'm entitled to cross not subject to any time

7      limitation, which will basically going back through

8      all the studies that she claims to rely on, et

9      cetera.

10                    MR. KRAMER:  Okay.  I look forward to

11      reading that to your motion to lead.

12           A.     Mr. Kozak, you're muted.

13                    MS. KOZAK:  Does this work.

14                    MR. KRAMER:  Yes.

15           A.     It always did, you just had to unmute.

16      Now you're muted again.

17                    MR. KRAMER:  We can't hear you.

18                    MS. KOZAK:  Two devices I have.  I have

19      the telephone and I have the iPad.

20                    Jim, I have just a couple of questions

21      based on the questions you just asked.

22      EXAMINATION BY

23      MR. KOZAK:

24           Q.     Dr. Moline, can you hear me okay?

25           A.     Yes, but how much time is this going to

Page 298

1              Jacqueline Moline, M.D.

2    be, a couple of questions, a couple of legal

3    questions, a couple of lawyer questions?  Are they

4    real questions or are you going to be here for half

5    an hour because I'm not going to do that?

6         Q.    It's just based on the questions that

7    Mr. Kramer just asked.

8              Dr. Moline, Mr. Kramer just asked you a

9    beginning question that was, would you please

10   describe your methodology.  Do you remember that?

11        A.    Yes.

12        Q.    You provided a list of items.  Do you

13   recall that?

14        A.    Yes.

15             MR. KRAMER:  Form.

16        Q.    Is there a name for that methodology?

17        A.    It's my dose calculation methodology.  I

18   haven't coined it or trademarked it or patented it

19   yet.

20        Q.    Can we find that methodology with those

21   steps anywhere in the scientific literature?

22        A.    I have not submitted a paper with such

23   methodology.

24        Q.    Is there anything in the scientific

25   literature that's anywhere close to the steps that

1            Jacqueline Moline, M.D.

2    type of exposure.

3        Q.    Was it with Colgate-Palmolive?  Do you

4    know what the product was that was used in the

5    Gordon/Fitzgerald test?

6        A.    Yes, it was a Colgate-Palmolive product.

7        Q.    Do you know of any study that has

8    concluded that someone that experienced an exposure

9    level of 0.034 fibers per cc of chrysotile contracted

10   peritoneal mesothelioma?

11            MR. KRAMER:  Objection to form.

12       A.    If we look at both Rodelsperger and

13   Jiang where they have levels that range from zero to

14   .15 and Rodelsperger, which was a mixed exposure and

15   Jiang, which was chrysotile only, which was zero

16   to .5 fiber per cc years, they have an increased risk

17   and included both pleural and peritoneal.

18       Q.    Your testimony is that if I were to look

19   at those two studies that I would find a level

20   commensurate with 0.034 fiber per cc years of

21   chrysotile only has been linked to peritoneal

22   mesothelioma?

23       A.    My recollection of the Jiang paper,

24   which is chrysotile only, they had an increased risk

25   of mesothelioma, and my understanding is that it

Page 308

1                        Jacqueline Moline, M.D.

2      included both pleural and peritoneal.  I don't have a

3      recollection of the breakdown between the risk for

4      pleural or peritoneal and don't know if they did that

5      in that particular paper.

6           Q.     Is that paper referenced in your report?

7           A.     I don't know if that specific paper is,

8      but it's on my reference list, which was attached to

9      the report.

10          Q.     There were 500 -- didn't you say there

11     were over 500 articles on your reliance list?

12          A.     Well, I'm giving you the name of the

13     author so you can look at it, it's Jiang, J-i-a-n-g.

14          Q.     Do you know the title?

15          A.     I believe it's Hand-spinning chrysotile

16     exposure and risk of malignant mesothelioma:  A

17     case-control study in Southeastern China.

18          Q.     That's a case involving people that

19     worked in a chrysotile manufacturing facility?

20                 MR. KRAMER:  Objection, article speaks

21     for itself.

22          A.     It's from individuals with chrysotile

23     exposure who were working in a factory or a facility

24     that used chrysotile and textiles.

25          Q.     You're talking about somebody using

Page 309

1              Jacqueline Moline, M.D.

2      chrysotile as a raw material to manufacture products,

3      not somebody who's alleging that it was a trace

4      contaminate of cosmetic talc, right?

5                  MR. KRAMER:  Objection to form.

6          A.    I'm speaking about -- I'm using the

7      article because it's chrysotile.  The exposure

8      scenario doesn't matter, but one was using cosmetic

9      talc and one was exposed in the workplace.

10         Q.    You certainly haven't made any

11     comparison between the kind of chrysotile they were

12     using in China to Clubman versus the kind of trace

13     contamination of Montana talc that Longo claims to

14     find, have you?

15                 MR. KRAMER:  Objection to form.

16         A.    I don't know what you're asking me.  Are

17     you asking me have I compared the fibers themselves

18     to see if they're both chrysotile?

19         Q.    Have you compared what product was used

20     in the Jiang Chinese manufacturing facility versus

21     what Dr. Longo says he found in the Clubman

22     container?

23                 MR. KRAMER:  Assumes facts.

24         A.    If you're asking if I compared

25     microscopic appearance of chrysotile, I have not.

```
 1                    Jacqueline Moline, M.D.

 2       That's not my area of expertise.  I'm just relaying

 3       that it was both chrysotile.

 4            Q.    I'm asking you if you considered

 5       whether, to use your term from your report, that

 6       agent at issue in this case is the same as the agent

 7       at issue in the report that you cited, and you made

 8       no comparison between whatever kind of chrysotile

 9       they were using in China with whatever kind of

10       chrysotile Dr. Longo says he found in Clubman, right?

11                 MR. KRAMER:  Assumes facts, asked and

12       answered.

13            A.    I don't understand.

14                 MR. KRAMER:  Misstates,

15       mischaracterizes.

16            A.    I'm sorry, Mr. Kramer.  I don't

17       understand what difference you're trying to impune.

18       I'm saying that they're both chrysotile exposures and

19       that's the agent that's at issue.  Whether there's

20       other findings in the ore of amphiboles as well in

21       the Montana ore or not that may also have been found,

22       but with respect to Dr. Longo's report, the agent is

23       chrysotile.

24                 MR. THACKSTON:  I'm going to attach as I

25       think it's number 23 the Jiang article.  It's called
```

Page 311

1           Jacqueline Moline, M.D.

2   2018 Hand-spinning chrysotile exposure and the risk

3   of MM:  A case-control study.

4               (Whereupon, 2018 article by Jiang was

5   received and marked Exhibit 23, for identification,

6   as of this date.)

7        Q.    It's your understanding that they make

8   the statement that there's debate about whether

9   chrysotile is even associated with the causation of

10  mesothelioma?

11              MR. KRAMER:  Objection, the article

12  speaks for itself.

13       A.    I don't have the article in front of me,

14  and I think that the literature is -- among

15  scientific bodies there's not a dispute with respect

16  to chrysotile, among some authors there might be, but

17  among all governmental agencies and the consensus in

18  the larger scientific community, there is no dispute

19  about whether chrysotile causes mesothelioma.

20              Are we done?

21              MR. KRAMER:  The time is 1:04.  We're

22  going to be done.

23              MR. THACKSTON:  I certainly have more

24  questions, but if you're going to terminate the

25  deposition, I can't question myself.

Page 312

1                    Jacqueline Moline, M.D.

2                    MS. LAWLER:  This is Katherine Lawler

3     for Mennen.  I will reserve my right to ask follow-up

4     questions to Mr. Kramer's direct at the appropriate

5     time.

6                    MR. RUTKOWSKI:  This is David Rutkowski

7     for Shulton.  I reserve our rights as well.  Thank

8     you.

9                    MR. MCCAFFREY:  Also, Kevin McCaffrey.

10    I'll join reserving rights, thanks.

11                   MR. KOZAK:  Chris Kozak.  I join in

12    reserving rights.  We also didn't have an opportunity

13    to follow up after Mr. Thackston, we only followed up

14    after Mr. Kramer, so there's that as well.

15                   VIDEOGRAPHER:  Anything further?

16                   MR. KRAMER:  No, that's it.  This

17    concludes today's testimony given by Dr. Jacqueline

18    Moline.  The total number of media units used was

19    three and will be retained by Veritext.

20                   We are going off the record at 1:05 p.m.

21    Eastern Daylight Time.

22                   (Time Noted:  1:05 p.m.)

23

24

25

Page 313

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

                          )    ss:

5    COUNTY OF NEW YORK   )

6

7              I, BRENDA FITZGERALD, a Shorthand

8    Reporter and Notary Public within and for the State

9    of New York, do hereby certify:

10             That, Jacqueline Moline, M.D., the

11   expert witness whose DEPOSITION was held on September

12   23rd, 2022, as hereinbefore set forth, was duly sworn

13   by me, and that this transcript of such Examination

14   is a true and accurate record of the testimony given

15   by such witness.

16             I further certify that I am not related

17   to any of the parties to this action by blood or by

18   marriage, and that I am in no way interested in the

19   outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21   my hand this 5th day of October 2022.

22

23                    *Brenda Fitzgerald*

                      _____

24

                      BRENDA FITZGERALD

25