# EXHIBIT L

```
                                                                1

          CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

                        STATE OF LOUISIANA

     NO. 2021-09379                            DIVISION "N"

                   JOHN WAYNE DAIGLE, ET AL

                             VERSUS

                 ANCO INSULATIONS, INC., et al.




                  REMOTE VIDEOTAPED DEPOSITION OF

                     JACQUELINE MOLINE, M.D.,

     called by the Defendants for examination, taken by

     and before Ann Medis, RPR, CLR, CSR-WA, and Notary

     Public in and for the Commonwealth of

     Pennsylvania, via Zoom Videoconference, on Friday,

     September 30, 2022, commencing at 10:05 a.m.
```

Page 2

```
        A P P E A R A N C E S
  (Participants appeared via Zoom videoconference)
For the Plaintiff
     MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
     BY:  SUZANNE RATCLIFFE, ESQUIRE
     2 Club Centre Court, Suite 4
     Edwardsville, Illinois  62025
     800.358.5922
     sratcliffe@mrhfmlaw.com

For the Defendant American International Industries
     LATHROP GPM
     BY:  ROBERT E. THACKSTON, ESQUIRE
        TAYLOR HAMILTON, TECHNICAL
        LITIGATION ANALYST
     2101 Cedar Springs Road, Suite 1400
     Dallas, Texas  75201
     469.983.6100
     robert.thackston@lathropgpm.com
     taylor.hamilton@lathropgpm.com
```

Page 3

```
        A P P E A R A N C E S (Continued)
     GORDON REES SCULLY MANSUKHANI, LLP
     BY:  KAY BARNES BAXTER, ESQUIRE
     201 St. Charles Avenue, Suite 2500
     New Orleans, Louisiana  70170
     504.470.8482
     kbaxter@grsm.com

For the Defendant Exxon Mobil Corporation
     BIENVENU BONNECAZE FOCO & VIATOR, LLC
     BY:  DAVID M. BIENVENU, JR., ESQUIRE
        JOHN A. VIATOR, ESQUIRE
     4210 Bluebonnet Boulevard
     Baton Route, Louisian  70809
     225.388.5600
     david.bienvenu@bblawla.com
     john.viator@bblawla.com
```

Page 4

```
        A P P E A R A N C E S (Continued)
For the Defendant Exxon Mobil Corporation (Continued)
     CHEHARDY SHERMAN WILLIAMS MURRAY RECILE
     STAKELUM & HAYES, L.L.P.
     BY:  PATRICK A. FOLLETTE, ESQUIRE
     One Galleria Boulevard, Suite 1100
     Metairie, Louisiana  70001
     504.833.5600
     patrick@thetrialteam.com

For the Defendant Foster Wheeler LLC
     FRILOT LLC
     BY:  MAGALI A. PUENTE, ESQUIRE
     3800 Energy Centre Building
     1100 Poydras Street, Suite 3600
     New Orleans, Louisiana  70163
     504.599.8000
     mpuente@frilot.com
```

Page 5

```
        A P P E A R A N C E S (Continued)
For the Defendants Whittaker, Clark & Daniels
     MARON MARVEL BRADLEY & ANDERSON LLC
     BY:  RICHARD M. CRUMP, ESQUIRE
     1020 Highland Colony Parkway, Suite 400
     Ridgeland, Mississippi  39157
     601.812.6630
     rcrump@maronmarvel.com

Also present
Nancy Holmstock, videographer
```

126

all. You can have an odds ratio that -- the whole risk of breast cancer and exogenous estrogen use is based on an odds ratio of 1.14 that is highly statistically significant.

There are so many factors that go into it. So that's not an appropriate phrase that's generally accepted in the medical community.
BY MR. THACKSTON:
    Q. Perhaps you didn't understand my question. Do they state in this article that an odds ratio of less than 2 in this study was not statistically significant?
    A. I don't recall.
    Q. We'll take a look at that. But let's look at the chart for now. So for the odds ratio, there's an odds ratio of mechanical, fitter and plumber that had 62 cases and the odds ratio is 2.82. Do you see that?
    A. Yes.
    Q. There is an occupation titled tile setter, plasterer. That must be a French word. It looks like paviour, P-A-V-I-O-U-R.
    A. It's German. Why would he put French in a German paper. But anyway, can you pull this up?
    Q. Je ne sais quoi.

127

    A. If you want to talk in French, I'm happy to speak in French for the rest of the deposition. That would be far more entertaining.
    Q. I pretty much exhausted all my French, but thank you.
    A. Like I said.
    Q. The occupation that begins with tile setter has an odds ratio of 3.67; right?
    A. Yes.
    Q. Now, these are established occupational classifications; right?
    A. These are based on job codes, German job codes.
    Q. Job code, and it's used for various purposes by the labor department and others; right?
    A. I'm not familiar with German labor law and how they use them. But they're job codes, and there's categories and there's a range.
    Q. The highlighted occupational title is the last one on the chart. It says, quote, housekeeper, cleaner, hairdresser, bartender; right?
    A. Yes.
    Q. And that had five cases with an odds

128

ratio of 0.71; right?
    A. Yes.
    Q. And we don't know -- of the four jobs listed there, we don't know which ones -- what the specific jobs were of the ones that had mesothelioma within that category, do we?
    A. No, we don't. That's one of the problems with grouping job categories.
    Q. And going back to your statement in your report on page 20 that Rödelsperger noted that hairdressers and barbers were asbestos exposed industries due to the use of asbestos-containing talcum powder, is that the reference in the Rödelsperger paper that you were referring to, that job category?
    A. You know, it's such a specific description in my report that I'm trying to recall which Rödelsperger paper it comes from, because I'm aware of this table. Obviously, I've seen this paper before, and I'm aware of this grouping and what the odds ratio was. But my recollection is that he has made that statement somewhere, or I would not have described it with that level of specificity.

And, unfortunately, it's not in this

129

paper and I do not -- I'm not even in my office. I don't have all my Rödelsperger papers to be able to tell you the reference. If I'm able to find it, I'm happy to send it.
    Q. Well, is there a reason why you didn't list the Rödelsperger paper that makes this statement in your report?
    A. No. There's no specific reason. I don't reference every single thing that every other author has said. There wasn't a specific reference. It's too specific for me not to have seen that line in a paper.
    Q. But you would agree that we couldn't reach the conclusion that you put in your report based on the statements made in this article?
    A. In this paper, that's correct.
    Q. You also in your report talk about your recent paper. This is on page 19. Your report says, quote, I have recently published a paper along with co-authors that describes 33 cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc (Moline, et al. 2019). Right?
    A. Yes.
    Q. And when asked to identify those 33

130

cases -- well, first of all, those 33 cases were litigation cases in which you were hired as an expert; right?
   MS. RATCLIFFE: Objection.
   THE WITNESS: Sure.
BY MR. THACKSTON:
   Q. That's correct?
   A. Yes.
   Q. And when asked in deposition to identify those 33 or any of those 33, you refused to identify them based on claims of confidentiality; right?
   A. Among other things, yes.
   Q. And you were specifically asked whether you were an expert in the Betty Bell case pending in North Carolina, weren't you?
   A. I'm not commenting.
   Q. Are you refusing to answer whether you were an expert in the Bell case?
   A. You're asking me about a case by another law firm. I'm not commenting on other cases in the same fashion that I was not commenting on other cases last week.
   Q. And your paper gave some detail about some of the cases. And you were asked

131

specifically whether Betty Bell was one of the 33 cases; were you not?
   MS. RATCLIFFE: Objection. She's already indicated she's not talking about this.
BY MR. THACKSTON:
   Q. Are you going to refuse to answer?
   A. I'm not discussing the names of the individuals who are in the paper.
   Q. And have you read the opinion from Judge Osteen in the Bell case about whether you're entitled to keep confidential the information from the Betty Bell case that relates to her exposures to asbestos?
   A. I have not.
   MS. RATCLIFFE: The deposition is not about her.
   MR. THACKSTON: It's about this article right here. It's about this article and I'm asking her whether she's aware of Judge Osteen's opinion that specifically rules on whether you're entitled to keep confidential the fact that Betty Bell was one of the 33 cases.
   MS. RATCLIFFE: Objection. She's not answering. She's already told you.

132

BY MR. THACKSTON:
   Q. I'll mark as No. 15 -- do you put in your report as one of your qualifications that you've been qualified to testify in various courts?
   A. I don't think I wrote -- put it in this report.
   Q. We'll mark as No. 15 the order from United States District Court, Middle District of North Carolina, Bell versus American International Industries, Memorandum Order and Opinion designed by Judge William L. Osteen on 9/13/2022, modified on 9/29/22. This is a 40-page memorandum opinion and order. And it says, "Before this court is Northwell Health's Inc.'s ('Northwell') Motion Reconsidering his Motion to Intervene and Extend Protective order. Also before the court is a motion to vacate the Preliminary Protective Order of September 25, 2020 filed by defendant American International Industries," et cetera.
       If I represent to you that this is the judge's ruling, although you're entitled not to disclose those specific 33 cases or one of those cases, your testimony under oath here today is that you've never seen it?

133

   A. I have not seen the specific order or the report. And I don't know if it's the final decision that was done by the court. But I have not read this.
   Q. And your article says that you had 33 cases of no known exposure to asbestos other than contaminated cosmetic talc; right?
   A. To the best of our knowledge, yes.
   Q. And it was brought to your attention that in the Betty Bell case, she had filed not one, but two workers' compensation claims for occupational exposure to asbestos having nothing to do with cosmetic talc; right?
   A. That were dismissed by the court as having no evidence, yes, I was aware of that.
   Q. And so you're giving kind of a legal opinion now about the mechanism by which it was dismissed. Do you know whether Judge Osteen specifically addressed that argument?
   A. I was speaking about the other within the worker's comp claims that she made. My understanding is that they were dismissed for lack of information or lack of evidence. I don't know what Osteen said. I haven't read the report. And I'm not going to answer questions related to this

134

1  without counsel present from Northwell Health. So
2  I will not be answering any questions that have to
3  do with this order without counsel present.
4      Q.  Let me turn the page.
5      A.  I'm not answering questions related to
6  this document without my counsel present.
7      Q.  Where did you get the understanding that
8  the Bell workers' comp claim was dismissed or how
9  it was dismissed?
10     A.  I believe I was provided with documents
11 years ago with respect to that particular case
12 and...
13         I mean, I'm not going to discuss another
14 case without their counsel present and my counsel
15 present.
16     Q.  Let's look at page 19. You're saying
17 here today that the Bell workers' compensation
18 claim was found to be without evidence; right?
19     A.  I'm not discussing this case any further
20 without Mrs. Bell's counsel present and without
21 Northwell Health's counsel present.
22     Q.  But you already had discussed it. You
23 made the statement --
24     A.  I'm not making any further comments.
25     Q.  I'm going to read --

135

1      MS. RATCLIFFE: She can't comment on
2  anything about this case in this case. This case
3  is about Mr. Daigle. If you have questions about
4  Mr. Daigle, then be my guest and ask them. But
5  asking her about an order, one, she's never seen
6  before, two, without her counsel from Northwell
7  Health nor counsel for the actual plaintiff is
8  inappropriate.
9  BY MR. THACKSTON:
10     Q.  Well, the report --
11     A.  I'm going to -- I'm going to stop the
12 deposition if you continue this. I do not have
13 counsel present. I will not be answering
14 questions specific to this document.
15     Q.  I'm not going to ask you a question
16 about it. I'm just going to read it to you. Page
17 19 of Judge Osteen's order --
18     A.  I'm going to suspend this. I'm not
19 going to participate in something where I do not
20 have counsel present, where you are reading
21 something of an opinion related to my employer
22 present without my counsel present.
23     Q.  You don't want to know what Judge Osteen
24 said about the ability to talk about the Bell
25 case?

136

1      A.  I am not having a conversation with you
2  without counsel present.
3      Q.  You have counsel present.
4      A.  She is not my counsel.
5      MS. RATCLIFFE: I'm not counsel for
6  Mr. Bell. I represent Mr. Daigle. Again, if you
7  have questions that are relevant to Mr. Daigle and
8  Mr. Daigle's case, be my guest and ask them. But
9  you are not asking any more questions about this
10 document which she's never seen before. It's
11 inappropriate. I don't represent the Bells.
12     MR. THACKSTON: We just put on the
13 record that her report in the Daigle case
14 references and relies upon her own study. This
15 order relates to that study and her position that
16 she can't answer questions about the individual
17 cases.
18     MS. RATCLIFFE: This order relates to
19 that case, not this case, that case.
20     MR. BIENVENU: It relates to her study,
21 not that case, but it relates to her study which
22 she's relying upon in this case.
23     MS. RATCLIFFE: She's not answering any
24 more questions about it. I don't know what part
25 of that isn't clear.

137

1      MR. THACKSTON: Well, then I would
2  suspend the deposition and get a court ruling on
3  that because I am asking questions about it.
4      MS. RATCLIFFE: Not today you're not.
5  She hasn't had an opportunity to read this
6  document. It's inappropriate.
7      MR. THACKSTON: I'm going to read into
8  the record the question I would ask by way of a
9  bill.
10         Page 19 of Judge Osteen's order, which
11 we're attaching as Exhibit No. 15, says, quote
12 Dr. Moline offered no basis for her statement that
13 an errata was unnecessary because the allegation
14 of alternative exposure was, quote, shown to be
15 without evidence, end of quote. Indeed, she did
16 not have to because the protective order
17 effectively shielded the assertion from
18 cross-examination. If the order was not in place,
19 then defense counsel in that case and defense
20 counsel in similar cosmetic talc cases would be
21 able to establish that Mrs. Bell was one of the
22 individuals the article studied and then challenge
23 Dr. Moline with Ms. Bell and plaintiff's workers'
24 compensation claims asserting under criminal
25 penalty for false statements that Mrs. Bell was

138

1 exposed to asbestos at textile jobsites.  Defense
2 counsel could show that those workers'
3 compensation claims were not adjudicated on the
4 merits.  Rather, they were dismissed without
5 prejudice weakening the credibility of the
6 Dr. Moline's statements that the allegation of
7 alternative exposure was, quote, shown to be
8 without evidence, end of quote.
9      MS. RATCLIFFE:  I move to strike every
10 single word that was uttered out of your mouth.  I
11 don't represent Northwell.  I don't represent the
12 Bells.  And this is highly inappropriate.  She has
13 told you multiple times that she's not speaking to
14 this, and she's not going to.  So please move on.
15 BY MR. THACKSTON:
16      Q.  Dr. Moline, is there any new information
17 that if presented to you would cause you to
18 reconsider the conclusions that you stated in your
19 article?
20      A.  The conclusions in my article are that
21 exposure to cosmetic talc is associated with
22 mesothelioma, and those conclusions remain.  The
23 conclusions were that a full history should be
24 taken with an understanding that exposures in
25 various settings can lead to mesothelioma.  Those

139

1 are the conclusions.  And those conclusions stand.
2      Q.  I'm not being facetious, but fair to say
3 that you're not -- among your many qualifications
4 does not include a law degree; right?
5      A.  One of my many qualifications, I'm what?
6      MS. RATCLIFFE:  No, she's not a lawyer.
7 Thank you for making that clear.
8      THE WITNESS:  I wasn't making a legal
9 statement.  I was saying you asked if my opinions
10 stay the same, and I was using a colloquial
11 phrase.  They still are my opinions.
12 BY MR. THACKSTON:
13      Q.  I'm going to back to your statement that
14 the Bell workers' compensation case was dismissed
15 and I'm asking you about what your training --
16      A.  I told you I'm not discussing this case
17 without counsel present and I am not -- or Bell's
18 counsel present.  So I'm not discussing it.
19      Q.  Let's go back to your report.  Your
20 report in the Daigle case at page 19 states,
21 quote, I have recently published a paper along
22 with co-authors that describes 33 cases of
23 mesothelioma among individuals whose only known
24 exposure to asbestos was through their use of
25 cosmetic talc, end of quote.  Correct?

140

1      A.  That's what I wrote.
2      Q.  And I would like to ask you about those
3 cases because there were allegations in those
4 cases of exposure to asbestos other than from
5 cosmetic talc, weren't there?
6      MS. RATCLIFFE:  Objection.  This is just
7 borderline harassment at this point.
8      THE WITNESS:  I don't hear a question
9 pending.  You told me what you'd like to do, but
10 that's not a question.
11 BY MR. THACKSTON:
12      Q.  In those 33 cases, there were
13 allegations of exposure to asbestos other than
14 from cosmetic talc, weren't there?
15      A.  I'm not discussing the cases in the
16 paper.  I'm not discussing the specifics or the
17 names of the individuals in the paper.
18      Q.  That statement was something that you
19 chose to put in your report in this case; right?
20      MS. RATCLIFFE:  Obviously.  It's in the
21 report.
22      THE WITNESS:  I don't know what
23 statement you're talking about.
24 BY MR. THACKSTON:
25      Q.  The one I just read to you, the one that

141

1 we have displayed.
2      MS. RATCLIFFE:  It's in the report.
3 It's in black and white.  What's the point?  Where
4 are we going with this?
5      MR. THACKSTON:  I'm not a Louisiana
6 lawyer, but I suspect that's not an appropriate
7 objection under Louisiana law.
8      MS. RATCLIFFE:  Form.  How about that?
9 BY MR. THACKSTON:
10      Q.  Dr. Moline, you wrote the report.
11 Nobody else wrote it; right?
12      MS. RATCLIFFE:  Asked and answered.
13      THE WITNESS:  Yes.
14 BY MR. THACKSTON:
15      Q.  And you chose to cite your own study;
16 right?
17      A.  Yes.
18      Q.  And you anticipate -- you've been an
19 expert witness in hundreds of cases over the
20 years; right?
21      MS. RATCLIFFE:  Objection.
22      THE WITNESS:  Yes.
23 BY MR. THACKSTON:
24      Q.  You anticipate being cross-examined
25 about the statements that you make in your report;

142

1  correct?
2      A.  **I never anticipate cross-examination.**
3  **I'm a doctor.  But I'm too smart to know to**
4  **anticipate anything that the lawyers might ask me.**
5      Q.  You've given hundreds of depositions;
6  correct?
7          MS. RATCLIFFE:  Objection.
8          THE WITNESS:  I don't know how many
9  depositions I've given.  I know you've deposed me
10 many times and asked me the same questions many
11 times.
12 BY MR. THACKSTON:
13     Q.  I've never asked you about Judge
14 Osteen's order before, have I?
15         MS. RATCLIFFE:  Objection.
16 Argumentative.  This is harassment.  We're not
17 talking about it.  She's not testifying about it.
18         MR. THACKSTON:  Well, I would ask to
19 take a break and confer with other counsel because
20 my position would be that there's no basis to
21 instruct the witness not to answer questions about
22 an order specifically --
23         MS. RATCLIFFE:  Absolutely not.  There's
24 absolutely -- it's a HIPAA violation, one, for her
25 to discuss any of her patients without their

143

1  consent.  Two, she's already testified it's
2  inappropriate because I don't represent her
3  employer Northwell and I don't represent the
4  Bells.  So whatever this order is that obviously
5  no one has seen, it's inappropriate.  So stop
6  asking questions about it.
7          MR. THACKSTON:  I think the rules in all
8  jurisdictions prevent counsel from interrupting
9  other counsel when they're trying to make a
10 record.  I allowed you to make your record.
11         My record is that Dr. Moline was not
12 Mrs. Bell's physician.  This 40-page opinion
13 specifically relates to the claim that she's
14 entitled to not discuss the Bell case.  Based on
15 every conceivable argument that was made by her,
16 her counsel, Northwell counsel, that's all been
17 adjudicated, and the results are in this order.
18         She's trying to use the paper
19 affirmatively -- that's exactly what this order
20 talks about -- and cut off all cross-examination
21 based on the claim of confidentiality.  I would
22 like for Dr. Moline to take the opportunity to
23 read the order and read what the court said about
24 these claims about the workers' compensation claim
25 being adjudicated to be without merit.

144

1  I think I'm entitled to ask her about
2  what courts have said specifically about this
3  article that she's relied upon.  If you're going
4  to instruct her not to answer the question, I will
5  adjourn the deposition and get a ruling on that.
6  If other counsel disagree, maybe we can caucus on
7  a separate phone call.
8          But I'm not going to allow counsel to
9  make up these rules and the witness refuse to
10 answer questions without getting a ruling on it
11 while we're still in the course of the deposition.
12         If Whittaker Clark & Daniel wants to ask
13 questions, then I'll pass the witness subject to
14 my statements.  But I'm not going to ask further
15 questions until I get a court ruling on this
16 issue.
17         MS. RATCLIFFE:  Be my guest.  I don't
18 understand how a North Carolina ruling has any
19 effect on this case here.  That case, yes, but not
20 this one.  I don't understand how you even think
21 she can speak to any of this when the Bells are
22 represented by other counsel.  It's just
23 inappropriate.
24         MR. THACKSTON:  It doesn't make any
25 difference who the Bells are represented by.  This

145

1  is a court ruling on the very position that
2  Dr. Moline has taken right now.
3          MS. RATCLIFFE:  In North Carolina.
4          MR. THACKSTON:  Federal court in North
5  Carolina.  And I'm entitled to ask the witness
6  whether she has read the order or whether she
7  cares what a court has said about her affirmative
8  statement that this claim was adjudicated to be
9  without merit.  That's a legal conclusion that the
10 witness making, and I'm asking her to read an
11 opinion specifically relating to that legal
12 conclusion.
13         MS. RATCLIFFE:  You asked her if she's
14 read it, and she hasn't.  So we've established
15 that.
16         MR. THACKSTON:  Well, I read it to her.
17         MS. RATCLIFFE:  Okay.  You read a
18 portion of something to her.  She hasn't had an
19 opportunity to read it.  Her counsel isn't present
20 for it.  This relates to a completely different
21 matter.
22         MR. THACKSTON:  It relates --
23         MS. RATCLIFFE:  I understand your
24 position, but I'm not changing mine.  I haven't
25 instructed her not to answer.  She said she's not

Page 146

1  answering.
2      MR. THACKSTON: I think we have some of
3  both. We have attached it to the deposition.
4  We'll provide it obviously to the witness along
5  with the draft of the transcript. I'll be happy
6  to send it to counsel right now. If you'd like to
7  take a break and have her read it, I'll be happy
8  to.
9      THE WITNESS: I am not going a speed
10 read a 40-page legal document without counsel for
11 Northwell present who can advise me. So I will
12 not be continuing if you're going to be asking me
13 any questions related to a court decision that was
14 related -- that was a Northwell Health decision --
15 I mean, that was -- they are a party to.
16 BY MR. THACKSTON:
17     Q. When you were first asked questions
18 about the article, did you state on the record
19 that it was your position that it was up to
20 Northwell whether they wanted to provide the
21 information about the people that were included in
22 the study?
23     A. I don't remember what I've said in the
24 past. My position is that these names should not
25 be disclosed. It's standard among the research

Page 147

1  community. I have obtained either the consent to
2  do a study with a waiver, with nondisclosure of
3  the specific individuals in the case. So I'm not
4  going to be discussing any specifics related to
5  that aspect without counsel present.
6      Q. If the court has heard extensive
7  argument and briefing on this issue and made a
8  ruling about the claim that you and Northwell are
9  making about confidentiality, are you interested
10 in the court's ruling with respect to the
11 argument?
12     MS. RATCLIFFE: Objection. Objection.
13 This has already been beaten to a pulp. If you
14 don't have any other questions for the witness, I
15 suggest you pass her and move on. If this is the
16 end of your questioning and you have no further
17 questions, we're going to move on. Get whatever
18 ruling you want. Do whatever you want. But right
19 now, this is it. There will not be another
20 question asked about this issue.
21     MR. THACKSTON: I object to the improper
22 coaching. I'd like an answer to that question.
23     MS. RATCLIFFE: I'm not coaching
24 anything. She has repeatedly, repeatedly told you
25 that she is not going to testify about it. This

Page 148

1  is harassment. It absolutely is. So if we want
2  to get rulings, let's start there as well.
3      MR. THACKSTON: The only one screaming
4  on the record is you. I'm very calmly asking the
5  witness whether she's interested --
6      MS. RATCLIFFE: You've asked the same
7  question at least ten times.
8      MR. THACKSTON: Counsel, please allow me
9  the courtesy of finishing my statement. I'm
10 asking the witness if she's interested in the
11 court's ruling on these arguments that she's
12 making about the identification of these 33 cases
13 as being confidential.
14     THE WITNESS: I'm not commenting on
15 anything related to this ruling without counsel
16 for Northwell Health being present.
17 BY MR. THACKSTON:
18     Q. Did you read the briefing that counsel
19 for Northwell Health made in the Bell case?
20     A. I am not discussing anything related to
21 this case that has to do with anything legal or
22 any documents without counsel present.
23     Q. Well, I'll note that we will not finish
24 the deposition subject to further questions about
25 that order.

Page 149

1      If we go back to Mr. Daigle's work
2  involving cosmetic talc, did you look specifically
3  at his testimony about what he did with talc?
4      A. Yes.
5      Q. And did you consider what he said about
6  the amount of time that it would take him to use
7  talc on a customer?
8      A. I'm sorry. I didn't hear what you said.
9      Q. Did you consider what he said about the
10 amount of time it would take him to apply talc to
11 a customer?
12     A. I do not have the specific amount of
13 time that he described that it took him written in
14 my report. I don't know if he was asked that
15 specific question, if he answered it or if he gave
16 a range. I don't recall the exact time.
17     Q. In your report, you say that the
18 methodology that you're applying considers whether
19 the individual was exposed to a substance at a
20 level where disease has occurred in other
21 settings; right?
22     A. Yes.
23     Q. What level -- first of all, what level
24 of talc exposure, that is talc inhalation, is it
25 your opinion that Mr. Daigle experienced when he

170

1  Correlation to 1445 Cases." It is by Roggli and
2  others.
3       Are you familiar with that paper?
4     A. Not verbatim, but I have seen it, yes.
5     Q. Do you recall there's a table in that
6  paper that lists mesothelioma cases by occupation?
7     A. I have a vague recollection. It
8  wouldn't surprise me. I think this paper was
9  published about 25 years ago, or it seems like it
10 was 25 years ago.
11    Q. Have I shared my screen with you? Are
12 you seeing a page of that report or that paper?
13    A. Now (indecipherable) technology because
14 it's illegible.
15       MS. RATCLIFFE: Can you make it bigger?
16 BY MR. CRUMP:
17    Q. Is that any better?
18    A. Much better.
19    Q. And this is page 56 of that article.
20 Table 2, Mesothelioma Cases by Occupation, do you
21 see pipefitter is the number one occupation for
22 the mesothelioma cases in the group of workers
23 that were studied by Dr. Roggli and others?
24    A. In this table, yes.
25    Q. And that would be consistent with your

171

1  general understanding regarding incidence of
2  mesothelioma among various occupations.
3  Pipefitters were very high up there in terms of
4  the incidence of mesothelioma?
5       MR. VIATOR: Objection. Form.
6       THE WITNESS: They're not the highest,
7  but they're certainly high.
8  BY MR. CRUMP:
9     Q. And, in fact, you and Dr. Lavie wrote a
10 book chapter in Occupational, Industrial and
11 Environmental Toxicology that related specifically
12 to plumbers and pipefitters?
13    A. Correct.
14    Q. And you noted in that book chapter the
15 significant exposure to asbestos that they had as
16 a group, pipefitters had as a group?
17    A. Yes.
18    Q. Dr. Moline, subject to Mr. Thackston's
19 same reservations regarding not just the one
20 individual, but I believe I would ask you about
21 patient 3, patient 4 and patient 17 of your group,
22 and you've indicated you would not answer
23 questions regarding those individuals. And so
24 subject to a reservation to talk to you about
25 those at some point if the court rules that we're

172

1  able to, those are all the questions that I have.
2       THE VIDEOGRAPHER: Are there any other
3  questions? If there's no other questions, stand
4  by. It is September 30, 2022. The time is now
5  3:47 p.m. completing today's deposition session.
6  Off the record.
7       (Whereupon, at 3:47 p.m., the taking of
8  the instant deposition ceased.)

173

1  COMMONWEALTH OF PENNSYLVANIA )
2  COUNTY OF ALLEGHENY          ) SS:
3        C E R T I F I C A T E
4     I, Ann Medis, RPR, CLR, CSR-WA and
5  Notary Public within and for the Commonwealth of
6  Pennsylvania, do hereby certify:
7     That JACQUELINE MOLINE, M.D., the
8  witness whose deposition is hereinbefore set
9  forth, was duly sworn by me via Zoom
10 videoconferencing, and that such deposition is a
11 true record of the testimony given by such
12 witness.
13    I further certify the inspection,
14 reading and signing of said deposition were not
15 waived by counsel for the respective parties and
16 by the witness.
17    I further certify that I am not related
18 to any of the parties to this action by blood or
19 marriage and that I am in no way interested in the
20 outcome of this matter.
21    IN WITNESS WHEREOF, I have hereunto set
22 my hand this 12th day of October, 2022.
23    _____
              Notary Public
24
25