# EXHIBIT N

```
 1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
            FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                    CIVIL TRIAL DIVISION

 3                           - - -

 4    HOLLY FISHER, EXECUTRIX OF THE:    JULY TERM, 2019
      ESTATE OF SANDRA REICHART,    :
 5                                  :
                Plaintiff,          :
 6                                  :
            vs.                     :
 7                                  :
      AMERICAN INTERNATIONAL        :
 8    INDUSTRIES, individually and  :
      as successor-in-interest for  :
 9    the CLUBMAN BRAND, and to THE :
      NESLEMUR COMPANY and PINAUD   :
10    COMPANY, et al.,              :
                                    :
11              Defendants.         :    NO.:   0877

12                           - - -

13              Thursday, October 13, 2022
                 Courtroom 675, City Hall
14              Philadelphia, Pennsylvania

15                           - - -

16    BEFORE:   THE HONORABLE SIERRA THOMAS STREET, J.

17                           - - -

18                        JURY TRIAL
                        P.M. SESSION
19
                             - - -
20
      REPORTED BY:  Kimberly Wilson, RMR, CRR
21
                             - - -
22          KIMBERLY A. WILSON, RMR, CRR
                OFFICIAL COURT REPORTER
23       100 SOUTH BROAD STREET, 2ND FLOOR
                PHILADELPHIA, PA  19110
24         kimberly.wilson@courts.phila.gov
                   (215) 683-8010
25
```

```
 1     APPEARANCES:
 2
 3          JAMES KRAMER, ESQUIRE,
            DONALD P. BLYDENBURGH, ESQUIRE,
 4          OLIVIA KELLY, ESQUIRE,
            Simmons Hanly Conroy
 5            112 Madison Avenue
              New York, NY  10016-7416
 6          212-784-6279
            jkramer@simmonsfirm.com
 7          okelly@simmonsfirm.com
            dblydenburgh@simmonsfirm.com
 8
 9          Counsel for Plaintiff
10
11          ERIC D. COOK, ESQUIRE,
            Willcox Savage
12            Wells Fargo Center
              440 Monticello Avenue, Suite 2200
13            Norfolk, Virginia  23510
            757-628-5661
14          ecook@wilsav.com
15
            DAVID W. SNYDER, ESQUIRE,
16          McGivney Kluger Clark & Intoccia, P.C.
              1650 Arch Street, Suite 1800
17            Philadelphia, PA  19103
            215-557-1990
18          dsnyder@mkcilaw.us.com
19
            Counsel for Defendant, Whittaker, Clark &
20            Daniels, Inc.
21
22
23
24
25
```

```
 1
     APPEARANCES:   (Cont'd.)
 2

 3        ROBERT E. THACKSTON, ESQUIRE,
          Lathrop GPM
 4          2101 Cedar Springs Road
            Suite 1400
 5          Dallas, TX   75201
          469-983-6023
 6        robert.thackston@lathropgpm.com

 7
          ROY F. VIOLA, JR., ESQUIRE,
 8        Gordon & Rees
            18 Columbia Turnpike
 9          Suite 220
            Florham Park, NJ   07936
10        973-822-1110
          rviola@grsm.com
11

12        Counsel for Defendant, American International
            Industries, successor-in-interest for the
13          Clubman Brand, and to The Neslemur Company
            and Pinaud Company
14

15

16

17

18

19

20

21

22

23

24

25
```

                    Dr. Jacqueline Moline, M.D. - Cross

1    physician, right?
2    A.   Correct.  They were all sent to me as part of
3    a medical-legal review.
4    Q.   These were litigation files that they gave
5    you, right?  Sent you to by plaintiff's lawyers who
6    hired you in litigation, right?
7    A.   In some instances I might have met with the
8    individuals.
9    Q.   This morning you talked about some intimate
10   medical details relating to Mrs. Reichart and
11   the -- and you wouldn't normally do that, like, out
12   on the street, would you?
13              MR. KRAMER:  Objection.
14              THE COURT:  Grounds?
15              MR. KRAMER:  Form.  Out on the
16      street.
17              THE COURT:  What's the relevance of
18      that question?  Sustained.
19   BY MR. THACKSTON:
20   Q.   When you receive medical information in the
21   context of litigation, there's been a release by
22   the person who filed the lawsuit that says,
23   "Because I'm filing a lawsuit over my medical
24   condition, I agree that people can use my medical
25   information for litigation purposes."  Right?

```
 1                MR. KRAMER:  Objection.  Outside the
 2        scope of this witness's expertise.  She's not
 3        a lawyer.  She's a doctor.  What these
 4        individuals do with their law firms and how
 5        the legal process is outside the scope.
 6                THE COURT:  Overruled.
 7                THE WITNESS:  My understanding is
 8        they sign a release and the medical records
 9        are then provided.
10   BY MR. THACKSTON:
11   Q.   When somebody files a lawsuit over their
12   medical condition, they sign a release that says,
13   "I understand you're going to need to talk about my
14   medical information in my lawsuit."  Right?
15   A.   You're asking me legal questions.  But that's
16   part of the process, yes.
17   Q.   Well, you're writing reports and testifying
18   about people's medical conditions.  I assume you
19   have a comfort level that that's okay in the
20   context of litigation when they filed a lawsuit,
21   right?
22   A.   For their specific case with respect to the
23   specific litigation, yes.  I would not discuss it
24   outside of the specific litigation.
25   Q.   And so, you wrote this article and you said
```

Dr. Jacqueline Moline, M.D. - Cross

```
 1    that these 33 cases that I reviewed, these people
 2    didn't have any other exposure to asbestos, so it
 3    might have been cosmetic talc, right?
 4    A.   To the best of my knowledge, they did not have
 5    any other sources.
 6    Q.   And then it came to your attention that one of
 7    them had filed a Workers' Compensation claim
 8    stating under oath that she was exposed to asbestos
 9    on the job that had nothing to do with cosmetic
10    talc, right?
11    A.   I'm aware -- I'm not going to discuss anyone
12    in the paper.  If you're going to ask me about a
13    particular case, I would be happy to talk to you
14    about it.  I'm not going to discuss any individual
15    who might be in the paper.
16    Q.   I'm not using anybody's name.
17    A.   I'm not discussing anyone in the paper.
18    Q.   So let me get this straight, Doctor.
19              MR. THACKSTON:  There's
20         no objection.
21              THE COURT:  Is there an objection?
22              MR. KRAMER:  I was just going to
23         note for the record the conversation we had
24         where I raised this objection initially with
25         regard to the appropriateness of discussing
```

1      individuals that might reveal their identity.
2                THE COURT:  The last thing I said
3      was that I will allow counsel to cross-examine
4      the witness about these issues.
5                MR. KRAMER:  I understand.  But I
6      think it might be going a little bit far
7      afield.  That's why I'm placing my objection
8      on the record.
9                THE COURT:  Overruled.
10  BY MR. THACKSTON:
11  Q.   Dr. Moline, I'm not in any way, shape or form
12  asking you to identify anyone at all.  What I'm
13  asking you is, it came to your attention that one
14  of the people had filed a Workers' Compensation
15  claim, right?
16  A.   I was aware that an individual has filed a
17  Workers' Compensation claim.
18  Q.   And somebody showed you the Workers'
19  Compensation claim that said, "Under penalty of
20  criminal law, I affirm that I was exposed to
21  asbestos on the job."  Right?
22  A.   And I was provided with other -- I don't
23  recall the exact forms that I had, but I was aware
24  of the ultimate finding that there was no exposure.
25  Q.   Okay. So let's just -- that's what you were

```
 1   talking about on direct when you said, well, there
 2   was a finding by a court that she was wrong.  Is
 3   that what you're saying?
 4            MR. KRAMER:  Objection.
 5       Mischaracterizes, Judge.
 6            THE COURT:  Overruled.
 7            THE WITNESS:  My understanding is
 8       that somebody filed, but it was not found.  Or
 9       there is a dispute whether there was actual
10       exposure.  And my recollection is that the
11       finding was that there was no exposure.
12   BY MR. THACKSTON:
13   Q.   So let me ask you about your scientific
14   methodology for writing an article then.  When you
15   are reviewing litigation files, and you're basing
16   your opinion that you're putting in the paper on
17   allegations that people made in depositions, right?
18   A.   Yes.
19   Q.   Fine. And so if ultimately some court decides
20   that those allegations are wrong, does that make
21   that person a liar for saying it?
22            MR. KRAMER:  Objection.  Calls
23       for --
24            THE COURT:  Sustained.
25
```

Dr. Jacqueline Moline, M.D. - Cross

```
 1   BY MR. THACKSTON:
 2   Q.   I mean, you're assuming that whatever someone
 3   has said under oath in a deposition is true, right?
 4   A.   It's often not just the individual, but there
 5   are other individuals that may provide
 6   corroborating information.  So I would look at the
 7   totality of the information.
 8   Q.   And you know that because it's a lawsuit that
 9   there's a defendant in the lawsuit who's denied
10   that that's true, right?  They've denied that the
11   person is entitled to be compensated, right?
12              MR. KRAMER:  Objection.  Again,
13       calls for speculation as to the process, what
14       defendants are thinking and doing.
15              THE COURT:  I would agree that you
16       should rephrase that question.  That question
17       alone does not identify exactly what you're
18       talking about, even though --
19   BY MR. THACKSTON:
20   Q.   On direct examination, over my objection, you
21   were allowed to answer a question about the effect
22   of a Workers' Compensation ruling, right?  You gave
23   an opinion about what the effect of a Workers'
24   Compensation ruling is, right?
25   A.   I was discussing my experience in dealing with
```

Dr. Jacqueline Moline, M.D. - Cross

1 Workers' Compensation patients, which I have been
2 dealing with for years. And my understanding of
3 having patients who have gone through the process
4 whereby a decision is made that there is or there
5 is not exposure that led to the disease.
6 Q. Okay, some kind of adjudication. Some kind of
7 judicial review of the claim, right?
8 A. At some point, yes, in the case, unless the
9 company accepts whatever the condition might have
10 been.
11 Q. And so when it was brought to your attention
12 that this person had made this claim under the
13 penalty of criminal penalty that they were exposed
14 to asbestos in a mill, based on the fact that you
15 think that that was adjudicated, you decided not to
16 include that fact in your paper, right?
17             MR. KRAMER: Objection as per the
18     characterization of criminal penalty. Calls
19     for speculation.
20             THE COURT: Overruled.
21             THE WITNESS: I based the
22     information on what I had at hand with respect
23     to my understanding of the exposures the
24     individual had.
25

Dr. Jacqueline Moline, M.D. - Cross

```
 1   BY MR. THACKSTON:
 2   Q.   And, in fact, the only denial was that the
 3   defendant that she made the claim against denied
 4   that they were liable, right?
 5   A.   I haven't memorized the entire file that
 6   you're speaking about.  I know that there was a
 7   dispute whether there was exposure.  And I'm not
 8   quite sure at how far it proceeded or if it was
 9   withdrawn at a certain point.
10   Q.   Well, no matter how it ended up, it started
11   out with someone saying under oath that they were
12   exposed to asbestos other than cosmetic talc,
13   right?
14               MR. KRAMER:  Objection.  What are we
15        talking about?
16               THE COURT:  Overruled.  Counsel, you
17        know exactly what we are talking about.  And
18        you objecting is not going to stop it.
19               THE WITNESS:  I'm sorry.  Can you
20        repeat the question?
21   BY MR. THACKSTON:
22   Q.   No matter how it turned out, it started out,
23   the Workers' Compensation claim started out with
24   the plaintiff saying under oath that she was
25   exposed to asbestos on the job other than cosmetic
```

Dr. Jacqueline Moline, M.D. - Cross

```
 1    talc, right?
 2    A.   I don't know what -- how the process starts in
 3    the state that this individual lived in, if it was
 4    just the lawyer making an assertion or whether it
 5    was the individual.  I do not have a specific
 6    recollection of the rules and regulations since
 7    they're state by state.
 8    Q.   You have been shown the claim before with the
 9    signature by the husband, right?
10    A.   I'm sure you have shown it to me in the past.
11    I don't -- but it's been years.  And the husband is
12    not the individual.  And the individual would have
13    known the exposure more than a husband.
14    Q.   Have you ever done any work for the Graham and
15    Wallace law firm in Salisbury, North Carolina?
16    A.   No.
17    Q.   Weren't you a retained expert in the Bell
18    case?
19    A.   I was an expert in the Bell case, but I was
20    not retained -- I don't recall that I was -- I was
21    not retained by that firm.  I don't know that firm.
22    Q.   Okay.  So after you wrote this article based
23    on these litigation cases, and you testified about
24    these articles on direct examination, and you said
25    there's no epidemiology -- well, let me back up.
```

Dr. Jacqueline Moline, M.D. - Cross

```
 1    There's no epidemiology suggesting that barbers or
 2    hairdressers are at an increased risk for
 3    mesothelioma, right?
 4    A.   No such study has yet been conducted.  It
 5    doesn't mean that it isn't true.  But there has not
 6    been a specific study that I have seen that is
 7    specifically looking at barbers and hairdressers.
 8    Q.   Well, we'll get to that.  Okay.
 9         And so you said that my study is significant
10    because I got these 33 people who were only exposed
11    to cosmetic talc and they got meso, right?
12    A.   I said my study was significant because it was
13    pointing to cosmetic talc as a cause of
14    mesothelioma and alerting physicians that they
15    should take a history.  If you read the conclusion,
16    that's the point of this article.
17    Q.   After you testified about your article to
18    juries, if somebody who's cross-examining you wants
19    to make sure that that's right, that in those 33
20    cases there was no other exposure -- alleged
21    exposure to asbestos, you take the position that
22    you won't disclose the names of any of those cases,
23    right?
24    A.   I take that position regardless of what
25    situation I'm in.  I do not disclose the names of
```

```
 1    individuals.  That is standard medical practice.
 2    That is standard research practice.  I am not doing
 3    anything different from any colleague that I know
 4    at any institution.
 5                 MR. THACKSTON:  Object to
 6         responsiveness about what colleagues do.
 7                 THE COURT:  Overruled.
 8    BY MR. THACKSTON:
 9    Q.    Well, let's take that a step at a time.  So
10    you're not they're treating physician.  You have no
11    physician-patient relationship with any of the 33,
12    right?
13                 MR. KRAMER:  Objection, Judge.  This
14         is now going into questioning regarding
15         whether or not or how she may -- the reason
16         why she's not going to be revealing these
17         individuals.  And when we had this
18         conversation, counsel said he was not --
19                 THE COURT:  I agree, he did say
20         that.
21                 MR. THACKSTON:  I'm sorry, Your
22         Honor?
23                 THE COURT:  You did say that you
24         were limited to the issue that you have
25         already touched.  Sustained.
```

```
 1
 2
 3                        CERTIFICATE
 4
 5
 6
 7         I HEREBY CERTIFY THAT THE PROCEEDINGS
    AND EVIDENCE ARE CONTAINED FULLY AND ACCURATELY
 8
    IN THE NOTES TAKEN BY ME ON THE TRIAL OF THE
 9
    ABOVE CAUSE, AND THAT THIS IS A CORRECT TRANSCRIPT
10  OF THE SAME.
11
12
13
14
15
                     KIMBERLY A. WILSON, RMR, CRR,
16
                         OFFICIAL COURT REPORTER
17
18
19
20           (THE FOREGOING CERTIFICATION OF THIS
21  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
22  THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
23  CONTROL AND/OR DIRECTION OF THE CERTIFYING COURT
24  REPORTER.)
25
```