# Exhibit D

```
                                                              Page 1

 1                    SUPERIOR COURT OF NEW JERSEY
                      LAW DIVISION: MIDDLESEX COUNTY
 2                    DOCKET NO. MID-L-006651-16ASL
                               MID-L-007336-16AS
 3                    APPELLATE DOCKET NO._____
 4
 5      DWAYNE JOHNSON,                          ) TRANSCRIPT OF
                        Plaintiff,               ) TRIAL
 6         v.                                    )
        AMERICAN INTERNATIONAL,                  )
 7      INDUSTRIES, et al.,                      )
                        Defendants.              )
 8      _____          )
        MARGARET R. LANGLEY LASHLEY AND          )
 9      EDWARD G. LASHLEY,                       ) (VOLUME 1 of 2)
                        Plaintiffs,              )
10         v.                                    )
        AMERICAN INTERNATIONAL INDUSTRIES,       )
11      et al.,                                  )
                        Defendants.              )
12      _____          )
13
14              Place:   Middlesex Courthouse
                         56 Paterson Street
15                       New Brunswick, New Jersey  08903
16              Date:    Wednesday, March 11, 2020
                         9:14 a.m.
17                       (Volume 1 of 2)
                         (Pages 1 - 200)
18
19      BEFORE:
20         HON. ANA C. VISCOMI, J.S.C. and JURY
21
22      TRANSCRIPT ORDERED BY:
23         JOSEPH MANDIA, ESQ.
           (Simon Greenstone Panatier)
24         5 Penn Plaza
           Suite 2308
25         New York, New York  10001
```

Page 2

```
 1   APPEARANCES:
 2        JOSEPH MANDIA, ESQ.
          SIMON GREENSTONE PANATIER
 3        5 Penn Plaza
          Suite 2308
 4        New York, New York  10001
               -and-
 5        STUART PURDY, ESQ.
          SIMON GREENSTONE PANATIER
 6        3780 Kilroy Airport Way
          Suite 540
 7        Long Beach, California  90806
          Attorneys for Plaintiffs,
 8        Dwayne Johnson, and
          Margaret R. Langley Lashley and
 9        Edward G. Lashley
10
11        ROBERT E. THACKSTON, ESQ.
          LATHROP GPM LLP
12        2101 Cedar Springs Road
          Suite 1400
13        Dallas, Texas  75201
               -and-
14        ROY F. VIOLA, JR., ESQ.
          HAWKINS, PARNELL & YOUNG, LLP
15        600 Lexington Avenue
          8th Floor
16        New York, New York  10022
          Attorneys for Defendant,
17        American International Industries
18
19
20
21        ANDREA F. NOCKS, CCR, CRR
          PRIORITY ONE
22        290 West Mount Pleasant Avenue
          Livingston, New Jersey  07039
23        (718) 983-1234
          E-mail: p1steno@veritext.com
24
25   Job No. NJ4011555
```

Page 3

```
 1             INDEX
 2
 3        DIRECT  CROSS  REDIRECT  RECROSS
 4   WITNESSES
 5   FOR THE PLAINTIFF:
 6   STEVEN COMPTON
 7      BY MR. THACKSTON    6
 8      BY MR. PURDY      112
 9
10   JACQUELINE MOLINE
11      BY MR. THACKSTON  160
```

Page 4

```
 1              E X H I B I T S
 2           MARKED FOR IDENTIFICATION
 3   NO.         DESCRIPTION          PAGE
 4   Plaintiffs' Exhibit  Stimuli to the Revision   121
     1070                 Process Modernization of
 5                        Asbestos Testing by U.S.P.
     Plaintiff's Exhibit  Executive Summary of the  148
 6   1076                 Interagency Working Group on
                          Asbestos in Consumer
 7                        Products
     Plaintiffs' Exhibit  J4-1 Test method          129
 8   1471
     Plaintiffs' Exhibit  Reliance materials        155
 9   1729
10
11
12              E X H I B I T S
13           MARKED INTO EVIDENCE
14   NO.         DESCRIPTION          PAGE
15   Court Exhibit C-1    Juror question       166
     Court Exhibit C-2    Juror question       167
16   Court Exhibit C-3    Juror question       168
```

Page 5

 1            COURT OFFICER:  Jury entering.
 2            (Jury enters.)
 3            THE COURT:  Good morning, everyone.  Please
 4       be seated.  Make sure cell phones are turned off.
 5            How about we ask Dr. Compton to return.
 6            Good morning, Dr. Compton.
 7            Today is March 11, 2020.  This is the
 8       continued trial in the matter of Margaret and Edward
 9       Lashley versus American International Industries and
10       Dwayne Johnson versus American International
11       Industries.
12            Can I have appearances, please, for the
13       plaintiffs.
14            MR. PURDY:  Yes.  Good morning again, your
15       Honor.  Stuart Purdy for the plaintiffs.
16            MR. MANDIA:  Good morning, your Honor.
17       Joseph Mandia for the plaintiffs.
18            THE COURT:  Thank you.
19            For the defendants.
20            MR. THACKSTON:  Good morning, your Honor.
21       Robert Thackston and Roy Viola.
22            THE COURT:  Thank you very much.
23            So, members of the jury, as you may recall,
24       we are in the plaintiffs' case and we're now in
25       cross-examination of the plaintiffs' expert witness,

|  |  |
|---|---|
| Page 194<br>1  Q   And they --<br>2  A   If they have both those types of data.<br>3  Q   And some of the registries have occupational<br>4  codes; they have a number for, say, 53 different<br>5  occupations, and they use the occupational codes and<br>6  compare the cancer instances to the different<br>7  occupations, right?<br>8  A   Right.  And then some will be more sophisticated<br>9  in terms of actual exposures rather than a job code<br>10  because a job code may not be, tell the whole story.<br>11  Q   Generally speaking, the epidemiological<br>12  studies that have considered whether there are<br>13  occupations that have an increased risk of mesothelioma<br>14  have identified certain occupations that consistently<br>15  identified certain occupations that have an increased<br>16  risk of mesothelioma, right?<br>17  A   In general, yes, particularly the construction<br>18  trades and the shipbuilding industry.<br>19  Q   Insulators, pipefitters, plumbers, those are<br>20  ones that have been shown to have a statistically<br>21  significant increased risk of mesothelioma, right?<br>22  A   Correct.<br>23  Q   And there's never been an epidemiological<br>24  study that has concluded that hairdressers or barbers<br>25  have a statistically significant increased risk of | Page 196<br>1  A   He's a Ph.D. microscopist who's within the<br>2  department of pathology.<br>3  Q   He's not a medical doctor?<br>4  A   Correct.<br>5  Q   This is titled, Mesothelioma Associated With<br>6  the Use of Cosmetic Talc, right?<br>7  A   Correct.<br>8  Q   And I think you said on direct, and correct<br>9  me if I paraphrase it wrong, but there wasn't any kind<br>10  of epidemiological study on cosmetic talc and<br>11  mesothelioma, so this, you felt this was going to be<br>12  the first one, right?<br>13  A   What I said is I was unaware of any study on<br>14  cosmetic talc end users, apart from a couple of case<br>15  reports, one of -- some of which I showed on that slide<br>16  earlier.  So this was the first case series, meaning<br>17  multiple cases that had been compiled of folks who used<br>18  cosmetic talc.<br>19  Q   And you compared it to the study, you have 33<br>20  people and you compared it to a study done by<br>21  Dr. Wagner, W-a-g-n-e-r, who studied 33 people who had<br>22  mesothelioma in South Africa?<br>23  A   I didn't compare it.  I used it as a number<br>24  because that had been the number that was used when<br>25  they had that first study that showed an association |
| Page 195<br>1  mesothelioma, has there?<br>2  A   Not that I recall specifically, no.<br>3  Q   And are you familiar with the epidemiology,<br>4  the epidemiological study of cancer in hairdressers<br>5  that, an IARC study, that looked at whether their<br>6  cancer is related to the colorings used by a<br>7  hairdresser?<br>8  A   You'd have to show it to me.  I'm not sure.<br>9  Q   Let me ask you about your paper.  Do you need<br>10  a copy of your paper?<br>11  A   If you're going to ask me specific questions, yes.<br>12  Q   Do you recognize this as the paper that you<br>13  wrote along with the other folks that are on --<br>14  A   Yes.<br>15  Q   And I won't pronounce their names because<br>16  they're hard to pronounce, but you're welcome to read<br>17  them out if you'd like.<br>18  A   I'd be happy to read them out.  It's Kristin<br>19  Bevilacqua, Maya Alexandri and Ronald Gordon.<br>20  Q   So Dr. Gordon is the same Dr. Gordon who was<br>21  one of the authors of the Gordon Fitzgerald Millette<br>22  paper?<br>23  A   Correct.<br>24  Q   And he's a Ph.D. pathologist at Mount Sinai,<br>25  right? | Page 197<br>1  between asbestos and mesothelioma, and so I picked 33<br>2  for that purpose.  I wasn't comparing the 33 in my<br>3  paper to the 33 in Dr. Wagner's paper.<br>4  Q   They were studying people who were diagnosed<br>5  with mesothelioma, and one of the authors on that study<br>6  was one of the physicians who had, whose patients had<br>7  died from mesothelioma, right?<br>8  A   To be honest, I don't know the role.  I think<br>9  Wagner is a pathologist.  I don't know who the others<br>10  that had treated the patients were.  I wasn't around in<br>11  1960, so I don't know.<br>12  Q   Me either.  Barely.<br>13     So this paper, though, is not, does not<br>14  relate to any patient that you've ever treated, no one<br>15  with whom you've had a physician/patient relationship,<br>16  right?<br>17  A   No.  These were all individuals -- some of the<br>18  individuals I had the opportunity to interview, but I<br>19  was not their treating physician.<br>20  Q   So these are all cases that came to you by<br>21  way of your legal consultations, right?<br>22  A   Correct.<br>23  Q   And it says that the case histories that you<br>24  have here -- by the way, the premise of your paper is<br>25  that these are cases of mesothelioma, either pleural or |

Page 198

1  peritoneal, that were the only known exposure is
2  cosmetic talc, right?
3  A   As best we could ascertain, that that was their
4  only exposure.  They did not have any other exposure
5  that I was able to glean from the materials I had been
6  provided.
7      Q   But now let's talk about that a little bit.
8      Materials, you mention here, "Data gathered
9  for 33 patients was gleaned from individuals' medical
10 records and sworn testimony, deposition transcripts of
11 individuals."  Right?
12 A   Correct.
13     Q   Now, the only medical records you would have
14 had would have been medical records sent to you
15 generally by the firms that retained you, right?
16 A   Yes, that are retained through a medical record
17 service that in general, or sometimes, I don't know how
18 the medical records are all obtained.  I know some of
19 them have the medical record service cover letters, so
20 they're obtained and then they're sent to me.
21     Q   Doctors seem to have some centralized access
22 to medical records now, they type it up when you go in
23 to see them.
24     You didn't have access to anyone's medical
25 files other than something that was sent to you in the

Page 199

1  context of litigation?
2  A   First of all, there's no centralized medical
3  center like that in this country.  Everyone's hospital
4  has a proprietary system.  And unless you have direct
5  patient contact with an individual, it's -- you don't
6  look up another patient, and I certainly would not have
7  access to another hospital's electronic medical
8  records.  These were all sent to me by plaintiffs'
9  counsel.
10     Q   And it says, "Cases reviewed by occupational
11 physician with experience evaluating asbestos exposure
12 in thousands of patients."  And that's you, right?
13 A   Correct.
14     Q   And then, "Exposure data obtained from sworn
15 testimony about the cases, which included questioning
16 regarding all sources of asbestos exposure.  This
17 included family, occupational histories, parents and
18 anyone cohabitating with the patient were all cases to
19 assess potential asbestos exposure, hobbies," et
20 cetera, right?
21 A   Correct.
22     (Continuation of the day's proceedings in
23 Volume 2.)
24
25

Page 200

1                   CERTIFICATION
2
3      I, ANDREA F. NOCKS, C.S.R., License Number
4  30XI00157300, a Certified Court Reporter, in and for the
5  State of New Jersey, do hereby certify the foregoing to
6  be prepared in full compliance with the current
7  Transcript Format for Judicial Proceedings and is a true
8  and accurate non-compressed transcript to the best of my
9  knowledge and ability.
10
               *Andrea Nocks CCR CRR* (signature)
11     ANDREA F. NOCKS           MARCH 11, 2020
12     CERTIFIED COURT REPORTER
13     MIDDLESEX COUNTY COURTHOUSE
14
15
16
17
18
19
20
21
22
23
24
25

```
                                                              Page 201

 1                       SUPERIOR COURT OF NEW JERSEY
                         LAW DIVISION: MIDDLESEX COUNTY
 2                       DOCKET NO. MID-L-006651-16ASL
                                    MID-L-007336-16AS
 3                       APPELLATE DOCKET NO._____
 4
 5      DWAYNE JOHNSON,                         ) TRANSCRIPT OF
                        Plaintiff,              ) TRIAL
 6         v.                                   )
        AMERICAN INTERNATIONAL,                 )
 7      INDUSTRIES, et al.,                     )
                        Defendants.             )
 8      _____          )
        MARGARET R. LANGLEY LASHLEY AND         )
 9      EDWARD G. LASHLEY,                      ) (VOLUME 2 of 2)
                        Plaintiffs,             )
10         v.                                   )
        AMERICAN INTERNATIONAL INDUSTRIES,      )
11      et al.,                                 )
                        Defendants.             )
12      _____          )
13
14                Place:   Middlesex Courthouse
                           56 Paterson Street
15                         New Brunswick, New Jersey  08903
16                Date:    Wednesday, March 11, 2020
                           9:14 a.m.
17                         (Volume 2 of 2)
                           (Pages 201 - 238)
18
19      BEFORE:
20         HON. ANA C. VISCOMI, J.S.C. and JURY
21
22      TRANSCRIPT ORDERED BY:
23         JOSEPH MANDIA, ESQ.
           (Simon Greenstone Panatier)
24         5 Penn Plaza
           Suite 2308
25         New York, New York  10001
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 202

```
 1   APPEARANCES:
 2        JOSEPH MANDIA, ESQ.
          SIMON GREENSTONE PANATIER
 3        5 Penn Plaza
          Suite 2308
 4        New York, New York  10001
          -and-
 5        STUART PURDY, ESQ.
          SIMON GREENSTONE PANATIER
 6        3780 Kilroy Airport Way
          Suite 540
 7        Long Beach, California  90806
          Attorneys for Plaintiffs,
 8        Dwayne Johnson, and
          Margaret R. Langley Lashley and
 9        Edward G. Lashley
10
11        ROBERT E. THACKSTON, ESQ.
          LATHROP GPM LLP
12        2101 Cedar Springs Road
          Suite 1400
13        Dallas, Texas  75201
          -and-
14        ROY F. VIOLA, JR., ESQ.
          HAWKINS, PARNELL & YOUNG, LLP
15        600 Lexington Avenue
          8th Floor
16        New York, New York  10022
          Attorneys for Defendant,
17        American International Industries
18
19
20
21        ANDREA F. NOCKS, CCR, CRR
          PRIORITY ONE
22        290 West Mount Pleasant Avenue
          Livingston, New Jersey  07039
23        (718) 983-1234
          E-mail: p1steno@veritext.com
24
25   Job No. NJ4011555
```

Page 203

```
 1              INDEX
 2
 3         DIRECT  CROSS  REDIRECT  RECROSS
 4   WITNESSES
 5   FOR THE PLAINTIFF:
 6   STEVEN COMPTON
 7     BY MR. THACKSTON    6
 8     BY MR. PURDY      112
 9
10   JACQUELINE MOLINE
11     BY MR. THACKSTON  160
```

Page 204

```
 1              E X H I B I T S
 2           MARKED FOR IDENTIFICATION
 3   NO.         DESCRIPTION            PAGE
 4   Plaintiffs' Exhibit  Stimuli to the Revision   121
     1070                 Process Modernization of
 5                        Asbestos Testing by U.S.P.
     Plaintiff's Exhibit  Executive Summary of the  148
 6   1076                 Interagency Working Group on
                          Asbestos in Consumer
 7                        Products
     Plaintiffs' Exhibit  J4-1 Test method          129
 8   1471
     Plaintiffs' Exhibit  Reliance materials        155
 9   1729
10
11
12              E X H I B I T S
13           MARKED INTO EVIDENCE
14   NO.         DESCRIPTION            PAGE
15   Court Exhibit C-1     Juror question    166
     Court Exhibit C-2     Juror question    167
16   Court Exhibit C-3     Juror question    168
```

Page 205

            (Continuation from Volume 1.)
BY MR. THACKSTON:
    Q   Now, because you got these cases in the
context of litigation, presumably other lawyers would
have them, defense lawyers who were involved in the
case who represented companies who were sued, right?
As far as you know, all the information you have was
information that was shared among all those in the
case?
    A   I would assume so.
    Q   And you've identified, both by case number
and in your deposition, you take the position that
you're not going to tell anybody what cases they are
because that's confidential, right?
    A   It's standard medical practice not to identify
individuals by names, and in the same way that, I
believe we discussed on Monday we don't discuss company
names.  But certainly I have never in my life, and I
read thousands of articles in the medical literature,
have never seen anyone's name ever put in a paper.
Sometimes it'll be initials.  But it has never been
that an individual's name is put into a medical article
that's published in the medical literature unless
perhaps it was -- the sole case might be in the guy who
discovered that H. Pylori caused stomach cancer and he

Page 206

1  wrote about it because he gave it to himself.
2      That's, I think, the only time that the name
3  of the person was put in an article that I've read in
4  thousands of articles.
5      Q   Okay. Well, let me rephrase my question.
6      Other than putting someone's name in the
7  article, no -- you've taken the position that no
8  identifying information can be shared with anyone about
9  who these people were; for example, for case number
10 one, you haven't made available any information that
11 would allow only the people who were involved in the
12 case to understand who case one may have been, right?
13     A   For the purposes of this paper, no. We
14 de-identified it, as is standard medical practice and
15 is standard practice when we publish the paper, so that
16 the medical community would not have access to the
17 names of these individuals.
18     Q   Well, and I guess the significance of that is
19 somebody who picks up this paper and reads it and sees
20 that the allegation is that the only known exposure to
21 asbestos is cosmetic talc, there's no way for anybody
22 to look behind that conclusion if they don't have any
23 idea who the people are, right?
24     A   The medical literature is filled with articles
25 where people state their opinions and state their best

Page 207

1  information. In the same way that we talked about a
2  paper where you were quoting me lines earlier and it
3  was someone's opinion that was being quoted that I
4  might not agree with that would occur in a paper.
5      That's standard in medical papers. You don't
6  go back and say here's the people, you can go evaluate
7  them. That's not done.
8      Q   Well, in this particular case, now you
9  believe that the paper can be cited as evidence that
10 there's asbestos in cosmetic talc and that causes
11 mesothelioma, right?
12     A   The point of my paper is to show that in
13 individuals for whom a comprehensive exposure history
14 was taken that show that they had exposure to cosmetic
15 talc, that we can think about the fact that cosmetic
16 talc contains asbestos.
17     And as has been shown by studies of cosmetic
18 talc and it's published in the literature and that
19 because we know that there is asbestos present in
20 cosmetic talc, we can think about that as a source of
21 mesothelioma. And one of the goals --
22     Q   Sorry. I didn't mean to interrupt.
23     A   -- is truly to emphasize that one must take a
24 comprehensive history and not just ask someone's job
25 and not just ask if their spouse worked with asbestos

Page 208

1  and stop there, but to really understand how someone
2  could have an exposure and go beyond just saying what
3  do you do or who do you live with, but ask about other
4  things. And I think I stated that many times in this
5  article and I certainly use that as my conclusion.
6      Q   Well, as you know from Dr. Compton's testing
7  of the Montana talc samples, all cosmetic talc didn't
8  necessarily have any asbestos in it, right?
9      A   From Dr. Compton's testing of the three finished
10 bottles, all three of the finished product that he
11 tested that I saw had asbestos in it. If you're asking
12 me from the samples that were provided to him from the
13 mine, not all of them had asbestos in it, that is
14 correct. But the finished products all did.
15     Q   The 30-year old finished product?
16     A   I don't know the number of years.
17     Q   And you say that you confirm, based on your
18 knowledge, that the people who you're reporting on had
19 no other exposure to asbestos, right?
20     A   As best as I could ascertain.
21     Q   And one of the -- one of the articles that
22 you cited talks about the fact that the Italian
23 registry, the Italian registry that keeps up with
24 different cancers, mentioned that it had a comment
25 about some people that had mesothelioma who were

Page 209

1  hairdressers, right?
2      A   Correct.
3      Q   And it said we suspect that that was from
4  asbestos in hair dryers, right?
5      A   That's what they had said, it was a possibility.
6  And it was also clear they never made any mention of
7  asking about cosmetic talc.
8      Q   This was published what, in the last three or
9  four years?
10     A   I'm sorry, which was?
11     Q   The Italian registry with that comment.
12     A   You're giving me more credit than I'm due, sir. I
13 don't remember the year that they published that
14 particular paper. That's reference Number 51, that was
15 published eight years ago.
16     Q   Were you aware that there was asbestos in
17 hair dryers?
18     A   In certain hair dryers, I have heard that it was
19 in some hair dryers. I don't know which ones and don't
20 know if they were in Italian hair dryers.
21     Q   You don't know what? I'm sorry.
22     A   I don't know if they were in Italian hair dryers.
23     Q   And when you were asked about asbestos in
24 hair dryers, you said you don't think all hairdressers
25 necessarily had hair dryers, did you?

3 (Pages 206 - 209)

Page 210

```
 1   A   Not all of them might have had handheld.  They may
 2   have had the sit in the chair with the curlers in your
 3   hair kind of hair dryers that you see from the 1950s.
 4       Q   Do you know whether both contained asbestos
 5   in the 1970s and 1980s?
 6   A   I don't know at what point there was a conversion
 7   to the handheld.
 8       Q   I've handed you a case report entitled,
 9   Peritoneal Mesothelioma From Asbestos in Hair Dryers,
10   James Dahlgren, International Journal of Occupational
11   and Environmental Health, 2015.  Is that an article
12   you're familiar with?
13   A   I don't think I've ever seen this.  This is
14   actually -- no, I haven't seen this.
15       Q   I've handed you a document titled, United
16   States Consumer Product Safety Commission New
17   Information on Hair Dryers CSP -- CPSC Hot-Line Swamped
18   By Calls, release date April 17, 1979.
19       Were you familiar with any of the details of
20   the Consumer Product Safety Commission of recall of
21   asbestos-containing hair dryers in the late 1970s?
22   A   No.
23       Q   I've showed you an article titled, Asbestos
24   Emissions From Handheld Hair Dryers by William
25   Hallenbeck of the School of Public Health, University
```

Page 211

```
 1   of Illinois Medical Center, from Environmental
 2   Management, Volume 5, appears to be 1981.
 3       Are you familiar with that article?
 4   A   No.
 5       Q   You testified that you've done a lot of work
 6   with NIOSH?
 7   A   I am -- yes.  Particularly in my capacity with the
 8   World Trade Center program.
 9       Q   Are you familiar with the testing of hair
10   dryers for asbestos emission done by NIOSH and United
11   States Consumer Product Safety Commission in 1979?
12   A   No.
13       Q   I think you also testified on direct about
14   having given testimony before congress recently on
15   issues relating to whether there's asbestos in cosmetic
16   talc, correct?
17   A   I talked about two times I testified in congress;
18   one was related to with the World Trade Center and one
19   of them was related to cosmetic talc.
20       Q   And specifically on the issue of cosmetic
21   talc, have you seen written testimony -- well, actually
22   you submitted it, so I guess you have.
23       Did you submit to this congressional panel
24   what would be your testimony in written form?
25   A   Yes.
```

Page 212

```
 1       Q   And is the document I just showed you that
 2   testimony, written testimony by Jacqueline Moline on
 3   Northwell Health stationery?
 4   A   Yes.
 5       Q   And it says, "Tuesday, before the Committee
 6   on Oversight and Reform Subcommittee on Economic and
 7   Consumer Policy, United States House of
 8   Representatives, examining" -- I'm sorry -- "examining
 9   carcinogens in talc and best methods for asbestos
10   detection."  Right?
11   A   That was the title of the session.  I didn't come
12   up with that session title.  That wasn't the title
13   of -- we didn't have titles for our talk.  That was the
14   title of what the committee had decided.
15       Q   Thank you.
16       So your testimony begins on the next page,
17   "Good afternoon, Chairman," et cetera, right?
18   A   Good luck with that one.  It's actually much
19   easier to pronounce than it is.
20       Q   Check that out.  Chairman, chair --
21   A   It's Krishnamoorthi.
22       Q   It's --
23   A   Once you got it, it's easy to say.  It's
24   Krishnamoorthi.
25       Q   Well, I won't try to say that gentleman's
```

Page 213

```
 1   name.
 2   A   I saved you.  I saved you that time.  Since I
 3   practiced saying it since I had to say it out loud.
 4       Q   I do appreciate that.
 5       You gave an example, you said, "It could be
 6   helpful to hear about an individual to better
 7   understand how cosmetic talc usage might impact one's
 8   health.  Miss D was a 66-year old woman who developed
 9   shortness of breath," et cetera, right?
10   A   Correct.
11       Q   And you went on to give some information
12   about this person that you -- this was an actual person
13   in this case that you were consulting on, right?
14   A   Correct.
15       Q   And her name didn't start with a D, but you
16   just --
17   A   I made that up.
18       Q   All right.  So it says she worked in the
19   textile industry, worked with polyester cotton yarn,
20   worked for tobacco company as a packer, right?
21   A   Correct.
22       Q   Has no known exposure to asbestos in these
23   jobs or from home construction activities, right?
24   A   Correct.
25       Q   Now, you were engaged by plaintiffs' lawyers
```

4 (Pages 210 - 213)

Page 214

1  in these cases, and you wrote this article, and you
2  testified in your deposition that you didn't tell them
3  that you were writing this article, right?
4     A   I'm sorry, I didn't tell who?
5     Q   You didn't tell the plaintiffs' lawyers who
6  had hired you that you were writing an article?
7     A   When I was in the process of writing the article?
8     Q   Right.
9     A   No.  I did not.  I did not confer with them.
10    Q   And by the way, they were there, you recall
11 that one of the plaintiffs' lawyers was there at the
12 hearings sitting behind you?
13    A   There were lawyers in the congressional hearing
14 room, yes.  They were aware that I was testifying.
15    Q   I mean, they were there with you when you
16 were testifying, right?
17    A   Well, the way that sounds isn't quite right.  I
18 happened to be there and they were also there.
19    Q   Okay.
20    A   I didn't go with them there.  They didn't engage
21 me to go there.  I was asked by the committee to
22 testify.
23    Q   I understand.  I'm not saying they gave you a
24 ride or anything, I'm --
25    A   They didn't hire me to go there.  I didn't get

Page 215

1  paid for my testimony.
2     Q   I understand.  But there were plaintiffs'
3  lawyers there who have retained you, who retained you
4  in this case; somebody from the Simon Greenstone
5  Panatier firm was there during your congressional
6  testimony sitting right behind you, right?
7     A   Congress is open to the public.  Anyone who may
8  want to go watch how our Government is supposed to work
9  is welcomed to sit in there and anyone is welcome to
10 enter the Capitol.  There happened to be folks
11 including someone from Mr. Purdy's firm there.  I was
12 not aware he was going to be there.
13    Q   Doctor, again, I'm not implying an ill
14 motive.  I'm just asking whether anybody from Simon
15 Greenstone was there.
16    A   True, true.
17    Q   They were there.  They heard you testify.
18        And this conclusion that you reach that none
19 of the people in these cases was exposed to any other
20 asbestos, you didn't -- before or after you published
21 the paper you never contacted the lawyers involved who
22 had hired you and said look, I'm going to make this
23 assertion in this paper that they weren't exposed to
24 anything else, do you have anything to the contrary to
25 that, I just want to make sure that I'm right in saying

Page 216

1  that because I'm making the argument that the only way
2  they could have gotten mesothelioma is from cosmetic
3  talc and I'm saying they weren't exposed to anything
4  else so I just want to double-check with you on that?
5        You didn't do that, did you?
6     A   No.  Which is why I said to the best of my ability
7  I had no information that they had other exposures.  I
8  did not contact any after or during, during the writing
9  of this paper.
10       THE COURT:  Let's take a five-minute break.
11       Members of the jury, you're going to go to
12 the jury room here on this floor.  Leave your notebooks
13 here.
14       Remember all the instructions I've been
15 providing to you.  We'll pick you up in five.
16       Thank you.
17       (Jury exits.)
18       (Recess:  3:34 p.m. to 3:47 p.m.)
19       COURT OFFICER:  Remain seated.  Jury
20 entering.
21       (Jury enters.)
22       THE COURT:  Please be seated.  Make sure cell
23 phones are turned off.
24       Mr. Thackston, whenever you're ready.
25       MR. THACKSTON:  Thank you, your Honor.

Page 217

1  BY MR. THACKSTON:
2     Q   Dr. Moline, I'm handing you a report of your,
3  that you wrote to Simon Greenstone, May 5, 2016, and
4  we've marked out the personal identifying information
5  but -- well, not all of it.  It's a very generic name,
6  though.
7        Could you glance at this?  This has got your
8  letterhead on it, and I believe it's signed, yes, on
9  page 19, you signed it, right?
10    A   Yes.  I would have signed it on -- on page 19, you
11 said?  Yes.
12    Q   Page 19.
13       Anyway, so this, I know you don't want to
14 identify by name and we're not identifying by name,
15 we're just identifying by the case, and you gave an
16 example before congress and you gave an example in your
17 written testimony, was the example that you gave in
18 your written testimony and before congress one of the
19 cases from your article?
20       MR. PURDY:  Objection, your Honor.
21       THE COURT:  Sidebar.
22       (Sidebar.)
23       MR. PURDY:  The objection is --
24       THE COURT:  Louder.
25       MR. PURDY:  The objection is I think this is

5 (Pages 214 - 217)

Page 218

1  a very not so back-door attempt to get the identities
2  of the person in the study. Mr. Thackston tried to do
3  that at deposition, was shut down. She was directed to
4  the legal staff of the hospital. To my knowledge, he
5  (inaudible). So even in old reports in isolation, but
6  to try to patch them up through the back door is in
7  violation of the paper. When she put together written
8  background information of the paper, this is
9  (inaudible).
10           THE COURT: You had access to the unredacted?
11           MR. THACKSTON: Yes.
12           THE COURT: So you know the identity of this
13  person?
14           MR. THACKSTON: Yes. It's a case we're
15  involved in. We're the defendant.
16           THE COURT: So how, tell me the purpose of
17  what you're seeking to do now.
18           MR. THACKSTON: The purpose, your Honor,
19  is that her testimony is that these are litigation
20  cases so everything she has, I have. It's all public.
21  I don't want anything that's not public information and
22  I'm not trying to identify, why would I want to
23  identify the person?
24           THE COURT: Didn't that question you just
25  asked seek to identify the person?

Page 219

1           MR. THACKSTON: Not the person, but the case.
2  We can call it case B, right? It's not a matter of --
3           THE COURT: You mean you want to know whether
4  this is Miss D that she testified about?
5           MR. THACKSTON: Yes.
6           THE COURT: Well, then that would be
7  identifying the person to you.
8           MR. THACKSTON: Exactly. Well, she should
9  identify the person to me.
10           THE COURT: Why?
11           MR. THACKSTON: Well, because she made a
12  representation in the public literature that there's no
13  other exposure to asbestos, right? Well, I'm in the
14  case and I know that not to be true. And I'm not
15  trying to malign her about it, but she's -- her
16  protocol didn't involve trying to get any other
17  information and whether there is information from
18  public sources that (inaudible). I should be entitled
19  to cross-examine her on that. But otherwise, it's
20  completely (inaudible). I'm not saying she did
21  anything wrong. I'm just saying based on your
22  methodology, you didn't know this woman has a sworn
23  complaint saying she was exposed to thermal insulation
24  at her workplace.
25           THE COURT: Thank you.

Page 220

1  I have no issue with you cross-examining
2  individually with regard to all of the different
3  reports that you have or that she may have referenced
4  in that paper that she co-authored, but seeking to
5  identify is inappropriate and so I'm not going to
6  permit that.
7           MR. THACKSTON: I'm not going to identify the
8  person at all.
9           THE COURT: No, but that question would seek
10  to identify to you, and that I'm not going to permit.
11  I don't have any issue with individual questions, but
12  that question I'm not going to allow.
13           MR. THACKSTON: Well, I'm going to try -- I'm
14  not exactly sure what I'm allowed to do, but I'll try
15  my best to --
16           THE COURT: Well, hold on. What I'm saying
17  is I have no issue with you cross-examining with regard
18  to any report that you have, any person that's
19  mentioned by type or case of description in her study,
20  in her published paper or the testimony she gave to
21  congress.
22           But you're asking Dr. Moline to testify as to
23  whether this person is that person that you referred
24  to, that I will not permit because that is seeking the
25  identification of who that person may be to you, and

Page 221

1  that I will not permit. It's inappropriate. It's
2  improper.
3           (Sidebar ends.)
4           THE COURT: So the objection to that question
5  is sustained.
6  BY MR. THACKSTON:
7      Q    Dr. Moline, you gave the example, and I don't
8  want anybody's name, I don't want you to identify
9  anybody, when you wrote your testimony for congress,
10  did you take portions directly from a report for a case
11  you're involved in?
12      A    I don't believe I took anything verbatim. I may
13  have looked to see an illustrative case and I wouldn't
14  have remembered all the facts of the medical course
15  which I think was described, nor the exposure scenario,
16  so I would have had to refer to something.
17      Q    You would have -- you would have said where
18  the person worked, right, what their job was?
19      A    I would have said the category. I wouldn't have
20  said what company.
21      Q    I mean, worked for a textile mill, tobacco
22  company; in fact, the example you give here in the
23  testimony, you say "she worked in a textile industry
24  working with polyester and cotton yarns, also worked
25  for tobacco company as a packer." Right?

6 (Pages 218 - 221)

Page 222

1  A  Correct.
2  Q  And you would have written a report for
3  someone in her case making those kinds of statements,
4  in your report you would also say what her jobs were,
5  right?
6  A  If I had written a report on her, yes.
7  Q  And you wouldn't know if -- in another
8  context, outside of the particular lawsuit where they
9  were discussing the claims and questions were asked,
10  you wouldn't know whether she filed another claim or
11  someone on her behalf filed another claim in another
12  context saying she was exposed to asbestos on her job?
13  You just wouldn't have that information, would you?
14  A  If she had made -- are you saying like a workers'
15  compensation claim?
16  Q  Yes.
17  A  I mean, typically I'm provided with all that kind
18  of information or an individual is asked about that
19  during their deposition, where they're asked if they've
20  ever filed any type of lawsuit or filed a workers'
21  compensation claim. So I might not have had all the
22  documents, but I would have had some information.
23  Q  Would that be relevant if somebody had a
24  worker's comp claim where they were saying they were
25  exposed to asbestos on-the-job?

Page 223

1  A  If they said that they were exposed and they had
2  exposure, sure.
3  Q  So I'd ask you to look at page -- this is
4  from the North Carolina Industrial Commission, and down
5  at the bottom left-hand corner you see NCIC, July 24,
6  2019, 1 of 25 pages. If you look at page 13 --
7  A  This is not fully redacted. The name is
8  throughout this document.
9  Q  The name what?
10  A  The name of the individual is on many pages here.
11  It's not fully redacted.
12  Q  Well, it's not going to be seen by anybody
13  other than --
14  A  Okay.
15  Q  -- counsel.
16  A  I see an individual's name here. I just wanted to
17  bring that to your attention.
18  Q  I guess you can see through it.
19  A  No. No. I just turned and I saw someone's name
20  on page 12, so I just was making sure you knew that. I
21  didn't know who would see it.
22  Q  You're the retained expert in this case.
23  They're the law firm in this case. The judge isn't
24  going to give it to anybody else --
25  A  Sir, I was just saying the name was there. I

Page 224

1  wasn't saying anything else. I just wanted to make
2  sure if it went further, there was someone's name here.
3  Q  I understand. The fact that there is a
4  lawsuit is public record, right? I mean, this person's
5  lawsuit is a public record. And at some point you will
6  give a deposition in that case, as far as you know,
7  right?
8  A  Depends on the state, and it could be, yes.
9  Q  Okay. And I just want you to look at this
10  and see, you recognize the type of document that it is,
11  North Carolina Industrial Commission, and I just want
12  you to read what the next line says?
13  A  Where am I looking?
14  Q  It says, "Claim by employee."
15  A  Okay.
16  Q  "Representative or dependent."
17  A  Okay.
18  Q  "For benefits for lung disease, including
19  asbestosis, silicosis and byssinosis."
20  A  Okay.
21  Q  "The use of this form is required under the
22  provisions of the Workers' Compensation Act."
23  A  Okay.
24  Q  Right?
25     Employer, and I won't say the name of the

Page 225

1  employer out loud, and it has dates of employment?
2     MR. PURDY: Mr. Thackston, can I ask what
3  page you're on?
4     MR. THACKSTON: Page 13.
5  A  Okay.
6  Q  And then on the next page it has employment
7  history and dates, and it says, "If you were exposed to
8  the listed substances while working for this employer.
9  Describe in detail the exposures employee was exposed
10  to the hazards of asbestos-containing products while
11  employed by this employer."
12     That's on page 14 of 25 right in the middle
13  of the page. You see that?
14  A  I don't know where you're pointing to.
15     MR. THACKSTON: Your Honor, may I publish?
16  A  In the bottom half?
17  Q  Right in the middle.
18     THE COURT: Yes. Go right ahead.
19  BY MR. THACKSTON:
20  Q  Right?
21     "Employee was exposed to the hazards of
22  asbestos-containing product while employed by this
23  employer." Right?
24  A  Yes.
25  Q  So if this is the same person who was your

7 (Pages 222 - 225)

Page 226

1  example before congress, it appears that they, at
2  least, have made a claim that they were exposed to
3  asbestos in some form other than just in using cosmetic
4  talc personally and as a hairdresser.
5       Would you agree?
6       MR. PURDY:  I'm going to object, your Honor.
7       THE COURT:  Objection sustained.
8  BY MR. THACKSTON:
9   Q   Since you put the article out have you had
10 any conversations with any of the lawyers about whether
11 your conclusions were correct with respect to the
12 alleged exposures by the plaintiffs to cosmetic talc
13 only?
14  A   I haven't had any conversations with that specific
15 question raised to me.
16  Q   And no one has contacted you and said look,
17 if case 6 or case 3 is our case, there's something you
18 ought to know, there's some other allegations; nobody's
19 given you that kind of information?
20  A   No.
21  Q   Let me get straight, why is it that you
22 couldn't -- let me back up.
23      So yesterday when you were on direct
24 examination and you were being asked questions about
25 Italian talc studies, you had various criticisms of the

Page 227

1  studies, right?
2   A   Yes.
3   Q   And one of the criticisms was that it wasn't
4  transparent, that one of the authors had gotten money
5  from Johnson & Johnson or somebody and it wasn't
6  transparent that they had had a role in some input in
7  the study, right?
8   A   Right.  That there was no disclosure that the
9  company had had a role in the development protocol and
10 writing of the paper.
11  Q   And you think that if someone's going to put
12 out an article where they're going to say there are
13 no -- we find no mesothelioma among this group of
14 people, that they ought to make the information
15 available that they're basing that on so other medical
16 professionals or others can critique that, right?
17  A   I said that they should let that information that
18 they were contacted by a company who approved the
19 protocol and was involved in the writing of the paper,
20 they should make the readers aware of that, yes.
21  Q   And so in your situation, this is all
22 information that's been available to all the people
23 involved in the cases, it would be possible for you to
24 have someone redact, even someone that worked for one
25 of the firms, redact any personal information and put

Page 228

1  it out there and say here, here's what I'm basing my
2  conclusion on, I'm going to be transparent, here's a
3  website, here's all the documents, case 1, case 2, case
4  3, I want everybody to know what I'm basing my
5  conclusion on that these people have meso and their
6  only known exposure was to cosmetic talc.
7       You could do that, right?
8   A   Theoretically, yes.
9   Q   And in your deposition you were asked
10 specifically, hey, I think I recognize this case, case
11 whatever, case number 3, the case of so and so.  And
12 you refused to answer that, right?
13  A   I am of the opinion that I am not identifying any
14 of the individuals in my paper by name as following
15 standard medical and research practice.
16  Q   But you would agree, you don't have any
17 contact with these people from the standpoint of a
18 medical practice.  You are not their physician.  You
19 are only consulting in their litigation, right?
20  A   They still have a right to privacy with respect to
21 the medical community and the medical literature at
22 large, and I am respecting that privacy.
23  Q   I understand.
24      But you understand, you would agree that
25 people involved in their case because they represent

Page 229

1  someone who's been sued already have access to the
2  medical records, they have access to everything you
3  have access to, right, the other people involved in the
4  cases, correct?
5   A   Yes.
6   Q   And you would agree with me, wouldn't you,
7  that either before or after you published the paper,
8  other people who might have knowledge of those cases
9  never had an opportunity for input in whether or not
10 those people had other alleged exposures to asbestos;
11 fair?
12  A   I did not consult with any attorneys in the
13 preparation of this paper.  I based it on the
14 information I had, which was clearly stated in the
15 methods of this paper in terms of how I obtained the
16 data.  I did not have conversations with any other
17 individuals apart from my co-authors who had access to
18 the same data I did.
19  Q   And if somebody writes a letter to the editor
20 and says well, I think I recognize, I can't say for
21 sure because they won't identify the person, but if
22 that's this case, I'll call it B, then there certainly
23 were other sworn allegations of exposure in that case,
24 so the premise that there was no other exposure to
25 asbestos might not be valid; you couldn't really take

8 (Pages 226 - 229)

Page 230

1  issue with that, could you?
2  A  Well, I could take issue with it. If they
3  provided other information, I think -- the premise of
4  the article is that cosmetic talc is associated with
5  mesothelioma, and the premise is no different from
6  someone who has more than one type of exposure to
7  asbestos.
8      In this particular group of 33 individuals, I
9  was not aware of any other exposures. Even if they had
10 additional exposures, it doesn't negate the fact that
11 all 33 had this exposure to asbestos from the cosmetic
12 talc.
13 Q  Well, that's assuming that the cosmetic talc
14 had asbestos in it, right?
15 A  That is the premise of the article that there --
16 or that is based on my understanding that there is
17 asbestos in cosmetic talc that leads to mesothelioma.
18 Q  That statement about, the only statement
19 about hairdressers that you cite, "Cases of
20 mesothelioma among hairdressers characterized
21 idiopathic" --
22 A  Where are you? You've got a lot of highlighting
23 there.
24 Q  True.
25 A  Just --

Page 231

1  Q  See the arrow now?
2  A  Okay.
3  Q  "Cases of mesothelioma among hairdressers
4  characterized as idiopathic also underscore the
5  contribution of an incomplete exposure history; the
6  potential failure to identify the use of talcum powder
7  exposure in their work would prevent the linking of
8  occupational exposure to asbestos to their
9  mesothelioma.
10     "In our paper, there were three female
11 hairdressers who regularly used talcum powder in their
12 work. It was unclear from any of the histories noted
13 in the medical records that these women were asked if
14 they used talcum powder as part of their haircutting
15 process."
16     Then it says, "In a report from the National
17 Meso Registry of Italy, staff noted a cluster of
18 mesothelioma due to unknown exposure among
19 hairdressers, but only examined hair dryer use as a
20 potential exposure. There was no discussion of the
21 occupational use of talcum powder." Right?
22 A  Correct.
23 Q  And don't we have to, can we fairly conclude
24 that the three hairdressers here also used hair dryers?
25 A  They might have. That wasn't at all the point of

Page 232

1  that paragraph.
2      But in answer to your question, we can assume
3  that some of the hairdressers might have used hair
4  dryers. The point of that paragraph was to say that no
5  one elicited the history of exposure and asked whether
6  they used talcum powder that was evident from either
7  the medical records of these individuals that I
8  reviewed nor from the published papers.
9      That was the point of that paragraph. If you
10 read it again with the understanding of what we were
11 trying to convey there, that was the point I was trying
12 to make, which is the only thing they asked about was
13 hair dryers. They didn't consider if they used
14 cosmetic talc in the course of their occupation. And
15 they didn't take a full history. That was the point.
16 Q  And the point of my question was when you
17 wrote this article did you consider that the only
18 published study mentioning hairdressers said you should
19 consider their use of hair dryers; did you consider
20 that when you made the statement that the only known
21 exposure for these ladies was cosmetic talc?
22 A  It's written in the paper that that was
23 considered, yes.
24 Q  That hair dryers were considered as a
25 possible exposure?

Page 233

1  A  It's certainly in Italy they described it in that.
2  Yeah.
3  Q  You say here, "Like Wagner, we present 33
4  cases, predominantly of women, who had no known
5  exposure to asbestos other than prolonged use of talcum
6  powder." Right?
7  A  Correct.
8  Q  Based on the Italian study that you cite,
9  another known use would be hair dryers, right?
10 A  It's possible. We don't know what years they used
11 it and whether they used hair dryers that had asbestos
12 in it. We don't know all hair dryers have asbestos.
13 Q  But to your point that what you were trying
14 to do was educate people about what to ask in a work
15 history, it seems like that would be one of the things
16 you would say that's what people should ask; if you're
17 talking to a hairdresser, let's find out if they used a
18 hair dryer and during what years and maybe compare it
19 to the list of known hair dryers with asbestos.
20     You don't make that suggestion, do you?
21 A  I did not in this paper.
22 Q  You said you educated yourself and reached a
23 conclusion in 2007 that you thought cosmetic talc might
24 be associated with mesothelioma, right?
25 A  I said I started looking at it in 2007/2008 and

9 (Pages 230 - 233)

Page 234

1  it's continued for the past, what is it, 13 years.
2  I've certainly continued to learn more every year.
3      Q   And this was published January 2020, I guess
4  you submitted it sometime at the end of 2019?
5      A   It was published online in October 2019.
6      Q   And your publication online in October 2019
7  was your first effort to get the word out that you
8  thought that occupational medicine doctors ought to ask
9  people about -- ask people about exposure to cosmetic
10 talc, right?
11     A   This was my first paper, yes, about this
12 particular topic.  I've written 70 odd other papers on
13 other topics.  I do more than just this in my
14 profession.
15     Q   I understand.
16         But you thought it was, that in 2007 you were
17 convinced that you thought cosmetic talc was causing
18 mesothelioma among people who were exposed to it even
19 getting haircuts.  You waited 13 years to try to get
20 that word out.
21         Is that what you're telling me?
22     A   Okay.  I was presented with a question in 2007.  I
23 began looking at it in 2007.  And in order to write a
24 paper you need to accumulate enough folks, and I also
25 needed to have enough time set aside to write the

Page 235

1  paper.  And there are other things that go on in one's
2  life and there are a whole bunch of papers I'd like to
3  be publishing that I don't have the time to write
4  about.
5          So it took a while.  We worked on this paper
6  starting in, goodness gracious, 2017 I think we started
7  writing this paper.  There was some interruptions.  So
8  it takes a while to get everything together to write a
9  paper, but it also takes time to think about how you're
10 going to write a paper.
11         It isn't just when you start looking at a
12 question that you say, oh, let me write a paper.  You
13 don't have enough information or enough to make it
14 meaningful.
15     Q   Well, short of writing a paper and trying to
16 get it published, you didn't write a letter to FDA or
17 anyone else saying hey, I'm an occupational medicine
18 specialist, I think that cosmetic talc is causing
19 mesothelioma in people that use it at home or get
20 haircuts and I think you ought to do something about
21 it; you didn't write a letter like that to the FDA, did
22 you?
23     A   I didn't write a letter to FDA.  I have given
24 lectures to my colleagues about that, but I did not
25 write a letter to the FDA.

Page 236

1          MR. THACKSTON:  Your Honor, I don't know what
2  time you want to stop.  I'm at a --
3          THE COURT:  Breaking point?
4          MR. THACKSTON:  -- transition point.
5          THE COURT:  About how much longer do you
6  anticipate?
7          MR. THACKSTON:  I think I've only got two
8  more topics, your Honor, so maybe I can clean it up
9  tonight, do it quickly in the morning.
10         THE COURT:  Dr. Moline, can you come tomorrow
11 morning?
12         THE WITNESS:  Yes.
13         THE COURT:  Thank you.
14         Members of the jury, we'll finish up now for
15 today.  Please place your notebooks in the envelopes
16 provided.  Leave them with the officer on the way out.
17 They'll be locked in my office overnight.  No one has
18 access to them.
19         No discussions with regard to this case,
20 including the testimony you heard this afternoon.  No
21 research of any kind whatsoever.
22         We'll see you tomorrow morning at 8:45.
23 Hopefully we can start by 9.
24         Dr. Moline, can you be here by 9?
25         THE WITNESS:  Sure.  I can be here by 9.  I

Page 237

1  can get here earlier if you want.
2          THE COURT:  8:45, be ready to start at 9.
3  Okay.  Thank you.
4          (Jury exits.)
5          THE COURT:  Off the record.
6          (Proceedings adjourn at 4:15 p.m.)

10 (Pages 234 - 237)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

```
                                                    Page 238
 1                    CERTIFICATION
 2
 3         I, ANDREA F. NOCKS, C.S.R., License Number
 4    30XI00157300, a Certified Court Reporter, in and for the
 5    State of New Jersey, do hereby certify the foregoing to
 6    be prepared in full compliance with the current
 7    Transcript Format for Judicial Proceedings and is a true
 8    and accurate non-compressed transcript to the best of my
 9    knowledge and ability.
10
      [signature: Andrea Nocks CCR CRR]
11    ANDREA F. NOCKS              MARCH 11, 2020
12    CERTIFIED COURT REPORTER
13    MIDDLESEX COUNTY COURTHOUSE
14
15
16
17
18
19
20
21
22
23
24
25
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234