# Exhibit E

```
 1  IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                  CIVIL TRIAL DIVISION
 3                       - - -
 4  HOLLY FISHER, EXECUTRIX OF THE:   JULY TERM, 2019
    ESTATE OF SANDRA REICHART,    :
 5                                :
 6           Plaintiff,            :
                                  :
 7           vs.                   :
    AMERICAN INTERNATIONAL         :
 8  INDUSTRIES, individually and   :
    as successor-in-interest for   :
 9  the CLUBMAN BRAND, and to THE  :
    NESLEMUR COMPANY and PINAUD    :
10  COMPANY, et al.,               :
                                  :
11           Defendants.           :  NO.:  0877
12                       - - -
13           Thursday, October 13, 2022
              Courtroom 675, City Hall
14            Philadelphia, Pennsylvania
15                       - - -
16  BEFORE:  THE HONORABLE SIERRA THOMAS STREET, J.
17                       - - -
18                   JURY TRIAL
                    P.M. SESSION
19                       - - -
20  REPORTED BY:  Kimberly Wilson, RMR, CRR
21                       - - -
22          KIMBERLY A. WILSON, RMR, CRR
               OFFICIAL COURT REPORTER
23          100 SOUTH BROAD STREET, 2ND FLOOR
                PHILADELPHIA, PA  19110
24           kimberly.wilson@courts.phila.gov
                    (215) 683-8010
25
```

```
 1  APPEARANCES:
 2
 3      JAMES KRAMER, ESQUIRE,
        DONALD P. BLYDENBURGH, ESQUIRE,
 4      OLIVIA KELLY, ESQUIRE,
        Simmons Hanly Conroy
 5        112 Madison Avenue
          New York, NY  10016-7416
 6      212-784-6279
        jkramer@simmonsfirm.com
 7      okelly@simmonsfirm.com
        dblydenburgh@simmonsfirm.com
 8
 9      Counsel for Plaintiff
10
11      ERIC D. COOK, ESQUIRE,
        Willcox Savage
12        Wells Fargo Center
          440 Monticello Avenue, Suite 2200
13        Norfolk, Virginia  23510
        757-628-5661
14      ecook@wilsav.com
15
16      DAVID W. SNYDER, ESQUIRE,
        McGivney Kluger Clark & Intoccia, P.C.
17        1650 Arch Street, Suite 1800
          Philadelphia, PA  19103
18      215-557-1990
        dsnyder@mkcilaw.us.com
19
20      Counsel for Defendant, Whittaker, Clark &
           Daniels, Inc.
21
22
23
24
25
```

3

```
 1  APPEARANCES:  (Cont'd.)
 2
 3      ROBERT E. THACKSTON, ESQUIRE,
        Lathrop GPM
 4        2101 Cedar Springs Road
          Suite 1400
 5        Dallas, TX  75201
        469-983-6023
 6      robert.thackston@lathropgpm.com
 7
        ROY F. VIOLA, JR., ESQUIRE,
 8      Gordon & Rees
          18 Columbia Turnpike
 9        Suite 220
          Florham Park, NJ  07936
10      973-822-1110
        rviola@grsm.com
11
12      Counsel for Defendant, American International
           Industries, successor-in-interest for the
13         Clubman Brand, and to The Neslemur Company
           and Pinaud Company
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1
 2                    I N D E X
 3          P L A I N T I F F ' S   E V I D E N C E
 4
 5  WITNESS                    DR    CR    RD    RC
 6  Dr. Jacqueline Moline, M.D.  --    5    88    99
    Holly Fisher               106    --    --    --
 7
```

1  you would want to know what got on the floor if
2  you're measuring what went on the floor.
3  Q.     Can you just agree with me that the more you
4  put on the brush, the more likely it is that some
5  gets on the floor?
6              THE COURT:   Objection sustained.
7         Speculation.
8              Move on to the next question.
9  BY MR. THACKSTON:
10 Q.     Now, on direct examination you talked about an
11 article that you wrote along with others about
12 mesothelioma and cosmetic talc, right?
13 A.     Yes.
14 Q.     And you wrote this while you were serving as
15 an expert witness for plaintiffs and asbestos,
16 slash, and cosmetic talc litigation, right?
17 A.     I wrote that during the same time frame, yes.
18 Q.     And when you got it finished, you testified
19 about it, right?
20 A.     I was asked questions about it. I testified
21 about it, yes.
22 Q.     And so the premises of the article is, look,
23 there's these 33 cases -- now, let me back up.
24        You're a medical doctor, but you didn't see
25 these 33 people in the context of being a treating

1  physician, right?
2  A.     Correct. They were all sent to me as part of
3  a medical-legal review.
4  Q.     These were litigation files that they gave
5  you, right? Sent you to by plaintiff's lawyers who
6  hired you in litigation, right?
7  A.     In some instances I might have met with the
8  individuals.
9  Q.     This morning you talked about some intimate
10 medical details relating to Mrs. Reichart and
11 the -- and you wouldn't normally do that, like, out
12 on the street, would you?
13             MR. KRAMER:   Objection.
14             THE COURT:   Grounds?
15             MR. KRAMER:   Form. Out on the
16        street.
17             THE COURT:   What's the relevance of
18        that question? Sustained.
19 BY MR. THACKSTON:
20 Q.     When you receive medical information in the
21 context of litigation, there's been a release by
22 the person who filed the lawsuit that says,
23 "Because I'm filing a lawsuit over my medical
24 condition, I agree that people can use my medical
25 information for litigation purposes." Right?

1              MR. KRAMER:   Objection. Outside the
2         scope of this witness's expertise. She's not
3         a lawyer. She's a doctor. What these
4         individuals do with their law firms and how
5         the legal process is outside the scope.
6              THE COURT:   Overruled.
7              THE WITNESS:   My understanding is
8         they sign a release and the medical records
9         are then provided.
10 BY MR. THACKSTON:
11 Q.     When somebody files a lawsuit over their
12 medical condition, they sign a release that says,
13 "I understand you're going to need to talk about my
14 medical information in my lawsuit." Right?
15 A.     You're asking me legal questions. But that's
16 part of the process, yes.
17 Q.     Well, you're writing reports and testifying
18 about people's medical conditions. I assume you
19 have a comfort level that that's okay in the
20 context of litigation when they filed a lawsuit,
21 right?
22 A.     For their specific case with respect to the
23 specific litigation, yes. I would not discuss it
24 outside of the specific litigation.
25 Q.     And so, you wrote this article and you said

1  that these 33 cases that I reviewed, these people
2  didn't have any other exposure to asbestos, so it
3  might have been cosmetic talc, right?
4  A.     To the best of my knowledge, they did not have
5  any other sources.
6  Q.     And then it came to your attention that one of
7  them had filed a Workers' Compensation claim
8  stating under oath that she was exposed to asbestos
9  on the job that had nothing to do with cosmetic
10 talc, right?
11 A.     I'm aware -- I'm not going to discuss anyone
12 in the paper. If you're going to ask me about a
13 particular case, I would be happy to talk to you
14 about it. I'm not going to discuss any individual
15 who might be in the paper.
16 Q.     I'm not using anybody's name.
17 A.     I'm not discussing anyone in the paper.
18 Q.     So let me get this straight, Doctor.
19             MR. THACKSTON:   There's
20        no objection.
21             THE COURT:   Is there an objection?
22             MR. KRAMER:   I was just going to
23        note for the record the conversation we had
24        where I raised this objection initially with
25        regard to the appropriateness of discussing

Dr. Jacqueline Moline, M.D. - Cross    34

1   individuals that might reveal their identity.
2           THE COURT:  The last thing I said
3       was that I will allow counsel to cross-examine
4       the witness about these issues.
5           MR. KRAMER:  I understand.  But I
6       think it might be going a little bit far
7       afield.  That's why I'm placing my objection
8       on the record.
9           THE COURT:  Overruled.
10  BY MR. THACKSTON:
11  Q.   Dr. Moline, I'm not in any way, shape or form
12  asking you to identify anyone at all.  What I'm
13  asking you is, it came to your attention that one
14  of the people had filed a Workers' Compensation
15  claim, right?
16  **A.   I was aware that an individual has filed a**
17  **Workers' Compensation claim.**
18  Q.   And somebody showed you the Workers'
19  Compensation claim that said, "Under penalty of
20  criminal law, I affirm that I was exposed to
21  asbestos on the job."  Right?
22  **A.   And I was provided with other -- I don't**
23  **recall the exact forms that I had, but I was aware**
24  **of the ultimate finding that there was no exposure.**
25  Q.   Okay.  So let's just -- that's what you were

Dr. Jacqueline Moline, M.D. - Cross    34

1   talking about on direct when you said, well, there
2   was a finding by a court that she was wrong.  Is
3   that what you're saying?
4           MR. KRAMER:  Objection.
5       Mischaracterizes, Judge.
6           THE COURT:  Overruled.
7           THE WITNESS:  My understanding is
8       that somebody filed, but it was not found.  Or
9       there is a dispute whether there was actual
10      exposure.  And my recollection is that the
11      finding was that there was no exposure.
12  BY MR. THACKSTON:
13  Q.   So let me ask you about your scientific
14  methodology for writing an article then.  When you
15  are reviewing litigation files, and you're basing
16  your opinion that you're putting in the paper on
17  allegations that people made in depositions, right?
18  **A.   Yes.**
19  Q.   Fine.  And so if ultimately some court decides
20  that those allegations are wrong, does that make
21  that person a liar for saying it?
22          MR. KRAMER:  Objection.  Calls
23      for --
24          THE COURT:  Sustained.
25

Dr. Jacqueline Moline, M.D. - Cross    35

1   BY MR. THACKSTON:
2   Q.   I mean, you're assuming that whatever someone
3   has said under oath in a deposition is true, right?
4   **A.   It's often not just the individual, but there**
5   **are other individuals that may provide**
6   **corroborating information.  So I would look at the**
7   **totality of the information.**
8   Q.   And you know that because it's a lawsuit that
9   there's a defendant in the lawsuit who's denied
10  that that's true, right?  They've denied that the
11  person is entitled to be compensated, right?
12          MR. KRAMER:  Objection.  Again,
13      calls for speculation as to the process, what
14      defendants are thinking and doing.
15          THE COURT:  I would agree that you
16      should rephrase that question.  That question
17      alone does not identify exactly what you're
18      talking about, even though --
19  BY MR. THACKSTON:
20  Q.   On direct examination, over my objection, you
21  were allowed to answer a question about the effect
22  of a Workers' Compensation ruling, right?  You gave
23  an opinion about what the effect of a Workers'
24  Compensation ruling is, right?
25  **A.   I was discussing my experience in dealing with**

Dr. Jacqueline Moline, M.D. - Cross    36

1   **Workers' Compensation patients, which I have been**
2   **dealing with for years.  And my understanding of**
3   **having patients who have gone through the process**
4   **whereby a decision is made that there is or there**
5   **is not exposure that led to the disease.**
6   Q.   Okay, some kind of adjudication.  Some kind of
7   judicial review of the claim, right?
8   **A.   At some point, yes, in the case, unless the**
9   **company accepts whatever the condition might have**
10  **been.**
11  Q.   And so when it was brought to your attention
12  that this person had made this claim under the
13  penalty of criminal penalty that they were exposed
14  to asbestos in a mill, based on the fact that you
15  think that that was adjudicated, you decided not to
16  include that fact in your paper, right?
17          MR. KRAMER:  Objection as per the
18      characterization of criminal penalty.  Calls
19      for speculation.
20          THE COURT:  Overruled.
21          THE WITNESS:  I based the
22      information on what I had at hand with respect
23      to my understanding of the exposures the
24      individual had.
25

1    BY MR. THACKSTON:
2    Q.   And, in fact, the only denial was that the
3    defendant that she made the claim against denied
4    that they were liable, right?
5    **A.   I haven't memorized the entire file that**
6    **you're speaking about. I know that there was a**
7    **dispute whether there was exposure. And I'm not**
8    **quite sure at how far it proceeded or if it was**
9    **withdrawn at a certain point.**
10   Q.   Well, no matter how it ended up, it started
11   out with someone saying under oath that they were
12   exposed to asbestos other than cosmetic talc,
13   right?
14              MR. KRAMER:   Objection. What are we
15       talking about?
16              THE COURT:   Overruled. Counsel, you
17       know exactly what we are talking about. And
18       you objecting is not going to stop it.
19              THE WITNESS:   I'm sorry. Can you
20       repeat the question?
21   BY MR. THACKSTON:
22   Q.   No matter how it turned out, it started out,
23   the Workers' Compensation claim started out with
24   the plaintiff saying under oath that she was
25   exposed to asbestos on the job other than cosmetic

1    talc, right?
2    **A.   I don't know what -- how the process starts in**
3    **the state that this individual lived in, if it was**
4    **just the lawyer making an assertion or whether it**
5    **was the individual. I do not have a specific**
6    **recollection of the rules and regulations since**
7    **they're state by state.**
8    Q.   You have been shown the claim before with the
9    signature by the husband, right?
10   **A.   I'm sure you have shown it to me in the past.**
11   **I don't -- but it's been years. And the husband is**
12   **not the individual. And the individual would have**
13   **known the exposure more than a husband.**
14   Q.   Have you ever done any work for the Graham and
15   Wallace law firm in Salisbury, North Carolina?
16   **A.   No.**
17   Q.   Weren't you a retained expert in the Bell
18   case?
19   **A.   I was an expert in the Bell case, but I was**
20   **not retained -- I don't recall that I was -- I was**
21   **not retained by that firm. I don't know that firm.**
22   Q.   Okay. So after you wrote this article based
23   on these litigation cases, and you testified about
24   these articles on direct examination, and you said
25   there's no epidemiology -- well, let me back up.

1    There's no epidemiology suggesting that barbers or
2    hairdressers are at an increased risk for
3    mesothelioma, right?
4    **A.   No such study has yet been conducted. It**
5    **doesn't mean that it isn't true. But there has not**
6    **been a specific study that I have seen that is**
7    **specifically looking at barbers and hairdressers.**
8    Q.   Well, we'll get to that. Okay.
9         And so you said that my study is significant
10   because I got these 33 people who were only exposed
11   to cosmetic talc and they got meso, right?
12   **A.   I said my study was significant because it was**
13   **pointing to cosmetic talc as a cause of**
14   **mesothelioma and alerting physicians that they**
15   **should take a history. If you read the conclusion,**
16   **that's the point of this article.**
17   Q.   After you testified about your article to
18   juries, if somebody who's cross-examining you wants
19   to make sure that that's right, that in those 33
20   cases there was no other exposure -- alleged
21   exposure to asbestos, you take the position that
22   you won't disclose the names of any of those cases,
23   right?
24   **A.   I take that position regardless of what**
25   **situation I'm in. I do not disclose the names of**

1    **individuals. That is standard medical practice.**
2    **That is standard research practice. I am not doing**
3    **anything different from any colleague that I know**
4    **at any institution.**
5              MR. THACKSTON:   Object to
6        responsiveness about what colleagues do.
7              THE COURT:   Overruled.
8    BY MR. THACKSTON:
9    Q.   Well, let's take that a step at a time. So
10   you're not they're treating physician. You have no
11   physician-patient relationship with any of the 33,
12   right?
13             MR. KRAMER:   Objection, Judge. This
14       is now going into questioning regarding
15       whether or not or how she may -- the reason
16       why she's not going to be revealing these
17       individuals. And when we had this
18       conversation, counsel said he was not --
19             THE COURT:   I agree, he did say
20       that.
21             MR. THACKSTON:   I'm sorry, Your
22       Honor?
23             THE COURT:   You did say that you
24       were limited to the issue that you have
25       already touched. Sustained.

41
Dr. Jacqueline Moline, M.D. - Cross

1  BY MR. THACKSTON:
2  Q.   The position -- well, Northwell, your
3  employer, is the one that has the information,
4  right?
5              MR. KRAMER:   Same objection, Judge.
6              THE COURT:   What's the purpose of
7     the question?
8              MR. THACKSTON:   I'm sorry, Your
9     Honor?
10             THE COURT:   What's the purpose of
11    this question, Counsel?
12             MR. THACKSTON:   I'm so sorry?
13             THE COURT:   What is the purpose of
14    this question?
15             MR. THACKSTON:   Oh.  The purpose of
16    the question is that the information has
17    already been released by Northwell.
18             THE COURT:   Okay.  Well, why don't
19    you ask that.
20 BY MR. THACKSTON:
21 Q.   Northwell has already produced the records
22 that shows that Mrs. Bell was a member of your
23 study, right?
24 A.   I -- what my organization might have done, I
25 will not discuss.  I will not discuss names of the

42
Dr. Jacqueline Moline, M.D. - Cross

1  individuals in my paper.
2  Q.   And you testified earlier about Workers'
3  Compensation orders.  Have you read -- you're aware
4  that there's a 40-page order from a federal court
5  saying that your position that you can't talk about
6  those people is wrong, right?
7              MR. KRAMER:   Objection, Judge.
8              THE COURT:   Sustained.
9  BY MR. THACKSTON:
10 Q.   Have you read that opinion yet?
11             MR. KRAMER:   Objection.
12             THE COURT:   Sustained.
13 BY MR. THACKSTON:
14 Q.   All right.  In the denial --
15             MR. THACKSTON:   May I approach, Your
16    Honor?  May I display the denial that she's
17    talking about?
18             MR. KRAMER:   We object, Your Honor.
19             THE COURT:   Denials of?
20             MR. THACKSTON:   The last question.
21             THE COURT:   Can you come over here?
22    I don't know what you're talking about.
23 BY MR. THACKSTON:
24 Q.   The only denial in that Workers' Compensation
25 claim -- I'm going to represent to you that my

43
Dr. Jacqueline Moline, M.D. - Cross

1  information is the only denial is the defendant
2  saying, "We deny the claim."
3       Are you aware of a judicial order finding that
4  Mrs. Bell's Workers' Compensation claim was
5  unfounded?
6              MR. KRAMER:   Same objection.
7              THE COURT:   Overruled.
8              THE WITNESS:   My understanding was
9     that there was a dispute and then either the
10    case was withdrawn or there was a decision.  I
11    may be misremembering, but I know it did not
12    go any further than that.  That there was a
13    dispute that there was any exposure.  I
14    thought it went and either a judge made that
15    determination or the case was withdrawn at
16    that point.  And no further action was taken.
17    So that's my recollection.  I don't know.
18 BY MR. THACKSTON:
19 Q.   Would you want that shown to the jury, if
20 there is such a thing, would you want that shown to
21 the jury in this case to back you up on that?
22 A.   Which thing?
23 Q.   If there is any such thing as an order finding
24 that Mrs. Bell's Workers' Compensation claim was
25 unfounded, would you want to jury to see that in

44
Dr. Jacqueline Moline, M.D. - Cross

1  this case?
2  A.   We're not here talking about Mrs. Bell.  We're
3  here talking about Mrs. Reichart.  I would like the
4  jury to hear about Ms. Reichart and not about
5  another case.
6              THE COURT:   Well, since I'm going to
7     decide what the jury hears, objection
8     sustained on that question.  If you have
9     something that you want to approach the
10    witness with, you may approach the witness
11    with.
12             The reason why you're being asked
13    about Ms. Bell was because she's part of your
14    study.  So it's not totally irrelevant.
15             Next question.
16 BY MR. THACKSTON:
17 Q.   And I happen to know something about the Bell
18 case because I was involved in it.  For the other
19 32 cases, you haven't released any identification
20 information on those 32 cases either?
21             MR. KRAMER:   Objection, Your Honor.
22             MR. THACKSTON:   It's the last
23    question.
24             MR. KRAMER:   I still object to it.
25    It could be three questions from the end.

1     THE COURT: It's asked and answered.
2 I mean, she said she --
3     MR. THACKSTON: Okay.
4     THE COURT: Sustained, Counsel.
5     MR. THACKSTON: Okay.
6 BY MR. THACKSTON:
7 Q. Now, Doctor, one of the things that your
8 article -- your article says that there were -- was
9 it three hairdressers in your study?
10 A. Yes.
11 Q. Okay. And is this your article that I have on
12 the screen now?
13 A. I'm sorry, I didn't hear what you said.
14 Q. Is this your article that I have up on the
15 screen?
16 A. Yes.
17 Q. And one of the things you say that's
18 highlighted over here on the right is that, "The
19 high prevalence of unexplained or idiopathic
20 mesothelioma among women necessitates further
21 inquiry into the potential non-occupational
22 exposures such as exposure to asbestos contaminated
23 talcum powder." Right?
24 A. Yes.
25 Q. So you note the -- you note the occupations of

1 a few of these people. One of the parts of the
2 paper deals with what you call fiber burden
3 studies, right?
4 A. There were six cases that had tissue
5 evaluated.
6 Q. It says -- your article says, "While fiber
7 burden studies are rarely undertaken in the course
8 of clinical treatment, and they're used primarily
9 for medico-legal purposes, the finding of various
10 fibers in the lung tissues can provide guidance on
11 potential prior asbestos exposure, et cetera"
12 Right?
13 A. Yes.
14 Q. Do you know whether there has been any fiber
15 burden analysis done of Mrs. Reichart's tissue?
16 A. I haven't seen any.
17 Q. Now, you reference in your papers something
18 called a mesothelioma registry?
19 A. Can you point me to what you're talking about?
20 Q. Do you remember mentioning the Italian
21 mesothelioma registry?
22 A. Yes.
23 Q. And you say that -- you say, quote, "Typically
24 patients with mesothelioma will be simply asked
25 whether they worked with or around asbestos, rather

1 than being provided with a listing of potential
2 sources of the types of exposure in which one might
3 encounter asbestos. Cases of mesothelioma among
4 hairdressers characterized as idiopathic, also
5 underscore the contribution of an incomplete
6 exposure history. The potential failure to
7 identify use of talcum powder exposure in their
8 work would prevent the linking of occupational
9 exposures to asbestos in their mesothelioma. In
10 our paper, there were three female hairdressers who
11 regularly used talcum powder in their work."
12 Right?
13 A. Correct.
14 Q. But then you say, "It was unclear from any of
15 the histories noted in the medical records that
16 these women were asked if they used talcum powder
17 as part of the haircutting process." And you say,
18 "In a report from the national mesothelioma
19 registry of Italy" -- now, that's like a listing of
20 all the mesothelioma cases in Italy, right?
21 A. Yes.
22 Q. "Staff noted a cluster of mesothelioma due to
23 unknown exposure among a hairdressers, but they
24 examined hairdryer use as a potential exposure."
25 Right?

1 A. Correct.
2 Q. Because hairdryers at one time contained
3 asbestos, right?
4 A. Some of them might have, not all of them.
5 Q. And they have a fan in them that blows air
6 through them, right?
7 A. I'm not a hairdryer expert.
8 Q. You're not aware of whether a hairdryer has a
9 fan in it?
10 A. I'm not going to comment on the mechanics of a
11 hairdryer.
12 Q. And so in your article you're saying there's
13 no other possible exposure to asbestos. But then
14 you mention hairdressers. And then you cite an
15 article that says, a source of asbestos exposure to
16 hairdressers could be hairdryers. Right?
17     THE COURT: Can you put that back
18 up, please? There's no objection, but you
19 didn't read the complete sentence in there.
20     MR. THACKSTON: Only examine
21 hairdryer use as a potential exposure. No
22 discussion of the occupational use of talcum
23 powder. Footnote 51.
24     THE COURT: If you're going to read
25 to the jury, read completely every word.