

2101 Cedar Springs Road
Suite 1400
Dallas, TX 75201
Main: 469.983.6100

> **MEMO ENDORSED**
>
> HON. VALERIE FIGUEREDO
> UNITED STATES MAGISTRATE JUDGE
>
> Dated: 11-7-2022
>
> Plaintiff is directed to file its response by November 21, 2022. A discovery conference is scheduled for December 12, 2022 at 2:00 p.m. Counsel for the parties are directed to call Judge Figueredo's AT&T conference line at the scheduled time. Please dial (888) 808-6929; access code 9781335.

November 4, 2022

**VIA ECF**

Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

RE: *Brian Joseph Gref v. American International Industries, et al.*
Case No.: 1:20-cv-05589-GBD-DCF

Dear Justice Figueredo:

Defendant American International Industries (sued individually and erroneously as "*successor-in-interest for the* CLUBMAN BRAND, to THE NESLEMUR COMPANY and PINAUD COMPANY") (hereinafter "A-I-I"); Colgate-Palmolive Company, as a successor-in-interest to The Mennen Company (hereinafter "Mennen"): Shulton, Inc.; and Whittaker Clark & Daniels, Inc.; (hereinafter "Defendants") by counsel and pursuant to Fed. R. Civ. P. 26(b)(1) and (2), 30(d), and 37, collectively move to Compel the Continuation of the deposition of Plaintiff's Expert Jacqueline Moline.

**I.     INTRODUCTION**

Defendants bring this motion to compel the continuation of the deposition of Plaintiff's expert Jacqueline Moline to complete her deposition. The parties have met and conferred prior to seeking relief. Plaintiff has unilaterally attempted to limit the deposition to one additional hour. As more fully set forth below, there are compelling reasons, that are not the fault of the defendants, that additional time is needed to complete Dr. Moline's deposition.  Specifically:

(1) Dr. Moline authored an article that serves as a basis for her opinions in this case "Mesothelioma Associated With the Use of Cosmetic Talc," Journal of Occupational and Environmental Medicine, Vol. 62, No. 1, Jan. 2020, ("**Exhibit A**") ("Moline Article") which relies on false premises;

(2) Dr. Moline's Article states she examined 33 mesothelioma litigation cases—which she refuses to identify—that she claims the only possible exposure to asbestos was through contaminated cosmetic talc despite likely alternative exposures;

(3) although Dr. Moline refuses to identify the cases, A-I-I proved one of these 33 cases was the *Betty Bell* case in North Carolina where the plaintiffs filed two workers' compensation claims for alleged occupational exposures to asbestos, with Dr. Moline being aware of both claims;

(4) Dr. Moline relies on her Article in reports and testifies about it on direct examination, but then claims various privileges to refuse to answer questions on cross examination;

(5) when A-I-I discovered the *Bell* case contradicted the foundations of her Article, Dr. Moline claimed, with no factual basis, that the workers' compensation claims were determined to be without merit;

(6) counsel for Plaintiff in this case has elicited this same false testimony from Dr. Moline at trial in the last month (the *Holly Fisher* trial in Philadelphia);

(7) initially, Dr. Moline provided a reliance list with 492 articles for her opinion in this case, though reliance and reference materials changed between the issuance of her case report, her first volume of her deposition, and her second day of deposition, so Defendants require additional time to determine the actual bases of her opinions;

(8) during her deposition, Dr. Moline brought more than half dozen additional expert reports with her that she now relies on that were not mentioned in her report;

(9) during her deposition, Dr. Moline reached new opinions based on a 17-page "Exposure Testimony Summary" sent to her by Plaintiff's counsel nine months after her initial report was produced to Defendants, these new opinions based on that summary were not disclosed until her deposition, and Plaintiff's counsel only produced this "Exposure Testimony Summary" to defense counsel the day before her deposition;

(10) throughout her deposition thus far in this case, Dr. Moline has consumed undue time with filibustering and insulting counsel; and

(11) technical issues inherent in remote depositions, plus Dr Moline finding fault with every document displayed, contributed to the time consumed thus far.

II. **DEFENDANTS REQUIRE ADDITIONAL TIME TO EXAMINE DR. MOLINE ON HER METHODOLOGIES THAT FORMED THE BASIS FOR HER OPINIONS IN THIS MATTER**

   A. **There is no epidemiological link between peritoneal mesothelioma and cosmetic talc, so Defendants need additional time to examine Dr. Moline on her methodologies and reliance materials used to reach her conclusions.**

Plaintiff Brian Gref is 40 years old and was diagnosed with a cancer of the lining of the abdominal cavity known as peritoneal mesothelioma. (Expert Report of Jacqueline Moline, MD,

dated October 28, 2021, "**Exhibit B**" at pp. 6-7). This type of cancer has a weak link to asbestos (only 8% of individuals with peritoneal mesothelioma reported asbestos exposures) and, when there is a link to asbestos, the link is only associated with heavy occupational exposures. (Carbone, Michele, et al., "Mesothelioma: Scientific Clues for Prevention, Diagnosis, and Therapy" 2019; 69:402-429, "**Exhibit C**" at 421). Plaintiff has no such known exposures to asbestos. (Ex. B).

Due to this lack of known asbestos exposures, Plaintiff alleges his cancer was causes by asbestos from trace contaminants in cosmetic talcs used on him and by him. (*Id*.; Doc. 37-1). Plaintiff's mother testified she used various men's shaving powders equally to change Plaintiff's diapers. (Relevant Portions of Deposition Testimony of Karen Nappi, dated June 16, 2021, "**Exhibit D**" at 55:20-57:15, 62:23-63:2; Ex. B at 7).[1] These men's shaving powders included English Leather, Mennen, Old Spice, and Clubman. (*Id*.). They continued using these shave talcs to change Plaintiff's diaper, in equal amounts, until he was out of diapers, even having these shave talcs shipped to their home in Guantanamo Bay specifically for Plaintiff's diaper changes. (Ex. B at 7; Ex. D at 92:21-94:4). Plaintiff alleges he also personally used these same shave talcs on his groin, arms, knees, and neck. (Ex. B at p. 7).

There is no epidemiology study supporting the claim that cosmetic talc increases the risk of any kind of mesothelioma, not the kind that occurs around the lungs (pleural), and certainly not the type that occurs in abdominal cavity (peritoneal) like Plaintiff's. (Report of Dr. Tim D. Oury, PhD (*Gref*), dated May 11, 2022, "**Exhibit E**" at p. 4-5).

> "In contrast to pleural mesothelioma, MpeM [malignant peritoneal mesothelioma] is rarely associated with asbestos exposure; in a large series, only 8% of patients reported exposure, and MpeM afflicts men and women equally—as anticipated when mesothelioma is not caused by occupational exposure. However, when MpeM occurs in individuals exposed to asbestos, they usually have a higher lung fiber burden than those with pleural mesotheliomas, possibly because a higher burden is required for asbestos fibers to bypass the lung filter and reach the peritoneum in sufficient amounts to cause mesothelioma."

(Ex. C at p. 421).

Dr. Moline was deposed in this matter for one and a half days on July 6, 2022, and September 23, 2022. (Relevant Portions from Transcripts of Virtual Videotaped Deposition of Jacqueline Moline, MD, volumes 1 and 2, "**Exhibit F**" and "**Exhibit G**"). Despite the unique qualities of peritoneal mesothelioma compared to pleural mesothelioma described above, Dr. Moline testified she did not separate peritoneal and pleural mesotheliomas when utilizing her methodology in formulating her opinions. (Ex. G at p. 234:16-235:2; Ex. B at p. 21). She has not published any work on the percentage of peritoneal mesotheliomas that are related to asbestos. (Ex.

---

[1] Depositions of Plaintiff, his father, and his mother took place <u>after</u> Plaintiff settled with and dismissed Johnson & Johnson and Johnson & Johnson Consumer Inc. (Doc. 44).

November 4, 2022
Page 4

G at p. 224:10-14). Dr. Moline's report in this case does not have any sections specific to peritoneal mesothelioma. (Ex. B; Ex. G at p. 225:9-21). She has never evaluated scientific literature supporting the conclusion that contaminated cosmetic talc can be linked to peritoneal mesothelioma. (Ex. G at pp. 239:23-240:9).

Because of the lack of epidemiology between cosmetic talc and mesothelioma (including peritoneal mesothelioma), Dr. Moline wrote an article to rely on for her testimony (and other's) that purports to find a link between talcum powder and mesothelioma. As discussed below, the claims in the article appear to be false and she refuses to answer questions about them. (*e.g.,* Ex. H, Ex. I, and Ex. V). Due to its importance to Plaintiff's case (as well as in other litigation), and because of the false basis for its conclusions, Dr. Moline must be compelled to answer questions about the litigation cases she claims to have studied which form the basis of her options in this case.

Because her opinions are unsupported by scientific literature and the lack of epidemiology, Dr. Moline developed and subsequently relied on her own article to develop a causation opinion that Plaintiff's use of cosmetic talcum powder caused his peritoneal mesothelioma. (Ex. B; Ex. C).

**B.  Because there is no epidemiology linking cosmetic talc to mesothelioma Dr. Moline wrote an article while serving as an expert witness purporting to find such a link.**

Dr. Moline is a prolific expert for plaintiffs, first in asbestos litigation and now in the effort to make talcum powder the "next asbestos." Her opinion in this case relies on her Article where Dr. Moline assumes the mesotheliomas found the 33 individuals referenced were caused by asbestos. (Ex. B, p. 20-21; Ex. A at 11). In her article, Dr. Moline claims they had no possible source of exposure other than presumed asbestos contamination of cosmetic talc. (Ex. A at 11) Each of the 33 individual came to Dr. Moline as part of her consultation work in asbestos litigation. (Ex. A; *see also* Deposition of Jacqueline Moline, M.D. (*Lashley*), taken January 15, 2020, "**Exhibit H**", at pp. 30:24-32:6). She was not a treating physician in any of the 33 cases. (Ex. 1 at p. 31:8-11). All 33 individuals publicly put their medical condition at issue by filing lawsuits for mesothelioma. (*see, e.g.,* Ex. A; Memorandum Opinion and Order dated September 13, 2022, *Bell et al. v. American International Industries, et al.*, 1:17-cv-00111-WO-JEP, US District Court, Middle District of North Carolina "**Exhibit I**" at p. 36 ("*Bell* Order")). These individuals presumably signed releases pertaining to their medical records for use in their respective lawsuits. (Ex. 1 at 168:21-172:22 (Dr. Moline assumed the information used to write her article was in possession of defense lawyers involved in the underlying cases of the 33 individuals)). Also, Dr. Moline provided detailed medical histories of these individuals in her reports produced for purposes of litigation without claiming confidentiality or HIPAA rights were at-issue. (*see, e.g.,* Report from Dr. Moline dated May 5, 2016 (*Bell*), attached hereto as "**Exhibit J**"). Dr. Moline also provided details of individual plaintiffs' medical history (albeit without explicitly naming them) to Congress when she provided testimony at a hearing on "Examining Carcinogens in Talc and the Best Methods for Asbestos Detection." (Hearing before the Subcommittee on Economic and Consumer Policy of the committee on Oversight and Reform (Dec. 10, 2019), "**Exhibit K**").

Dr. Moline relies heavily on her article for her causation testimony in cosmetic talc cases. Yet, she refuses to answer any questions about the underlying litigation files on which her article is allegedly based. She claims all such information is confidential based on a variety of privileges. Dr. Moline is of course free to keep all such information private if she does not choose to serve as an expert witness or rely on her Article and testify about the cases on direct. This creates a tangled web where Dr. Moline funnels litigation files into a research article, then relies on her own Article to develop new litigation opinions, but refuses to answer questions about her article because she claims the information if privileged. (*see, e.g.,* Ex. H and Ex. I). Her positions have been fully litigated and rejected by another federal court.

### C.   Dr. Moline's Claims of Privilege Have been Adjudicated and Rejected.

Dr. Moline's refusal to answer questions about these underlying cases is the sole subject of a 40 page opinion in *Bell v. A-I-I* from the United States District Court for the Middle District of North Carolina. (Ex. I). After a momentous effort, it was discovered that the *Bell* case was one of the litigation files Dr. Moline used in her study. Based on the known details of Mrs. Bell's case, A-I-I determined Dr. Moline's Article was based on a faulty premise: namely, that Mrs. Bell had alleged occupational exposures to asbestos from her lengthy employment at textile mills. (Ex. I). Mrs. Bell's allegations were obviously contrary to Dr. Moline's assertion in her article that "[n]o individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." (Ex. A).

Plaintiff moved to seal all pleadings mentioning the facts of Mrs. Bell's identity, again claiming various privileges. Extensive time and effort went into plaintiff, Moline and her employer, Northwell Health, trying to keep sealed the fact that *Bell* was part of the study. After A-I-I won the case on summary judgment, it moved to unseal the *Bell* pleadings. Judge Osteen United States District Court extensively analyzed the facts and balanced privilege claims against the need for discovery of expert opinions, holding:

> Mrs. Bell nonetheless made statements to the Industrial Commission, while represented by counsel, that she had sustained an occupational disease caused by exposure to asbestos during employment with Hoechst Celanese Corporation and Pillowtex Corporation. The alleged occupational disease was mesothelioma. As Mrs. Bell's counsel explained, "[s]he made a [workers' compensation] claim because she thought she might have been exposed." **Mrs. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the "33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder." The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the**

**fact that one of the individuals claimed otherwise has direct bearing on the study's credibility.** This court expressed concern about this seeming contradiction before, and does so again.

This court's concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide. For example, Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial. The plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos: "Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this." **Dr. Moline has given testimony in many other cosmetic talc cases. Moreover, other expert witnesses have begun relying on the article for the basis of their opinions. [O]ne [expert] describe[ed] it as "the only peer-reviewed paper that [he] know[s]" to support the conclusion that cosmetic talc use by hairdressers releases material amounts of asbestos into the air.** When entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller specifically discussed the article's integral role in supporting the plaintiffs' claims.

This court finds that with the protective order in place defense counsel in cosmetic talc cases across the country are stymied from effectively cross-examining plaintiff expert witnesses on the article's foundation. The following exchange from Dr. Moline's cross-examination in the California state trial is illustrative:

> Q . . . Other than cosmetic talc, you eliminated anybody from your study who might have had other asbestos exposures; is that correct?
>
> A To the best of my knowledge, yes.
>
> Q Okay. And after you published the paper and testified in Congress about the paper, did you come to learn that some of the information regarding one or more of the people in your study was incorrect as published?
>
> A There was a question about one particular individual that I was presented with information about, but I -- based on the information that I had, there was -- it wasn't determined that they had the -- any additional exposure. I'm not sure of any others.
> [****]
> Q Did you publish an errata with regard to your paper after you found out that this one plaintiff that was provided to you had other alleged exposures?

November 4, 2022
Page 7

> A    As I said just a minute ago, there was an allegation or there was a -- a comment, but it was shown to be without evidence, so I did not publish an errata based on that one individual.

Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure "was shown to be without evidence." Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case—and defense counsel in similar cosmetic talc cases—would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Mrs. Bell and Plaintiff's workers' compensation claims asserting, under criminal penalty for false statements, that Mrs. Bell was exposed to asbestos at textile job sites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits, rather they were dismissed without prejudice, weakening the credibility of Dr. Moline's statement that the allegation of alternative exposure "was shown to be without evidence."

**Perhaps more significant than this example of a hamstrung cross-examination is the <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) issue created by concealment of Mrs. Bell's possible exposure.** Dr. Moline testified that "based on the information . . . it wasn't determined that [the research subjects] had . . . any additional exposure." Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, Daubert imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594 (internal citations omitted). **Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.**

From this court's perspective, inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the

> principles that underlie a proposed submission." Daubert, 509 U.S. at 594–95. Even if reliability is examined by a court and deemed sufficient to support admissibility, relevant cross-examination of an expert includes "factual underpinnings [which] . . . affect the weight and credibility of the witness' assessment." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation mark omitted) (quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)).
> […]
> In this case, a principal factual underpinning of the article is that in all thirty-three cases studied "no identified source apart from the talcum powder" was identified. (Doc. 274-1 at 2.) **The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the factual underpinning of no known exposure to asbestos other than talcum powder.**

(Ex. I at p. 16-22) (emphasis added) (internal citations omitted).

The *Bell* order was dated September 13, 2022. (*Id.*). Northwell was a party to the case at that point and given notice of the order. (*Id.*). Northwell was also given seven days to appeal but did not. (*Id.* at 39).

In a deposition two weeks after the *Bell* order was entered, Dr. Moline continued refusing to answer questions about the study. (Relevant portions of Deposition of Jacqueline Moline, M.D. (*Daigle*), taken Sept. 30, 2021, attached hereto as "**Exhibit L**", at 129:17-148:25). Dr. Moline also repeated the false claim that Mrs. Bell's workers compensation cases were "dismissed for lack of information or lack of evidence." (*Id.* at 133:9-15). She claimed to be unaware of the Bell order in which Judge Osteen specifically spelled out that the Bell workers compensation claims were not adjudicated as she has been testifying. (*Id.* at 137:7-138:8, 139:13-140:17). The pertinent portion of the *Bell* order was even read to Dr. Moline on the record:

> MR. THACKSTON: […]
> Page 19 of Judge Osteen's order, which we're attaching as Exhibit No. 15, says, quote Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure was, quote, shown to be without evidence, end of quote. Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case and defense counsel in similar cosmetic talc cases would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Ms. Bell and plaintiff's workers' compensation claims asserting under criminal penalty for false statements that Mrs. Bell was exposed to asbestos at textile jobsites. **Defense counsel could show that those workers' compensation claims were not adjudicated on the merits**. Rather,

> they were dismissed without prejudice weakening the credibility of the Dr. Moline's statements that the allegation of alternative exposure was, quote, shown to be without evidence, end of quote.

Ex. L at 137:10-138:8[2] (emphasis added).

---

[2] The full context of Dr. Moline's deposition testimony in the *Daigle* matter are illuminating as to her evasiveness when being examined about the bases of her study's findings:

Q. And it was brought to your attention that in the Betty Bell case, she had filed not one, but two workers' compensation claims for occupational exposure to asbestos having nothing to do with cosmetic talc; right?
A. That were dismissed by the court as having no evidence, yes, I was aware of that.
Q. And so you're giving kind of a legal opinion now about the mechanism by which it was dismissed. Do you know whether Judge Osteen specifically addressed that argument?
A. I was speaking about the other within the worker's comp claims that she made. My understanding is that they were dismissed for lack of information or lack of evidence. I don't know what Osteen said. I haven't read the report. And I'm not going to answer questions related to this without counsel present from Northwell Health. So I will not be answering any questions that have to do with this order without counsel present.
Q. Let me turn the page.
A. I'm not answering questions related to this document without my counsel present.
Q. Where did you get the understanding that the Bell workers' comp claim was dismissed or how it was dismissed?
A. I believe I was provided with documents years ago with respect to that particular case and... I mean, I'm not going to discuss another case without their counsel present and my counsel present.
Q. Let's look at page 19. You're saying here today that the Bell workers' compensation claim was found to be without evidence; right?
A. I'm not discussing this case any further without Mrs. Bell's counsel present and without Northwell Health's counsel present.
Q. But you already had discussed it. You made the statement –
A. I'm not making any further comments.
[…]
MR. THACKSTON: I'm going to read into the record the question I would ask by way of a bill.
Page 19 of Judge Osteen's order, which we're attaching as Exhibit No. 15, says, quote Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure was, quote, shown to be without evidence, end of quote. Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case and defense counsel in similar cosmetic talc cases would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Ms. Bell and plaintiff's workers' compensation claims asserting under criminal penalty for false statements that Mrs. Bell was exposed to asbestos at textile jobsites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits. Rather, they were dismissed without prejudice weakening the credibility of the Dr. Moline's statements that the allegation of alternative exposure was, quote, shown to be without evidence, end of quote.
[…]
Q. I'm going to back to your statement that the Bell workers' compensation case was dismissed and I'm asking you about what your training –
A. I told you I'm not discussing this case without counsel present and I am not -- or Bell's counsel present. So I'm not discussing it.
Q. Let's go back to your report. Your report in the Daigle case at page 19 states, quote, I have recently published a paper along with co-authors that describes 33 cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc, end of quote. Correct?
A. That's what I wrote.
Q. And I would like to ask you about those cases because there were allegations in those cases of exposure to asbestos other than from cosmetic talc, weren't there?
MS. RATCLIFFE: Objection. This is just borderline harassment at this point.
THE WITNESS: I don't hear a question pending. You told me what you'd like to do, but that's not a question.
BY MR. THACKSTON:
Q. In those 33 cases, there were allegations of exposure to asbestos other than from cosmetic talc, weren't there?
A. I'm not discussing the cases in the paper. I'm not discussing the specifics or the names of the individuals in the paper.

Approximately <u>two weeks after</u> being specifically apprised that a federal court had rejected her testimony about dispositions of the *Bell* workers compensation claims, Dr. Moline repeated the same false claim in testimony to a jury in Philadelphia on October 13, 2022, this time even purporting to be an authority on the workers' compensation process. (Relevant Portions of *Fisher v. A-I-I*, Trial Tr. Morning Session, October 13, 2022, "**Exhibit M**"; *Fisher v. A-I-I*, Trial Tr. P.M. Session, October 13, 2022, "**Exhibit N**"). On direct examination, the same counsel who represents Mr. Gref asked Dr. Moline the following:

> Q   Are you familiar with the process of workers' compensation?
>
> A   I am. I've been dealing with workers' compensation patients since I started at Mount Sinai.
>
> Q   Could you explain in what way you're involved with that process?
>
> A   Sure. It's a process where a patient may feel that they have an exposure at a workplace that's making them sick. They have to do some paperwork, then they have to provide medical evidence that their exposures are related – that their workplace exposures have caused the disease, and then the workplace has to provide information saying whether there is exposure at the workplace that could cause the disease and it's -- part of it is an insurance process, but it also can involve if there's a dispute that there may not be such an exposure or the exposure didn't cause the disease, and then you have hearings, and there's workers' comp judges that make decisions.
>
> Q   **What significance is there, if any, to a workers' compensation judge denying a worker's application or claim?**
>
> [objection omitted]
>
> THE WITNESS: **That a worker's compensation is going to look at the information provided to them by the employer and by the claimant or the patient, as well as if there's medical information, look to see if there's a connection, look to see if there's an exposure in the workplace and make a decision if there's sufficient evidence for there to be a claim to go forward.**

(Ex. M at 27:23-29:10). And again, only last month in October 2022 Dr. Moline claimed to a jury that she could not testify about the cases on which she relied on in her 2019 article due to "standard medical practice":

---

*Id*. at 133:9-134:24, 137:7-138:8, 139:13-140:17.

> Q. After you testified about your article to juries, if somebody who's cross-examining you wants to make sure that that's right, that in those 33 cases there was no other exposure – alleged exposure to asbestos, you take the position that you won't disclose the names of any of those cases, right?
>
> A. I take that position regardless of what situation I'm in. **I do not disclose the names of individuals. That is standard medical practice.** That is standard research practice…

(Ex. N at 30:17-40:4).

It is false and misleading for her to suggest that she had any medical relationship with the 33 litigation cases discussed in her article where she was not any of their treating physicians and the cases came to her through the course of litigation. Dr. Moline's continuing reliance on her Article, misrepresentations in the article and about events that came to light after it was published provide a compelling basis for a complete deposition in this case.

### D. **Although Dr. Moline Refuses to Identify the Underlying Cases, Facts Described in the Article Resemble Other Cases That Also Had Allegations of Asbestos Exposure**

In addition to the *Bell* case, described above, there are at least four other cases that appear to be ones Dr. Moline used that also involved additional exposures to asbestos, contrary to her claims. Defendants have determined at least four of the plaintiff-cases in Dr. Moline's 2019 study match plaintiffs in other cases involving the Defendants for whom there is significant evidence of exposure to asbestos that is not alleged to be in talc.

What Dr. Moline refers to as "Case 3" in her 2019 article aligns with the facts of the *Doris Jackson* case, a school teacher. (Ex. A; Dr. Moline's Expert Report (Jackson), attached hereto as "**Exhibit O**" at 3; Ronald Gordon, Ph.D.'s Tissue Digestion (Jackson), attached hereto as "**Exhibit P**" at 2) The United States District Court for the District of Columbia granted a talcum powder defendant's *Daubert* motion to exclude the testimony of Ms. Jackson's expert, Dr. Ronald Gordon because he failed to follow the Helsinki Criteria in disregarding Ms. Jackson's exposure to *"ceiling pipes with degrading insulation" during her more than 30 year career as a public school teacher.* (*Jackson* Daubert Decision, "**Exhibit Q**" at 18 (emphasis added)). The Court excluded the opinion finding "Dr. Gordon's specific causation opinion is unreliable under *Daubert*." *Id*. Like Dr. Gordon, Dr. Moline reviewed and noted evidence of alternative exposure in her expert report, yet represented that Plaintiff 3/Doris Jackson had no asbestos exposure other than talcum powder. (Ex. O at 5)

Case 4 aligns with *Valerie Jo Dalis*, who filed a $450,000 bankruptcy trust claim based on her husband's automotive work, receiving $28,000 from the Manville Personal Injury Settlement Trust related to known commercial asbestos exposure separate and apart from her alleged talcum powder exposure. (Ex. A; Dr. Moline's Expert Report (Dalis), attached hereto as "**Exhibit R**" at

November 4, 2022
Page 12

4; *see also* Ronald Gordon, Ph.D.'s Tissue Digestion Analysis (*Dalis*), attached hereto as "**Exhibit S**" at 2; Bankruptcy Trust claim, Claim Detail Report and claim Information Report (*Valerie Dalis*), attached hereto as "**Exhibit T**"). Dr. Moline was aware of the bankruptcy trust claim, having received the transcripts of the depositions of both Mr. and Mrs. Dalis in preparation of or drafting her expert report in 2016. (Ex. R). Despite this review, Dr. Moline again misrepresented "Case 4"/Mrs. Dalis as having no exposures to asbestos other than talcum powder in her 2019 article. (Ex. A).

Case 17's facts align with *Helene Kohr*. (Ex. A; Dr. Moline's Expert Report *(Kohr)*, attached hereto as "**Exhibit U**" at 3). In her case specific report for Ms. Kohr, Dr. Moline acknowledged Ms. Kohr's 50-60 pack year smoking history, which included smoking Kent cigarettes with crocidolite asbestos-containing filters. (Ex. U). However, Dr. Moline did not include this fact in her 2019 article. (Ex. A). Thus, based on Dr. Moline's own causation opinion, Plaintiff 17/Helene Kohr had alternative exposures and should have been excluded from the study based on Dr. Moline's description of the scope of the study. (*Id.*).

Despite having served as an expert to plaintiff-participants in their cases, when asked recently about her 2016 expert reports from the *Betty Bell* and *Doris Jackson* cases, Dr. Moline refused to answer questions before any questions were even asked. (Relevant Portions of Deposition of Jacqueline Moline, M.D. (*Chenet*)(Mar. 25, 2021), "**Exhibit V**" at pp. 151:5-153:19; 154:12-155:19; *see also* Ex. 1).

E. **Dr Moline Cannot use her study offensively as reliance material then refuse to answer questions about it based on alleged privileges**

Dr. Moline's claims that the litigation information on which she based her article is confidential in the context of her work as an expert witness has been exhaustively litigated and resolved against her and her employer. (Ex. I). In *Bell*, Plaintiff's counsel and Northwell made confidentiality and privilege arguments, including concerns about HIPAA and human research confidentiality, to shield Dr Moline's 2019 article from examination. The Bell court rejected those arguments and ordered unsealed all information relating to the Bell case being a subject of the study. The *Bell* court unsealed 36 pleadings initially protected based on claims of confidentiality and privilege. (Ex. I). The fact that there were 36 pleadings on that topic indicate how thoroughly this issue has been litigated.

In *Bell*, counsel for the plaintiff even conceded that HIPAA does not apply to the information Moline received as an expert witness and used in her study. As to HIPPA claims, the court found:

> Moreover, **AII and Plaintiff agree that none of the information in the Northwell Document is HIPAA protected**. (Compare AII's Br. (Doc. 369) at 21, with Pl.'s Resp. (Doc. 377) at 19.) Plaintiff's concession that no HIPAA-protected information is at risk of disclosure nullifies Northwell's argument that 'vacation the protective order would violate the purpose of

> HIPAA." (Northwell's Resp. (Doc. 392) at 17 (capitalization removed).) As Northwell acknowledges, the relevant purpose of HIPAA is to benefit patients by providing privacy protections for certain types of health information. (See id. at 17 (citing 45 C.F.R. §§ 160.103, 164.502, 164.508 (2020)).) Here, the patient's representatives, Plaintiff, concedes no HIPAA-protected is at risk of disclosure. In light of this concession-not to mention the HIPAA waiver Plaintiff executed, (Doc. 179-6) – **HIPAA does not seem to apply nor is its purpose violated**.

(Ex. I at 36 (emphasis added)).

The Court also noted that many of the 33 cases do not qualify for privacy protections granted to "human test subjects" given the cases involved deceased individuals at the time the study began. (*Id*. at 29-34).

As noted, Northwell intervened in the *Bell* case to make these same arguments. The Court subsequently rejected them. Northwell was then given the opportunity to appeal the Court's decision and did not. In this case, pursuant to a subpoena, Northwell is producing documents related to the Moline article. Other Courts have also rejected arguments related to "privacy" in relation to questioning the individuals involved in Dr. Moline's study. (No. 2019-7989 Div. "E", SEC. 7, Civil District Court Parish of Orleans, State of Louisiana, Judgment dated July 16, 2021, attached hereto as "**Exhibit W**").

### F. Additional Time is Needed to Fairly Examine Dr. Moline Due given the Nature of her Opinions and the History of Obstruction.

Although a party may terminate or limit a deposition that is "being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses" their expert, the Rules provide that "[t]he court **must allow additional time** consistent with Rule 26(b)(1) and (2) **if needed to fairly examine the deponent….**" Fed. R. Civ. P. 30(d)(3)(A) and 30(d)(1). "[T]**here may often be a need for additional time […] for full exploration of the theories upon which the [expert] witness relies**." Fed. R. Civ. P. 30(d), 2000 Advisory Committee Notes. The Rules also demonstrate a preference for "broadening of discovery against experts in the cases [] where expert testimony [is] central to the case," as this will make for more efficient and better cross-examination and rebuttal at trial. Fed. R. Civ. P. 26(b)(4), 1970 Advisory Committee Notes.

The Rules of Evidence state an "expert may be required to disclose [the underlying] facts or data [of her opinion] on cross-examination. Fed. R. Evid. 705. Rule 26(b)(4) governing protections of expert discovery is not meant to impede any discovery efforts about an expert's opinion or the "development, foundation, or basis of those opinions." Fed. R. Civ. P. 26(b)(4), 2010 Advisory Committee Notes.

> For example, the expert's testing of material involved in litigation, and notes of any such testing, would not be exempted from discovery by this

>           rule. **Counsel are also free to question expert witnesses about alternative analyses, testing methods, or approaches to the issues on which they are testifying, whether or not the expert considered them in forming the opinions expressed.** These discovery changes therefore do not affect the gatekeeping functions called for by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and related cases.

*Id*. (emphasis added).

Defendants are allowed to examine Plaintiff's expert about any source whose information pertained to her opinions for this case. *Cnty. of Suffolk v. Long Island Lighting Co.*, 122 F.R.D. 120, 124 (E.D.N.Y. 1988). Examination of Dr. Moline's methodology used in her 2019 article is required to determine whether her opinion in this case is based on reliable analysis. *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Finally, "**[t]he need to provide the parties with an adequate opportunity to develop the record and present their strongest arguments**" trumps any interest the Court may have in expediency. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 9771806, at *2 n.1 (S.D.N.Y. May 4, 2017).

Here, Defendants must be allowed additional time to explore the theories on which Dr. Moline's opinion is based, including on her article she explicitly cited in her Report as a basis for her opinions in this case. (Ex. A). Questioning how Dr. Moline developed her methodologies cannot be considered "bad faith," let alone unreasonably annoying, harassing, or oppressive. Indeed, Defendants are permitted to fully exposure "the theories upon which [Dr. Moline] relies." The Defendants cannot develop a complete record Dr. Moline without the adequate opportunity to "vigorous[ly] cross-examin[e]" on the development, foundation, or basis of her opinions found in her 2019 article, as Dr. Moline's opinion in this case relies on the thesis of her 2019 article.

Federal Rule of Evidence 705 is clear: Plaintiff's expert is required to disclose the facts or data underlying her opinion. Each of the 33 plaintiff-participants who were hand-picked by Dr. Moline for her study were those who had already filed his or her own personal injury action and for whom Dr. Moline had been designated as an expert witness to testify regarding their disease and the alleged cause(s) of the plaintiffs' disease. The Defendants would be unduly prejudiced if they are prevented from having a full and complete opportunity to cross-examine Dr. Moline about her unsound methodologies to properly challenge, and exclude, the testing results and her expert opinions under *Daubert*.

Notably, *Daubert* imposes multiple factors for courts to consider in assessing the reliability of an expert. *Daubert v. Merrell Dow Phrams., Inc.*, 409 U.S. 579, 594 (1993). This includes determining "the known or potential rate of error and existence and maintenance of standards controlling the technique's operation." (*Id*.). Given at least one of the individuals listed in her 2019 article is known to not meet the alleged premises of her study, and there are likely at least three

more, full cross-examination on the basis of her study, including the full backgrounds of the individuals in the 2019 article is required to determine the reliability of or "potential rate of error" in her study given its false claim that all 33 individuals had "no identified source [of asbestos exposures] apart from the talcum powder." (*see* Ex. I at pp. 20-21, 23).

Finally, public policy supports allowing Defendants to fully question Dr. Moline. Dr. Moline's misleading 2 article has had influence "on cosmetic talc litigation nationwide." (*Id.* at p. 17). Not only does Dr. Moline rely on and cite her article, other expert witnesses in this litigation have relied on it for their opinions. (*Id.* at pp. 17-18). Dr. Moline gave testimony to Congress about the "findings" in her 2019 article, which has the potential to influence policy nationwide. (Ex. K). Given its reach and influence, Defendants must have the ability to challenge the basis of her testimony given its reliability is in question based on the information Dr. Moline omitted about the individual's known asbestos exposures.

Following informal requests to continue Dr. Moline's deposition based on the foregoing, Plaintiff only offered one hour of additional time to depose Dr. Moline. Given she not only wrote the article on which this litigation is built, but she also managed to avoid answering <u>any substantive</u> questions about it using various dilatory tactics for two years, Dr. Moline must be examined fully on her article or withdraw as an expert.

As the *Bell* Court found, the potential issue created by concealment of the individuals in her 2019 article "goes directly to the issue of standards controlling her study's operation." Respectfully, this Court should find the same. Therefore, Defendants need additional time to depose Dr. Moline to examine her on her flawed methodologies, and Dr. Moline should be compelled to answer questions on the names and backgrounds of the individuals in her 2019 article pursuant to Federal Rules 26, 30, and 37.

### III. DEFENDANTS NEED ADDITIONAL TIME TO DEPOSE DR. MOLINE DUE TO UNDUE DELAYS AND EXCESSIVE AND UNTIMELY DISCLOSURES OF OPINIONS.

#### A. Defendants need additional time to question Dr. Moline to determine which materials she actually relies on to determine her opinion.

Defendants cannot be expected to fully examine a witness on the basis of her opinions when they have no way of ascertaining where her opinions came from. Dr. Moline's purposefully obfuscates which materials she relies on to develop her case-specific opinions, prolonging her examination. She purports to rely on a "reference" list of articles or documents containing 492 references to develop her opinions. (Ex. B). However, throughout her report she make assertions without citations to specific articles or studies, pointing to the 492 references as the basis for her assertion. (*e.g.*, Ex. G at p. 241:10-21). Likewise, during her second day of deposition she claimed her reference list actually contained "about 505" items as the basis for her assertions. (*Id.* at pp. 241:22-242:2).

November 4, 2022
Page 16

      Beyond the 492 reference materials listed, Dr. Moline presented at the deposition with multiple expert reports and additional testimony and opinions not disclosed in her original report. (Ex. F at pp. 14:18-17:11). This included a 17-page "Exposure Testimony Summary", which she did not draft, which was not provided to Defendants until the day prior the deposition and which she relied on for her opinions in the deposition. (*Id*. at pp. 13:9-25, 135:16-136:2, 170:15-21). Despite receiving this "Exposure Testimony Summary" nine months after her report was produced, she relied on this for new opinions in this case.

      Another example of Dr. Moline's obfuscation came during defense examination related to her alleged methodology in formulating her opinion. She alleged there was an "analogous exposure scenario" referenced by the Center for Disease Control ("CDC"), although she offered no citation to any specific article. . (Ex. B at 21). Dr. Moline testified that someone would have to "go and find" the CDC article from her list of 505 articles in her report's reference list. (Ex. G at pp. 241:10-242:9). She also testified that the article did involve linking peritoneal mesothelioma to asbestos exposures, and she claimed it stated "that cosmetic talc may be a cause." (Ex. G at pp. 242:25-243:16).

      Likewise, after the first day of deposition, Dr. Moline made dose estimates/dose applications for various products allegedly at-issue in this matter. (Ex. G at pp. 273:17-274:17). She did not provide these estimates to counsel, but she relied on these estimates for her opinions expressed for the first time on direct at the end of her deposition. (*Id*.).

      Similarly, she reviewed a report from Dr. William Longo produced after her October 28, 2021, report which she reviewed and considered for her opinions in this case. (Ex. G at pp. 275:20-277:14). Despite considering this report for her opinions in this case, she never supplemented her report to reflect her updated opinions. (*Id*.)

      During examination by plaintiff's counsel near the very end of the second day of deposition, Dr. Moline again developed new dose estimates and "cumulative exposure" estimates, including dose estimates for individual defendant's products. (Ex. G at 295:2-296:14). Again, these estimates were not provided by Dr. Moline prior to her deposition. (*Id*.).

      When given the opportunity to briefly examine Dr. Moline on these estimates, she was asked whether she knew of any studies, whether in her over 500 listed references or not, that examined individuals within the range she alleged Plaintiff Gref was exposed to from cosmetic powders contracted mesothelioma and she was unable. (*Id*. at pp. 307:7-311:25). She mentioned one study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos, and the examination was terminated before Defendants were finished examining her on this study or her new dose estimate opinions. (*Id*.).

      In addition and specific to Mennen, Mennen's counsel asked Dr. Moline about the bases for her opinions on Day 1, and Dr. Moline testified she did not rely on the late-produced reports from Dr. Longo on purported asbestos content of Mennen products. Indeed, Dr. Moline confirmed

November 4, 2022
Page 17

she reviewed three reports from MAS/ Dr. Longo on Mennen products after her 8/28/21 report and never supplemented her report or opinions.  Ex. F at 14:18-15:4, 16:8-16, 166:12-169:3.

With regard to the 17-page "Exposure Testimony Summary" that was not provided to Defendants until the day before the deposition, Dr. Moline testified she "didn't have anything to do with the preparation of it." Ex. F at pp. 170:7-21.  She further testified that she did not perform a dose estimate or "any quantification" in terms of fiber release for Mennen products. (*Id*. at pp. 171:7- 172:9).  Nevertheless, after the second day of her deposition when her own counsel did his direct examination, Dr. Moline offered new opinions beyond her report for the first time and after more than 6 hours of deposition.  Specifically, Dr. Moline testified she developed new dose estimates and "cumulative exposure" estimates, including a fiber release and dose estimate specific to Mennen. (Ex. G at 295:2-296:14). Counsel for Mennen was unable to ask follow up questions as to the basis for this brand new opinion before Plaintiff's counsel called time on the deposition.

As shown, Dr. Moline essentially aims to "hide the ball" from examining counsel as to the foundations for her opinions. Not only does her reference list change mid-deposition without notice to defendants, but she does not cite to specific articles to make her assertions and she modifies her opinions without notice to defendants or supplementing her opinion report. As noted in Section II, studies demonstrate that only 8% of peritoneal mesotheliomas like Plaintiff Gref's have known relation to asbestos. If Dr. Moline's is allowed to point to "about 505" references for the "foundation" of her opinion, determining the actual grounds for her opinion is impossible.

Questioning how Dr. Moline developed her methodologies cannot be considered "bad faith," let alone unreasonably annoying, harassing, or oppressive. Indeed, Dr. Moline cannot claim to be oppressed while charging $750 per hour to give her testimony. (Ex. F at p. 20:23-25).

Defendants are permitted to fully expose "the theories upon which [Dr. Moline] relies." Likewise, simply reviewing this "Reference List" does not satisfy Defendants' right to examine and depose Dr. Moline. (*Harris v. United States*, 132 F. App'x 183, 185 (9th Cir. 2005) ("The opportunity to review the opposing party's expert witness's report does not satisfy a party's right to depose that expert.")). This is even more relevant here, where, as noted, Dr. Moline brought <u>additional reports</u> she relied on to her deposition that Defendants had <u>minimal or</u> <u>no opportunity</u> to review prior to the deposition.

Here, there is no basis for terminating Dr. Moline's deposition before defense has adequate time to examine her, and there is no basis for limiting its continuation to one hour. Given Defendants did not have adequate opportunity to fairly examine Dr. Moline on the materials she relied on for her opinions – both those disclosed in her initial report as well as those disclosed the day of her deposition.

November 4, 2022
Page 18

### B. Undue Delays Caused by Dr. Moline's Unresponsive Answers And Technical Issues Justify Additional Time For Examination.

During her deposition, Dr. Moline consumed undue time to insult the questioning attorneys or make snide remarks, which unduly wasted time on at least seventeen occasions. (*Id*. at 50:9-13, 59:15-22, 80:9-24, 80:25-81:11, 81:12-25, 89:3-13, 95:3-19, 102:2-3, 106:17-24, 116:11-18, 118:10-119:7, 131:14-21, 132:24-133:10, 297:12-16, 196:14-197:22, 281:2-16, 297:24-298:5). These unprofessional remarks causing delays occurred while counsel questioned Dr. Moline's about her reliance materials (outside of her 2019 article) forming the bases for her opinion, including questions about dose levels, methodologies she claimed to follow, Mr. Gref's non-talc, alternative exposures to asbestos, and testing done on cosmetic talc, among other topics. (*Id*.)

In addition to delays caused by Dr. Moline, technical issues caused by virtual nature of the deposition also caused delays in the deposition while on the record. These issues included hearing issues, screen sharing issues (for exhibits), and camera positioning, none of which were the sole fault of any one party present at the deposition. (*e.g., id*. at 10:14-20, 26:11-15, 29:2-3, 85:13-24, 117:5-19, 121:20-25, 193:2-7, 214:20-23, 240:16-17, 244:9-18, 267:13-25, 297:12-19).

Despite these delays, and despite defendants stating they had additional questions on the reliance materials through which Dr. Moline formed her opinion, Plaintiff's counsel ended the deposition. (Ex. G at p. 291:25-292:24, 297:5-9, 311:21-312:16).

As noted *supra*, the Rules provide that "[t]he court **must allow additional time** consistent with Rule 26(b)(1) and (2) **if needed to fairly examine the deponent or if the deponent […] or any other circumstance impedes or delays the examination**." Fed. R. Civ. P. 30(d)(3)(A) and 30(d)(1). "Other circumstances" allowing for additional examination time include circumstances outside the control of the parties, including "a power outage, a health emergency, or other event." Fed. R. Civ. P. 30(d), 2000 Advisory Committee Notes.

Dr. Moline's deposition was repeatedly delayed by her personal insults on examining attorneys and mocking non-responsive remarks aimed at the questioning attorneys. Similarly, the deposition experienced multiple technical issues while on the record which further delayed her examination. These are exactly the situations covered under Rule 30(d)(1) – not only did Dr. Moline delay her own examination through her remarks, but "other circumstances" caused by technical failures impeded her deposition. As such, this Court "must allow additional time" to allow Defendants "to fairly examine" Dr. Moline.

Given the combative, nonresponsive nature of Dr. Moline's testimony, time limits are unfair to the defendant. They allow the witness, and counsel with long improper objections, to "run out the clock" without actually providing answers during Defendant's examination. Therefore, pursuant to Federal Rules 26, 30, and 37, A-I-I moves this Court to grant additional time to fairly examine Dr. Moline on all bases of her opinion.

///

November 4, 2022
Page 19

### IV. CONCLUSION & PRAYER

For the foregoing reasons, Defendants seek an order compelling the continuation of Dr. Moline's deposition until Defendants are given reasonable opportunity to explore fully the bases for Dr. Moline's opinions, and Defendants seek an order compelling Dr. Moline to answer questions regarding her article. The Defendants also seek such other relief the Court may consider appropriate.

Respectfully Submitted,

**Lathrop GPM LLP**

Robert E. Thackston
Partner

cc:   All parties of records (via ECF)