IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN JOSEPH GREF, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 1:20-CV-05589-GBD |
| v. | § | |
| | § | |
| AMERICAN INTERNATIONAL | § | |
| INDUSTRIES, et al. | § | |
| | § | |
| Defendants. | § | |
| | § | |

**AMERICAN INTERNATIONAL INDUSTRIES' OPPOSITION TO
NORTHWELL HEALTH, INC.'S MOTION TO MODIFY SUBPOENA
SERVED BY DEFENDANT AND CROSS-MOTION TO ENFORCE
A-I-I'S SUBPOENA**

Defendant American International Industries (sued individually and erroneously as "*successor-in-interest for the* CLUBMAN BRAND, to THE NESLEMUR COMPANY and PINAUD COMPANY") ("A-I-I"), by counsel, requests this Court deny Northwell Health, Incorporated's ("Northwell") Motion to Modify Subpoena served by Defendant A-I-I ("Motion to Modify") and grant A-I-I's Cross Motion to Enforce its Subpoena for the following reasons:

**BACKGROUND** – In 2020, Dr. Jacqueline Moline, who is a well-known causation expert for plaintiffs in talc and asbestos litigation published an article about certain plaintiffs who claimed to have used cosmetic talc products. ("Mesothelioma Associated With the Use of Cosmetic Talc," Journal of Occupational and Environmental Medicine, Vol. 62, No. 1, Jan. 2020, ("**Exhibit C"**) ("Moline Article"). The twin assertions of the Article are: (i) that all 33 mesotheliomas were caused by asbestos, and (ii) their only possible source of asbestos exposure was contaminated cosmetic talc. To the contrary, it was discovered in the *Betty Bell* case that Mrs. Bell was one of the Article subjects and that she, and later her estate, filed two workers' compensation cases alleging occupational exposure to asbestos from a textile mill where she

worked. When subsequently confronted with that fact, Dr. Moline made the false statement under oath that those claims were "adjudicated" to be without merit. Neither she nor Northwell has ever provided any documentation to support such a claim. When this information was disclosed in a similar motion filed by Northwell in *Bell*, the United States District Court for the Middle District of North Carolina ("M.D.N.C.") twice found it troubling that Dr. Moline might mislead factfinders by testifying that the Article's subjects had no alleged exposures to asbestos, knowing there were workers' compensation claims in one of them, while being shielded from cross-examination by claiming that her reliance materials were privileged medical information. (*See* **Ex. A** at p. 20-22).

**REASON #1** – Northwell's Motion to Modify raises the exact same arguments recently rejected by the M.D.N.C. (*See, e.g.,* Memorandum Opinion and Order dated September 13, 2022, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111-WO-JEP, M.D.N.C. "**Exhibit A**" at p. 36 ("*Bell* Order"); Northwell's Memorandum of Law in support of Motion to Intervene and Extend Protective Order, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111, ECF 259 "**Exhibit B**" ("Northwell's *Bell* Motion")). Both Northwell and plaintiff's counsel in *Bell* repeatedly raised these arguments. They were fully briefed and decided against Northwell in a detailed 41-page opinion. The *Bell* Court also ordered unsealed 37 pleadings discussing the fact that Mrs. Bell was a subject of the Moline Article despite her and her Estate's belief that she had occupational exposure to asbestos. Thus, Northwell must be estopped from making the same arguments to this Court, seeking a contrary result.

**REASON #2** – If this Court finds not all conditions for collateral estoppel are present, Northwell's Motion to Modify should be denied because the claim that its "interests" in the information about the identities of the 33 subjects is privileged is factually and legally wrong. The 33 subjects of the Moline Article were never patients of the doctor or in any Northwell facility. Instead, they were plaintiffs in talc litigation in which their lawyers hired Dr. Moline as an expert. The only information Dr. Moline received about the cases was litigation materials chosen for her by the lawyers who hired her, such as deposition transcripts and discovery responses. These were public materials for those cases to which defense counsel and courts in those cases also had access. The defendants in this matter are simply asking for those very same public litigation materials and a key that corresponds with the subject numbers assigned in the Moline Article.

/ / /

/ / /

2

## ARGUMENT

**I.    Principles of Collateral Estoppel Bar Northwell's Motion to Modify A-I-I's Subpoena.**

Collateral estoppel "will bar relitigation of an issue that is identical to an issue which has necessarily been decided in the prior action." *Application of Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989). This principle "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979), *citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329 (1971). "Collateral estoppel saves parties and the courts from the waste and burden of relitigating stale issues, and, by discouraging inconsistent results, forwards public policy favoring the establishment of certainty in legal relations." *Bounkhoun v. Barnes*, No. 15-CV-631A, 2020 WL 1526917, at *4 (W.D.N.Y. Mar. 30, 2020).

Collateral estoppel applies if:

> (1) the issues in both proceedings are identical,
>
> (2) the issue in the prior proceeding was actually litigated and actually decided,
>
> (3) there was a full and fair opportunity for litigation in the prior proceeding, and
>
> (4) the issues previously litigated were necessary to support a valid and final judgment on the merits.

*Lord v. Int'l Marine Ins. Servs.*, 420 F. App'x 40, 41 (2d Cir. 2011).

3

Here, Northwell's Motion to Modify meets all criteria for the application of collateral estoppel: (1) the Motion to Modify attempts to hide the identity of the participants of Dr. Moline's Article using the exact arguments Northwell used in *Bell et al. v. American International Industries, et al.* ("*Bell* case"); (2) A-I-I expended great expense to fully litigate these same arguments in the *Bell* case; (3) Northwell intervened in *Bell* and fully briefed and argued these same issues in the *Bell* case over the course of nearly two years; and (4) all issues raised by Northwell here were fully litigated and decided by the M.D.N.C in a valid and final judgment. (*See* Ex. A ("*Bell* Order"). Plus, Northwell was given an opportunity to appeal the *Bell* court's ruling and did not. Now, it seeks to consume the resources of this Court to try to get a different result.

In *Bell*, counsel for plaintiff and Northwell made confidentiality and privilege arguments, including concerns about HIPAA and "human research" confidentiality, to shield Moline's Article from full and fair cross-examination. The *Bell* court rejected those arguments and ordered unsealed all information relating to Mrs. Bell as a subject of the study. The *Bell* court unsealed 37 pleadings initially protected based on claims of confidentiality and privilege. (Ex. A). The existence of 37 pleadings on that topic indicate how thoroughly this issue has been litigated.

Northwell intervened in the *Bell* case making the same argument it makes in its Motion to Modify. (Ex. B at p.2). In *Bell*, Northwell requested the court not require Dr. Moline to disclose "the identity of any subjects of her research study," claiming such disclosures "would be contrary to":

1. The Federal Policy for the Protection of Human Subjects, 45 C.F.R. Part 46, Subpart A (or, "The Common Rule");

2. Bedrock Institutional Review Board ("IRB") standards of privacy and confidentiality covering research subjects;

3. The specific IRB approvals that Dr. Moline secured in advance of writing and publishing the Article;

4. Well-established standards and universally accepted norms in the medical research community related to research subjects and anonymity; and

5. Relevant case law affirming privacy and confidentiality requirements for research subjects.

(*Id*.; compare with Northwell's Motion to Modify, ECF 266 at p. 3). Apart from minor wording changes in argument three (3), these are *verbatim* the same arguments Northwell makes in its Motion to Modify in this matter where Northwell requests the Court enjoin A-I-I from compelling Northwell to "identify any research subjects" that were part of Dr. Moline's 2020 article at-issue before the Court. (*See* Ex. C, Moline Article).

As the *Bell* court found, Dr. Moline is using her article offensively to assert a connection between mesothelioma and cosmetic talc. (Ex A). This creates a new chapter in asbestos litigation from which Dr. Moline handsomely profits as an expert – for the last 25 years. She also volunteered to testify before a congressional committee and used one of the cases from her Article as an example of someone with mesothelioma who had no known exposure to asbestos. (Hearing before the Subcommittee on Economic and Consumer Policy of the committee on Oversight and Reform (Dec. 10, 2019), "**Exhibit D**"). There, she repeated the claim from her Article

that, "[n]o individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." (Ex. C).

Dr. Moline's congressional testimony was nearly verbatim from her (non-confidential) litigation report issued in the *Bell* case. (*See* Report from Dr. Moline dated May 5, 2016 (*Bell*), attached hereto as "**Exhibit H**"). Counsel from that case knew Mrs. Bell had filed workers' compensation cases. (Ex. A). When confronted with that inconsistency, Dr. Moline claimed she could not confirm the *Bell* case was one in her study nor answer any questions about it. Thus, she was in the enviable position, for an expert witness, of being able to make what she claimed were "groundbreaking" claims of causation but not having to answer questions about the grounds for those claims. (Ex. A).

Both the *Bell* plaintiffs and Northwell moved to seal the identities of the subjects of Moline's Article, including Mrs. Bell's identity, claiming various privileges and privacy concerns. (*See, e.g.,* Ex. B). The M.D.N.C. Magistrate Judge relied on their representations that confidential medical information was at issue and tentatively sealed all pleadings relating to Mrs. Bell's identity as a subject of the study. After A-I-I won the case on summary judgment, it moved to unseal those pleadings. United States District Judge William Osteen, Jr. extensively considered Northwell's arguments in light of the facts and issued a detailed 41-page Opinion solely dedicated to this issue, including:

> Mrs. Bell nonetheless made statements to the Industrial
> Commission, while represented by counsel, that she had
> sustained an occupational disease caused by exposure to asbestos
> during employment with Hoechst Celanese Corporation and

6

Pillowtex Corporation. The alleged occupational disease was mesothelioma. As Mrs. Bell's counsel explained, "[s]he made a [workers' compensation] claim because she thought she might have been exposed." **Mrs. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the "33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder**." **The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility.** This court expressed concern about this seeming contradiction before, and does so again.

This court's concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide. For example, Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial. The plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos: "Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this." **Dr. Moline has given testimony in many other cosmetic talc cases. Moreover, other expert witnesses have begun relying on the article for the basis of their opinions. [O]ne [expert] describe[ed] it as "the only peer-reviewed paper that [he] know[s]" to support the conclusion that cosmetic talc use by hairdressers releases material amounts of asbestos into the air.** When entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller specifically discussed the article's integral role in supporting the plaintiffs' claims.

This court finds that with the protective order in place defense counsel in cosmetic talc cases across the country are stymied from effectively cross-examining plaintiff expert witnesses on the article's foundation. The following exchange from Dr. Moline's cross-examination in the California state trial is illustrative:

7

Q . . . Other than cosmetic talc, you eliminated anybody from your study who might have had other asbestos exposures; is that correct?

A To the best of my knowledge, yes.

Q Okay. And after you published the paper and testified in Congress about the paper, did you come to learn that some of the information regarding one or more of the people in your study was incorrect as published?

A There was a question about one particular individual that I was presented with information about, but I -- based on the information that I had, there was -- it wasn't determined that they had the -- any additional exposure. I'm not sure of any others.
[****]
Q Did you publish an errata with regard to your paper after you found out that this one plaintiff that was provided to you had other alleged exposures?

A As I said just a minute ago, there was an allegation or there was a -- a comment, but it was shown to be without evidence, so I did not publish an errata based on that one individual.

Dr. Moline offered no basis for her statement that an errata was unnecessary because the allegation of alternative exposure "was shown to be without evidence." Indeed, she did not have to because the protective order effectively shielded the assertion from cross-examination. If the order was not in place, then defense counsel in that case—and defense counsel in similar cosmetic talc cases—would be able to establish that Mrs. Bell was one of the individuals the article studied and then challenge Dr. Moline with Mrs. Bell and Plaintiff's workers' compensation claims asserting, under criminal penalty for false statements, that Mrs. Bell was exposed to asbestos at textile job sites. Defense counsel could show that those workers' compensation claims were not adjudicated on the merits, rather they were dismissed without prejudice, weakening the credibility of Dr. Moline's statement that the allegation of alternative exposure "was shown to be without evidence."

48304334v.1

**Perhaps more significant than this example of a hamstrung cross-examination is the <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) issue created by concealment of Mrs. Bell's possible exposure.** Dr. Moline testified that "based on the information . . . it wasn't determined that [the research subjects] had . . . any additional exposure." Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, Daubert imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594 (internal citations omitted). **Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.**

From this court's perspective, inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." Daubert, 509 U.S. at 594–95. Even if reliability is examined by a court and deemed sufficient to support admissibility, relevant cross-examination of an expert includes "factual underpinnings [which] . . . affect the weight and credibility of the witness' assessment." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation mark omitted) (quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)).
[...]
In this case, a principal factual underpinning of the article is that in all thirty-three cases studied "no identified source apart from the talcum powder" was identified. (Doc. 274-1 at 2.) **The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the**

**factual underpinning of no known exposure to asbestos other than talcum powder.**

(Ex. A at p. 16-22) (emphasis added) (internal citations omitted).

For Northwell's specific arguments, the *Bell* court explicitly rejected that "The Common Rule" applied to the Moline Article. The judge noted:

> As an initial matter, Northwell appears to concede that because Dr. Moline's study was not conducted by or on behalf of the federal government these protections for human subjects do not inherently apply. (Northwell's Resp. (Doc. 392) at 14–15.) Rather, Northwell insists the protections apply because it has voluntarily elected, as part of its "Federalwide Assurance" to the government, to have these protections apply to all its human subject research—regardless of the source of support or funding for that research. (Id.) Northwell's concession that these protections only apply because it has chosen to apply them (and has told the government about that choice), suggests to this court that these protections are not requirements imposed on Northwell by the government, but rather requirements it has imposed upon itself. Thus, nonenforcement of these protections would not seem to violate any federal requirements the government itself has imposed on Northwell.

(Ex. A at p. 31, fn. 8; *see also* Northwell's Response in Opposition to Defendant *American International Industries*' Motion to Vacate the Preliminary Protective Order of September 25, 2020, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111, ECF 392 "**Exhibit E**").

The *Bell* court also rejected the notion that the IRB approval conferred privacy or confidentiality on the subjects of Moline's Article given the IRB "<u>waived the requirement that Dr. Moline and her coauthors acquire informed consent from the individuals to be studied</u>." (Ex. A at p. 33, fn. 10). Northwell admitted this waiver was granted "because the IRB found Dr. Moline's research subjects faced no more than 'a

10

minimal risk of harm resulting from a breach of confidentiality.'" (*Id.*, quoting Ex. E at 14). "That finding undercuts Northwell and Plaintiff's argument that research subjects would suffer great harm if their identities were disclosed." (*Id.*).

> While being part of a larger study that qualified as human subject research may have facially and incidentally granted Mrs. Bell greater confidentiality protections, this court is hesitant to give much weight to those protections that were not crafted with the goal of protecting the privacy of deceased individuals like Mrs. Bell.

(Ex A at p. 33).

The *Bell* court also rejected Northwell's argument that disclosing the identities of the subjects of Moline's Article would have a "chilling effect" that "would significantly dissuade individuals from agreeing to participate in human subject research" because the individuals involved in Moline's Article "never agreed to participate in Dr. Moline's research because the study was not required to obtain informed consent from any of the individuals studied." (Ex. A at p. 34-35)(*see also* Northwell's Motion to Modify, ECF 266 at p. 1 ("preserving the anonymity of research subjects' identities is essential to avoid the chilling effect that disclosure of those subjects' identities would inevitably have have….")).

The court ruled that deceased individuals are not considered "human subjects" for purposes of confidentiality protections. It also found that all individuals (living or deceased) in Moline's Article were afforded less confidentiality protections because they consented to put their medical information in the legal domain by filing lawsuits:

"all the information in the Northwell Document[1]—and indeed much more sensitive medical information—is already contained in this case's publicly available filings." (Ex. A at p. 35).

The *Bell* Order also rejected Northwell's HIPAA concerns. In *Bell*, plaintiff's attorney admitted HIPAA did not apply to documentation containing Mrs. Bell's identity. (Ex. A at p. 36; Plaintiff's Response in Opposition to *Defendant American International Industries'* Motion to Vacate the Preliminary Protective Order of September 25, 2020, *Bell et al. v. American International Industries, et al.,* 1:17-cv-00111, ECF 377 "**Exhibit F**"). Yet, now, Northwell seeks to resurrect even that claim. Dr. Moline did not treat the medical information of the 33 as protected by HIPAA when she wrote and disseminated litigation reports about their detailed medical history. Northwell's position on HIPAA is, in essence, that Dr. Moline was free to disregard those protections when she used the information but can invoke it when convenient to avoid cross-examination. Ignoring her supposed confidentiality concerns, Dr. Moline even identified Mrs. Bell (for the purpose of making the false claim that her workers' compensation claims were dismissed as meritless) while refusing to identify Mrs. Bell during cross-examination by defense.

The *Bell* court concluded Northwell did not have "any remaining privacy interest" in Mrs. Bell's identity being disclosed from Moline's Article "because in a medical research study, **the interest in confidentiality belongs primarily to the**

---

[1] The "Northwell Document" referred to by the court was a 5-page document produced by Northwell containing Mrs. Bell's name, brands of talc she used, the law firm representing her, her occupation, and her mesothelioma diagnosis.

48304334v.1

**study participant, not the researcher or sponsoring facility**." (Ex. A at pp. 36-37). Specifically, the court found "the study participant chose to publicly expose the fact of her mesothelioma by filing a complaint in this case, and the workers' compensation claim she chose to file, alleging she was exposed to asbestos in the textile industry, is publicly available." (*Id*. at p. 37)(internal citations omitted). Here, the identity of <u>every</u> subject of Dr. Moline's study chose to publicly expose the fact of their mesothelioma diagnoses by filing complaints, verifying discovery, and giving testimony in their respective cases.

There are several analogous cases where federal courts have applied the principles of collateral estoppel in cases involving the issuances of subpoenas. First, in *Sreter v. Hynes,* plaintiffs operating nursing homes sought to enjoin enforcement of a subpoena for records in United States District Court for the Eastern District of New York. 419 F. Supp. 546, 547–48 (E.D.N.Y. 1976). Plaintiffs initially attempted to quash the same subpoena in New York state court, though the New York Supreme Court denied their application. *Id*. at 548. The District Court held that plaintiffs' claim attempting to quash the subpoena was barred by *res judicata* given it involved "identical parties and the same basic claim (invalidity of the subpoena)" previously ruled on by the state court decision. *Id*.

In another case, a plaintiff comic book media group sued various entities about the ownership of characters used in other forms of media, suing Disney in the District Court of Colorado, Marvel Enterprises in the Southern District in New York, and Stan Lee in the Central District of California. *Stan Lee Media, Inc. v. Walt Disney*

48304334v.1

*Co.*, 774 F.3d 1292, 1294–95 (10th Cir. 2014). The California District Court initially denied the plaintiff media group's claim on *res judicata* grounds related to a decision in the Southern District of New York, though the Ninth Circuit affirmed the denial on other grounds (sufficiency of the pleadings due to lack of plausibility). *Id.* at 1296. Following the Ninth Circuit's decision, the Tenth Circuit found the issues in its case "substantively identical" despite the differences in defendants, noting collateral estoppel precludes relitigation of the issues "even if the issue arises when the party is pursuing or defending against a different claim." *Id.* at 1297. While the plaintiff argued it was allowed to "fully litigate" the claims or amend its claims, the Tenth Circuit held it fully briefed the issues of pleading sufficiency to the Ninth Circuit and these substantively similar claims were denied. *Id.* at 1298-99; *see also Kwolek v. United States,* No. 11-MC-53, 2011 WL 2940984, at *1 (W.D. Pa. July 21, 2011) (finding collateral estoppel applied to deny motion to quash subpoena in Western District of Pennsylvania case because an evidentiary hearing was not required to determine if issue "fully litigated" in Northern District of California).

Finally, in *Edwards v. Maxwell*, a non-party filed a motion to quash a subpoena in the Southern District of Florida issued by the defendant in the underlying action, *Giuffre v. Maxwell*, in the Southern District of New York. No. 15CV07433RWSSDNY, 2016 WL 7413505, at *1 (S.D. Fla. Dec. 22, 2016) (unreported). The defendant in the underlying action previously subpoenaed another non-party who had subsequently moved to quash the subpoena in the District of Utah, which transferred the motion back to the Southern District of New York. *Id.* Because the court in the underlying

case had previously ruled on identical requests for the other non-party, the Southern District of Florida transferred the motion to quash to the Southern District of New York on *res judicata* grounds, among others, citing the "great risk of inconsistent rulings" and "the interests of fairness, consistency, judicial economy, and speed of resolution." *Id.* at *2-3. The court highlighted the importance of "[u]niformity of discovery rulings in a case of this complexity is critical to achieving fairness to the parties and non-parties." *Id.* at *3.

Here, Northwell should be barred from raising its arguments in its Motion to Modify given that every argument was fully litigated in the *Bell* case. As demonstrated above, United States District Courts in New York have already rejected the attempts of parties to stop subpoenas by making the same arguments in a new court after an adverse ruling in another. *See Sreter v. Hynes,* 419 F. Supp. 546, 547–48 (E.D.N.Y. 1976). As with the *Kwolek* and *Stan Lee Media* cases noted above, Northwell's Motion to Modify and its previously filed motion in *Bell* are "substantively identical" or "nearly identical" to each other. Beyond the final judgment of the *Bell* Order – which Northwell did not appeal – Northwell's Motion to Modify is nearly unchanged for large sections of its argument. (*Compare* Motion to Modify, ECF 266 at p. 1 to Ex. B at 2; Motion to Modify, ECF 266, III(A) at 7-11 to Ex. B at 7-10; Motion to Modify, ECF 266, III(B) at 11 to Ex. B III(B) at 10-11). Northwell essentially admits the facts in its Motion to Modify are unchanged from those litigated in *Bell* as Northwell relies on an affidavit of Dr. Moline used in the *Bell* case, stating "Northwell notes that Dr. Moline's affidavit was provided in another

case (and reflects the caption of that case). <u>Because Northwell relies on the same facts and testimony provided therein</u>, Northwell does not believe a new, identical affidavit is necessary here." (Motion to Modify, ECF 266 at p. 2, fn. 1) (emphasis added).

The District Court in *Bell* already rejected Northwell's privacy concerns raised in its Motion to Modify. Just as Northwell argues here, the *Bell* court considered whether the "Common Rule" applied to the subjects in Moline's article and held that it did not. Just as Northwell argues here, the *Bell* court considered whether the IRB conferred privacy rights over the subjects in Moline's article and held that it did not. As is argued here, the *Bell* court considered whether Northwell had a privacy interest in the identity of the subjects and held that it did not. Finally, the *Bell* court considered whether not identifying the subjects of Moline's article would prejudice A-I-I and found that it would.

Given the arguments Northwell makes here are substantively identical to those made in *Bell*, not precluding these arguments creates a "great risk of inconsistent rulings." Because "uniformity of discovery rulings... is critical to achieving fairness to the parties and non-parties," this Court should preclude Northwell from making the same argument rejected by the *Bell* Court and deny its Motion to Modify. *See Edwards v. Maxwell*, No. 15CV07433RWSSDNY, 2016 WL 7413505 (S.D. Fla. Dec. 22, 2016).

Additionally, none of the arguments raised by Northwell fall under the exceptions to the collateral estoppel principle. There have been no changes to the legal rules at issue; there have been no changes to the factual predicates essential to

16

the *Bell* Order (i.e., the disclosure of the subjects' identities of the Moline Article); there are no pure questions of law at issue; and the interests of finality and judicial economy are not outweighed by "other substantive policies." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718–19 (2d Cir. 1993).

Given Northwell's arguments were previously litigated, barring Northwell from relitigating these issues here would protect A-I-I from the burden of relitigating these same issues and promote judicial economy. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Therefore, A-I-I requests this Court bar Northwell from re-litigating previously adjudicated issues in its Motion to Modify.

## II.   In the Alternative to Precluding Northwell's Motion By Collateral Estoppel, This Court Should Deny Its Motion Because There Is No Privilege Protecting the Identities of the 33 Subjects in Moline's Article As All Information Sought Is from the Subjects' Own Lawsuits.

Assuming, *arguendo*, this Court does not find all conditions for Collateral Estoppel are met, this Court should deny Northwell's Motion to Modify given the privileges it espouses do not apply. Northwell's efforts to enjoin A-I-I from compelling Northwell to identify any research subjects of Moline's Article is based on a fundamental misunderstanding of the law and facts. Not only is the information not privileged, it is highly relevant. And precluding inquiry regarding the subjects' inclusion in the study will significantly prejudice A-I-I.

The facts against Northwell's Motion to Modify are straightforward: the 33 subjects are not (and were never) patients of Dr. Moline. None sought health treatment at Northwell. Dr. Moline did not obtain their health information used in

17

her Article in the course of treatment, nor did she obtain this health information in the course of research. Rather, all information sought by A-I-I was obtained by Dr. Moline – and subsequently Northwell – through Dr. Moline's work in litigation. All information sought was provided by these 33 subjects after they disclosed their medical condition publicly by filing their respective lawsuits. Dr. Moline admitted the background information she relied on to draft her Article was provided to her by counsel for those subjects, and she even assumed all this health information was made available to defense counsel during the course of the subjects' litigation. Finally, not only did Northwell waive a requirement that Dr. Moline obtain informed consent from any of the subjects or their counsel, Dr. Moline never informed any of the subjects' counsel that she was drafting her Article based on the information.

A.   **There is no privilege with respect to any of the study subjects in Moline's Article when their information was obtained through Dr. Moline's capacity as an expert witness in the subjects' own lawsuits.**

Moline's Article does not involve research where a physician used medical records from her employer to conduct research and publish a paper in a scientific journal. Dr. Moline did not have a physician-patient relationship with any of the subjects, and none of the subjects were seen by any doctor at Northwell. (Ex. C at 11). The personal health information for all 33 subjects Northwell claims it seeks to protect was obtained from lawyers representing the plaintiffs and was contained in Dr. Moline's litigation reports that she issued as part of her work as an expert in those cases. (Ex. A; Ex. C at 11 ("The [33] cases were referred to author J.M. for medicolegal evaluation as part of tort litigation.")); Relevant Portions of Deposition of

18

Jacqueline Moline, M.D. (*Lashley*), taken January 15, 2020, "**Exhibit G**", at pp. 30:24-34:12). Dr. Moline already provided detailed histories of these individuals in her expert reports produced for purposes of litigation without claiming confidentiality or HIPAA rights were at-issue. (*See, e.g.,* Ex. H).

Likewise, all 33 subjects publicly put their medical condition at issue by filing lawsuits for mesothelioma. (Ex. A). Indeed, Dr. Moline admitted she assumed "all information" she relied on for her article was already "in the possession of defense lawyers" during the course of litigation. (Ex. G at p. 172:17-22).

As such, none of the information Northwell seeks to protect was confidential when disclosed in those underlying lawsuits. Plaintiffs in personal injury litigation execute a release for medical information relating to their claims, and they waive the patient-physician relationship as it relates to the medical conditions that are at issue in the case. Hence, there is no privilege that applies. And, there is certainly no privilege as it relates to questioning Dr. Moline about the subjects' inclusion in her Article on which she bases her opinions.

Likewise, Northwell's "concerns" that "potential research subjects might well be disinclined to consent to participating in research at all" are disingenuous. As noted, <u>none</u> of the 33 subjects knowingly participated in medical research conducted by Dr. Moline. All 33 subjects filed lawsuits and waived privacy of their respective medical information. Tellingly, the IRB "waived the requirement that Dr. Moline and her coauthors acquire informed consent from the individuals to be studied." (Ex. A at p. 33, fn. 10). Moreover, Dr. Moline did not inform counsel for any of these subjects

that she was drafting her purported "research" based on the subjects' health information until <u>after</u> her Article was accepted for publication. (Ex. G at pp. 167:14-168:20).

There is no privilege that attaches to materials produced by plaintiffs in litigation when they are received by a retained expert who happens to be a physician. Northwell tries to argue that the approval of the study by the IRB at Northwell somehow confers a privilege or confidentiality to the information. This is false. Dr. Moline received the information in her capacity as an expert witness in litigation. Hence, the information was no longer privileged at the time she included it in her 33 litigation reports and then used the "same" information to write her "study." That the IRB later approved her use of the non-privileged information for a study does not confer any privilege on material where the underlying physician-patient privilege was already waived by filing 33 lawsuits and turning the information over to an expert witness.

Northwell attempts to misuse confidentiality and privilege claims intended to protect patients in medical studies in a context wholly unlike Dr. Moline's use of depositions and litigation materials to write an article that supports her expert witness work in those and future cases. Northwell cites no law that says funneling litigation materials through a retained medical expert gives those litigation materials confidentiality protections intended for real subjects of human studies sharing their confidential medical information with medical researchers.

20

Northwell also claims privacy concerns stop it from complying, so it requests this Court enjoin A-I-I from compelling Northwell to "produce documentation from which the identities of research subjects can be ascertained." (Motion to Modify, ECF 266). This ignores the fact that both Dr. Moline and Northwell previously produced such individually identifiable health information or confirming documentation about the identity of individual subjects. For example, Northwell previously disclosed documentation containing Mrs. Bell's information to A-I-I containing her name, diagnosis, date of diagnosis, and alleged exposure information. (Ex. A at 6). As the court noted in the *Bell* Order, all information contained in this document "is already contained in this [Bell] case's publicly available filings." (*Id*. at 36).

Dr. Moline claimed "no patient identifiers would be included in research-related summaries." (Ex. F para. 16 to Decl. of Nathanial Huff). [2] However, she provided substantial information in her Article and her testimony before Congress about individual subjects, which allowed A-I-I to correctly identify Mrs. Bell. (Ex. D). In her Congressional testimony, Dr. Moline willingly provided the following details about Mrs. Bell (whom she referred to as "Ms. D"): her age, her medical diagnosis, her symptoms, her medications, her treatments, her smoking history, her employment and occupation history, and the timing of her death following her diagnosis. (*Id*.). This is similar to the identifying information provided in her Article:

---

[2] Other defendants in this litigation have been able to determine the identity of at least four other subjects of Dr. Moline's Article based on the information she included in her reports. All four of these subjects had additional exposures to asbestos, contrary to Dr. Moline's claims. However, the identities of these subjects is yet to be confirmed due to Dr. Moline's refusal to provide confirmation. *See infra*.

she identified six subjects' ages, genders, symptoms, diagnoses, date of diagnoses, treatments, date of treatments, and alleged exposures. (Ex. C). Beyond this information that Dr. Moline willingly disclosed without regard to HIPAA or other privacy concerns, counsel for plaintiff in the *Bell* case admitted her information was not "protected by HIPAA" given the authorized release produced in that case. (Ex. F at 19; *see also* Ex. G at p. 172:17-22 (Dr. Moline acknowledging defendants in the subjects' underlying lawsuits would have access to the same medical information she relied on)).

Finally, none of the authorities cited by Northwell support the proposition that information obtained by an expert through litigation somehow gains confidential protection when that same expert uses that litigation information to publish a paper that supports her litigation activities. (Motion to Modify, ECF 266 at p. 10-11).

A prime example from the authority cited by Northwell is *In re Am. Tobacco Co.*, 880 F.2d 1520, 1522–23 (2d Cir. 1989). While Northwell cites this case as an example of a court "allowing non-party recipients of subpoenas to redact the names and other identifying information of participants in research studies and enjoining defendants from determining the identities of research participants from the information provided," the differences between the research studies in that case compared to the 33 litigation subjects in Moline's Article are widely apparent. In *In re Am. Tobacco Co.*, neither Dr. Selikoff nor any of his employers' staffs were being called as paid expert witnesses in litigation. *Id.* at 1522–23. The information sought in that case was <u>not</u> obtained through the course of litigation, and Dr. Selikoff

22

obtained the sought-after information through his own research and <u>assured his subjects</u> that the information they provided would remain confidential. *Id*.

As noted, *supra*, Dr. Moline is offering her opinion in Plaintiff's case as an expert witness, and her opinion relies on her Article. She obtained all sought-after information through the course of her work in litigation from her subjects' lawsuits. The individuals in the Moline Article did not explicitly agree to participate in her research, and Dr. Moline did not obtain informed consent from any of the 33 individuals. (Ex. A at 34-35). Finally, all information sought by Defendants here is already contained in publicly available litigation reports, transcripts, and filings. (*Id*.).

The remaining cases on which Northwell relies are no better. *See, e.g., Cusumano v. Microsoft Corp.,* 162 F.3d 708, 714 (1st Cir. 1998) ("Whether the creator of the materials is a member of the media or of the academy, the courts will make a measure of protection available to him as long as he intended 'at the inception of the newsgathering process' to use the fruits of his research 'to disseminate information to the public.'")(citing *von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir. 1987). It can hardly be said that Dr. Moline intended "at the inception" of her research to use the information on her Article's subjects to disseminate it to the public for the betterment of society. On the contrary, at the inception, she obtained that information <u>in her capacity as an expert witness</u> for the "betterment" of her work as an expert witness. *See also, e.g., In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.,* 249 F.R.D. 8, 11 (D. Mass. 2008) (this involved a subpoena to the New England

Journal of Medicine (a third-party with no relationship to the underlying litigation) for all documents regarding any studies submitted to the Journal involving Celebrex or Bextra untethered to whether that information was obtained in litigation); *Andrews v. Eli Lilly & Co., Inc.,* 97 F.R.D. 494 (N.D. Ill. 1983), *vacated sub nom. Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556 (7th Cir. 1984) (finding the lower court abused its discretion in denying Squibb discovery into a third-party researcher's registry on patients with clear cell adenocarcinoma); *Lampshire v. Procter & Gamble Co.,* 94 F.R.D. 58, 59 (N.D. Ga. 1982) (granting discovery into the CDC's study on tampons and toxic shock but requiring names be redacted when the underlying patients had no connection to the litigation).

Clearly, Dr. Moline's Article was not drafted with the privacy of the 33 subjects secured or in mind, and, as such, should not be afforded the subsequent privacy protections requested by Northwell.

## B. Allowing Northwell to Modify A-I-I's Subpoena Would Significantly Prejudice A-I-I's Defense.

Northwell argues that modifying A-I-I's subpoena to cover "all" subjects in Moline's Article "will not prejudice or delay Defendant A-I-I in any way." (ECF No. 266 at 11). This is plainly false. The only reason that Northwell wants to modify A-I-I's subpoena is to prevent A-I-I from questioning Dr. Moline about the participants in the study as doing so will destroy Dr. Moline's credibility and the central claim in her paper. The central premise of her Article is that cosmetic talc must have caused mesothelioma in all 33 study subjects (*i.e.*, plaintiffs) because those study subjects had no other exposures to asbestos. (Ex. C at 11; Ex. A) ("For all 33 cases, other

24

potential exposures to asbestos were considered, with no identified source apart from the talcum powder."). A-I-I has proof that this premise is false as the plaintiffs representing the one confirmed subject, Mrs. Bell, filed two workers' compensation claims alleging exposure to asbestos during her work at Fiber Industries in the 1970s. (Ex. A at 16). As the court in *Bell* explained,

> The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's [Moline Article's] credibility.

(Ex. A at 16-17).

In addition to the *Bell* case, there are at least three other cases that appear to be ones Dr. Moline used that also involved additional exposures to asbestos, contrary to the express claims of her Article. Thus far, defendants have determined that at least four of the subjects in Moline's Article match plaintiffs for whom there is significant evidence of exposure to asbestos that is not from purportedly contaminated talc.

What Dr. Moline refers to as "Case 3" in her 2020 article aligns with the facts of the *Doris Jackson* case, a school teacher. (Ex. C; Dr. Moline's Expert Report (*Jackson*), attached hereto as "**Exhibit I**" at 3; Ronald Gordon, Ph.D.'s Tissue Digestion (Jackson), attached hereto as "**Exhibit J**" at 2) The U.S.D.C. for the District of Columbia granted a talcum powder defendant's *Daubert* motion to exclude the testimony of Ms. Jackson's expert, Dr. Ronald Gordon, because he failed to follow

the Helsinki Criteria in disregarding Ms. Jackson's exposure to "ceiling pipes with degrading insulation" during her more than 30 year career as a public school teacher. (*Jackson* Daubert Decision, "**Exhibit K**" at 18 (emphasis added)). The court excluded the opinion finding, "Dr. Gordon's specific causation opinion is unreliable under *Daubert*." *Id.* Like Dr. Gordon, Dr. Moline reviewed and noted evidence of alternative exposure in her litigation report, yet she represented that "Case 3"/Doris Jackson had no asbestos exposure other than talcum powder. (Ex. I at 5).

"Case 4" aligns with *Valerie Jo Dalis* who filed a $450,000 asbestos bankruptcy trust claim based on her husband's automotive work. She received $28,000 from the Manville Personal Injury Settlement Trust related to known commercial asbestos exposure—separate and apart from her alleged talcum powder exposure. (Ex. C; Dr. Moline's Expert Report (*Dalis*), attached hereto as "**Exhibit L**" at 4; *see also* Ronald Gordon, Ph.D.'s Tissue Digestion Analysis (*Dalis*), attached hereto as "**Exhibit M**" at 2; Bankruptcy Trust claim, Claim Detail Report and Claim Information Report (*Valerie Dalis*), attached hereto as "**Exhibit N**"). Dr. Moline was aware of the asbestos bankruptcy trust claim, having received the transcripts of the depositions of both Mr. and Mrs. Dalis in preparation of or drafting her litigation report in 2016. (Ex. L). Despite this review and knowledge, Dr. Moline again misrepresented "Case 4"/Mrs. Dalis as having no exposures to asbestos other than talcum powder in her 2020 article. (Ex. C).

Case 17's facts align with *Helene Kohr*. (Ex. C; Dr. Moline's Expert Report *(Kohr)*, attached hereto as "**Exhibit O**" at 3). In her case-specific litigation report for

Ms. Kohr, Dr. Moline acknowledged Ms. Kohr's 50 to 60 pack year smoking history, which included smoking Kent cigarettes with crocidolite asbestos-containing filters. (Ex. O). However, Dr. Moline did not include this fact in her 2020 article. (Ex. C). Thus, based on Dr. Moline's own causation opinion, "Case 17"/Helene Kohr had alternative exposures and should have been excluded from the study due to Dr. Moline's description of the scope of the study. (*Id*.).

Northwell asks this Court to aid it in continuing to mislead the medical community, judges, and jurors into believing that this Article shows a link between cosmetic talc and mesothelioma, when the underlying facts show this to be false. Because the information on these subjects' inclusion in Dr. Moline's study is critical to A-I-I's defense, modifying A-I-I's subpoena such that Northwell would not have to produce identifying information about these subjects would significantly prejudice A-I-I. As noted by the *Bell* court, concealing the identities of these subjects and their alternative exposures significantly hamstrings A-I-I's cross-examination of Dr. Moline, and it creates an obvious *Daubert* issue in that A-I-I cannot determine whether her opinions are based on "sufficient facts or data" and "reliable principles and methods" as required by Federal Rule of Evidence 702. (Ex. A at 19-29, *citing Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). For this reason, and those discussed above, the Court should deny Northwell's Motion to Modify.

## CROSS MOTION TO ENFORCE A-I-I'S SUBPOENA

A-I-I served its subpoena, dated September 27, 2022, to Northwell and, to date, Northwell has not produced the requested documents or information. As discussed

*supra*, the items requested are highly relevant and non-production significantly prejudices A-I-I. To ensure Northwell complies with this subpoena, pursuant to Federal Rules of Civil Procedure 45, A-I-I respectfully requests that this Court grant A-I-I's Cross Motion To Enforce its Subpoena compelling Northwell to comply with the subpoena and further relief as the Court deems appropriate.

## **CONCLUSION**

In light of the foregoing, A-I-I respectfully requests that this Court (i) deny Northwell's Motion to Modify Subpoena, and (ii) grant A-I-I's Cross Motion to Enforce its Subpoena pursuant to Fed. R. Civ. P. 45.

This 21st day of November 2022.

*/s/ Robert E. Thackston*
Robert E. Thackston (*pro hac vice*)
NY Bar No. 5448428
**LATHROP GPM LLP**
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Robert.thackston@lathropgpm.com

*/s/ Alfred J. Sargente*
Alfred J. Sargente, Esq.
New York Bar No. 2651750
**HAWKINS PARNELL & YOUNG LLP**
600 Lexington Avenue, 8th Floor
New York, NY 10022-7678
Telephone: (212) 897-9655
Facsimile: (646) 589-8700
asargente@hpylaw.com
***Attorneys for Defendant***
***American International Industries***

48304334v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that, on November 21, 2022, a true and correct copy of the foregoing American International Industries' OPPOSITION TO NORTHWELL HEALTH, INC.'S MOTION TO MODIFY SUBPOENA SERVED BY DEFENDANT AND CROSS-MOTION TO ENFORCE A-I-I'S SUBPOENA was served to all registered parties and non-parties pursuant to the Federal Rules of Civil Procedure via CM/ECF NextGen.

*/s/ Robert E. Thackston*
Robert E. Thackston

48304334v.1