**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

November 21, 2021

<u>**VIA ECF**</u>
Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:    ***Gref v. Am. Int'l Indus.,*** **et al., 20-cv-05589**

Dear Judge Figueredo:

Plaintiff Brian Gref hereby opposes the Motion to Compel the Continuation of the deposition of Plaintiff's Expert Dr. Jacqueline Moline, filed collectively by Defendant American International Industries ("AII"), Colgate-Palmolive Company ("Colgate"), Shulton, Inc. ("Shulton), and Whittaker Clark & Daniels, Inc. ("WCD"), and hereby cross-moves for a protective order pursuant to Federal Rule of Civil Procedure 26(c). Given the numerous procedural and substantive deficiencies of Defendants' motion discussed herein, including Defendants' failure to adhere to Your Honor's Part Rules in both form and substance, Defendants' motion should be denied in its entirety. Additionally, because, as set forth below, Defendants' motion seeks clearly confidential and protected testimony regarding human subjects of scientific studies, the Court should enter a protective order precluding Defendants from asking Dr. Moline questions regarding the same.

## <u>INTRODUCTION</u>

Dr. Jacqueline Moline is an exceptionally qualified and experienced expert in occupational and environmental medicine who has been deposed and cross-examined by defendants in asbestos and cosmetic talcum powder litigation ***hundreds*** of times. *See e.g.* Dr. Moline Testimony List (Updated Aug. 31, 2022), attached as **Exhibit 1**. In all cases in which she has been retained as an expert, she applies essentially the same generally-accepted methodology to determine the medical causation of a plaintiff or decedent's asbestos-related disease. As she has repeatedly explained in countless depositions – including many attended by the defendants in the instant case – this methodology involves reviewing the individual's clinical history, past medical history, and environmental and occupational history in order to determine if he or she was exposed to asbestos, and whether, based on case-specific evidence and relevant peer-reviewed scientific literature, the exposure was at a level at which disease has occurred in others. Dr. Moline's reliance materials, which firmly support the methodology she applies, are published, peer-reviewed scientific literature that is generally-accepted within the scientific and medical communities. Insofar as all Defendants in this case are entities that are frequently involved in cosmetic talc cases, they are all familiar with Dr. Moline, the methodology she applies and literature she relies upon.

Despite having deposed Dr. Moline on dozens of prior occasions and completed a seven-and-a-half hour deposition in this case during which the full scope of Dr. Moline's opinion and reliance materials were explored, Defendants move this Court to permit an open-ended continued deposition of Dr. Moline claiming further questioning is needed to understand Dr. Moline's methodology and opinions. In addition to numerous procedural flaws, Defendants' motion makes significant misrepresentations about cited case law, the honesty and integrity of Plaintiff's counsel, Dr. Moline, and the good faith that Plaintiff exercised in attempting to resolve this discovery dispute with Defendants prior to their seeking judicial intervention. Disturbingly, Defendants go so far as to accuse Dr. Moline of giving false testimony and Plaintiff's counsel of suborning perjury. These false accusations, casually levied against Plaintiff and his expert without any evidence, should not be given any credence by the Court, and should be viewed instead as generally undermining the credibility of Defendants' motion as more a vehicle for *ad hominem* attacks than a genuine request for discovery.

As set forth in detail herein, each of the grounds on which Defendants claim additional time is needed to depose Dr. Moline is without merit. Significantly, almost none of these issues were raised with Plaintiff in meet and confer negotiations before Defendants filed the instant motion. Under Your Honor's Part Rules, this alone warrants denial of Defendants' motion.

To the extent Defendants make "Mesothelioma Associated With the Use of Cosmetic Talc" (hereinafter "the Moline Study), the peer-reviewed Study that Dr. Moline co-authored in 2019, the primary focus of its motion, this, in all events, is an improper basis for further questioning. Indeed, having known about the Study for over two years, Defendants have previously examined Dr. Moline about the Study and the methodology she and the co-authors applied (AII as recently as last month in the *Fisher* trial), and had ample opportunity to question Dr. Moline about it at the two-day deposition in this case. Except for a few questions raised on the first day of Dr. Moline's deposition, **Defendants never returned to the topic**, not even during meet-and-confer discussions after the deposition was completed in accordance with Federal Rule 30(d)(1). Defendants now seek to reopen Dr. Moline's deposition by arguing that they are entitled to inquire as to the identity of the Study's human research subjects. As argued by Northwell Health, Dr. Moline's employer, who is the exclusive owner of that information and the target of a subpoena by AII and WCD for records regarding the subjects of Dr. Moline's Study, this information is, as other courts have found, privileged and confidential.[1] Despite Defendants' argument to the contrary, the recent decision by Chief Judge Osteen in *Bell v. American Int'l. Indust.*, which focuses on a sole issue pertinent to that particular case and has no bearing on the instant matter, does not provide otherwise. Indeed, though it does not inform the Court of this, the *Bell* decision explicitly precluded AII from discovering the identities of the very human subjects Defendant now attempts to have this Court compel. *See* Opinion and Order, dated Sept. 13, 2022, attached as **Exhibit 2**. Plaintiff submits that, just as the *Bell* Court, among many others, recognized that the identifying information

---

[1] In this case, Defendants misleadingly argue that "pursuant to a subpoena, Northwell is producing documents related to the Moline article." *See* Defendants' Motion at 13. What Defendants fail to mention is that Northwell filed objections to the subpoena served by the Defendants and further moved to limit the subpoenas. *See* Northwell's Non-Party Objections To Subpoena, **Exhibit 3**. Pursuant to the briefing schedule ordered by the Court, Defendants' responses to Northwell's motions are due today.

which Defendants seek is clearly confidential and protected information, this Court should too preclude Defendants from attempting to question Dr. Moline regarding the same. As such, Plaintiff submits that the Court should enter a protective order, pursuant to Federal Rule of Civil Procedure 26(c), prohibiting Defendants from attempting to depose Dr. Moline regarding the identity of the Study's human research subjects.

The remaining issues raised by Defendants' motion are plagued by various misrepresentations and half-truths about the record and rely on insignificant quibbles with Dr. Moline to feign a need for additional time. All in all, Defendants fail to demonstrate that they used the time afforded by the Federal Rules to depose Dr. Moline efficiently, and they fail to demonstrate that good cause exists to warrant the Court granting them any additional time to continue deposing Dr. Moline. Without these showings, Defendants' interest in questioning Dr. Moline further about any of the topics that they list in their motion is not in good faith. Accordingly, Defendants' motion must be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

I.      **Ignoring the Deeply-Rooted Scientific Foundation Supporting Dr. Moline's Opinion and Extensive Testimony She Has Provided Regarding The Generally-Accepted Methodologies Applied to Reach a Causation Opinion in this Case, Defendants' Claimed Need for Additional Time to Examine Dr. Moline on These Topics Is Both Procedurally Improper and Meritless**

A.      **Defendants Improperly Base Their Motion to Depose Dr. Moline Far Beyond the 7-Hour Limit on Areas of Inquiry That Were Not Discussed During Required Meet-and-Confer Negotiations And, In All Events, Are Not Discoverable And/Or Have Already Been Asked of Dr. Moline in this Case or Past Depositions That Defendants Agreed to Rely Upon**

In accordance with the then-governing case scheduling order and in response to Defendants' Notice of Deposition, Plaintiff produced his medical causation expert, Dr. Jacqueline Moline, for a deposition on July 6, 2022, and September 23, 2022. Notably, at AII's request, Plaintiff agreed that Defendants could use Dr. Moline's prior testimony from other similar cases (*Crudge*, *Lashley*, and *Bell*) so that questions already asked of Dr. Moline as to issues in common with this case would not have to be repeated, thereby eliminating the need to spend time on matters previously addressed. *See* Dep. of Dr. Moline, dated July 6, 2022, attached as **Exhibit 4**, at 6:14-17, 194:12-23. Notwithstanding having the benefit of these multiple transcripts, Defendants proceeded to question Dr. Moline over the course of two days for 7 hours and 35 minutes (exclusive of breaks), during which large portions of Defendants' examination re-visited matters addressed in Dr. Moline's prior testimony. Revealingly, towards the end of the second day of the deposition (defense was still permitted to cross Dr. Moline further), counsel for AII opposed ending the deposition 35 minutes after the 7-hour mark, claiming, without any support: "*I'm entitled to cross not subject to any time limitation, which will basically [be] going back through all the studies that [Dr. Moline] claims to rely on, et cetera.*" *See* Dep. of Dr. Moline, dated Sept. 23, 2022, attached as **Exhibit 5** at 297:5-9 (emphasis added).

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

As the deposition transcripts reveal, Defendants explored the full scope of Dr. Moline's opinions and the studies on which she relies, the vast majority of which Defendants are already familiar with. Specifically, Defendants asked Dr. Moline about general, non-case-specific topics that defendants in the talc litigation have already exhaustively explored. Such topics include the scientific literature that supports Dr. Moline's opinion that repeated exposure to asbestos-contaminated cosmetic talcum powder products increases the risk of developing mesothelioma (*see e.g.* **Exhibit 4**, at 87:2-88:3, 93:18-105:24, 150:15-25; **Exhibit 5**, at 239:23-241:9), that the causative link between exposure to asbestos and mesothelioma is supported by epidemiological studies (*see e.g.* **Exhibit 4** 137:2-160:19), and that there is no safe threshold to exposures above background that has been established by generally-accepted medical literature (*see e.g. id.* at 60:7-61:13, 74:18-77:7, 78:7-80:19).

Regarding the article entitled "Mesothelioma Associated With the Use of Cosmetic Talc" (hereinafter "the Moline Study") (attached as **Exhibit 6**), co-authored by Dr. Moline and published in a peer-reviewed journal, Defendants asked Dr. Moline (yet again) about the "cumulative doses" that the subjects studied in that article experienced and the data regarding their asbestos exposures "from all sources." *Id.* at 143:12-145:3. In addition to re-hashing these topics, Defendants also explored Dr. Moline's opinions regarding Plaintiff's specific exposures in this case, her review of his diagnosis, medical and occupational history (*see e.g.* **Exhibit 4** at 13:9-14:9, 116:8-119:18, 134:24-136:25, 161:12-162:7), and the methodology she employed to assign causation of Plaintiff's disease to his use and exposure to Defendants' cosmetic talcum powder products (*see e.g. id.* at 137:2-160:19; **Exhibit 5** at 212:24-213:6, 224:15-239:22, 241:10-261:2).

Following the completion of Dr. Moline's deposition in accordance with Federal Rule 30(d)(1), Plaintiff met via telephone conference with counsel for Defendant Colgate-Palmolive Company, who was acting as liaison for all Defendants, regarding the Defendants' request for a continuation of Dr. Moline's deposition. During the meet and confer, Defendants proposed a "not-to-exceed" four-hour time period to further examine Dr. Moline, explaining that the focus and majority of the estimated four-hour timeframe was necessitated by Defendants' lack of clarity regarding how Dr. Moline arrived at her exposure calculations in this case.

In response, and despite Defendants having already received the benefit of additional time beyond the seven hours provided for under the Federal Rules, Plaintiff nonetheless offered Defendants an additional one hour of time within which to depose Dr. Moline on her dose estimations. From Plaintiff's perspective, this offer was reasonable and in-line with Defendants' own estimation of the additional time they needed now that Plaintiff had confirmed for Defendants the manner and method by which Dr. Moline performed her calculations in this case. Defendants rejected Plaintiff's counter proposal and advised that they would be seeking the Court's intervention to resolve the dispute. This exchange encompassed the totality of the subjects discussed in the parties' good-faith meet-and-confer sessions.

On November 4, 2022, AII, on behalf of all Defendants, moved to compel the continued deposition of Dr. Moline. In direct violation of this Court's Part Rules, AII (i) failed to state any of the specifics of the meet-and-confer negotiations that took place between Plaintiff and Colgate's counsel, (ii) mischaracterized the subject and scope of those negotiations and Plaintiff's position

regarding the one-hour counter proposal, and (iii) filed a brief more than six times longer than the Court's three-page limit. In its improper, non-compliant brief, AII further departed from the proposed four-hour limitation Defendants initially proposed and argued that Dr. Moline's deposition should be continued for an unspecified length of time so that Defendants could inquire as to various subjects that are either facially improper or have already been explored *ad nauseum* with Dr. Moline in this and/or past cases. Tellingly, in listing the subjects on which they seek to further question Dr. Moline, AII fails to advise the Court that the Moline Study and the identity of the human subjects of the study – the very topic on which AII focuses in urging the Court to grant its request for additional time within which to depose Dr. Moline – was neither raised nor the subject of any discussion during the multiple meet and confers.[2] AII's motion also fails to demonstrate that Defendants used the time they had efficiently, or that their questions are not otherwise covered by the testimony they incorporated by reference during the deposition.

**B.     It is Well Established in the Scientific Community That Exposure to Asbestos (As Found In Contaminated Cosmetic Talcum Powder) Causes All Forms of Mesothelioma**

AII sets the stage for its misleading arguments regarding Dr. Moline's Article by repeating the fallacy often raised by defendants in cosmetic talc litigation that there is a lack of epidemiology to support a causal link between Plaintiff's mesothelioma and cosmetic talc use. This argument, which is routinely rejected by courts across the country in the context of decisions on summary judgment motions and *Daubert* motions, ignores that it is the *asbestos* in Defendants' cosmetic talcum powder products that caused Plaintiff's disease. Based on peer-reviewed scientific literature from a range of disciplines, including epidemiology, toxicology, medical research, and industrial hygiene, there is overwhelming consensus that exposure to all forms of asbestos cause cancer, including peritoneal mesothelioma. *See e.g.* Excerpts of WHO, International Agency Research on Cancer ("IARC"), *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, A Review of Human Carcinogens, Part C: Arsenic, Metals, Fibres, and Dusts* Vol. 100C (2012), attached as **Exhibit 7** at 294; Joint Policy Committee of the Societies of Epidemiology*, Position Statement on Asbestos from the Joint Policy Committee of the Societies of Epidemiology (JPC-SE)* (June 4, 2012), attached as **Exhibit 8**. Similarly, it is a widely-accepted scientific fact that talc containing asbestos is a human carcinogen. **Exhibit 7** at 38, 219, 291-294. Numerous experts, including Dr. Moline, have testified to the scientific literature that forms the foundation on which a medical expert may, based upon a case-specific review of an individuals' medical and occupational history, assign causation to the individual's exposure to asbestos-contaminated cosmetic talcum powder product(s) in accordance with generally-accepted methodology.

Importantly, a cosmetic talcum powder product-specific epidemiological study is not required to establish (either legally or scientifically) that there is a link between asbestos-

---

[2] As discussed below, AII not only improperly asks this Court to compel Dr. Moline to disclose the identity of human subjects of medical research and studies in violation of federal, state, and local laws, but also neglects to inform the Court that its attempts have been expressly rejected by multiple other courts. In arguing that the Middle District of North Carolina's decision supports it request, AII misrepresents the scope and impact of that decision, as discussed, *infra*.

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

contaminated talc and disease. Indeed, "there are about 3,000 products," but "not 3,000 separate studies of every product that contained asbestos." *See* Dr. Moline AM Trial Testimony in *Fisher*, dated Oct. 13, 2022, attached as **Exhibit 9** at 54:7-17. Epidemiologically, it is beyond dispute that asbestos causes disease. The issue in answering whether a product caused an asbestos-related disease is not "the product *per se*. It's whether there was asbestos in the product." *Id*. Altogether, as in past cases involving the same Defendants as here, Dr. Moline[3], with the support of the peer-reviewed literature cited in her reference list, will explain at trial that, breathing asbestos as a result of using cosmetic talcum powder is capable of causing disease just as it is in connection with any other product.

Despite Defendants' claims to the contrary, there is no meaningful difference between pleural and peritoneal mesothelioma. It is the same disease in different locations of the body – the lining of the pleura (in the lung) versus the peritoneum (in the abdomen). **Exhibit 5** at 238:19-239:17. It is beyond credible scientific dispute that both locations of this disease are caused via exposure to asbestos fibers. *See Consensus Report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution*, 23 SCAND. J. WORK ENVIRON. HEALTH 4, 311-316 (1997) cited *infra*.[4] As reflected in Dr. Moline's report and deposition, this distinction does not change the scientific foundation for concluding that asbestos exposure from cosmetic talcum powder products causes each disease. **Exhibit 4** at 84:12-85:2 (explaining that low levels of asbestos exposure are capable of causing peritoneal mesothelioma, undermining earlier notions that higher levels of exposure were required to trigger the disease); **Exhibit 5** at 237:22-243:16 (reiterating the consensus within medical literature that asbestos causes mesothelioma in all locations). Mesothelioma is a "signal" tumor for asbestos exposure. *See* Dr. Moline's Trial Testimony, dated March 9, 2020 in *Lashley*, attached as **Exhibit 11** at 48:12-13. As relevant to this case, based on Plaintiff's exposure history, he suffered an exposure to asbestos through cosmetic talc use that is associated with the very cancer he has and that supports Defendants' products contributed to the development of his disease. **Exhibit 4** at 112:18-24.

In challenging the epidemiology of peritoneal mesothelioma in relation to asbestos and asbestos-contaminated cosmetic talc, Defendants generally ignore the consensus of the objective scientific community that *all forms of mesothelioma* are causally linked to asbestos exposure. *See Consensus Report: Asbestos, asbestosis, and Cancer, the Helsinki Criteria for Diagnosis and Attribution 2014: Recommendations*, 41 SCAND. J. WORK ENVIRON. HEALTH 1, 5-15 (2015), attached as **Exhibit 12**; *Consensus Report: Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution*, 23 SCAND. J. WORK ENVIRON. HEALTH 4, 311-316 (1997), attached as **Exhibit 13**; **Exhibit 7**. Such consensus is based on the full body of scientific evidence, including

---

[3] As indicated in her *Curriculum Vitae*, Dr. Moline has training and experience in the field of epidemiology. *See* **Exhibit 10**.

[4] AII argues, incredibly, that only 8% of peritoneal mesothelioma victims "report" asbestos exposure, and thus there is a "weak link" between asbestos and peritoneal mesothelioma. Putting to one side that this is not surprising as many mesothelioma victims, including the instant Plaintiff, were unaware that products they were exposed to decades ago contained asbestos, whether a patient "reports" asbestos exposure or not is irrelevant when determining general causation. The fact remains that the credible medical literature is unanimous in concluding that asbestos causes all forms of mesothelioma.

epidemiological studies, human fiber burden testing, animal studies, *in vitro* studies, as well as case series and case-control studies showing that all types of asbestos cause cellular changes that lead to mesothelioma, including peritoneal. *See* Kanarek and Mandich, *Peritoneal Mesothelioma and Asbestos: Clarifying the Relationship by Epidemiology*, Epidemiology Open Access Journal (2016), attached as **Exhibit 14**.

As in past cases, Dr. Moline testified at her deposition in this case about the extensive body of scientific literature supporting her causation opinion and the methodology she applied to reach her opinion. The reference list attached to the report Dr. Moline prepared for this case, which, at the time of disclosure, contained 492 items, is a "living document" to which she adds sources as they become available. *See* Dr. Moline's Dep., dated July 8, 2022 in *Lashley*, attached as **Exhibit 15**, at 83:11-18; *see also* Dr. Moline's Expert Report, **Exhibit 16**. Curiously, Defendants attack Dr. Moline for purportedly lacking a scientific foundation for her opinion, but then complain that her reference list with hundreds of scientific articles supporting her opinion is too large. Ultimately, as Dr. Moline has testified repeatedly, the list demonstrates the overwhelming consensus that exists in the medical and scientific communities that exposure to all forms of asbestos fibers cause mesothelioma.

Notably, each of the above-cited sources is included on Dr. Moline's list. As discussed in further detail below, because Dr. Moline has been deposed hundreds of times in this litigation and the scientific foundation for her opinions is a subject universally explored by defendants, it is beyond disingenuous for Defendants to now claim that they cannot ascertain the bases for Dr. Moline's opinions. Indeed, Defendants were already familiar with the majority of Dr. Moline's reference list before her deposition. On issues that Defendants asked for more specific information about Dr. Moline's reliance materials, Dr. Moline responsively summarized the available literature and/or pointed Defendants to specific sources on her reference list. *See e.g.* **Exhibit 4** at 141:6-145:11 (narrowing sources cited for purposes of reflecting "analogous exposure scenarios" to those specific to peritoneal mesothelioma) **Exhibit 5** at 239:23-240:9 (explaining that literature linking asbestos-contaminated talc and peritoneal mesothelioma are case series and case reports), 241:10-242:24 (clarifying the author, title, and year of Center for Disease Control article cited in report).

### C.   Dr. Moline's Peer-Reviewed Article Provides Additional Support for Connecting the Causal Link Between Exposure to Asbestos-Contaminated Cosmetic Talc and Mesothelioma

In their efforts to discredit Dr. Moline and her article, Defendants completely ignore the peer-review process that the article had to go through in order to be published, which gives the article significant indicia of reliability. *See In re Fosamax Products Liability Litig.*, 645 F.Supp.2d 164, 183 (S.D.N.Y. 2009) ("That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists*, i.e.*, that it meets at least the minimal criteria of good science," citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("Daubert II"), 43 F.3d 1311, 1318 (9th Cir. 1995). Viewed appropriately in context and substance, Dr. Moline's peer-reviewed, published article is a meaningful addition to the already well-developed lexicon of medical literature that

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

physicians and scientists may rely upon in treating patients and developing opinions regarding mesothelioma, asbestos, and cosmetic talc.

In January 2020, the Moline Study, which Dr. Moline authored with Dr. Kristin Bevilacqua, Dr. Maya Alexandri, and Dr. Ronald Gordon, was published in the Journal of Occupational and Environmental Medicine. **Exhibit 6**. The Study examined data for 33 human subjects with malignant mesothelioma and no *confirmed* asbestos exposure other than cosmetic talcum powder. [5] *Id.* at 11. The cases were obtained through referrals for medico-legal evaluation, and tissue digestions were performed in six cases.[6] *Id.* The Study concludes that exposure to asbestos-contaminated cosmetic talc can cause mesothelioma and urges clinicians to elicit a history of talcum powder usage in all patients presenting with mesothelioma. **Exhibit 6** at 11.

Notably, the limitations of the Study and methodology employed are disclosed:

> The case series presented should be understood in the context of its limitations. Data were obtained from medical records and transcripts of depositions, rather than structured, in-person interviews. However, the information solicited during the course of the patients' depositions were thorough, and included exhaustive questioning about alternative sources of asbestos exposure, including household exposure, exposures from external industrial sources, occupational exposure, and potential exposure from family members. While deposition testimony is by definition self-report, depositions were given under oath and the potential for recall bias noted would be presented whether patients completed a structured interview or were asked questions during sworn testimony. Furthermore, the utilization of medical records allowed the authors to corroborate important medical information and confirm the pathological diagnosis.

**Exhibit 6** at 16.

Given the enormous body of scientific literature establishing that exposure to asbestos, regardless of the product in which it is contained, is capable of causing mesothelioma, Defendants' claim that Dr. Moline drafted an article *because* there is no epidemiology linking cosmetic talc to mesothelioma is an egregious misstatement. As reflected in Point II(2), *supra*, a scientific foundation to support a medical expert's opinion that exposure to asbestos-contaminated cosmetic talc exists without the Moline's Study. The Study is now merely one of numerous peer-reviewed scientific publications discussing the presence of asbestos in talcum powder and asbestos-related

---

[5] As discussed fully, *infra*, this is includes the *Bell* plaintiff who, despite a full opportunity to do so by AII and other defendants, has never been proven to have experienced a confirmed asbestos exposure other than to cosmetic talc.

[6] Generally speaking, tissue digestions involve removing biological material from a sample of tissue so that the inorganic materials contained therein can be examined on a filter under a microscope. Tissue digestions are significant because they allow for the examination of various fibers in the lung tissues through fiber burden studies, which can provide guidance as to potential prior asbestos exposure, whether from occupational, residential, or para-occupational exposure to asbestos. *See* **Exhibit 6**; *see also Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women*, Gordon, et al., **Exhibit 17**.

disease that is relied upon by Plaintiff's experts when, based on the facts of a case, causation is attributed to a cosmetic talcum powder product. As with any other item of scientific literature, Dr. Moline's Study is not used as, nor is it intended to be, proof that, because the 33 patients were exposed to asbestos from cosmetic talc and diagnosed with mesothelioma, any particular Plaintiff contracted mesothelioma from his or her exposure to cosmetic talc. The Study is merely additional support in the foundation of scientific literature that experts rely on to form their medical causation opinions in a case involving cosmetic talcum powder products.

Moreover, the Study was not written for any litigation purpose. It was borne out of the observation that, historically, there has been a "high prevalence of unexplained or, 'idiopathic mesothelioma' among women," that, a growing body of scientific data, indicates that millions of men and women were unwittingly exposed to asbestos from cosmetic talc products (mostly women as they are the more likely users of these powders), and that these exposures were generally not considered by medical practitioners when examining a mesothelioma patient's exposure history. **Exhibit 6**. Based on the data examined by Dr. Moline and her colleagues, the Study alerts the medical community to cosmetic talc as a potential source of asbestos exposure that should be considered when examining a patient's history. *Id*.; *See* **Exhibit 9** at 67:13-68:8; Dr. Moline PM Trial Testimony in *Fisher*, dated Oct. 13, 2022, attached as **Exhibit 18** at 39:12-16.

Pursuant to the Department of Health and Human Services and the Food and Drug Administration Regulations, the 33 human subjects of Dr. Moline's Study were anonymized in the paper. *Id*; *see* 45 C.F.R. 46.111(a)(7); 21 C.F.R. 56.111(a)(7). As discussed in further detail below, based on these federal regulations as well as the terms of the directive which granted Dr. Moline and her colleagues permission to conduct the Study, the identities of the subjects and their personal medical data are privileged and confidential. Accordingly, requests for disclosure of this information have been repeatedly denied. Nevertheless, as discussed below, even without this information, Defendants have conducted meaningful cross-examinations of Dr. Moline regarding the Study, the methodology applied, the potential alternative exposures that the subjects experienced, and the ultimate conclusions drawn.

D.   **The Identity of the Subjects of Peer-Reviewed Medical Literature is Confidential, Protected Information, That is Not Subject to Discovery**

For more than two years in litigation across the country, Defendants, led by AII, have been improperly (and unsuccessfully) attempting to discover the protected identities of the human subjects involved in Dr. Moline's Study, either through cross-examining Dr. Moline or filing discovery requests directed at plaintiffs. Because this information is owned exclusively by Northwell Health, Dr. Moline's employer, who gave approval to Dr. Moline and her co-authors to conduct the Study and prepare the peer-reviewed article, but nothing more, neither Plaintiff nor Dr. Moline are in a position to provide Defendants with the information they seek. In any event, as Courts have repeatedly found, this information is protected and confidential and, thus, not discoverable. Contrary to Defendants' contention, the recent decision issued by the Middle District of North Carolina in *Bell v. American Int'l. Indus.*, does not provide otherwise. As discussed below, although Chief Judge Osteen decided to lift a protective order maintaining the anonymity of the decedent in that case as a subject of Dr. Moline's Study, this decision is clearly limited to

the facts and circumstances of that case and does not apply to any of the other 32 subjects, whose identities Judge Osteen *explicitly recognized remain protected*. *See* **Exhibit 2** at 35.

As confirmed by the motions to quash filed by Northwell in response to defense subpoenas seeking, *inter alia*, "information relating to any publication authored or co-authored by Dr. Moline while employed by Northwell, including her article entitled, 'Mesothelioma Associated With the Use of Cosmetic Talc,'" "all Reports written by Dr. Moline on Northwell letterhead/stationary with respect to each of the 33 individuals included in the study," and "the subjects' first and last names, brand(s) of talc they used, law firm representation, occupation(s), and date of diagnosis and/or date of birth," (*see* Dkt. Nos. 264-269), the personal information and medical data of the subjects involved in Dr. Moline's Study is privileged and confidential, such that Dr. Moline is not permitted to divulge the identities of the subjects or provide other revealing details. Dkt. Nos. 264-269. As explained in Northwell's memorandum of law, the disclosure of such information would violate (1) The Federal Policy for the Protection of Human Subjects, 45 C.F.R. Part 46, Subpart A ("The Common Rule"); (2) Bedrock Institutional Review Board ("IRB") standards of privacy and confidentiality covering research subjects; (3) The specific IRB approvals that Dr. Moline secured in advance of writing and publishing her peer-reviewed article; (4) well-established standards and universally accepted norms in the medical research community related to research subjects and anonymity; and (5) relevant case law affirming privacy and confidentiality requirements for research subjects. Doc. Nos. 266 and 269.

Northwell's position is supported by the decisions of multiple courts that have confronted Defendants' requests for the disclosure of the subjects' identities in litigation. For instance, in 2020, at a trial in the New Jersey Superior Court, Middlesex County, Judge Ana C. Viscomi, who presides over all asbestos matters filed in the State, prohibited AII from attempting to elicit the identity of human subjects involved in Dr. Moline's study during cross-examination, rightly recognizing that the information was protected and not necessary to exploring the Study's methodology. *See* Excerpts of Dr. Moline's Testimony in *Johnson/Lashley*, dated Mar. 11, 2020, attached as **Exhibit 19** at 205:3-208:5, 217:2-221:2. The court permitted AII to question Dr. Moline about "all of the different reports that [AII had] or that [Dr. Moline] may have referenced in that paper," but held that identifying any of the Study's subjects would be inappropriate, even where AII was attempting to match the identity of a subject to a plaintiff in a case in which AII was a named defendant. *Id.* (*Lashley/Johnson*) at 218:24-221:2. AII went on to inquire what impact, if any, a worker's compensation claim filed by a Study's subject alleging an alternative asbestos exposure would have on the Study's findings. *Id.* at 222:23-223:2. Dr. Moline explained that to be relevant, there would have to have been actual exposure and not just an allegation of exposure. *Id.* at 223:1-2. And, in any event, "an additional exposure" would not change the Study's conclusion that asbestos in cosmetic talc leads to mesothelioma because it does not "negate the fact that all 33 [subjects] had this exposure to asbestos from the cosmetic talc." *Id.* at 230:9-12.

In 2021, Chanel, Inc., a defendant in another New Jersey cosmetic talcum powder case, filed a motion to compel seeking the identities of the 33 human subjects of Dr. Moline's Study. The request was denied based on Judge Viscomi's ruling in *Lashley/Johnson* that the identity of

the subjects was not discoverable. *See* Order Denying Request for Discovery in *Harpster v. Chanel, Inc.*, dated Aug. 19, 2021, attached as **Exhibit 20**.

In 2022, at the trial of *Fisher v. American Int'l. Indus.*, Judge Sierra Thomas-Street of the Pennsylvania Court of Common Pleas, Philadelphia County, granted Plaintiff's motion to preclude AII from improperly attempting to elicit the identity of the human subjects involved in Dr. Moline's study during cross-examination. **Exhibit 9** at 75:9-14. Based on the recent ruling in *Bell v. AII*, which, as discussed below, is far more limited than AII argued either at *Fisher* or in the instant motion, Judge Thomas-Street permitted AII to reference the "Bell" case in connection with Dr. Moline's Study and ask Dr. Moline as to the significance, if any, of that plaintiff's filing of a workers' compensation claim in the Study's analysis. *Id*. at 81:17-83:19; **Exhibit 18** at 32:6-17, 33:12-34:18, 35:20-40:4, 42:24-43:17. Nevertheless, the Court refused to compel Dr. Moline to disclose the identities or underlying personal data about the subjects of the Study. **Exhibit 9** at 79:6-9.

Additionally, multiple Courts have rejected motions *in limine* seeking to preclude Dr. Moline's Study from being used at trial based on the fact that it is based, in part, on confidential information obtained from human subjects. *See* 3/18/22 Order in *Stanley v. Avon Products, Inc., et al.*, **Exhibit 21**; 3/17/20 Order in *Zimmerman v. Autozone, Inc., et al.*, **Exhibit 22**.

Disregarding the rulings that have rejected their requests for the subjects' identities, Defendants point to *Bell v. AII*, as having "litigated and rejected" Dr. Moline's position that this information is privileged and confidential. *See* Defs. Motion at 5-8. An honest and complete reading of Chief Judge Osteen's 40-page opinion and order belies Defendants' argument and, in fact, confirms that, as maintained by Plaintiff, Dr. Moline, and Northwell Health, the identities of all subjects except for Ms. Bell are not discoverable in this case.

In *Bell*, AII subpoenaed Northwell for information to discover whether Ms. Bell, the decedent, was a subject of Dr. Moline's Study. **Exhibit 2** at 4. According to AII, confirming Ms. Bell was a subject of Dr. Moline's Study was critical because Ms. Bell filed a workers' compensation claim asserting that she may have been exposed to asbestos while employed by two textile mills and, although the claims were denied by the employers and ultimately dismissed, AII believes the allegation is sufficient to undermine the Study's representation that its subjects were women with mesothelioma and no known source of asbestos exposure other than cosmetic talc. Upon receipt of the subpoena and a "HIPAA-authorization" authorizing the disclosure of certain protected medical information, Northwell produced a single document (the "Northwell Document") containing a list of all human subjects of Dr. Moline's Study with all information redacted except relating to Ms. Bell. *Id*. at 5. Shortly thereafter, the plaintiff filed an emergency motion for a protective order to preclude discovery and inquiry into the identities of the thirty-three individuals, and to prevent the use of the Northwell Document in that case as well as any other. *Id*.

In September 2020, a Magistrate Judge issued a temporary order holding that the Northwell Document could be used in that case, but that it, and the information therein confirming that Ms. Bell was one of the thirty-three individuals studied, was "confidential and limited solely to this

case." **Exhibit 2**, at 6. In reaching this decision, the Magistrate Judge Joi E. Peake was clear that because Ms. Bell was the decedent in the case and Dr. Moline was that plaintiff's retained expert, "Ms. Bell's information and her relationship to Dr. Moline's Study should have been provided in expert discovery as to Dr. Moline," but that disclosure of the other individuals included in the study presented a "very different issue." *See* Transcript of Telephonic Motions Hearing, dated Sept. 25, 2020, attached as **Exhibit 23** at 5:23-6:21. Indeed, Magistrate Judge Peake remarked that she "completely agree[d]" with Judge Viscomi's ruling in *Lashley/Johnson* that it would be improper for defense to attempt to identify a subject or question Dr. Moline whether one of the subjects of the Study was a plaintiff in another case in which AII was involved. *Id*. at 59:8-14, 82:2-21. Defendants could not utilize a HIPAA-authorization form from another case for use *Bell* case to obtain the release of that individual's information or connection to Dr. Moline's study. *Id*. at 6:15-17, 82:2-21. Magistrate Judge Peake recognized: "There are important confidentiality and privacy issues as to the other individuals in the study." *Id*. at 6:17-21.

Once the *Bell* case was resolved, AII filed a motion seeking to vacate the order protecting the identification of Ms. Bell as one of the individuals in the Study from disclosure outside of that case. **Exhibit 2**, at 6-7. In deciding to grant AII's motion, Chief Judge Osteen considered four factors and the facts specific to *Bell* and, although the factors were mixed, that the order should be vacated. *Id*. Notably, the seven pages of Judge Osteen's order that AII block quotes across four pages of its motion represents only the first part of the analysis. Although it is here that Judge Osteen agrees with AII that there is value in making public that Ms. Bell was a subject of Dr. Moline's Study and filed worker's compensation claims, AII fails to highlight to this Court that Judge Osteen "agrees with Plaintiff that the mere existence of the unsuccessful workers' compensation claims does not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces." *Id*. at 16. Indeed, Judge Osteen acknowledges that other than stating "she thought she might have been exposed," Ms. Bell's claim never substantiated an alternative source of asbestos exposure. *Id*. at 16-17. Although there was not a formal adjudication on the merits involving an examination of competing evidence, there is no indication evidence supporting the claim was ever presented, nor does AII supply any such evidence for this Court to consider. Indeed, none exists.

It is likewise misleading for AII to suggest that Judge Osteen's decision to lift the protective order over the Northwell Document based upon a balancing of "privacy claims against the need for discovery of expert opinions" supports the disclosure of information regarding any other Study subject in any other case. It is clear that the *Bell* decision hinged largely on the fact that the Northwell Document was redacted so that "all information on other individuals," *i.e.* the 32 other research subjects other than Ms. Bell, remained protected. **Exhibit 2** at 35. Like Magistrate Judge Peake, Judge Osteen was less protective of Ms. Bell's identity and connection to Dr. Moline's study than of other participants because her information was disclosed in a case that was brought on her behalf and in which Dr. Moline was retained. *Id*. Judge Osteen also recognized that, even though Ms. Bell was not a "human subject" as defined by federal regulations because she was deceased at the time that Dr. Moline's Study received IRB approval, Dr. Moline's "article as a whole likely qualified as human subject research" as defined by 45 C.F.R. Part 46 and specific

IRB approvals. *Id.* at 32-33. Accordingly, Judge Osteen observed that other study subjects were "likely" entitled to "greater confidentiality protections than Mrs. Bell." *Id.* at 35.

Clearly, far from demonstrating that AII is entitled to depose Dr. Moline longer than the seven-and-a-half-hours that Defendants already had, the *Bell* opinion and order undermines Defendants' claim that they are entitled to question Dr. Moline about the Study's subjects (other than Ms. Bell) or obtain information that may help in their impermissible fishing expedition to match other plaintiffs to cases described therein. Even under the most liberal reading of Judge Osteen's order from a separate jurisdiction involving a separate plaintiff, Defendants are only entitled to discover information specific to the plaintiff involved in a particular case. Insofar as there is no possibility that Mr. Gref was a subject of Dr. Moline's Study, there are no valid questions Defendants could present to Dr. Moline other than what has already been explored.

Given the holding of Judge Osteen's decision, Defendants' citation to a deposition taken of Dr. Moline on September 30, 2022, in *Daigle v. Anco Insulations, Inc.*, a Louisiana state case,[7] to suggest that Dr. Moline acted improperly two weeks after the *Bell* order was issued by refusing to discuss "the specifics" of cases in the Study "or the names of the individuals in the paper" is unavailing.[8] *See* Defs. Motion at 8-9. As the above discussion reflects, under *Bell* as well as federal regulations, the Bedrock and Northwell IRBs, and relevant state and federal law (as argued in Northwell's motion to quash), the identities of the human research subjects are privileged and confidential, and Dr. Moline was well within her rights to maintain these protections.

Relatedly, contrary to Defendants' contentions, it is not "false" for Dr. Moline, in explaining her understanding as to how Ms. Bell's workers' compensation claims were resolved, to state that they were "dismissed for lack of information or lack of evidence." Defs. Motion at 8. As Judge Osteen's order reflects, the only "evidence" that Ms. Bell experienced an alternative exposure to asbestos separate from cosmetic talcum powder is the allegation she made based solely on personal belief in the context of workers' compensation claims. **Exhibit 2** at 16. It is well-

---

[7] Defendants' reliance on an unpublished decision from another Louisiana state case, *Biermann v. Colgate-Palmolive Co.*, July 16, 2021, is likewise unavailing. There, the court did not order that the identities of the human subjects are discoverable or exclude the study; it *denied* the defendants' motion to exclude Dr. Moline's expert testimony with the caveat that defendants could cross-examine Dr. Moline about the subjects' identities if she referenced them on direct examination. *See* Exhibit W to Defs. Motion; *see also* Transcript of Motion Hearing in *Biermann v. Colgate-Palmolive Co.*, dated May 18, 2021, attached as **Exhibit 24**, at 72:7-14. In addition, the *Biermann* plaintiff failed to notify the court of information that would have necessitated a different ruling (*id.* at 44:16-58:3), as there was no mention of, *inter alia*, any federal statute or regulation. Insofar as *Biermann* stands in contradiction to other courts who have considered the issue, including Magistrate Judge Peake who expressed agreement with Judge Viscomi's ruling, this Court should not be swayed by this outlier.

[8] Defendants do not explain why they asked Dr. Moline about Study, the identities of the subjects, and other information they believed they were entitled to at the deposition in *Daigle*, but not at day two of the deposition in *this* case that took place three days before, on September 27, 2022. In fact, AII failed to question Dr. Moline on either day of her deposition on these topics. Other than a few questions by WCD's counsel on the first day of the deposition, Defendants did not ask Dr. Moline about the Study at all, undermining their claim that the Study and its subjects is a basis justifying a need for any further inquiry at all.

settled that "unproven, nonadjudicated allegations are not evidence." *Bernstein v. Village of Wesley Hills*, 95 FSupp.3d 547, 569 (S.D.N.Y. March 27, 2015). In any event, Judge Osteen found that claims based on the belief of possible exposure was appropriate fodder for cross-examination to challenge the representation in Dr. Moline's Study that none of the 33 subjects had "known exposure to asbestos other than prolonged used of talcum powder." However, Judge Osteen also acknowledged that the claims were dismissed without prejudice and that "the mere existence of the unsuccessful workers' compensation claims does not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces." *Id*. at 16. Altogether, Dr. Moline's testimony indicating that it is her understanding the claims were dismissed because they were not substantiated with evidence of actual exposure is generally consistent with how Ms. Bell's workers' compensation claims were resolved. Nothing Defendants cite requires Dr. Moline to accept Defendants' interpretation of the record in *Bell*, nor does Judge Osteen require Dr. Moline to somehow concede (unjustifiably) that Ms. Bell's workers' compensation claims compromise the results of the Study. All Judge Osteen's decision permits Defendants to do is make specific reference to Ms. Bell as a subject of the Study, and ask Dr. Moline about the impact, if any, the unsuccessful workers' compensation claims had on her interpretation of data and conclusions – something Dr. Moline has already done now in depositions and trial.

For essentially the same reasons, Defendants' claims that Dr. Moline gave "false testimony" about Ms. Bell's workers' compensation claims during trial in *Fisher v. AII* is incorrect. *See* Defs. Motion at 10-11. At that trial, AII's counsel asked numerous questions about Dr. Moline's knowledge of the *Bell* case, whether Ms. Bell's worker's compensation claim was ever adjudicated, and if Dr. Moline's Study considered all of the subjects' possible sources of alternative asbestos exposures. Despite Defendants' claim to the contrary, Dr. Moline did not hold herself out as an "authority on the workers' compensation process" (Defs. Motion at 10), but merely testified about her knowledge of the process based on her decades of experience working with workers' compensation patients. **Exhibit 9** at 27:23-29:10. She did not apply any of this knowledge specifically to Ms. Bell's claim. Specifically, regarding Ms. Bell's worker's compensation claim, Dr. Moline reasonably explained, yet again:

> "My understanding was that there was a dispute and then either the case was withdrawn or there was a decision. I may be misremembering, but I know it did not go any further than that. That there was a dispute that there was any exposure. I thought it went and either a judge made that determination or the case was withdrawn at that point. And no further action was taken. So that's my recollection. I don't know."

**Exhibit 18** at 43:8-17. Based on what was known about Ms. Bell's exposures and that the worker's compensation claim was dismissed (even if it was just because the employers denied the claim, there was no evidence presented to substantiate Ms. Bell's allegation of exposure), Dr. Moline's testimony is appropriate.

Defendants take issue with Dr. Moline's citing "standard medical practice" as a basis for refusing to identify the subjects of her Study, claiming that she did not have a doctor-patient relationship with the subjects to justify invoking these standards. This argument relies on a myopic

understanding of the medical practice research standards and ethics at play. As argued by Northwell Health in its motions to quash, the information Defendants seek is protected by federal regulations, the Bedrock IRB, and the Northwell IRB through which approval for the Study was specifically granted, as well as generally-accepted standards in the medical research community.

Even experts retained by Defendants *in this case* recognize the legitimacy of Dr. Moline's position. For instance, Defendant Colgate-Palmolive's medical expert Dr. Gregory Diette has testified in another matter as to the importance of protecting the identity of the 33 subjects whose medical data is featured in the 2020 peer-reviewed article. *See* Excerpt of Dep. of G. Diette, M.D., dated 6/19/20, **Exhibit 25**, at 118:10-119:16. Similarly, Dr. Victor Roggli, M.D., a well-known pathologist who has testified as a medical expert on behalf of asbestos defendants in hundreds of cases and has published numerous articles involving case studies of human subjects (including studies on which Defendants' experts rely), testified as to his concerns regarding the disclosure of case files. *See* Excerpt of Dep. of V. Roggli, M.D., dated Feb. 3, 2011, **Exhibit 26**, at 42:9-45:21. He also remarked:

> "I also have objection to it because in – personally, because in the 25 years that I've been testifying as an expert in federal and state courts these requests go far beyond anything that have been requested of myself or my colleagues that I'm aware of, and I don't think that they are appropriate investigation into scientific merit or arguments that are made in the scientific literature…"

*Id*. at 44:25-45:7.

Ultimately, the importance of protecting the identity of human research subjects is well supported by numerous sources, including legal, medical, and ethical authorities. *See In re Fosamax Prod. Liab. Litig.*, No. 1:06-MD-1789, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009) (granting motion to quash subpoena issued to third-party researcher, because it created a "serious danger" of threatening the "ardor and fearlessness of scholars," qualities that are "indispensable for fruitful academic labor). Although Defendants clearly disagree with these sources, they fail to provide any persuasive counter-authority to justify the relief they seek. Even the case law from *Bell*, which Defendants argue champions their cause, recognizes that the identities of all human research subjects other than Ms. Bell constitute protected, confidential information that cannot be disclosed.

## II.    Ignoring Dr. Moline's Deposition Transcript Makes Clear That Defendants Have Feigned A Need To Question Her Further Based On Nonexistent "Undue Delays And Excessive And Untimely Disclosures Of Opinions."

### A.    At Every Turn, Dr. Moline Specifically Pointed Defendants To Her The Materials She Relied Upon In Forming Her Opinion.

Defendants go to great lengths to create the false impression that Dr. Moline's deposition testimony left them with more questions than answers because she was evasive and ambiguous about her opinions and the bases thereof. To that end, Defendants argue that they had "no way of ascertaining where [Dr. Moline's] opinions came from" at the deposition because she "purposefully obfuscate[d] the materials she relied on to develop her case-specific opinions,"

attempted to "hide the ball" by failing to cite to specific articles to support her assertions, and "modifie[d] her opinions without notice to defendants or supplementing her opinion report." *See* Defs. Motion at 15-17. As set forth below, Defendants' arguments rely upon unsupported assumptions, not facts, and completely ignore the long history they have of deposing Dr. Moline in previous cases in which she applied the same generally-accepted methodologies and relied on many of the same reliance materials. Even without the benefit of past experience with Dr. Moline, a full review of Dr. Moline's pre-trial expert disclosure and deposition testimony in this case, and not the conveniently cherry-picked narrative presented by the Defendants, makes clear that, at every turn, Dr. Moline fully apprised Defendants of the opinions that she will offer at trial, such that Defendants have no legitimate basis for further questioning.

As Defendants are well aware, Federal Rule of Civil Procedure 26(B) required Dr. Moline to produce a written report containing (i) a complete statement of all the opinions she will express at trial and the bases and reasons for them; (ii) the facts or data considered by Dr. Moline in forming her opinions; (iii) any exhibits that will be used to summarize or support Dr. Moline's opinions; (iv) Dr. Moline's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, Dr. Moline testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for her testimony in the case. Just a cursory review of Dr. Moline's report reveals that she faithfully complied with this requirement by producing an exhaustive report – 86 pages, not including her reliance materials – setting forth all the requirements of Federal Rule of Civil Procedure 26(B). Although Defendants would have this Court believe otherwise, Dr. Moline's report repeatedly cited to the published literature and studies which support the various aspects of her testimony, thereby allowing any litigant to prepare for her deposition by reviewing the scientific foundation of her causation opinion. Instead of acknowledging this fact, Defendants repeatedly bemoan the length of Dr. Moline's reference list and materials, an assertion which says far more about the sound basis supporting her opinion than Dr. Moline's desire to "hide the ball," as Defendants put it.

Importantly, Dr. Moline's deposition transcript demonstrates that Defendants were permitted to fully explore the opinions expressed in her report for longer than the presumptive 7-hour limit, which suggests that their current motion is simply an attempt to make her needlessly sit for additional expensive questioning. That Defendants have manufactured claims that Dr. Moline somehow obfuscated or shielded her opinion is best exemplified by their incomplete and misleading assertion that Dr. Moline testified that an "analogous exposure scenario" to Mr. Gref's could be found in CDC literature, but that Dr. Moline "offered no citation to any specific article," instead testifying that defense counsel would have to "go and find" the CDC article from her list of reliance materials. *See* Defs. Motion at 15.

During Dr. Moline's deposition, Defendant AII asked her about a reference to a CDC report in her own expert report, to which Dr. Moline responded that it was a morbidity and mortality weekly report for which she initially could not recall the specific citation. What Defendants fail to mention is that a mere moments later, Dr. Moline specifically identified the article as Mazurek, et al., *Malignant Mesothelioma Mortality – United States, 1999-2015*, Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report, 66, Volume 8, Pages 214-218, March 3rd, 2017. *See* **Exhibit 5**, at 242:10-24. Dr. Moline's specific citation allowed counsel for Defendant AII to present Dr. Moline with the article and question her extensively regarding the same. *Id.* at 242:10-243:1-16, 244:3-255:17, 258:20-260:4. Dr. Moline's testimony regarding the

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

simmonsfirm.com
(800) 479-9533

Mazurek article undercuts Defendants' claims that they are in the dark as to which CDC publication Dr. Moline was referring to.

Equally without merit are Defendants' misleading suggestions that Dr. Moline somehow withheld new "dose estimates/dose applications" until the second day of her deposition, or that Plaintiff deprived Defendants of questioning Dr. Moline regarding her dose estimate. As plainly reflected in the transcripts, Dr. Moline did not belatedly disclose new dose estimate opinions, but rather, merely prepared an informal dose estimate for Mr. Gref to address repetitive questioning from Defendants regarding the same. Unsurprisingly, Defendants neglected to mention that, as set forth below, during the first day of Dr. Moline's deposition, they squandered their time by repeatedly asking Dr. Moline whether she had performed a dose estimate for Mr. Gref, an answer which Dr. Moline consistently answered in the negative. *See, e.g.* **Exhibit 4**, at 154:4-12, 157:14-21. As Dr. Moline clearly explained, a formal dose estimate was scientifically and legally unnecessary for determining the causation of Mr. Gref's disease because his exposures were significantly above a hypothetical baseline exposure a person may experience from the background air. *See* **Exhibit 4**, at 135:16-25, 136:1-23; **Exhibit 5**, at 294:7-15.

Although Defendants would have this Court believe otherwise, Dr. Moline did not wait until the second day of her deposition to reveal a new dose estimate opinion that is somehow critical to her trial testimony. To the contrary, Dr. Moline explained that she merely "scribbled notes" the week of her continued deposition to arrive at what is essentially a back-of-the-envelope dose estimate in the event that Defendants insisted asking her about it again. *See* **Exhibit 5**, at 273:17-24, 274:4-24. Importantly, Dr. Moline re-affirmed that a dose estimate was not necessary for her to render a causation opinion at trial. *See* **Exhibit 5**, at 294:7-15. To the contrary, the dose calculation which Defendants claim is so critical that her deposition must be re-opened was nothing more than an "absolute estimate" that she did not even bother providing to Plaintiff's counsel. *Id.* at 294:7-17. Despite this, Dr. Moline proceeded to answer pages of questions on the subject, explaining her methodology, the calculations for each Defendants' products, and how her exposure estimate relates to the published literature. *See* **Exhibit 5**, at 282:13-21, 290:5-16, 293:7-296:19, 297:24-311:20. Critically, Dr. Moline explained that she arrived at her calculation by relying on three studies – the Gordon paper, the Stefan Paper, and the Anderson paper – which Defendants asked Dr. Moline about during the first day of her deposition. **Exhibit 4**, at 86:23-88:3, 93:18-105:23; **Exhibit 5**, at 305:11-307:6.[9]

Unable to establish that Dr. Moline belatedly disclosed a new "dose estimate" opinion or failed to answer questions regarding her opinion, Defendants claim that "[w]hen given the opportunity to briefly examine Dr. Moline on these estimates, she was asked whether she knew of any studies, whether in her over 500 listed references or not, that examined individuals within the range she alleged Plaintiff Gref was exposed to from cosmetic powders contracted mesothelioma and she was unable." *See* Defs. Motion at 16. Rather, according to Defendants, Dr. Moline vaguely mentioned "one study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos." *Id.* Once again, Defendants' misleading argument demonstrates their lack of fidelity to

---

[9] During post-deposition meet-and-confer discussions at which Defendants indicated a need to continue Dr. Moline's deposition on the limited issue of her "dose" calculations, Plaintiff advised that Dr. Moline applied the same methodology as in *Woods*, a case in which Dr. Moline had prepared a detailed declaration that Defendants were provided copies of.

the record, as Dr. Moline did not merely refer Defendants to a "study related to workers at a Chinese factory hand-spinning raw chrysotile asbestos." Rather, Dr. Moline specifically cited to Rodelsperger (incorrectly recorded as "Roethlisberger" by the stenographer in the first transcript), a study which Dr. Moline discussed during the first day of her deposition, as well as Jiang, et al.'s article "Hand-spinning chrysotile exposure and risk of malignant mesothelioma: a case-control study Southeastern China." *See* **Exhibit 4**, at 150:12-24, 153:14-154:3, 157:22-160:19; **Exhibit 5**, at 307:7-308:24. That Dr. Moline sufficiently identified the Jiang study is evidenced by the fact that counsel for AII marked the Jiang article as an exhibit and questioned Dr. Moline regarding it. 309:10-312:5. Despite Dr. Moline having fully answered Defendants' questions regarding the dose estimate that she prepared merely to assuage their concerns, Plaintiffs, as set forth above, offered Defendants an additional hour – nearly 15% the length of the original deposition – to address any outstanding questions regarding this estimate.[10] Defendants' failure to fully disclose this fact in their motion underscores that they have no real specific need for the carte blanche extension of time that they now seek.

Next, Defendants take issue with the fact that Dr. Moline presented at the deposition with an "Exposure Testimony Summary" which she herself did not prepare. Defendants' arguments on this point require little of the Court's attention, as the Exposure Testimony Summary is not an undisclosed report or reliance material. As its title suggests, it is merely a summary of the exposure testimony as reflected in the depositions of Plaintiff and his parents, which are the ***exact same*** sources of the exposure summary provided by Dr. Moline in her disclosed expert report. The summary and notes that Dr. Moline writes during a deposition regarding Mr. Gref's exposures are simply calculations based on the information already set forth in the reports, which were timely produced to Defendants. Thus, Defendants' argument is meritless.

Lastly, consistent with its practice of relying upon half-truths, Defendants argue that Dr. Moline presented at the deposition with "multiple expert reports" that were not disclosed in her original report or the subject of a supplemental report. *See* Defs. Motion at 16. In this regard, Defendants refer to certain expert reports prepared by Plaintiff's expert in materials science and industrial hygiene, Dr. William Longo. What Defendants' motion fails to mention is that, based on when she received them, Dr. Moline could not have included these reports as her reliance material, nor could they have been the subject of a supplemental report. Dr. Moline wrote her report in 2021, but Dr. Longo's testing was not done until 2022, and the results were not provided to her until August 2022 – after her deposition had already started. *See* **Exhibit 5**, at 275:20-276:17. Similarly, Defendants argue that Dr. Moline reviewed three reports from Dr. Longo pertaining to testing of Mennen products, yet "never supplemented her report or opinions." *See* Defs. Motion at 17. Defendants similarly fail to mention that Dr. Moline did not even receive the Mennen reports until the week of her deposition after returning from being out of the office, thus leaving her no real time to issue a supplemental report. *See* **Exhibit 4**, at 14:17-16:16. Ultimately, as set forth below, Dr. Moline is free to rely on these reports and was not required to supplement her report to include any of Dr. Longo's test results as "reliance materials" to comply with the discovery rules.

---

[10] As indicated *supra*, Defendants' claimed need to depose Dr. Moline regarding her dose estimate was the only reason proffered by Defendants during the meet-and-confer process.

**B.      Dr. Moline's Deposition Was Prolonged By Counsel's Needlessly Repetitive Questioning And Interruptions**

In an obvious attempt to malign Dr. Moline's character, Defendants self-servingly cite portions of the deposition transcript to create the impression that Dr. Moline obstructed the deposition with a series of unwarranted snide or insulting remarks. Putting aside that the "seventeen occasions" Defendants cite as constituting "undue" consumption of time aggregates to, at most, a mere handful of minutes of deposition testimony, and therefore, could not reasonably be construed as a justification for an indefinitely-continued deposition, Defendants' strategy is clearly an attempt to distract the Court from the fact that it was their counsel's repetitive and interruptive questioning, and not Dr. Moline's testimony, which wasted large swaths of the seven hours afforded under the Federal Rules. This conclusion is best exemplified by a citation to a portion of the transcript which Defendants incredibly – and incorrectly – argue supports the notion that Dr. Moline's conduct wasted time during her deposition. Midway through the first day of Dr. Moline's testimony, Dr. Moline expressed frustration with a question posed by Defendant for WCD and responded:

> You know, I've been asked these questions so many times. I'm really at a loss why I'm being asked the same questions that I've been asked for the past ten years. And it's just that there's volumes of transcripts that you could be referring to rather than wasting all of our time. But I just, I just don't understand this.

*See* **Exhibit 4**, at 80:2-18.

Without a doubt, Dr. Moline's frustration with Defendants' questioning is entirely justified and exemplifies the complete lack of need for a continued deposition. Dating back to 2004, Dr. Moline has testified in hundreds of cases involving asbestos exposure, often regarding the exact same or substantially similar questions of diagnosis, medical causation, and disease attribution.[11] Importantly, a significant portion of these prior occasions involves questioning from the ***exact same*** Defendants and defense counsel. Case in point is Defendants' request that they be permitted to rely on Dr. Moline's past testimony in the *Crudge*, *Lashley*, and *Bell* cases in order to avoid asking her the same questions. **Exhibit 4** at 6:14-17, 194:12-23. It does not appear that Defendants have ever followed through with their intent to rely on Dr. Moline's past testimony, despite instigating an agreement with Plaintiff to allow them to do so. This would have been the most efficient and considerate use of time for all involved with Dr. Moline's deposition, including the Court, which now has to consider these lengthy motion papers. Dr. Moline has already thoroughly explained, under oath, her methodology and reliance materials to the same litigants and attorneys for hours on end. Defendants are well aware that instead of asking Dr. Moline to step away from her medical practice and sit for yet another deposition to answer the same questions that have already been answered *ad nauseum*, they could simply refer to Dr. Moline's past transcripts to review her sworn testimony.

---

[11] By way of example, talc defendants have already questioned Dr. Moline regarding her Study, and further attempted to question her regarding the identities of the human subjects of her Study, on multiple occasions. *See, e.g.* Relevant Excerpts of Dr. Moline's Testimony in *Harpster*, **Exhibit 27**; Relevant Excerpts of Dr. Moline's Testimony in *Zimmerman*, **Exhibit 28**; Relevant Excerpts of Dr. Moline's Testimony in *Dolan*, **Exhibit 29**.

Despite this, Defendants – whether intentionally or unintentionally – act as though Dr. Moline has never testified before, and instead, attempt to rehash the same questions, often within the same deposition. For example, WCD, a party which has appeared at Dr. Moline's depositions numerous times, asked Dr. Moline iterations of essentially the same question within a matter of minutes pertaining to a well-trodden subject: the well-accepted notion in the peer-reviewed Helsinki Criteria that very low doses of asbestos exposure, without a minimum threshold, have been associated with the development of mesothelioma. *See* **Exhibit 4**, at 60:7-61:13, 77:8-19, 80:2-24, 81:11-19, 81:20-82:6. In light of this questioning, Dr. Moline understandably expressed her frustration, as anyone would. Unfortunately, this was not the only instance in which Defendants squandered their time by subjecting Dr. Moline to repetitive questioning. WCD asked Dr. Moline more than once whether she performed a dose estimate or comparison for Mr. Gref, even though she clearly and unequivocally answered the first time that she did not (*see* **Exhibit 4**, at 135:16-25, 136:14-23, 154:4-12, 155:2-16, 157:14-21), and asked Dr. Moline more than once whether it was possible to calculate an individual's lifetime dose to asbestos. **See Exhibit** 4 at 63:23-25, 64:1-66:2.[12] WCD compounded this error by repeatedly interrupting Dr. Moline's testimony and not allowing her to finish her answer. **Exhibit 4**, at 77:8-24, 80:25-81:10, 89:6-12. Simply stated, Defendants' argument that Dr. Moline "insulted" the questioning attorneys or made "snide remarks" overlooks that Defendants have clearly made it their mission to either goad Dr. Moline or obtain a different answer to the same types of questions by asking them persistently. In either case, Defendants should not be rewarded for their conduct, which is at best, an inefficient and improper use of time or, at worst, deliberate harassment of Plaintiff's expert which on its own qualifies as a valid cause to halt the deposition under F.R.C.P. 30.

Defendants' argument that "technical issues caused by the virtual nature of the deposition also caused delays in the deposition" extends beyond absurdity and into frivolity. Defendants did not cite to a single portion of the transcript where they encountered any real technical difficulty based on the virtual nature of the deposition, nor can any Defendants point to a real time request that the deposition be extended based upon technical difficulties – a request that Plaintiff would have entertained had it been made at the deposition. Instead, Defendants string cite to a handful of lines of the deposition which cannot be reasonably characterized as "technical issues" even under the most charitable interpretation. For example, Defendants cite to several portions, totaling mere seconds, in which Dr. Moline asked that displayed documents be enlarged so as to make the easier to read. **Exhibit 4**, at 29:2-3, 121:20-25, 193:1-5, 214:17-23. Additionally, Defendants cite to quick requests from Dr. Moline that the questioner adjust his seating so that his face could be seen, a simple courtesy which is not a "technical issue," and is no different than asking a questioner to speak up or move their hand away from their face during a live deposition. **Exhibit 4**, at 10:10-20, 85:13-15. That Defendants seek to re-open Dr. Moline's deposition for an indefinite period of time by mischaracterizing routine, promptly-addressed issues that can arise during any deposition as "technical issues" underscores that Defendants' have no real need for the relief they seek, and are unnecessarily burdening the Court with excessive and inappropriate motion practice.

---

[12] As Plaintiff did dozens of times throughout the deposition, Plaintiff's counsel objected to repetitive questioning as asked and answered.

## ARGUMENT

### I.    Defendants' Motion Should Be Summarily Denied Due to Defendants' Violation of Your Honor's Part Rules

As a threshold matter, Defendants' motion should be denied because, in violation of Part Rules II(c)(2), Defendants filed a letter motion 16 pages over the limit and failed to certify with the requisite specificity that the parties met and conferred regarding this discovery dispute prior to Defendants filing the motion. As per Your Honor's rules, it is not enough for Defendants to merely mention that the "parties have met and conferred prior to seeking relief," as they did here. *See* Def. Motion at 1. The moving party must state: (1) the date and time of such conference; (2) the approximate duration of the conference; (3) the names of the attorneys who participated in the conference; (4) the adversary's position as to each issue being raised (as stated by the adversary during the in-person or telephone conference); and (5) that the moving party informed the adversary during the conference that the moving party believed the parties to be at an impasse and that the moving party would be requesting a conference with the Court. Other than stating that "Plaintiff has unilaterally attempted to limit the deposition to one additional hour," which grossly understates the Plaintiff's position and the scope of discussions with which Plaintiff's counsel engaged with Defendant Colgate-Palmolive Company's counsel, Defendants fail to make any showing with respect to the pre-requisites for seeking discovery relief from the Court as per Your Honor's Part Rules. Defendants likely made no attempt to make this showing because the substantial majority of issues they now raise in their motion were never mentioned during the meet and confer process. Had any of these issues actually been raised by Defendants, the parties would have, at the very least, been given the opportunity to resolve some of the issues without requiring the Court's intervention. In short, because Defendants plainly failed to comply with this requirement, their motion should be summarily denied in its entirety.

### II.    Defendants' Motion Should Be Denied Because They Fail to Demonstrate Good Cause Justifying a Continued Deposition of Dr. Moline Beyond the Seven Hours Afforded by the Federal Rules

"Rule 30 of the Federal Rules of Civil Procedure governs the conduct of parties, deponents, and attorneys at depositions. Rule 30(d)(2) governs that, '[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day or seven hours." *Pierre v. City of New York*, 2022 WL 2384150, *1 (S.D.N.Y. July 1, 2022), quoting Fed. R. Civ. P. 30(d)(2). "Nevertheless, a Court 'must allow additional time, consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent." *Id.* "A party seeking a court order to extend the time for examination or otherwise alter the limitations is expected to show good cause to justify an order." *Id.,* citing *Robinson v. De Niro*, 2022 WL 274677, *2 (S.D.N.Y. Jan. 26, 2022). "Whether good cause exists to extend a deposition beyond the presumptive time limit of seven hours is a fact-specific determination." *Pierre*, 2022 WL 2384150 at *1. "A district court has broad discretion to set the length of depositions appropriate to the circumstances of the case." *Arista Records LLC v. Lime Group LLC*, 2008 WL 1752254 (S.D.N.Y. Apr. 16, 2008).

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

As demonstrated in detail above, there is no question that Defendants failed to establish good cause justifying the Court to compel Dr. Moline to sit for an indefinite continued deposition. Rather than make the requisite procedural or substantive showing with respect to any requested area of inquiry, Defendants use their motion to misrepresent the scientific foundation underlying Plaintiff's claims and assert *ad hominem* attacks against the character and integrity of Plaintiff's counsel and Dr. Moline rather than seek genuinely-needed discovery.

Indeed, without even mentioning that they initially sought to conduct a limited four-hour deposition of Dr. Moline about her exposure calculations for Mr. Gref, Defendants request an open-ended deposition to explore a broad range of other topics, including the identities of the human research subjects involved with Dr. Moline's Study, which courts, including Magistrate Judge Peake and Chief Judge Osteen in *Bell*, have consistently recognized are protected from disclosure. Putting aside that Defendants inexplicably changed the position they took during the meet-and-confer process, Defendants fail to demonstrate good cause for any individual topic. In fact, Defendants failed to make even the threshold showing that, in the seven-and-a-half hours that they already exhausted, their time was used efficiently. *See Margel v. E.G.L. Gem Lab Ltd.*, 2008 WL 2224288, at *7-8 (S.D.N.Y. May 29, 2008) (defendants failed to make appropriate showing that they used the time previously afforded efficiently and that there are additional relevant areas of inquiry); *Bender v. Del Volle*, 2007 WL 1827839, at *3 (S.D.N.Y. June 25, 2007) ("While it is understandable that the Bivens defendants may wish to inquire as to a variety of other topics, such thorough questioning on all potential subjects is not envisioned under the rules"). Instead, Defendants seek to re-tread ground that has already been covered, or wade into subjects that are prohibited by law. This is not a permissible basis on which additional time beyond that afforded by Federal Rule 30(d) should be granted.

To the extent Defendants reference *Daubert* as a justification for further questioning, Defendants' argument is without merit. As discussed, before Dr. Moline's deposition in this case even started, Defendants were familiar with Dr. Moline's opinion, the methodology she applied to determined that Mr. Gref's mesothelioma was caused by asbestos-contaminated cosmetic talcum powder, and the scientific literature she relies on. Defendants have previously deposed Dr. Moline on numerous occasions in other talc cases involving similar allegations of liability. Notwithstanding the benefit of this experience, Defendants deposed Dr. Moline in this case for over seven hours (exclusive of breaks), exploring the full scope of her opinion, confirming the sources on which she relies for various aspects of her opinion, and the methodologies she applies. Given the extensive testimony Dr. Moline has provided regarding the bases of her opinion, Defendants have all the discovery they need to raise a *Daubert* challenge, should they choose to do so.

Without a legitimate basis to request further discovery to explore a potential *Daubert* challenge, Defendants attempt to invoke *Daubert* as grounds for questioning Dr. Moline further about her Study. Under the guise of exploring the Study's methodology, Defendants seek to identify the human research subjects so as to match them to the plaintiffs in other cases that Defendants believe had alternative exposures that will undercut the Study's representation that the subjects only asbestos exposure was through cosmetic talcum powder use. This convoluted use of

*Daubert* is improper and does not support any additional questioning of Dr. Moline. Obviously, the *Daubert* factors apply to determine the admissibility of expert testimony. They cannot be used against reliance materials or scholarship.

Nor can *Daubert* be used to override the clear federal standards which protect the identity of the Study's subjects. As discussed, despite Defendants' claims to the contrary, the identities of all the subjects except for Ms. Bell remain protected, even under Chief Judge Osteen's decision in *Bell*. Indeed, although Ms. Bell was not a "human subject" as defined by federal regulations, Judge Osteen recognized that Dr. Moline's "article as a whole likely qualified as human subject research" as defined by 45 C.F.R. Part 46 and specific IRB approvals. **Exhibit 2** at 32-33. Accordingly, all 32 other study subjects were "likely" entitled to "greater confidentiality protections than Mrs. Bell." *Id*. at 35. This view is consistent with that argued by Northwell Health in opposition to the subpoenas filed by AII and WCD to discover records concerning the Moline Study and its subjects. Ultimately, *Bell* does not support any further disclosure of information regarding the Moline Study in this case than was already provided by Dr. Moline in response to the small number of questions Defendants presented during the first day of her deposition. In general, under *Bell* and all other relevant case law, Defendants are entitled, as they were during both days of Dr. Moline's deposition, to ask Dr. Moline about the Study, challenge the reliability of the Study through questions regarding the methodology and the types of information considered (or not considered). Defendants are not permitted to discover the identities of the Study's subjects. Because this information is not discoverable, good cause does not exist to require Dr. Moline to sit for an additional deposition on this topic.

Defendants likewise failed to establish good cause to require Dr. Moline to sit for a continued examination through their citation to a litany of complaints and non-existent "technical issues" which the record makes clear are entirely unfounded. As set forth above, Dr. Moline sat for seven-and-a-half hours and fairly answered each question posed by the Defendants. Far from "hiding the ball," as Defendants put it, Dr. Moline fully explained her methodology for attributing causation, oriented the Defendants to the materials and literature upon which her opinions are based, and even sat for additional questioning beyond the federal limit to answer questions regarding a dose estimate that she created merely to assuage Defendant's persistent questioning on the subject. Simply stated, Defendants have not identified a single area that Dr. Moline failed to testify to, nor did Defendants come close to establishing that their legal rights were infringed by the manner in which she testified. The closest Defendants come to identifying a legal objection to Dr. Moline's testimony is their argument that, at the deposition, she testified that she relied on new reports from Dr. Longo which required her to issue a supplemental report. However, Defendant's argument is meritless, as there is no dispute that Dr. Moline was not required to supplement her initial report to indicate that she considered Dr. Longo's reports, and as such, any further time to question her regarding her reliance on the same would be unwarranted.

Indeed, as Federal Rule of Civil Procedure 26(e) makes clear, a party who has made an initial disclosure must only supplement or correct his or her disclosure or response (1) as ordered by the Court, or (2) if the party learns that in some material respect the disclosure or response is incomplete or incorrect and "[t]he additional or corrective information has not otherwise been

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

known to the other parties during the discovery process or in writing." Here, Defendants cannot establish that supplementation was required by either prong, as this Court did not direct Dr. Moline to supplement her initial disclosure, nor was supplementation required, given that the additional information – Dr. Longo's reports – were otherwise disclosed to the Defendants before Dr. Moline's deposition took place.[13] For this reason alone, Defendants' argument must be rejected. Although Defendants may argue that Dr. Moline should have alerted them to the fact that she would consider Dr. Longo's reports as additional support for her opinion, any such contention would be meritless. Defendants cannot dispute that Dr. Moline's initial report already references product testing which Dr. Longo's laboratory has conducted throughout the years. As such, it should have been readily apparent to Defendants that Dr. Moline may consider additional materials prepared by Dr. Longo which were not in existence or made available to her when she prepared her initial report. To the extent Defendants disagree with the methodology or conclusions expressed in Dr. Longo's reports, they had the opportunity to depose Dr. Longo regarding the same at his deposition in this case.

Lastly, Defendants' motion makes clear that, despite the unequivocal authority cited *supra* establishing that Dr. Moline is not permitted to reveal identifying information concerning her Study's human research subjects, Defendants will continue their improper campaign to elicit such information at any continued deposition, arguing that "Dr. Moline should be compelled to answer questions on the names and backgrounds of the individuals in her 2019 article pursuant to Federal Rules 26, 30, and 37." *See* Defs. Mot. At 15. In order to prevent Defendants from attempting to wade into these clearly protected areas of inquiry, should Dr. Moline's deposition be extended, the Court should enter a protective order. Indeed, pursuant to Federal Rule of Civil Procedure 26(c), a District Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including forbidding disclosure or discovery, or forbidding inquiry into certain matters. Plaintiff submits that good cause exists for the issuance of a protective order in this case, given that, as stated above, the personal information and medical data of the subjects involved in Dr. Moline's Study is privileged and confidential, such that Dr. Moline is not permitted to divulge the identities of the subjects or provide other revealing details. For this reason, the Court should not merely deny Defendants' motion; rather, it should also grant Plaintiff's cross-motion for a protective order.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel the Continuation of the Deposition of Plaintiff's Expert, Dr. Jacqueline Moline, should be denied in its entirety.

---

[13] As of the filing of this opposition, Dr. Longo has already been deposed on these reports, among many other subjects.

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

Respectfully submitted,

James M. Kramer