UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

| | | |
|---|---|---|
| | : | CIVIL ACTION NO. |
| BRIAN JOSEPH GREF, | : | 1:20-cv-05589-GBD-DCF |
| | : | |
| Plaintiff, | : | |
| -against- | : | |
| | : | |
| | : | |
| AMERICAN INTERNATIONAL INDUSTRIES, | : | **PLAINTIFF'S** |
| *individually and as successor-in-interest for the* | : | **MEMORANDUM OF** |
| CLUBMAN BRAND, and to THE NESLEMUR | : | **LAW IN SUPPORT OF** |
| COMPANY and PINAUD COMPANY, *et. al.*, | : | **MOTION FOR** |
| | : | **SANCTIONS** |
| Defendants. | : | |

-------------------------------------------------------------------------X

## INTRODUCTION

It is clear that the narrative by which Defendants, led by AII, have pursued discovery concerning the identity of the 33 subjects of Dr. Moline's 2020 Article is based on one that AII knew to be false. Since November 2022, AII (joined by Defendants) argued for the disclosure of information identifying the 33 human subjects involved in the article Dr. Moline co-authored and published in a peer-reviewed journal in 2020—"Mesothelioma Associated With the Use of Cosmetic Talc"[1] (hereinafter "the Article"). The linchpin to Defendants' allegations that the Article relies on "false premises" (Dkt. 263, at 1) is the claim that Betty Bell was "falsely" included in the Study because she had occupational exposures to asbestos outside of her cosmetic talc use. *Id*. at 1, 2, 4, 5, 15. What Defendants have glaringly failed to mention is that testimony by ***the***

---

[1] The Article, attached as **Exhibit 1**, was published online in 2019, and in print in 2020 in the Journal of Occupational and Environmental Medicine (Vol. 62, No. 1), which is the official journal of the American College of Occupational and Environmental Medicine. *See* https://journals.lww.com/joem/Pages/aboutthejournal.aspx (last visited May 18, 2023)). Its editorial board includes, *inter alia*, medical doctors from Yale University School of Medicine, Johns Hopkins and Drexel university, and doctors from industry, including Exxon Mobil and General Electric. *See* https://journals.lww.com/joem/Pages/editorialboard.aspx. Additionally, this article was peer-reviewed, and it satisfied the authorship criteria of the International Committee of Medical Journal Editors. *See* https://journals.lww.com/joem/Pages/editoriallegalethicalpolicies.aspx.

*same defense experts* AII retained in *Bell* and retained in *this* case – Dr. Allan Feingold and Dr. Kenneth Mundt, upon review of all relevant case-specific evidence, refute AII's claim:

- As an expert retained by AII in the *Bell* case, Dr. Feingold, reviewed Ms. Bell's entire case file, including worker's compensation claims, authored a litigation report, and still, like Dr. Moline, ***could not identify an occupational exposure to asbestos***. *See* Dep. of Dr. Feingold, dated March 10, 2023, attached as **Exhibit 2**, at 126:21-129:3, 140:11-141:6, 141:8-142:2 and Exhibit 3 thereto at p. 397.

- As the epidemiology expert retained by AII in *Bell*, Dr. Mundt, based on his review of the record, went so far as to ***agree*** with Dr. Moline's inclusion of Ms. Bell in the Article, because the evidence reflected that Ms. Bell had mesothelioma and ***no known asbestos exposure other than cosmetic talc use***. *See* Dep. of Dr. Mundt, dated April 11, 2023, attached as **Exhibit 3**, at 125:7-16.

Disturbingly, Dr. Feingold was only produced for three hours of deposition in this case. After reluctantly producing Dr. Feingold for a minimal deposition, AII has persistently refused to produce Dr. Feingold for completion of his deposition, knowing full well since motion practice on this issue began in November 2022, that Dr. Feingold's opinions will undermine Defendants' claimed basis for discovery of this confidential and protected information.

AII's false narrative and withholding of Dr. Feingold are not the only examples of bad faith discovery tactics. As this Court will recall, Defendants demanded information revealing the identity of subjects of the Article under the guise of seeking discovery necessary to cross-examine Dr. Moline about "the methodologies that formed the basis for her opinions in this matter" (Dkt. 263, at 2). Although Defendants initially acknowledged that "***Dr. Moline is of course free to keep all such information private if she does not choose to serve as an expert witness or rely on her Article and testify about the cases on direct***" (*id.* at 5), now that Plaintiff has attempted to formally withdraw Dr. Moline's reliance on the Article, Defendants have backtracked on this representation, thereby confirming that their stated need for this "discovery" was a false pretense. It is now crystal clear that the information pertaining to the subjects of Dr. Moline's Article has nothing to do with

2

cross-examining Dr. Moline about her opinion as to the specific cause of Mr. Gref's mesothelioma in *this* case.[2] Rather, it has everything to do with gathering information AII (and other cosmetic talcum powder defendants) can use in *this* and *other* cases nationwide to promote the delusion that plaintiffs have conjured up talc litigation by paying for scientific research supporting their claims.[3] It is an obvious farce.[4] Nevertheless, as discussed below, attacking scientists that present as a real threat to industry is a common bad-faith litigation strategy. Johnson & Johnson ("J&J") has been deploying this tactic since the 1970s, and it is clear that AII works from that playbook.

The false narrative and pretense that AII has repeatedly represented to this Court over the past six months in order to persuade Your Honor to take the unprecedented step of revealing information protected by 45 C.F.R. § 46.111(a)(7) (research confidentiality protection enforced by an Institutional Review Board approval) and HIPAA (42 U.S.C. § 1320d *et seq*.) confirm that AII has, at best, violated basic discovery rules requiring attorneys to certify to the best of their knowledge that each discovery request is "consistent with the Federal Rules and warranted by existing law" (Fed. R. Civ. Pro. 26(g)(1)) and, at worst, perpetrated a fraud on the court. *See United States Sec. & Exch. Comm'n. v. Collector's Coffee Inc.*, 2021 WL 266284, at *12 (S.D.N.Y. Jan. 27, 2021) ("A fraud on the court occurs where a party: … (2) unfairly hamper[s] the presentation of the opposing party's claim or defense, (3) lies to the court and his adversary intentionally,

---

[2] As discussed below, Defendants do not need the underlying data to effectively cross-examine Dr. Moline about the Article, and their repeated claims that the Article is unreliable because the data was obtained through medico-legal evaluation is without merit. As discussed herein, the truth is that Defendants' experts routinely publish upon data first obtained while they were paid experts in litigation.

[3] Defendants' improper and baseless attacks against Dr. Moline in this case were a preview of the disturbing allegations that Johnson & Johnson, through LTL Management LLC ("LTL"), asserted when it **sued** Dr. Moline directly in the sham bankruptcy that was attempted to dispose of J&J's cosmetic talcum powder liabilities, but reversed by the Third Circuit.

[4] "No funds or external assistance were obtained by any outside source in the development, writing, analysis, or conclusion of this manuscript." **Exhibit 1**, at 11.

repeatedly, and about issues that are central to the truth-finding process…"). Both violations are sanctionable and, indeed, justify the Court imposing sanctions against AII here.

## **RELEVANT FACTS**

1. <u>Baselessly Attacking Unfavorable Science is a Decades-Old Defense Litigation Strategy</u>

As noted, AII's mission here is not new, it is simply an escalation of the talc industry's fifty-year effort to discredit anyone who dared allege that talc contains asbestos. The strategy is so entwined with the industry itself that J&J weighed in on the issue in this case despite the fact that it was dismissed two years ago. J&J perfected this strategy back in 1972 when it dubbed many doctors and public health officials as "Antagonistic Personalities." *See* **Exhibit 3**. The list of antagonistic personalities included Dr. Irving Selikoff of Mt. Sinai Hospital, "an epidemiologist heavily involved with asbestos and its adverse effects on health," Dr. Langer of Mt. Sinai Hospital "a microscopist who visually identifies chrysotile in most samples of talc that he examines," Dr. Lewin of New York University and the FDA who "insists on claiming that asbestos is present in talc found to be free of asbestos by the other authorities," as well as other acclaimed scientists of the day. *Id.* Now AII continues J&J's tradition of attacking doctors who are part of the "leading group who initiate[] the attack on talc [] located in New York City." *Id.* If the list was remade today, there is no doubt that Dr. Moline would be included.

Just like the original "antagonistic personality"—Dr. Selikoff, Dr. Moline has "dedicated [her] entire professional life to the studying the prevention and treatment of exposure-related illnesses, including diseases caused by asbestos." *See* Moline Congress testimony 12/10/19, attached as **Exhibit 4**. Dr. Moline's dedication to public health is the very reason she has become an "antagonistic personality" to talc defendants, including AII and J&J. As evidenced by a fifty-year history, anyone who has the audacity to publish and speak aloud that "[t]he occurrence and

4

commonality of asbestos in cosmetic talcum powder" is likely the cause of mesothelioma in those "who have no other known asbestos exposure" is one the talc companies will seek to compromise. *Id*. at 2.[5]

Recent news articles published shortly after filings or appearances before the Court that are promoted by defense counsel support that AII and, now, (without even having standing in this case), J&J have ulterior motives in their pursuit of discovery related to Dr. Moline's Article that are much more nefarious than represented to the Court. *See e.g.* Law.com, "'All or Nothing': Plaintiffs' Talc Expert Pressed to Provide Names in Groundbreaking Report" (April 27, 2023), attached as **Exhibit 5**; Mealey's Toxic Tort/Environmental, "Talc Plaintiff Says Withdrawal of Study Moots Discovery Attempts," (May 8, 2023), attached as **Exhibit 6**.

2. AII's Pursuit of Discovery Related to Dr. Moline's Article Was Made Under False Pretense and Has, At All Relevant Times, Been Based on a False Narrative

Although Defendants have attempted to frame their pursuit of discovery related to Dr. Moline's Article through a good-faith lens, recent events and testimony by their own experts have confirmed that Defendants, led by AII, have misled the Court by acting under a false pretense and pushing a false narrative that there is any actual evidence that Betty Bell suffered non-talc occupational exposures to asbestos.

A. **False Narrative**

At all times before this Court, noticeably absent from AII's submissions was even a scintilla of credible evidence that Ms. Bell was actually exposed to asbestos at her place of work that would in any way support its need to shatter the confidentiality of the human subjects. AII's

---

[5] Morton Dubin, the signatory of J&J's May 3, 2023 letter to this Court and national counsel for J&J, found his letter to be of such importance that it is the subject of one of the three news articles listed on his firm biographical page. *See* https://www.kslaw.com/people/morton-dubin (last accessed 5/17/2023.)

own experts explain this glaring absence in no uncertain terms: no such evidence exists, nor did they even consider allegations of alternative exposures when rendering their opinions. Put another way, the myth of alternate asbestos exposure in the *Bell* case is one that AII's lawyers have perpetuated, and that not even their hired experts are able to support. More troubling, AII has known its experts' position on this very issue all along, and yet continued to lead this Court down its deceptive discovery charade. This is fraud.

<u>Defense Medical Causation Expert Dr. Allan Feingold</u>

The Court need look no further than the testimony of AII's own experts to unravel the deception. The issue begins (and, in essence, ends) with Allan Feingold, M.D., a prolific defense expert who has been testifying in litigation for over forty years. Over the past ten years, Dr. Feingold has become a darling of the cosmetic talc defense bar, producing hundreds of reports and testifying in dozens of cases across the country on behalf of major defendants, including J&J, WCD, Chanel, Colgate-Palmolive Company, AII, Shulton, and GlaxoSmithKline. *See* Dep. of Dr. Feingold (draft),[6] dated May 16, 2023, attached as **Exhibit 7** at 11:13-12:11, 13:2-6, 13:19-14:5, 14:7-15:16; List of Dr. Feingold's Deposition List, updated March 22, 2023, attached as **Exhibit 8**; List of Dr. Feingold's Trial Testimony List, updated March 15, 2023, attached as **Exhibit 9**.

Dr. Feingold was a paid expert for AII and other cosmetic talc defendants in the *Bell* case. AII was represented by the same counsel as in this case. As the Court may recall, AII's counsel has emphasized its involvement in the *Bell* case to highlight its familiarity with evidence and Judge Osteen's decision, which AII repeatedly mischaracterized as supporting the de-anonymity of subjects involved in the Article. As is his custom and practice, Dr. Feingold reviews the case file

---

[6] As of this writing, only a draft version of this transcript is available. A final copy may be provided when available, at the Court's request.

to determine what caused the disease in question, allowing him to consider or reject all possible exposures before rendering an opinion. Consistent with this thorough practice, Dr. Feingold, upon reviewing Ms. Bell's deposition testimony, medical records, *workers' compensation claims*, and discovery, opined that (1) **none of Ms. Bell's occupations were such that she was at an increased risk or potential increased risk for developing mesothelioma based on her occupation title alone**; and (2) **he could not conclude that Ms. Bell had a significant exposure to commercial asbestos despite his review of all relevant evidence**. *See* **Exhibit 2**, at 126:21-129:3, 140:11-141:6, 141:8-142:2 and Exhibit 3 thereto at p. 397.

AII also fails to mention that Dr. Feingold disagrees with Defendants' current approach of asserting *ad hominem* attacks against Dr. Moline and "suing witnesses about their published work." According to Dr. Feingold, "the way to deal with that is in criticizing the results of that published work," which he did in the case of the Article. **Exhibit 2** (3/10/23) at 118:24-119:20. Notably, Dr. Feingold's critique of the Article did *not* include any opinions concerning the inclusion of Ms. Bell as one of the 33 subjects. *Id.* at 153:13-16. And, critically, Dr. Feingold **_agreed_** that subjects of peer-reviewed medical and scientific papers should remain anonymous. *Id.* at 145:24-146:4.

<u>Defense Epidemiologist Dr. Kenneth Mundt</u>

Although the testimony of its expert on medical causation is certainly enough to support that Ms. Bell was not exposed to asbestos other than through cosmetic talc, further support is provided through a second AII expert who was also charged with examining the *Bell* record for any and all asbestos exposures. Kenneth Mundt, Ph.D., FACE, is an epidemiologist retained by AII in this case, just as he was retained by AII in the *Bell* case. He agrees, contrary to representations AII's counsel has made to this Court, that Ms. Bell fits Dr. Moline's criteria for

inclusion in the Article, as the evidence reflected that she had mesothelioma and **no known asbestos exposure other than cosmetic talc use**. *See* **Exhibit 3**, at 125:7-16. He also agreed that there was **no evidence** to conclude that Ms. Bell was exposed to levels of commercial asbestos at any of her places of employment that increased her risk of mesothelioma. *Id*. at 118:17-119:4.

> **B.      False Pretense**

In November 2022, AII (and Whittaker Clark & Daniels, Inc., who is no longer active in this case), served subpoenas seeking records to discover the identity of the anonymous study participants, and effectively relitigate the claims that they had filed in their respective lawsuits. In a related motion, AII, joined by Defendants, sought to continue Dr. Moline's deposition for an indefinite amount of time beyond the seven-and-a-half hours that they had already questioned her. (Dkt. 263).

Critically, in claiming to pursue the requested discovery to examine Dr. Moline as to the methodologies that formed the basis for her opinions in *Gref* (which Defendants had already done for seven and a half hours, more than the amount permitted by the Federal Rules), AII explicitly represented that it would ***not*** pursue the identities of the study participants if either Dr. Moline was not an expert or she chose not to rely on the Article. Indeed, AII stated in no uncertain terms that: "***Dr. Moline is of course free to keep all such information private if she does not choose to serve as an expert witness or rely on her Article and testify about the cases on direct***." *Id*. at 5. Taking Defendant as true to its word, on May 1, 2023, noting concerns about unduly delaying trial, Plaintiff wrote to the Court advising that all his experts withdraw reliance on the Article in this case. (Dkt. 337). Revealingly, AII departed from its past representation to the Court and Plaintiff, and doubled down on its argument that the Court should order the requested discovery,

emphasizing that this information was necessary to challenge Dr. Moline's credibility in other cases and jurisdictions.

### C.      Defendants' Critiques of The Article As Litigation-Driven And Inherently Unreliable Are Intellectually Dishonest And Ask this Court to Adopt a Double Standard

Related to the misrepresentations AII asserted to wedge the door open to protected information are the arguments that data obtained from litigation is inherently unreliable and that, therefore, Defendants must identify the subjects of the Article to challenge the foundation of its conclusions. The truth is that defense experts routinely rely on case series reports, including their own such reports, generated from cases obtained through litigation. For example, Dr. David Weill, who was retained as an expert in this case by Colgate, has relied on case series reports as the basis for his opinions in other cosmetic talc cases, ***including*** the Article co-authored by Dr. Moline. *See* Dr. Weill Reference List in *Gref*, updated Jan. 29, 2022, attached as **Exhibit 10**, at p. 38. Dr. Weill and Dr. Feingold also rely upon case series reports that were (i) written by defense experts based on subjects they reviewed in litigation; and (ii) for which the authors refuse to reveal the identities of the participants based on confidentiality concerns. *Id.* at p. 4, identifying Roggli, V. L., Sharma, A., Butnor, K. J., and Sporn, T., and Vollmer, R.T., "Malignant Mesothelioma and Occupational Exposure to Asbestos: A Clinicopathological Correlation of 1445 Cases," *Ultrastruc. Pathol.*, 26:55-65; *See* Excerpt of Dr. Feingold's Report in *Gref*, attached as **Exhibit 11**, at p. 298. For that study, Dr. Roggli and his co-authors accessed the tissue samples and exposure information by working as testifying experts in litigation, but Dr. Roggli has refused to release the identifying information for those "medicolegal cases" upon which he publishes.

Defendants also universally rely on epidemiology studies which refuse to identify the names of the underlying subjects. The Selevan Vermont epidemiology study, for example, is a

mortality study for which J&J refuses to produce the social security numbers for its Vermont workers in order to enable plaintiffs to verify the death certificates and mortality data. Dr. Weill and Dr. Feingold rely on this study in this case to render their opinions. **Exhibit 10** (Weill Reference List), at p. 53; **Exhibit 11** (Feingold Report), at p. 300. Additionally, regarding epidemiology studies most commonly cited by defendants as evidence disproving plaintiffs' claims—the Italian "talc miners and millers" studies, J&J will not provide the identity of the workers, despite having originated the studies, funded the studies, and "controlled" the work, including writing portions of the published papers. *See* J&J Correspondence, collectively attached as **Exhibit 12**.

Given these facts, AII effectively asks the Court to adopt a double standard by which scientific literature relied on by plaintiff experts may be subject to closer judicial scrutiny and more invasive discovery than the literature relied on by defense experts.

3.  <u>AII Has Improperly Shielded Its Expert That Will Undermine Its Attack of Dr. Moline</u>

Over the course of the last year, AII repeatedly attempted to shield its causation expert, Dr. Allan Feingold, from testifying while simultaneously arguing that it is entitled to additional time to depose Dr. Moline. Indeed, by the time that AII filed its initial application, AII already once pulled Dr. Feingold's deposition. *See* **Exhibit 13**. After producing Dr. Feingold for less than three hours of deposition in November 2022 and January 2023, Plaintiff repeatedly asked AII to re-tender Dr. Feingold so that his deposition could be completed. However, Plaintiff's repeated attempts to complete a routine deposition of a standard defense expert witness have been met with silence and resistance. *See, e.g.* **Exhibit 14**. As of the filing of this motion, AII has still yet to produce Dr. Feingold to complete a deposition that began months ago, an unsurprising result, given that AII previously advised Plaintiff that, despite any authority whatsoever to do so, it would

withhold Dr. Feingold until Dr. Moline's deposition is completed. *See* **Exhibit 15**. As a review of Dr. Feingold's prior testimony makes clear, AII's reason for its repeated refusal to participate in discovery could not be any clearer: AII is well aware that Dr. Feingold's testimony directly contradicts its self-constructed canard that Dr. Moline lied about Ms. Bell's alternative exposures to asbestos, and it would rather continue pulling the wool over the Court's eyes than afford Plaintiff ammunition to debunk its narrative.

## ARGUMENT

"[A] court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court." *Yukos Cap S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2000). "Sanctions for fraud are warranted if it is established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." *Id.*, quoting *N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F.App'x 25, 25 (2d Cir. 2011). "A fraud on the court occurs where a party: (1) improperly influence[s] the trier, (2) unfairly hamper[s] the presentation of the opposing party's claim or defense, (3) lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, or (4) knowingly submit[s] fraudulent documents to the Court." *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 2021 WL 266284, at *12 (S.D.N.Y. Jan. 27, 2021).

"[I]n order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 2021 WL 2660439, at *3 (S.D.N.Y. June 29, 2021), citing *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012). Notably, sanctions imposed pursuant to

11

a court's inherent authority can "be made against an attorney, a party, or both," and can include, *inter alia*, monetary sanctions *Id.*; *Network Data Rooms, LLC v. Saulrealism LLC*, 2022 WL 17404501, at *3 (S.D.N.Y. Dec. 2, 2022). Ultimately, "[t]he imposition of sanctions pursuant to a court's inherent authority is truly discretionary." *Yukos Cap. S.A.R.L.*, 977 F.3d at 235.

Additionally, pursuant to Federal Rule of Civil Procedure 26(g)(1), when an attorney signs a discovery request, he or she certifies to the best of their knowledge, information, and belief that the discovery request is: (1) consistent with the Federal Rules and warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law, or establishing new law; (2) not interposed for any purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (3) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action. When a certification violates Federal Rule 26(g) without substantial justification, "the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." *See* Federal Rule of Civil Procedure § 26(g)(3). "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." *Id.*

Based upon the foregoing, there is no question that AII should, at a minimum, be sanctioned for forcing Plaintiff and this Court to dedicate significant time and resources to a discovery side show which AII has known from day one has no good faith basis, but instead, was raised solely to harass Plaintiff and his expert. As this Court is well aware, AII's discovery application to continue Dr. Moline's deposition rested on a simple premise: it should be afforded additional, unprecedented discovery concerning the 33 subjects of Dr. Moline's Article because it knew that subject Betty Bell had occupational exposures to asbestos unrelated to talc exposure. Significantly,

AII stated, in no uncertain terms, that if Dr. Moline simply withdrew her reliance on the Article, it would discontinue its pursuit and allow Dr. Moline to "keep all such information private." AII's conduct before, during, and after its application has shown that both of these representations were flat out lies.

As set forth above, AII did not merely carelessly represent to the Court that Betty Bell was included in the Article despite occupational exposures to asbestos without knowing whether it was true; rather, the undisputed evidence shows that its own expert, retained in this case and in Bell, had already confirmed that this statement was false at the time it was made. Indeed, Dr. Feingold had already refuted AII's theory that Betty Bell had occupational exposures to asbestos. However, instead of acknowledging this undeniable truism to the Court, it continued to press its debunked theory that because Ms. Bell had occupational exposures to asbestos, other subjects may also have had occupational exposures to asbestos, in the hopes that this Court would simply provide it with the identities of the Article.

However, AII did not merely shield this information from the Court; rather, it also took active steps to prevent Plaintiff from obtaining and presenting this information to the Court. As the parties' correspondence makes clear, for the last six months, AII has repeatedly prohibited Plaintiff from completing a routine discovery deposition of Dr. Feingold. It did not do so due to legitimate scheduling difficulties, a lack of effort by the Plaintiff, or a genuine belief that Dr. Moline's deposition must be completed before Dr. Feingold's. Instead, it guarded Dr. Feingold from further questioning because it knew that simple probing by Plaintiff would confirm that which AII had long since known: that Betty Bell did not have any alternative, occupational exposures to asbestos.

Notably, AII has continued to controvert this issue even though Plaintiff resolved this so-called discovery dispute in a manner which it asserted, on day one, would be satisfactory. As set forth above, AII indicated that disclosure of the identities of the subjects would not be necessary if Dr. Moline withdrew reliance on the Article, which is exactly what she did. However, instead of accepting the remedy which AII itself offered, AII shifted strategy and offered a bevy of new reasons why its discovery charade must continue. That AII reneged on its initial representation confirms that which Plaintiff has stated for months: AII has no genuine interest in obtaining this information for use in Mr. Gref's case. Instead, AII is acting as a surrogate for the entire asbestos defense bar, following the playbook drafted by former party J&J, which recently came to its aid, by harassing Dr. Moline long enough so that it may obtain information – any information at all - that might prevent her from offering future testimony in other cases which goes against their company line that asbestos-contaminated talc is safe and does not cause cancer.

Simply stated, AII's conduct is the very kind that Federal Rule of Civil Procedure 26(g)(1) and this Court's inherent authority to sanction attorneys and parties was designed to protect against. AII has repeatedly shown that it will stop at nothing, including lying and obstructing discovery, in order to obtain information that the asbestos defense bar has desperately sought for use in other cases. Plaintiff submits that in order to deter AII and others from abusing the judicial process for illegitimate means, sanctions are the only appropriate remedy.

## **<u>CONCLUSION</u>**

In light of the misrepresentations made by AII's counsel to the Court regarding its stated need for discovery relating to the Article and the legal basis supporting its entitlement to this otherwise protected information, sanctions pursuant to Fed. R. Civ. P. § 26(g)(1) and related case law are warranted. Plaintiff specifically seeks the following:

14

1)  An order of the Court finding that the "Bell issue" is irrelevant to the facts of the *Gref*
    case and any mention of the "Bell issue" is precluded including any argument or
    reference that Dr. Moline improperly, carelessly, or fraudulently included Betty Bell in
    the Article. Insofar as Plaintiff maintains the withdrawal of his experts' reliance on the
    Article, it will not be presented in evidence in any form during direct examination at
    trial. Alternatively, any statement made by any attorney or witness on behalf of
    Defendants regarding the Betty Bell case be met with the following instruction to the
    jury: Defendants' own retained experts, Dr. Kenneth Mundt and Dr. Allan Feingold,
    agree with Dr. Moline and reasonably conclude Betty Bell had no exposures to asbestos
    other than her use of cosmetic talc.

2)  Attorneys fees at $950.00 per hour for a total of 150 hours (totaling $142,500), which
    includes the filing of multiple briefs and letters and appearing for court conferences
    regarding the issues since November 2022, as well as the preparation of the instant
    motion.

Dated: May 18, 2023
       New York, New York

                                             Olivia P. Kelly, Esq.
                                             SIMMONS HANLY CONROY
                                             *Attorneys for Plaintiffs*
                                             112 Madison Avenue, 7th Floor
                                             New York, NY 10016