IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN JOSEPH GREF, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 1:20-CV-05589-GBD |
| v. | § | |
| | § | |
| AMERICAN INTERNATIONAL | § | |
| INDUSTRIES, et al. | § | |
| | § | |
| Defendants. | § | |
| | § | |

## AMERICAN INTERNATIONAL INDUSTRIES' OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Defendant American International Industries (sued individually and erroneously as "*successor-in-interest for the* CLUBMAN BRAND, to THE NESLEMUR COMPANY and PINAUD COMPANY") ("A-I-I"), by counsel, requests that Plaintiff's Motion for Sanctions be denied.

## INTRODUCTION

Plaintiff has not met the requirements—under the Federal Rules or this Court's local and individual rules—to bring a sanctions motion. Further, on the merits, Plaintiff's Motion is frivolous. Following months of briefing and argument related to the identity of litigation files Plaintiff's expert relied on to draft an article that she and other experts rely on in this case, Plaintiff belatedly would have this Court believe that seeking discovery of Dr. Moline's reliance material is sanctionable conduct. This is a poor attempt at "the best defense is a good offense" philosophy, intended solely to deflect attention away from issues related to Plaintiff's experts' reliance materials.

1

Plaintiff's new theory is that the Court should divert its attention to the recent depositions of two defense experts where they were asked to recollect their opinions from the *Bell* case—years after the fact. In so doing, Plaintiff is carrying the water for the same plaintiff's firm that represented the plaintiffs in *Bell*. Indeed, here, Plaintiff cited testimony elicited by that firm and copied a similar motion for sanctions filed by that firm. The other motion was denied outright.

Additionally, and unsurprisingly, Plaintiff wholly ignores the 40-page Memorandum Opinion and Order issued by the Middle District of North Carolina in *Bell*. After careful consideration, Judge Osteen detailed why Mrs. Bell's claimed exposures were important to Dr. Moline's opinions and any effective cross-examination or challenge under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993):

> Defense counsel could show that those workers' compensation claims were not adjudicated on the merits, rather they were dismissed without prejudice, (Docs. 333-3, 333-11), weakening the credibility of Dr. Moline's statement that the allegation of alternative exposure "was shown to be without evidence."

> Perhaps more significant than this example of a hamstrung cross-examination is the *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) issue created by concealment of Mrs. Bell's possible exposure. Dr. Moline testified that "based on the information . . . it wasn't determined that [the research subjects] had . . . any additional exposure." (Doc. 377-1 at 6.) Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Relatedly, *Daubert* imposes a list of factors a court should consider in assessing the reliability of expert testimony, including "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." 509 U.S. at 594 (internal citations omitted). Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.

(*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at \*6–7 (M.D.N.C. Sept. 13, 2022).) Because Plaintiff's "deflection attempt" fails to state any claims that are remotely sanctionable, this Court should deny Plaintiff's Motion.

## STATEMENT OF FACTS

1.  **The Moline 2020 Article and the *Bell* Case**

Dr. Moline published her "groundbreaking" article, "Mesothelioma Associated with the Use of Cosmetic Talc," ("Moline 2020") in late 2019. (*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at \*7 (M.D.N.C. Sept. 13, 2022).) The article received a great deal of publicity, with Dr. Moline giving interviews to various media outlets and even testifying before Congress. (ECF No. 348-5.) The article's conclusion, found in the first paragraph of Moline 2020, unequivocally states: "Exposure to asbestos-contaminated talcum powder can cause mesothelioma." (*See* Exhibit W, "Mesothelioma Associated with the Use of Cosmetic Talc.") Dr. Moline claims she reached this conclusion through a review of litigants' alleged "exposure data" to determine "potential asbestos exposures," as well as the individual litigants' medical history. Dr. Moline further claims that she and her co-authors considered "other potential exposures to asbestos," but found there were "no identified source[s] apart from the talcum powder." (*Id.*) Dr. Moline and her co-authors supposedly reviewed all cases for "potential" exposures from several areas including occupational sources, hobbies, "possible environmental exposures," and "any other potential sources of asbestos exposures." (*Id.*)

In her eagerness to garner attention, Dr. Moline provided biographical details of one litigant used in the article: "Ms. D." Ms. D's biographical information closely mirrored the case of *Betty Bell*, an individual who not only alleged asbestos exposure through cosmetic talc in a New Jersey state court (later removed to the United States District Court for the Middle District of North

Carolina ("MDNC")), but also filed asbestos-related workers' compensation claims against two former employers with the North Carolina Industrial Commission. (ECF No. 279-4.)

Dr. Moline was a retained expert in Mrs. Bell's New Jersey and MDNC actions, providing reports in both. (*See* Exhibit B, 2016 Moline Report (*Bell*); Exhibit A, 2020 Moline Report (*Bell*).) For her report in the New Jersey case in 2016, Dr. Moline reviewed Mrs. Bell's "workers' compensation file." (Ex. B, 2016 Moline Report (*Bell*).) After removal to the MDNC, Dr. Moline no longer listed the "workers' compensation file" under her reviewed material in 2020 (despite Mrs. Bell's husband filing a second workers' compensation claim in April 2019 following Mrs. Bell's death). (Ex. A, 2020 Moline Report (*Bell*).) This second claim was still pending before the North Carolina Industrial Commission when Moline 2020 was published. (ECF No. 319 at 3-4.)

The MDNC court aired concerns to the parties about the "inconsistent" positions being taken by plaintiff in *Bell*. There, plaintiff claimed that Mrs. Bell was only exposed to asbestos through her use of cosmetic talc. Before the North Carolina Industrial Commission, plaintiff claimed that Mrs. Bell was injured through asbestos exposure at two textile mills where she was employed for numerous years. (*See* Exhibit C, Hr'g. Tr., Aug. 4, 2020, at 80:15-25 (*Bell*).) William Graham, plaintiff's attorney for the workers' compensation claims, denied any inconsistency stating—before the court—that the claims for occupational exposure were based on his "experience and knowledge of the plant" where Mrs. Bell worked. He further informed the court that Mrs. Bell's testimony (where she did not recall explicit asbestos products at her jobsites) was not a "determinative end of the story" as to whether she was exposed to asbestos at her jobsites. (*Id*. at 78:22-25, 88:24-89:4, 112:3-15.) Mr. Graham's "knowledge" provided a "good-faith basis" for Mrs. Bell in 2015—and, later, her husband in 2019—to assert, under criminal penalty for making false statements, that Mrs. Bell was exposed to asbestos at her jobsites. (*Id.*)

When pressed for evidence of this "good-faith basis" for filing the workers' compensation claims, plaintiff's counsel in *Bell* produced documentation showing that Fiber Industries Inc. a/k/a Hoechst Celanese Corporation and Pillowtex Corporation f/k/a Fieldcrest Cannon, Inc. f/k/a Cannon Mills—the textile mills where Mrs. Bell worked for over 20 years (1967-1992)—were "approved sites" for numerous asbestos bankruptcy trusts including Fibreboard, B&W, G-I Holdings Inc., and Owens Corning.[1] (*See* Exhibit E, Plaintiff's Letter re: Production on Good Faith Basis (*Bell*), pertinent pages only.)[2] This means that, simply by working at these plants, Mrs. Bell is deemed to have been exposed to asbestos-containing products and entitled to recover monetary settlements from these trusts.

Indeed, in a prior case, Dr. William Longo (Plaintiff's expert in this case), issued an expert report concerning a plaintiff's asbestos exposure at Fiber Industries (Hoechst Celanese) wherein Dr. Longo stated:

> … it is clear that [the plaintiff] would have had significant exposures to airborne asbestos fibers from the various asbestos products that he worked with and near beginning in 1966 [and continuing potentially up until 1982] at the Fiber Industries plant in Salisbury, North Carolina … He would have had both significant direct and bystander exposures. These asbestos-containing products included asbestos pipe insulation, asbestos gaskets and packing, as well as insulating cements.

(*See* Exhibit F, Report of Dr. Longo dated April 29, 2020 (*Vinson*).)

In their case-specific reports and testimony, defense experts also pointed out the potential for exposure to amosite asbestos at the textile mills where Mrs. Bell worked. The conclusion of Dr. Allan Feingold's report, initially quoting defense expert Dr. Oury, states:

> **It is my understanding that Ms. Bell worked in an industrial setting with potential exposure to thermal insulation containing commercial amphiboles. I am also aware of a workers' compensation document as well as a history of**

---

[1] Companies that manufactured insulation, construction materials, boilers, etc.
[2] The attached spreadsheets contain only the approved sites in North Carolina sharing site names similar to Mrs. Bell's worksites. For descriptions of these trusts, *see* https://www.simmonsfirm.com/mesothelioma/asbestos-exposure/companies/owens-corning-fiberglas/

**violations at a plant she worked at for improper use of amphibole asbestos at the plant.** If there is evidence that asbestos did contribute to her mesothelioma, exposure to commercial amphiboles from her work around thermal insulation and/or exposure to amphiboles in association with the improper use of asbestos at the plant would have contributed to the pathogenesis of her mesothelioma. I entirely concur with Dr. Oury's opinions regarding the missed opportunity to perform an autopsy and obtain lung tissue for analysis, and the diagnostic consequences of not performing an asbestos fiber burden on this patient's lung tissue.

(*See* Exhibit G, Report of Dr. Feingold (*Bell*), dated August 13, 2020, at p. 394, emphasis added.)

Regarding the potential for Mrs. Bell to have been exposed to asbestos at her jobsites, Dr.

Feingold testified in *Bell*:

A.   I think it's fair, but there is a compelling reason to believe that it occurred. I should say two compelling reasons. One, is that the patient probably had asbestos-induced pleural plaque, not certainly. You know I've emphasized several times I'm not sure about it, nor is anybody else, but she probably had asbestos-induced pleural plaque. And I know that she worked in a factory during two periods of time, 1967 to 1968, and 1972 to 1973.

And I know that in industrial plants during that era, asbestos was typically and frequently used for the insulation of pipes and of other equipment. So taking that together, I look to Fiber Industries as a potential source.

But you're right when you asked me the other questions. Do I have specific knowledge about what she might have been exposed to at that place, no, I do not.

(*See* Exhibit H, Deposition of Dr. Feingold (*Bell*), May 11, 2021, at p. 53:23-54:14).

Similarly, defense expert, Dr. Mundt, opined in his case-specific report for *Bell*:

Based on materials provided to me, it appears that Mrs. Bell filed a workers' compensation claim for asbestos exposures sustained while she was employed at Fiber Industries and Cannon Mills (Exhibit D-3 to the Depo of Betty Bell, Vol. III); however, no details regarding the source or type of exposure were available. Additionally, her medical records denote the detection of a pleural plaque, which might reflect historical asbestos exposure. Had she been exposed to substantial levels of amphibole asbestos at these or other locations, her risk of malignant pleural mesothelioma accordingly would have been increased. Should documentation of these exposures become available, I reserve the right to review them and possibly refine my opinions.

(*See* Exhibit I, Report of Dr. Mundt (*Bell*), August 4, 2020, at p. 1.) In *Bell*, Dr. Mundt testified:

In other words, I saw no evidence that her mesothelioma was to a reasonable

degree of epidemiological or scientific probability or certainty caused by any asbestos exposure. That doesn't mean it might not have been, and the detection of the pleural plaque and the workers' compensation claim for asbestos exposures at prior employers suggest that there is a belief that such exposures might have occurred.

(*See* <u>Exhibit J</u>, Deposition of Dr. Mundt (*Bell*), February 2, 2021, at 34:21-35:3).

Defense expert, Dr. Geyer, was even more explicit in his report dated August 12, 2020:

6. Mrs. Bell worked at Fiber Industries from approximately 1967 to 1968 and from 1970 to 1972 or from 1972 until 1973. She worked at Fieldcrest Cannon for 20 years starting in approximately 1976. **Deposition testimony, asbestos abatement documents, North Carolina Department of Health and Human Services Documents, and worker's compensation claims indicate that insulation materials were used at Fiber Industries and Fieldcrest Cannon when Mrs. Bell worked at those jobsites.**

7. Insulation materials, in many instances contained amosite asbestos, the fiber type found most often in the lungs of United States workers with malignant mesothelioma.

8. Mrs. Bell testified that her father smoked Kent cigarettes in the family home, including between 1952 and 1956, when she lived in the home. Mrs. Bell cleaned the ashtrays used by her father during and after he smoked Kent cigarettes. Kent cigarettes with Micronite filters may have exposed Mrs. Bell to crocidolite asbestos, the most potent asbestos fiber type that causes malignant mesothelioma.

9. Exposure to amosite asbestos, more likely than not, caused Betty Bell's malignant mesothelioma.

(*See* <u>Exhibit K</u>, Report of Dr. Geyer (*Bell*), August 12, 2020 at p. 10, emphasis added.)[3]

After Dr. Moline's employer, Northwell Health ("Northwell"), confirmed that Mrs. Bell was one of the 33 litigants, and following two years of prolonged legal proceedings, the MDNC court unsealed records related to Mrs. Bell's identity as a litigant used in Moline 2020. (*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at *7 (M.D.N.C. Sept. 13, 2022).) The court found, "Given the groundbreaking nature of the article and its express premise that all individuals

---

[3] Defense expert, Dr. David Weill, also offered opinions in *Bell* stating that, "Ms. Bell was exposed to commercial amphibole asbestos at the Cannon Mills and Celanese facilities, and this exposure elevated her risk of developing both bilateral pleural plaques and mesothelioma." (*See* <u>Exhibit D</u>, Report of Dr. Weill, August 13, 2020 (*Bell*).)

studied had no known alternative asbestos exposures, **the fact that one of the individuals claimed otherwise** has direct bearing on the study's credibility." (*Id.* at *6)(emphasis added.)

### 2.  Evolving Positions on Moline 2020

Following the article's publication, Dr. Moline and counsel relying on her opinions shifted their views on Moline 2020. In mid-2021, counsel for plaintiffs touted Moline 2020 as evidence that cosmetic talc could cause mesothelioma—with one firm even pointing to Dr. Moline's testimony before Congress to bolster Moline 2020. (*Id.*) Approximately two years later, however, Plaintiff's counsel now paints Moline 2020 as inconsequential to his allegations. (*See* Exhibit X, *Gref* Hrg. Tr., Apr. 27, 2023, at 33:21-34:19.)

Likewise, during this period, other defendants uncovered evidence that additional litigants in Dr. Moline's article had alternative sources of asbestos exposure. (ECF No. 263 at 11-12.) One example is the *Helene Kohr* case where plaintiff alleged Ms. Kohr's mesothelioma was caused by both cosmetic talc and her smoking of Kent cigarettes with crocidolite asbestos filters. (*See* Exhibit L, *LTL Management v. Moline*, 3:23-cv-02990 (D.N.J. May 31, 2023), at ¶151-159.) Dr. Moline's own report in *Kohr* opines that Ms. Kohr's cancer was caused by both talcum powder and Kent cigarettes. (ECF No. 279-15.) Although Dr. Moline continued to deny that any of the 33 litigants had alternative exposures, Ms. Kohr's biographical information resembled that of "Case 17" in Moline 2020. (*See* Ex. L, LTL Compl., at ¶151-159.) Only after questions about her methodology, along with criticisms of Moline 2020, were published in May 2023 did Dr. Moline appear to admit that she ignored her own report from *Kohr* by publishing an *errata* for Moline 2020.[4] (*See* Exhibit M, Letter from Dr. Brent; Exhibit N, Dr. Moline Response to Dr. Brent Letter; and Exhibit O, Erratum to Moline 2020.)

---

[4] Although Dr. Moline's erratum mirrors the allegations from the lawsuit against her, because she has not been required to disclose the names of the litigants, defendants have not verified that Case 17 is the *Kohr* case.

3.      **Plaintiff's Motion for Sanctions**

Plaintiff's Motion is replete with half-truths and lies. Knowing all the above, Plaintiff seeks

sanctions for alleged discovery violations by baselessly claiming that A-I-I knew "full well" that

its reasoning for seeking the names of the 33 litigants to determine the facts and bases of Dr.

Moline's opinions was "false and fraudulent." (ECF No. 348 at 1-3.) Plaintiff did not attempt to

meet and confer with A-I-I prior to filing this Motion, which purports to be pursuant to Fed. R.

Civ. P. 26. Nonetheless, upon receipt of the Motion, A-I-I asked Plaintiff to withdraw his improper

request for sanctions based on the procedural deficiencies and clear inaccuracies upon which the

Motion claimed to rest. (*See* Exhibit P, May 26, 2023, Letter to Plaintiff Requesting Withdrawal

of Motion.)

Plaintiff incredulously claims there is not "a scintilla of credible evidence" that Mrs. Bell

was exposed to asbestos at her employment. (ECF No. 348 at 6.) His Motion also inaccurately

asserts that defense experts did not "consider allegations of alternative exposures when rendering

their opinions." (*Id*.) Plaintiff further fails to acknowledge that the Moline 2020 authors

purportedly reviewed "any other **potential** source of asbestos exposures," and, rather, focuses on

evidence of "known" exposures or "actual" exposures, apparently meaning only those testified

explicitly about by Mrs. Bell. (*Id*. at 2, 5, 6, 8.)

4.      **Testimony from the *Weiss* Case**

Plaintiff's apparent impetus for filing this Motion was testimony recently elicited by

another plaintiffs' firm in an Arizona state court case, *Weiss*, from defense experts, Drs. Mundt

and Feingold. (ECF No. 348 at 2.) Plaintiff states both experts "upon review of all relevant case-

specific evidence" refute A-I-I's claims that Mrs. Bell was improperly included in Moline 2020.

(*Id*.) Unsurprisingly, Plaintiff does not cite (i) either of these experts' reports from *Bell*, (ii) the

testimony of either expert from *Bell*, (iii) the express claims made in Moline 2020, (iv) the representations made by Mrs. Bell and her estate in their workers' compensation claims, or (v) the more than 40-page Opinion issued by the MDNC on this specific issue. (*Id*.) Plaintiff also does not cite the opinions of other defense experts in *Bell*. (*Id*.) Numerous defense experts opined that, not only did cosmetic talc not contribute to Mrs. Bell's disease, her likely exposure to asbestos at her places of employ was the cause. (*See infra*.)

The examination of Drs. Feingold and Mundt in *Weiss* occurred approximately three years after their expert reports were issued in *Bell*. (*See infra* at 11.) These experts were not provided time to review their reports or prior testimony in *Bell* before or during their examination in *Weiss*. (*Id*.) Coincidentally, the depositions were conducted by an attorney for Simon Greenstone Panatier, Mrs. Bell's attorneys in the New Jersey and MDNC actions. (ECF No. 348-3.) Less than two weeks before Plaintiff filed this Motion, Simon Greenstone Panatier filed a motion for sanctions in *Weiss* relating to the same depositions of Drs. Mundt and Feingold. (*See* Exhibit Q, Plaintiff's Motion and Request for Discovery and Monetary Sanctions, May 5, 2023 (*Weiss*).) The *Weiss* court almost immediately rejected the motion. (See Exhibit R, Order of May 31, 2023 (*Weiss*).) Likewise, on May 15, 2023, Weitz & Luxenberg (another asbestos plaintiffs' firm) filed a motion in California—copying the same deposition testimony of Drs. Mundt and Feingold from *Weiss*. (*See* Exhibit S, Plaintiff's Motion in *Limine* to Preclude Evidence, May 15, 2023 (*Metcalf*).) All three motions claim the issues surrounding Moline 2020 are "unsupported" or "lawyer fabricated." (Exs. Q and S; *compare* ECF No. 348 at 13 (claiming alternative exposures were a "debunked theory.").) None cite Judge Osteen's Memorandum Opinion and Order. (*See Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at *6 (M.D.N.C. Sept. 13, 2022).) In fact, all three pretend the *Bell* Order does not exist.

Plaintiff's Motion also only attaches partial transcripts of the depositions of Drs. Mundt and Feingold in *Weiss*. (ECF No. 348-3 and -4.) For Dr. Mundt, Plaintiff includes two pages. Volume 2 alone was 75 pages in length. (*See* Exhibit T, Deposition Dr. Mundt, Vol. 2, April 11, 2023 (*Weiss*).) Dr. Mundt testified, unequivocally, that "the *Bell* case was closed years ago and has been – you know, I've had no reason to discuss the facts, the findings or my opinions in that case; although I understand you have some reason to be asking me about it and some interest in it." (*Id.* at 77:15-19.) Dr. Mundt testified he had "no additional information regarding Ms. Bell and any of her alleged exposures" since the filing of his August 2020 report. (*Id.* at 107:20-21.) He then stated his opinion in *Bell* was:

> there was evidence provided that there could have been exposure to asbestos.·One element of that evidence that was provided was Ms. Bell's own belief to the level of and having the concurrence of, I suppose, some legal persons to make that claim. So I guess if it were entirely made up or fantastical, then we can't tell just from the documents in hand.·So but I would give, I guess, Ms. Bell the benefit of the doubt in believing that she in fact had been exposed to asbestos somewhere was also in aliment <*sic*> with deposition  testimony provided by others in this matter.

(*Id.* at 111:8-19.) Contrary to Plaintiff's claims, Dr. Mundt additionally testified: "in retrospect […] I would say clearly both Bell and Weiss could have been included in the 2023 [Moline article],[5] **but neither probably would have been included in the [2020 Moline article]**." (*Id.* at 123:13-23)(emphasis added.)

The plaintiff's attorney in *Weiss* (again, the same firm that represented Mrs. Bell) also tried to get Dr. Mundt to testify about the effects of a "denial" of the workers' compensation claims by Mrs. Bell's employers—despite Dr. Mundt explaining he was "uncomfortable speculating on things in a worker comp system…." (*Id.* at 109:17-110:13, 112:2-113:7.) This attorney, like his colleague who deposed Mrs. Bell, tried to trick the witness into believing that a "denial" (answer

---

[5] Dr. Moline's article published in 2023 purports to contain individuals who were exposed to asbestos from contaminated cosmetic talc and from traditional sources.

and affirmative defenses) by the employer was the equivalent of a denial of the claim (or an adjudication on the merits) by the North Carolina Industrial Commission. (*Id.*) He did not provide the witness with the multiple bases (defenses) for the employer's denial including that the alleged injury was (i) not a "covered claim" under N.C. law, (ii) outside the statute of limitations, or (iii) the employer was not the location where Mrs. Bell "was last injuriously exposed to asbestos…." (*See, e.g.*, ECF No. 319-6, Form 61 – Denial of Workers' Compensation Claim filed by Fieldcrest Cannon Inc./Pillowtex Corporation, dated October 22, 2015; *see* ECF No. 319 at 4 ("Mrs. Bell's attorneys misrepresented her first workers' compensation to her during her deposition, claiming the employers' responsive pleadings were "denials" from the Industrial Commission based on lack of exposures.").)

Plaintiff's Motion includes a bit more from the third volume of Dr. Feingold's deposition in *Weiss*—13 of 197 total pages. (ECF No. 348-3.) Dr. Feingold testified that nothing in his *Bell* report stated Mrs. Bell did not have occupational exposure to asbestos. (*See* <u>Exhibit U</u>, Deposition of Dr. Feingold, Vol. 3, March 10, 2023 (*Weiss*) at 171:8-17, 174:12-22.) He likewise agreed it was "significant" that two separate workers' compensation claims were made on behalf of Mrs. Bell, stating, "[i]t makes it more likely that they believed that they had exposure." (*Id.* at 170:19-24.) Dr. Feingold further testified that research involving subjects who give permission is different than an expert who merely relies on litigation information. (*Id.* at 159:17-22.) Dr. Feingold was also unaware of Judge Osteen's Opinion and the related briefing on issues of unsealing Mrs. Bell's identity. (*Id.* at 163:12-16.)

## 5.     Procedural History of Dr. Feingold's Deposition in *Gref*

Plaintiff claims A-I-I "has improperly shielded" Dr. Feingold from testifying in this case. (ECF No. 348 at 10.) Notably, Plaintiff does not cite any correspondence or status reports past

February 2023. (ECF No. 346-16.) On February 28, 2023, the parties submitted a joint status report on discovery where A-I-I explicitly outlined its position on Dr. Feingold's deposition. (ECF No. 316 at 2-3.)

Therein, A-I-I offered numerous dates for the continuation of Dr. Feingold's deposition. (*Id*.) Plaintiff ignored the first offered dates of January 11 and 12, 2023 (for five hours of testimony). (*See* Exhibit V, Email Correspondence Jan. 6 to Jan. 13, 2023.) On January 9, 2023, Plaintiff's counsel claimed he was available on January 18, 19, and 20 to depose Dr. Feingold. (*Id*.) On this representation, four days later, A-I-I offered four hours on January 18 and one hour on January 19. (*Id*.) Plaintiff accepted the January 19 date—when Dr. Feingold was only available for one hour. (*Id*.) A-I-I then requested Plaintiff's availability for March 2023, but Plaintiff's counsel refused to provide his availability until after filing his Motion for Sanctions on May 19, 2023.

**LEGAL ARGUMENT**

1. **Plaintiff's Motion for Sanctions Is Procedurally Defective**

Plaintiff's Motion purports to be pursuant to Fed. R. Civ. P. 26. (ECF No. 348 at 3, 12.) Accordingly, Plaintiff was required to comply with Local Civil Rule 6.1(a), which governs all motions and applications under Rules 26 through 37. Local Rule 6.1(a) requires any motion to include: the notice of motion, supporting affidavits, and memoranda of law. Plaintiff's Motion fails to include a notice of motion, statutory authority under which Plaintiff seeks relief, and, most importantly, any supporting affidavits with exhibits that contain factual information or portions of the record for the Court, or A-I-I, to utilize in preparing its Opposition. Similarly, Local Rule 37.2 states:

> No motion under Rules 26 through 37 inclusive of the Federal Rules of Civil Procedure shall be heard unless counsel for the moving party has first

> requested an informal conference with the Court by letter-motion for a pre-
> motion discovery conference [...] and such request has either been denied
> or the discovery dispute has not been resolved as a consequence of such a
> conference.

(Joint Local Rules, S.D.N.Y. and E.D.N.Y, R. 37.2). Plaintiff never requested an informal

conference prior to filing his Motion for Sanctions. Therefore, his Motion must fail.

To the extent Plaintiff claims his Motion is not pursuant to Rule 26 (thereby requiring

compliance with Local Rule 6.1), it is an improper request for sanctions under Rule 11. Rule 11

requires service of notice of motion, as well as notice of the sources of authority for the sanctions

being considered, prior to the motion's filing. (Fed. R. Civ. P. 11; *Star Mark Mgmt., Inc. v. Koon*

*Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).) Plaintiff did not

provide notice to A-I-I prior to filing his Motion for Sanctions. Consequently, his Motion fails

under Rule 11.

Plaintiff's Motion also fails to comply with this Court's Individual Practice Rules.

Individual Practice Rule III(b) requires all memoranda include "a fact section [...] and, for each

factual statement, provides one or more citations [...] to pleadings, declarations, affidavits, or other

documents that have been separately filed." Plaintiff's Motion includes a "Relevant Facts" section,

but it has minimal citations. For example, Plaintiff makes the following statements purported to

be "facts," none of which include a citation (and many of which are not facts at all):

> Although Defendants have attempted to frame their pursuit of discovery related to
> Dr. Moline's Article through a good-faith lens, recent events and testimony by their
> own experts have confirmed that Defendants, led by AII, have misled the Court by
> acting under a false pretense and pushing a false narrative that there is any actual
> evidence that Betty Bell suffered non-talc occupational exposures to asbestos.

[...]

> AII's own experts explain this glaring absence in no uncertain terms: no such
> evidence exists, nor did they even consider allegations of alternative exposures
> when rendering their opinions. Put another way, the myth of alternate asbestos
> exposure in the *Bell* case is one that AII's lawyers have perpetuated, and that not
> even their hired experts are able to support. More troubling, AII has known its

experts' position on this very issue all along, and yet continued to lead this Court down its deceptive discovery charade. This is fraud.

[…]

As the Court may recall, AII's counsel has emphasized its involvement in the *Bell* case to highlight its familiarity with evidence and Judge Osteen's decision,[6] which AII repeatedly mischaracterized as supporting the de-anonymity of subjects involved in the Article.

[…]

Although the testimony of its expert on medical causation is certainly enough to support that Ms. Bell was not exposed to asbestos other than through cosmetic talc, further support is provided through a second AII expert who was also charged with examining the *Bell* record for any and all asbestos exposures.

[…]

In November 2022, AII (and Whittaker Clark & Daniels, Inc., who is no longer active in this case), served subpoenas seeking records to discover the identity of the anonymous study participants, and effectively relitigate the claims that they had filed in their respective lawsuits.

[…]

Defendants also universally rely on epidemiology studies which refuse to identify the names of the underlying subjects.

[…]

Over the course of the last year, AII repeatedly attempted to shield its causation expert, Dr. Allan Feingold, from testifying while simultaneously arguing that it is entitled to additional time to depose Dr. Moline.

(ECF No. 348 at 4-10.) Given Plaintiff's repeated failure to comply with this Court's requirement to provide a citation for each factual statement, Plaintiff's Motion is improper and must fail.

Finally, as explored in more detail below, Plaintiff's Motion must be denied because Plaintiff (i) failed to demonstrate there was no "colorable basis" for A-I-I's discovery, (ii) did not demonstrate the discovery "lacked legal or factual support," and (iii) failed to demonstrate the discovery was sought in bad faith (to allow for sanctions under the Court's inherent authority). *See, e.g., Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 368 (2d Cir. 2021); *United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 481 (S.D.N.Y. 2018). Dr. Moline was aware that Mrs. Bell filed a workers' compensation claim in 2015, and she claimed to have reviewed all "potential sources" of asbestos exposure for the litigants in Moline 2020. Despite this,

---

[6] This is the only reference Plaintiff's Motion makes to the MDNC decision in *Bell*.

Dr. Moline ignored the pending workers' compensation claim brought by Mrs. Bell's estate (and other likely sources of asbestos exposure from Mrs. Bell's jobsites), and she likely ignored alternative exposures of other litigants used in her study. (*See, e.g.,* <u>Ex. L</u>, *LTL v. Moline Compl.*, *infra*.) Because Plaintiff's Motion is procedurally defective, it should be denied.

**2.    <u>Plaintiff's Motion Fails to Demonstrate a Violation of Rule 26</u>**

Under Rule 26, a party serving discovery requests certifies such requests are:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

(Fed. R. Civ. P. 26(g)(1)(B).) Sanctions are permissible if a certification fails to comply with this rule. (Fed. R. Civ. P. 26(g)(3).)

**A.    *Non-Frivolous Purpose for A-I-I's Discovery***

Here, Plaintiff's Motion rests on the argument that A-I-I "had no good faith basis" to seek the facts and data underlying Dr. Moline's opinions in this case. (ECF No. 348 at 12-13.) Plaintiff claims A-I-I "carelessly represent[ed]" that Mrs. Bell was wrongfully included in Moline 2020 despite "the undisputed evidence shows that its own expert, retained in this case and in *Bell*, had already confirmed that this statement was false at the time it was made." (*Id*.) As shown above, not only is this an outright fabrication on Plaintiff's part, but, the undisputed evidence shows the opposite: Mrs. Bell filed workers' compensation claims based on her belief and her attorney's "experience and knowledge" of her jobsites. These claims, for which Mrs. Bell's counsel was required by the federal court to support with his "good faith basis for filing," were made once again by Mrs. Bell's estate and these same attorneys after Mrs. Bell's death. The claims of her estate

were active before the North Carolina Industrial Commission at the time Moline 2020 was published.

Additionally, Dr. Moline's subsequent *erratum*, published in May 2023, demonstrates that A-I-I's requests related to Moline 2020 were nonfrivolous. Dr. Moline has now admitted that, beyond Mrs. Bell's claims of occupational exposure at sites with known asbestos-containing materials, she ignored known crocidolite asbestos exposure to another litigant used in Moline 2020. In addition, as outlined in the Johnson & Johnson (LTL) lawsuit, numerous other litigants in Moline 2020 likely experienced alternative exposures that were ignored by Dr. Moline. Given the importance placed on Moline 2020 in creating the alleged causal connection between cosmetic talc and mesothelioma, delving into the article's credibility was proper and important to the issues at stake in this case. (*See, e.g.*, ECF Nos. 263, 319.)

### B.    *Factual Support for Sought Discovery*

Plaintiff's Motion relies almost wholly on testimony given in 2023 by Drs. Feingold and Mundt in *Weiss*, which A-I-I was not a party to. Rather than providing full transcripts for context, Plaintiff opted to attach only two of 75 pages and 13 of 197 pages for Drs. Mundt and Feingold, respectively. Reviewing the entirety of these transcripts, along with the defense experts' reports and testimony from *Bell*, the rationale for A-I-I's discovery becomes clear: Dr. Moline claimed to have reviewed any "potential" exposure to asbestos, but she ignored the known asbestos present at Mrs. Bell's jobsites, the sworn statements of Mrs. Bell and her spouse, and the lawyer admissions to the MDNC court—which were subject to the duty of candor to the tribunal—of Mrs. Bell's attorneys. Not only did both Drs. Feingold and Mundt point to Mrs. Bell's workers' compensation claims as relevant to their opinions about whether she was exposed to asbestos occupationally, but other defense experts explicitly pointed to her employment as the cause of her

mesothelioma. Given Dr. Moline's opinions rely on the "findings" of Moline 2020, determining what else she ignored in reaching her opinions was—and remains—necessary for A-I-I.

Further fatal to Plaintiff's Motion is the fact that neither Dr. Mundt nor Dr. Feingold changed their opinions related to the *Bell* case from the date of issuance (2020) through the dates of their respective depositions in *Weiss* (2023). If these experts' opinions were at all relevant, Plaintiff would not have waited nearly seven months after A-I-I issued its subpoena to Northwell to file this Motion. The fact is, Plaintiff waited until after Dr. Moline published another article this year before advancing his argument, which demonstrates Plaintiff's full knowledge of the weakness of his claim.[7]

Equally relevant to A-I-I's sought discovery is the Memorandum Opinion and Order of the MDNC in *Bell*, the holding of which was predictably ignored by Plaintiff. In his detailed Opinion, Judge Osteen explained that, "the fact that one of the individuals claimed [to have had alternative asbestos exposures] has direct bearing on the study's credibility." (*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at *6 (M.D.N.C. Sept. 13, 2022.) Judge Osteen further noted the obvious "*Daubert* issue" created by Dr. Moline and plaintiffs hiding information for Moline 2020, finding that "inquiry into the accuracy of the facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required." (*Id*. at *7.)

Judge Osteen's Opinion aligns with the testimony of Dr. Feingold from *Weiss*, which was not cited by Plaintiff, where he stated the filing of two workers' compensation claims was "significant" because it "makes it more likely that they believed that they had exposure" at the jobsites. (Ex. U, Feingold Dep. in *Weiss* at 170:19-24.) Further underscoring the support for A-I-

---

[7] The fact that Dr. Moline published another article following the issuance of the *Bell* Order in September 2022 and the issuance of A-I-I's subpoena in this case shows how Northwell's arguments about a "chilling effect" if disclosures of the litigants is allowed are demonstrably wrong. (ECF No. 26 at 10-11.)

I's discovery, not only did the one litigant whose identity was confirmed (*Bell*) swear she was exposed to asbestos at her jobsites, but Dr. Moline has now admitted that at least one other litigant from Moline 2020 had alternative asbestos exposures (*Kohr*). (Ex. O, Moline Erratum.) Dr. Moline's expert report in *Kohr* noted the plaintiff's exposure to crocidolite asbestos from Kent cigarettes. (ECF No. 279-15; Exs. L, M, & N.) Given at least two of the 33 litigants with, at the very least, sworn allegations of exposure to asbestos separate from cosmetic talc, the need for determining the veracity of the conclusions of Moline 2020 was and is apparent. Because A-I-I had factual support to inquire into the accuracy of the facts and assumptions underlying Moline 2020, Plaintiff's Motion should be denied.

### C.   *Importance of Issues in This Action*

When A-I-I issued its subpoena to Northwell seeking the names of the litigation cases underlying Moline 2020, there were only two articles drawing a causal connection between talcum powder and mesothelioma. (Ex. X, *Gref* Hr'g. Tr., April 27, 2023, at 35:18-24.) A-I-I was aware of at least one litigation case used in Moline 2020 where there were sworn allegations of alternative exposures that were ignored, but it suspected there were others. After Dr. Moline falsely testified that Mrs. Bell's workers' compensation claims, "were dismissed by the court as having no evidence," Dr. Moline was literally read portions of the MDNC Opinion allowing the *Bell* case to be discussed as well as the section explicitly stating there was no adjudication of the workers' compensation claims. (ECF No. 263-12, at 133:9-134:24, 137:7-138:8, 13:13-140:17.) Despite this, two weeks later, counsel for Plaintiff Gref—also aware there was no adjudication of Mrs. Bell's workers' compensation claims and aware A-I-I was prepared to cross-examine Dr. Moline on Mrs. Bell's multiple claims—elicited the same false testimony from Dr. Moline

> Q What significance is there, if any, to a workers' compensation judge denying a
>    worker's application or claim?

[objection omitted]

> THE WITNESS: That a worker's compensation is going to look at the information provided to them by the employer and by the claimant or the patient, as well as if there's medical information, look to see if there's a connection, look to see if there's an exposure in the workplace and make a decision if there's sufficient evidence for there to be a claim to go forward.

(*Fisher* Trial, ECF No. 263-13 at 27:23-29:10.)

About this same matter, *Fisher*, Plaintiff claimed: "[I]n a recent state court case in Pennsylvania, […] Dr. Moline refused at trial to provide testimony that would identify any of the 33 research subjects. […] The court refused to compel Dr. Moline to identify any of the 33 research subjects." (ECF No. 266 at 7.) In reality, at this trial, when counsel for A-I-I began examining Dr. Moline about Mrs. Bell's workers' compensation claims, not only did Dr. Moline repeat the false claim that there had been an "adjudication," but the court chastised the witness for refusing to answer questions about the *Bell* case:

> Q. The only denial in that Workers' Compensation claim -- I'm going to represent to you that my information is the only denial is the defendant saying, "We deny the claim." Are you aware of a judicial order finding that Mrs. Bell's Workers' Compensation claim was unfounded?
>
> MR. KRAMER: Same objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: My understanding was that there was a dispute and then either the case was withdrawn or there was a decision. I may be misremembering, but I know it did not go any further than that. That there was a dispute that there was any exposure. I thought it went and either a judge made that determination or the case was withdrawn at that point. And no further action was taken. So that's my recollection. I don't know.
>
> BY MR. THACKSTON:
> Q. Would you want that shown to the jury, if there is such a thing, would you want that shown to the jury in this case to back you up on that?
>
> A. Which thing?

Q. If there is any such thing as an order finding that Mrs. Bell's Workers' Compensation claim was unfounded, would you want to jury to see that in this case?

A. We're not here talking about Mrs. Bell. We're here talking about Mrs. Reichart. I would like the jury to hear about Ms. Reichart and not about another case.

THE COURT: Well, since I'm going to decide what the jury hears, objection sustained on that question. If you have something that you want to approach the witness with, you may approach the witness with. **The reason why you're being asked about Ms. Bell was because she's part of your study. So it's not totally irrelevant.**
Next question.

(ECF No. 263-14, at 42:23-44:15.)

Given Dr. Moline's reliance on Moline 2020 to form her opinions in this case and her propensity for perpetuating falsehoods about a litigation case used in Moline 2020, as well as counsel for Plaintiff's willingness to play along, obtaining the sought discovery was of paramount concern for A-I-I in determining the accuracy of the facts and data relied on by Plaintiff's experts for their opinions in this action.

3.   **Plaintiff's Motion Fails to Demonstrate that A-I-I Acted in Bad Faith, Vexatiously, Wantonly, or for Oppressive Reasons.**

Plaintiff argues sanctions are appropriate under this Court's inherent authority. As noted in Plaintiff's Motion, however, "in order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.,* motivated by improper purposes such as harassment or delay." *New York Wheel Owner LLC v. Mammoet Holding B.V.,* 2021 WL 2660439, at *3 (S.D.N.Y. June 29, 2021), citing *Enmon v. Prospect Cap. Corp.,* 675 F.3d 138, 143 (2d Cir. 2012). This same case states: "A federal court's inherent authority to impose sanctions stems from its need 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases,' and 'must be exercised with restraint and discretion.'" *Mammoet*, 2021 WL 2660439, at *3, *quoting Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991). Such an exercise is appropriate "when a party has acted in bad

faith, vexatiously, wantonly, or for oppressive reasons." *Id*. Courts should only impose sanctions "in rare circumstances." *Id*., *citing Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020). Here, due to Plaintiff's delay in filing this Motion—along with his delay in offering to "withdraw" his experts' reliance on Moline 2020 "on direct" months after A-I-I served its discovery and the parties spent months briefing the issues (*see* ECF 337)—Plaintiff cannot reasonably claim his prayer to the Court to use its inherent authority to issue sanctions is to "achieve the orderly and expeditious disposition of [this] case[]." (*Mammoet*, 2021 WL 2660439, at *3.)

Plaintiff also falsely claims A-I-I was the party that initially "offered" Plaintiff's so-called offer made May 1, 2023, to withdraw his experts' reliance on Moline 2020 (on direct only) if A-I-I would withdraw its subpoena to Northwell. (ECF No. 348 at 14; ECF No. 337.) Plaintiff ignores the context of the statement he emphasizes throughout the Motion: "Dr. Moline is of course free to keep all such information private if she does not choose to serve as an expert witness or rely on her Article and testify about the cases on direct." (ECF No. 263 at 4-5.) This section, consisting of only two paragraphs, relates to Dr. Moline's role as a litigation consultant as opposed to a researcher or epidemiologist. The rhetorical statement merely serves to highlight—and contrast—Dr. Moline's role within Plaintiff's litigation industry: drafting litigation-driven articles to create causation evidence where none existed before, then relying on her own litigation-driven articles to bolster her causation opinion testimony in litigation. (*Id*.) Notably, the statement Plaintiff relies on appears <u>nowhere</u> in A-I-I's prayer for relief. (*Id*. at 19.) Additionally, just as with Plaintiff's Motion and claimed "withdrawal," Plaintiff completely ignored this statement for months, which demonstrates that Plaintiff understood this sentence was not an offer at all (contrary to his current claim).

A-I-I did—and does—have a colorable basis for seeking Dr. Moline's reliance materials. Dr. Moline claimed in Moline 2020 to have reviewed all "potential" sources of asbestos exposure, relying mainly on sworn statements made by or on behalf of litigants. (*See* <u>Ex. W</u>, Moline 2022.) The *Bell* case, however, demonstrated that she ignored sworn statements by litigants and their estate when they did not conform to her pre-determined opinions. As noted by the MDNC court:

> Mrs. Bell's assertion that she may have been exposed to asbestos through the textile industry and Dr. Moline's possible rejection of that potential fact are important pieces of information to aid in the assessment of the potential rate of error of the study's assertion that the thirty-three participants had no asbestos exposure other than talcum powder. Similarly, Dr. Moline's possible rejection of evidence of additional exposure goes directly to the issue of standards controlling her study's operation.

(*Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at *7 (M.D.N.C. Sept. 13, 2022).)

Now, given Dr. Moline claims to have once again reviewed litigation materials related to these 33 litigants in response to criticism about the article and has admitted to ignoring asbestos exposure in another of the 33 cases, A-I-I's inquiry into Moline 2020—which Dr. Moline relied on to form her opinions in this case—to determine the accuracy of the facts and assumptions underlying this reliance material is clearly not only appropriate, but also necessary and required. (*Id.*, at *7, citing FRE 702.) In light of the appropriateness of A-I-I's discovery, Plaintiff's Motion fails to demonstrate any bad faith on the part of A-I-I.

**4.      <u>A-I-I Has Not "Shielded" Dr. Feingold from Testifying.</u>**

While confusing, Plaintiff lastly argues that sanctions are appropriate because A-I-I "took active steps to prevent Plaintiff from obtaining and presenting this information [on the *Bell* matter]" including "guard[ing] Dr. Feingold from further questioning because it knew that simple probing by Plaintiff would confirm that which [A-I-I] had long since known: that Betty Bell did

not have any alternative, occupational exposures to asbestos." (ECF No. 348 at 13-14.) As discussed above, Dr. Feingold's opinions from the *Bell* case have not changed in years.

Despite accusing A-I-I of "lying and obstructing discovery," Plaintiff conveniently fails to mention that A-I-I offered Dr. Feingold for his deposition continuation on <u>four separate dates</u> in January 2023. (*See, e.g,* ECF No. 316; <u>Ex</u>. <u>V</u>, Email between A-I-I and Plaintiff.) Two of the four were dates Plaintiff's counsel claimed he was available to depose the witness, though, inexplicably, Plaintiff opted only to notice Dr. Feingold's deposition on the date he knew the doctor was available for only one hour. Counsel for A-I-I then requested that Plaintiff's counsel provide his availability to continue the deposition, but Plaintiff refused—until after voicing his desire to change his causation expert's (Dr. Moline) reliance material in this case. After Plaintiff revealed his plan to change his own experts' reliance material in May 2023, A-I-I informed Plaintiff it would not offer Dr. Feingold for his continuation until there is certainty on what Plaintiff's causation experts will rely on for their opinions at trial.

## CONCLUSION

Let's call a spade a spade. Plaintiff did not offer to withdraw his experts' reliance on Moline 2020 based on anything A-I-I did or said. Plaintiff made this offer because he anticipated an order from the Court allowing discovery into the identity of all 33 litigants and wanted to quickly deflect and diffuse. "The best defense is a good offense" theory is one that "may prevail on the battlefield [but] should not prevail in the courtroom." (*Milani v. Int'l Bus. Machines Corp.*, No. 02 CIV. 3346(MBM), 2004 WL 3068451, at *2 (S.D.N.Y. Dec. 30, 2004; *Barr v. Abrams*, 641 F. Supp. 547, 554 (S.D.N.Y. 1986), <u>aff'd</u>, 810 F.2d 358 (2d Cir. 1987); *Bailey v. New York City Transit Auth.*, No. CIV.A.CV-97-102(DGT), 1998 WL 178866, at *1, fn.5 (E.D.N.Y. Mar. 10, 1998).) To paraphrase the *Bell* court, seeking discovery related to the reliance material of Dr. Moline to

determine the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required. *Bell v. Am. Int'l Indus.*, No. 1:17CV111, 2022 WL 16571057, at \*6 (M.D.N.C. Sept. 13, 2022). Because the discovery was not propounded in bad faith or for an improper purpose, A-I-I respectfully requests that this Court (i) deny Plaintiff's Motion for Sanctions, and (ii) provide any further relief this Court deems just and proper.

This 16th day of June 2023.

*/s/ Robert E. Thackston*
Robert E. Thackston (*pro hac vice*)
NY Bar No. 5448428
**LATHROP GPM LLP**
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Robert.thackston@lathropgpm.com

/s/ *Alfred J. Sargente*
Alfred J. Sargente, Esq.
New York Bar No. 2651750
**HAWKINS PARNELL & YOUNG LLP**
600 Lexington Avenue, 8th Floor
New York, NY 10022-7678
Telephone: (212) 897-9655
Facsimile: (646) 589-8700
asargente@hpylaw.com
***Attorneys for Defendant***
***American International Industries***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 16, 2023, a true and correct copy of the foregoing was served to all registered parties and non-parties pursuant to the Federal Rules of Civil Procedure via CM/ECF NextGen.

*/s/ Robert E. Thackston*
Robert E. Thackston