UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BRIAN JOSEPH GREF,

                              Plaintiff,

            -against-

AMERICAN INTERNATIONAL
INDUSTRIES, et al.,

                             Defendants.

------------------------------------------------------------------X

20-CV-5589 (GBD) (VF)

**OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge**

On May 18, 2023, Plaintiff Brian Joseph Gref filed the instant motion for sanctions against Defendant American International Industries ("AII"). See ECF Nos. 346, 348. For the reasons explained below, the motion for sanctions is **DENIED**.

## BACKGROUND

A. Gref's suit

Gref commenced this action in July 2020, alleging that his lifelong use of talcum-powder products exposed him to asbestos and caused him to develop a type of cancer known as peritoneal mesothelioma. ECF Nos. 10-1, 42. Defendants manufactured and sold the asbestos-contaminated talcum-powder products that Gref alleges caused his cancer through his inhalation of asbestos dust and fibers. See, e.g., ECF No. 42 ¶¶ 1-3, 6-9. To help prove that his exposure to talcum powder caused his mesothelioma, Gref retained Dr. Jacqueline Moline, a board-certified physician employed by Northwell Health, Inc. ("Northwell"), as an expert witness. See ECF No. 263-2 ("Moline Expert Rep."). In her expert report, Dr. Moline opined that Gref's "malignant

1

mesothelioma" was the "result of his cumulative exposure" to "asbestos-contaminated talcum powder." Id. at 7-8, 23.

  B. Dr. Moline's 2020 Article

In January 2020, Dr. Moline coauthored and published a peer-reviewed article entitled, "Mesothelioma Associated with the Use of Cosmetic Talc." See ECF No. 263-1 (the "Article"). Using data from 33 individuals who used cosmetic talcum powder and developed malignant mesothelioma, the Article concluded that asbestos-contaminated talcum powder can cause mesothelioma, because the 33 individuals studied "had no known exposure to asbestos other than prolonged use of talcum powder." Article at 11-12, 14-16; see also ECF No. 268-6 ("Moline Aff.") at ¶¶ 8-9. Dr. Moline obtained the medical records and other data from the 33 individuals through her role as an expert witness in each of those cases. See Article at 11 ("The cases were referred to author J.M. for medico-legal evaluation as part of tort litigation."). The Article does not identify any of the 33 individuals; it contains deidentified medical history and other background information about six of the 33 individuals. See Article at 12-13 (discussing six case histories).

In her expert report, Dr. Moline relied on her Article. After documenting Gref's life-long use of talcum powders, Dr. Moline opined that Gref's "exposure to asbestos-contaminated talcum powder led to his diagnosis of peritoneal mesothelioma." Moline Ex. Rep. at 7-8, 23. Dr. Moline explained that "[a]sbestos fibers have been reported in cosmetic talcum powder for decades," and "[e]xposure to asbestos-containing talc has been shown to cause asbestos related diseases, including mesothelioma." Id. at 17-18. According to Dr. Moline, "there are numerous other individuals with exposure to asbestos-containing talc products who have developed malignant mesothelioma." Id. at 21. To support that statement, Dr. Moline cited, among other articles, her 2020 Article. See id. at 21 n.2. Dr. Moline explained that her Article "describes 33

2

cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc." Id. at 21. Although Dr. Moline cites to various articles in her expert report, her 2020 Article is one of only two studies cited that found a causal link between the occurrence of mesothelioma and an individual's use of cosmetic talc. Id.

On September 28, 2022, AII served a subpoena on non-party Northwell, requesting six categories of documents related to Dr. Moline's 2020 Article. See ECF No. 265-1 (Subpoena). At bottom, AII's subpoena sought disclosure from Northwell of the identities of the 33 individuals in Dr. Moline's Article. See ECF Nos. 265-1 at 2 (Request No. 6); 268-2 at 3 (Request No. 9). Northwell subsequently filed a motion to modify the subpoena, seeking an order from the Court barring AII from compelling Northwell to "identify any research subjects or produce documentation from which the identities of such subjects can be ascertained." ECF No. 266 at 1. Before the Court could issue a decision on Northwell's motion—but after multiple conferences, extensive briefing, and oral argument on the issues raised in the motion—Plaintiff withdrew Dr. Moline's "reliance" on the 2020 Article. See ECF No. 337. Plaintiff indicated that "neither Dr. Moline nor any of Mr. Gref's experts will use [the 2020 Article] offensively in this matter." Id. at 1.

    C.  Dr. Moline's role in *Bell v. American International Industries*

The question of disclosure of the identities of the 33 individuals in Dr. Moline's Article was most recently litigated in another federal case, Bell v. American International Industries, 627 F. Supp. 3d 520 (M.D.N.C. 2022). Prior to her federal suit, Bell filed a workers' compensation claim, "asserting that she was exposed to asbestos during prior employment with two textile employers." Id. at 524. And she filed a second workers' compensation claim after she had

commenced her federal suit. Id. at 525. Both workers' compensation claims were dismissed without prejudice. Id.

Bell also retained Dr. Moline as an expert witness. Id. In her Article, Dr. Moline represented that none of the 33 individuals had any known exposure to asbestos other than through use of talcum powders. Id. Based on other publicly available information, AII, which was also the defendant in Bell, suspected that Bell was one of the 33 individuals that Dr. Moline's Article had studied. Id.

"After [Defendant AII] provided Northwell with a HIPAA authorization form signed by [Bell]," Northwell produced a spreadsheet that confirmed Bell's identity as one of the 33 individuals in the Article. Id. at 525-26. Northwell did not disclose the identity of the 32 other individuals. Id. at 526. The court in Bell issued a protective order, limiting the use of Bell's information to that case and designating the information confidential. Id. After the case concluded, AII filed a motion to vacate the protective order so that the identification of Bell as one of the 33 individuals in Dr. Moline's Article could be disclosed in other litigation involving AII or other talcum-powder manufacturers. Id. AII argued in Bell that public disclosure of Bell's identity was necessary to "discredit[ ]" Dr. Moline's Article and "debunk the false narrative that the only plausible asbestos exposure in the 33 cases were from contaminated cosmetic talc." Id. at 529 (internal quotation marks omitted).

The court in Bell granted the motion to vacate the protective order. The court reasoned that "[g]iven the groundbreaking nature of [Dr. Moline's] article and its express premise that all individuals studied had no known alternative exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility." Id. at 530. The court emphasized that the Article had considerable influence nationwide, citing to instances where counsel for a

4

plaintiff had relied on Dr. Moline's Article in closing argument to connect cosmetic talc exposure to mesothelioma. Id.

D. The instant motion for sanctions

Plaintiff claims that, in seeking discovery concerning the identity of the 33 subjects in Dr. Moline's 2020 Article, AII advanced the "false premise" that Bell had occupational exposure to asbestos, despite testimony from two defense experts that indicated that Bell had no known asbestos exposure other than cosmetic talc use. ECF No. 348 ("Pl.'s Br.") at 1-3, 5-8. Plaintiff relies on the deposition testimony of Dr. Allan Feingold from March 10, 2023, in a state court case in Arizona, Weiss v. Albertsons Companies, Inc. See ECF No. 348-3. According to Plaintiff, Dr. Feingold was a paid expert for AII in Bell and in Weiss, see Pl.'s Br. at 6, and in his March 2023 deposition in Weiss, Dr. Feingold testified that "(1) none of Ms. Bell's occupations were such that she was at an increased risk or potential increased risk for developing mesothelioma based on her occupation title alone; and (2) he could not conclude that Ms. Bell had a significant exposure to commercial asbestos despite his review of all relevant evidence," id. at 7.

Plaintiff also points to the deposition testimony of Dr. Kenneth Mundt, an epidemiologist retained by AII in Weiss and Bell, see Pl.'s Br. at 8; ECF No. 348-4. In Weiss, Dr. Mundt gave deposition testimony on April 11, 2023. ECF No. 348-4. According to Plaintiff, Dr. Mundt testified that Bell had "no known asbestos exposure other than cosmetic talc use." Pl.'s Br. at 8.

In short, Plaintiff contends that AII knew, based on testimony from its experts in Weiss, that Bell did not have occupational exposures to asbestos, but nevertheless falsely claimed otherwise in its motion seeking discovery about the identities of the 33 patients in Dr. Moline's Article. Id. at 6, 13. Plaintiff seeks sanctions against AII under the Court's inherent powers,

5

claiming that AII has pursued discovery into the identities of the 33 subjects in Dr. Moline's study in bad faith, ECF No. 379 ("Pl.'s Reply Br.") at 5-7, and forced "Plaintiff and this Court to dedicate significant time and resources to a discovery side show which AII has known from day one . . . was raised solely to harass Plaintiff and his expert," Pl.'s Br. at 11-12.

## DISCUSSION

A. Legal Standard

   1. *The Court's inherent power to impose sanctions*

The Court's authority to impose sanctions is grounded in its inherent power "'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" Goodyear Tire & Rubber Co. v. Haeger, 581 U.S. 101, 107 (2017) (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)). That power "includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991)). A court may sanction a party or attorney "who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013) (citation and internal quotation marks omitted). "When a district court invokes its inherent power to impose a sanction of attorneys' fees or to punish actions by an attorney . . . , the district court must make an explicit finding of bad faith." Rossbach v. Montefiore Med. Ctr., 81 F.4th 124, 143 (2d Cir. 2023) (citation and internal quotation marks omitted). The court must find "clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." Wolters Kluwer Fin. Servs., Inc. v. Scivantage, 564 F.3d 110, 114 (2d Cir. 2009) (citation omitted); Revson v. Cinque & Cinque P.C., 221 F.3d 71, 78 (2d Cir. 2000) ("An award of sanctions under the court's inherent power requires both 'clear evidence that the challenged actions are *entirely without color*, and [are taken] for reasons of harassment or delay

or for other improper purposes[,] and a high degree of specificity in the factual findings of [the] lower courts.'") (quoting Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986)) (emphasis and alterations in original).

A claim is without color when it "lacks *any* legal or factual basis." Schlaifer Nance & Co., Inc., 194 F.3d 323, 337 (2d Cir. 1999) (citation an internal quotation marks omitted, emphasis in original). A claim is "colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Revson, 221 F.3d at 78-79 (citation and internal quotation marks omitted). "The question is whether a reasonable attorney . . . could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Schlaifer Nance, 194 F.3d at 337 (noting that a claim that fails as a matter of law "is not necessarily lacking any basis at all") (citation, emphasis, and internal quotation marks omitted). "[B]ad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." Id. at 336 (citation and internal quotation marks omitted). Both findings "must be supported by a high degree of specificity in the factual findings." Wolters Kluwer, 564 F.3d 110 at 114. Whether to impose sanctions is left to the Court's discretion. Sorenson v. Wolfson, 170 F. Supp. 3d 622, 634 (S.D.N.Y. 2016), aff'd, 683 F. App'x 33 (2d Cir. 2017).

   2.   *Sanctions under Rule 26(g)*

"Rule 26(g) is intended to deter and curb discovery abuses, including evasive responses, by 'explicitly encouraging the imposition of sanctions.'" Kiobel v. Royal Dutch Petroleum Co., No. 02-cv-7618 (KMW)(HBP), 2009 WL 1810104, at *2 (S.D.N.Y. June 25, 2009) (quoting Fed. R. Civ. P. 26 advisory committee's note). Rule 26(g) requires that "[e]very disclosure under

Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name." Fed. R. Civ. P. 26(g)(1). "By signing a discovery request, an attorney certifies that to the best of her 'knowledge, information, and belief formed after a reasonable inquiry,' the response is (1) consistent with the Federal Rules of Civil Procedure and justified under existing law; (2) not interposed for any improper purpose, such as to unnecessarily delay or needlessly increase the costs of litigation; and (3) reasonable given the importance of the issue and the circumstances of the case." Kiobel, 2009 WL 1810104, at *2 (quoting Fed. R. Civ. P. 26(g)(1)). The certification requirement "obliges each attorney to stop and think about the legitimacy of the discovery request, a response thereto, or an objection." Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (quoting Fed. R. Civ. P. 26(g), advisory committee's note to 1983 Amendment, emphasis omitted).

    B. <u>Plaintiff Has Not Shown That AII Acted In Bad Faith And Therefore Sanctions Are Not Warranted.</u>

Plaintiff contends that sanctions are appropriate because AII pursued discovery related to Dr. Moline's 2020 Article based on the false narrative that Betty Bell, a subject in Dr. Moline's study, suffered occupational exposure to asbestos. Pl.'s Br. at 5-8, 12-13. According to Plaintiff, AII's own experts, through deposition testimony in Weiss, refuted AII's claim that Bell had occupational exposure to asbestos. Id. at 12. Plaintiff, however, has not shown that AII has no colorable legal or factual basis for its subpoena request seeking disclosure of the identities of the 33 subjects in Dr. Moline's Article. Because Plaintiff has not pointed to any evidence suggesting that AII acted in bad faith in seeking discovery, the motion for sanctions under the Court's inherent powers necessarily fails.

8

First, the Bell court itself noted that there was evidence that Bell had occupational exposure to asbestos, pointing to two workers' compensation claims where Bell had asserted that "she was exposed to asbestos during prior employment with two textile employers." 627 F. Supp. 3d at 524. As the court explained, Bell "made statements to the Industrial Commission, while represented by counsel, that she had sustained an occupational disease [mesothelioma] caused by exposure to asbestos during employment with" two different companies. Id. at 530. The Bell court reasoned that "Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the 33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder." Id. (internal quotation marks omitted, alteration in original).

Moreover, Dr. Feingold and Dr. Mundt both opined in Bell that Bell had a potential exposure to asbestos at the textile mills where she had worked. In his expert report in Bell, for example, Dr. Feingold opined that "the identification of mesothelioma suggests the *possibility* of occupational exposure to amphibole asbestos" and Bell, as noted by another expert, "worked in an industrial setting with potential exposure to thermal insulation containing commercial amphiboles." ECF No. 371-8 at 394-95 (emphasis added). Likewise, Dr. Mundt opined in his report in Bell that "epidemiological studies clearly and consistently demonstrate that substantial occupational or environmental exposure to respirable amphibole asbestos fibers significantly increases the risk of . . . malignant mesothelioma" and materials he had reviewed showed that "Bell filed a workers' compensation claim for asbestos exposure sustained while she was employed at Fiber Industries and Cannon Mills." See ECF No. 371-10 at 1 (¶ 2). That the record in Bell suggested only a potential exposure to occupational asbestos (rather than a definitive exposure) does not demonstrate that AII had no colorable basis for seeking discovery of the

9

identity of the study participants. As the Bell court aptly recognized, even evidence of a potential exposure could undermine the weight the trier of fact might attribute to Dr. Moline's findings. 627 F. Supp. 3d at 530.

Moreover, Plaintiff has not identified any testimony by Dr. Feingold or Dr. Mundt in Weiss that contradicts their prior opinions in Bell and would suggest that AII pursued the discovery here in bad faith. In his deposition in Weiss, Dr. Feingold was asked if Bell fit the profile of the subjects in Dr. Moline's 2020 Article because she was a person with "no history of asbestos exposure except from cosmetic talc." See ECF No. 379-5 at 2 (134:12-19). In response, Dr. Feingold explained that he did not "have a high degree of confidence" but "could see how that could be argued," and he explained that although "[t]here's [no] definitive history of asbestos exposure," Bell "did work in industrial settings." Id. Notably, Dr. Feingold added, "I don't think I would have" included Bell "in a group of people to be studied who had no reliable evidence of asbestos exposure," as Dr. Moline did in her 2020 Article. Id. at 3 (135:1-9).

Plaintiff cites to Dr. Feingold's deposition in Weiss to argue that Dr. Feingold could not determine that Bell suffered any occupational exposure to asbestos. Pl.'s Reply Br. at 5. Dr. Feingold was asked if he could "make the conclusion that [Bell] did have *significant* exposure to commercial amphibole asbestos," and Dr. Feingold testified that he "could not make that conclusion or exclude it." See ECF No. 379-5 at 9-10 (141:21-142-2) (emphasis added). That, however, is a point Dr. Feingold also made in Bell. See ECF No. 371-9 (53:4-54:14) (explaining that there was a possibility (not a certainty) of occupational exposure by Bell). And, as the Bell court explained, there was a possibility that Bell may have had occupational exposure to asbestos given her workers' compensation claims, and that possibility was a sufficient basis to seek discovery which might undermine Dr. Moline's credibility. See Bell, 627 F. Supp. 3d at 530.

10

Plaintiff fares no better with his reliance on Dr. Mundt's testimony in Weiss. According to Plaintiff, Dr. Mundt testified that, contrary to AII's representations to this Court, Bell had no known asbestos exposure other than through cosmetic talc use. See Pl.'s Br. at 8. But the one page of deposition testimony cited by Plaintiff (see ECF No. 348-4) does not support that assertion. Instead, Dr. Mundt testified that Bell should not have been included in Dr. Moline's 2020 Article, but could have been included in Dr. Moline's later study for a 2023 article, because that study included individuals with possible or probable exposure to various other sources of asbestos, other than talcum powder. See ECF No. 348-4 at 3. What's more, elsewhere in his testimony, Dr. Mundt stated that his opinion in Bell was "that there was evidence provided that there could have been exposure to asbestos," such as Bell's own workers' compensation claim. See ECF No. 371-21 at 7 (111: 8-19).

Likewise, none of Dr. Mundt's deposition testimony cited by Plaintiff in his reply brief (see Pl.'s Reply Br. at 5) supports Plaintiff's claim that Dr. Mundt confirmed that Bell had not suffered occupational exposure to asbestos. Id. Instead, Dr. Mundt testified that in his expert opinion in Bell, he could not determine whether Bell had been exposed to *substantial* levels of asbestos at her workplace, such that it would have increased her risk of mesothelioma. See ECF No. 379-10 at 13 (114:4-25); ECF No. 379-11 at 2-3 (118:18-119:4).

At bottom, Plaintiff's argument is that because no one, including AII's own experts, has conclusively shown that Bell was exposed to asbestos in her workplace, AII had no good faith basis for seeking discovery related to the subjects of Dr. Moline's study. Plaintiff also faults AII's critique of Dr. Moline's Article as being "intellectually dishonest," because defense experts routinely rely on data obtained from litigation, as Dr. Moline did for her 2020 Article. Pl.'s Br. at 9-10. Plaintiff's arguments, however, go to the merit of a motion to compel discovery from Dr.

11

Moline or Northwell about the identity of the study's participants. Plaintiff has failed to point to any evidence that AII's lawyers acted in bad faith in seeking such discovery, as is necessary for the imposition of sanctions.

Finally, Plaintiff claims that AII has improperly shielded its causation expert, Dr. Allan Feingold, from testifying while simultaneously arguing that it is entitled to additional time to depose Dr. Moline. Pl.'s Br. at 10. Specifically, Plaintiff argues that AII has yet to produce Dr. Feingold to complete his deposition. Id. at 10-11. Even if AII has engaged in dilatory conduct in scheduling its expert's deposition, that still would not show that AII's subpoena to Northwell was entirely without color and issued for an improper purpose. Plaintiff's sanctions motion boils down to a disagreement over litigation tactics. Plaintiff quibbles with AII's tactics but falls short of establishing the bad faith necessary for the imposition of sanctions.

## CONCLUSION

For the reasons discussed, Plaintiff's motion for sanctions is **DENIED**. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 346 and 348.

**SO ORDERED.**

DATED:   New York, New York
         January 22, 2024

_____
VALERIE FIGUEREDO
United States Magistrate Judge